**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARIEL INVESTMENTS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-3717 |
| | ) | |
| ARIEL CAPITAL ADVISORS LLC | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiff Ariel's Statement of Material Facts**
**in Support of Its Motion for Partial Summary Judgment**

Plaintiff Ariel Investments, LLC ("Ariel") respectfully submits the following statement of material facts in support of its motion for partial summary judgment in accordance with Local Rule 56.1(a)(3).

**I.      Jurisdiction and Venue**

1.      This is an action seeking damages and injunctive relief under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/1 to 510/7, and Illinois common law.  Therefore, this Court has subject matter jurisdiction over this matter. (Defendants' Answer, Dkt. 98, attached as Exhibit A, at ¶¶ 4-5.)

2.      A substantial part of the events giving rise to this action have occurred or will occur in the Northern District of Illinois.  Therefore, this Court has personal jurisdiction over the defendant and venue is proper in this District.  (Order dated October 29, 2015, Dkt. 44, attached as Exhibit B.)

## II.    The Parties

### A.    Plaintiff Ariel Investments, LLC

3.      Plaintiff Ariel is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business at 200 East Randolph Street, Suite 2900, Chicago, Illinois.  (Declaration of Mareilé Cusack, attached as Exhibit D, at ¶ 3.)

4.      John Rogers founded Ariel Capital Management, Inc. in January 1983.  (Ariel Rule 30(b)(6) Deposition, attached as Exhibit E, at 18:10-12, 20:7-9.)  Ariel Capital Management, Inc. reorganized as Ariel Capital Management, LLC in 2004.  (Declaration of Merrillyn Kosier dated October 7, 2016, attached as Exhibit F, at ¶ 5.)  Ariel Capital Management, LLC changed its name to Ariel Investments, LLC in 2008.  (Ex. E at 64:16-19.) "Ariel Capital Management Holdings, Inc." remains as the assumed name of Ariel's holding company, ACMI, Inc.  (*Id.* at 65:11-24, 66:1.)

5.      Exhibit G is a photograph that fairly depicts the door of Ariel's office in January 1983.  (Ex. F at ¶ 3.)  Exhibit G shows Mr. Rogers using the "Ariel" name on the office door as early as January 1983.  (*Id.*)  Exhibit H is a true and correct copy of a newsletter authored by John Rogers, called *The Patient Investor*.  (Ex. E at 296:8-24, 297:1-24, 298:1-7; Deposition Exhibit 10 to the Ariel Rule 30(b)(6) Deposition, attached as Exhibit H.)  This newsletter was circulated to clients and prospective clients of Ariel.  (Ex. H; Ex. E at 298:8-10.)  Exhibit H shows use of the Ariel name as of the date of that newsletter, May 6, 1983.  (Ex H at AI 5029.)

6.      Exhibit I is a true and correct copy of Ariel Capital Management, Inc.'s application to register its Ariel mark in the U.S. Patent & Trademark Office.  (Ex. E at 300:1-24; Deposition Exhibit 11 to the Ariel Rule 30(b)(6) Deposition, attached as Exhibit I.)  In Exhibit I, Ariel Capital Management, Inc. states that it has been using the "Ariel" name since January 10,

1983, and using it in interstate commerce since March 23, 1983.  (Ex. I.)  Ariel, its predecessors, and related companies have continuously used "Ariel" in their name in commerce since 1983. (Ex. F at ¶ 4.)

7.     Since 1983, Ariel and its predecessors-in-interest have provided investment services and financial and advisory services, and offered products including separate accounts and mutual funds, to investors, endowments, foundations, pensions, 401(k) plans, corporations, high net worth individual and family offices.  (Ex. E at 106:12-24; 107:1-12.)  In short, Ariel provides independent and objective investment management services to individuals and families throughout the United States.  (Declaration of Todd Trubey, attached as Exhibit J, at ¶ 11.)  Ariel searches for stocks that represent a style of investing (*e.g.*, mid-cap, value or large cap).  (Ex. J at ¶ 14.)  Ariel groups stocks within the same style of investing, and these groups of stocks are offered to Ariel's clients via mutual funds or "separate accounts."  (*Id*.)

8.     A "separate account" is a client account invested in a group of stocks identified by Ariel.  However, there are several differences between mutual funds and "separate accounts." (Ex. J. at ¶ 15.)  Unlike a mutual fund, a "separate account" is one in which Ariel invests the client's money separately from other clients.  (Ex. J ¶ at 16.)  Mutual funds combine funds invested by multiple clients.  (Ex. J at ¶ 16.)  In some cases, a separate account will have a portfolio of investments that mirrors those offered under Ariel's mutual funds; in other cases, Ariel's clients' separate accounts look very different from Ariel's mutual funds.  (Ex. J at ¶ 17.) Unlike when investing in a mutual fund, an Ariel separate account client can restrict where Ariel invests the client's money (*e.g.*, no bank stocks, companies must be socially responsible, no more than a set percentage of funds may be invested in a given industry/company/country, *etc*.). (Ex. J at ¶ 18.)  In such cases, Ariel works with the client to make sure the portfolio of

investments in a separate account suits the client's needs.  (Ex. J at ¶ 18.)  Ariel primarily offers

"separate accounts" to high net worth individuals, endowments, foundations, pension plans and

family offices.  (Ex. E at 109:20-24; 110:1-17; Ex. J at ¶ 20.)

9.     Ariel's revenues are split about 50/50 between mutual funds and "separate

accounts."  (Ex. E at 109:22-23.)

10.     Individual investors become clients of Ariel through Ariel's website, by calling or

visiting Ariel, or through the client's financial advisor, such as Schwab, Fidelity, T. Rowe Price

or another broker-dealer.  (Ex. E at 111:2-24, 112:1-21.)  The most common way individual

investors first learn about Ariel is referrals, where someone has recommended Ariel to the new

client.  (Ex. E at 118:2-8, 119:1-12.)  Today, Ariel is a well-known provider of investment

services, managing over $10 billion in assets for its clients.  (Declaration of Merrillyn Kosier

dated Aug. 5, 2015, Dkt. No. 28, attached as Exhibit K, at ¶ 3.)  Ariel offers its services in all

fifty states and has over 300,000 mutual fund shareholders across the nation.  (*Id*.)  Ariel has

non-institutional separate account clients across the country, including clients with addresses in

Florida and Ohio.  (Ex. J at ¶ 21.)

11.     Ariel owns federally registered trademarks containing the term "ARIEL,"

including the marks at issue in this case:

| Mark | Reg. No. / Reg. Date | Goods/Services |
|---|---|---|
| ARIEL | 1286420<br>7/17/1984 | management of investments and investment funds |
| ARIEL APPRECIATION FUND | 2772978<br>10/14/2003 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL FUND | 2772980<br>10/14/2003 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |

- 4 -

| Mark | Reg. No. / Reg. Date | Goods/Services |
|---|---|---|
| ARIEL INVESTMENTS | 3506141<br><br>9/23/2008 | printed publications, namely, reports, educational materials, newsletters, pamphlets and periodicals featuring investment news and commentary<br><br>investment advisory services; investment<br><br>management; mutual fund brokerage, distribution and investment; financial sponsorship of cultural and performing arts events; providing on-line information in the field of investments |
| ARIEL FOCUS FUND | 3657317<br><br>7/21/2009 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL'S ABCS OF MONEY | 3897717<br><br>12/28/2010 | online information in the fields of investments and personal financial matters |
| ARIEL DISCOVERY FUND | 4025627<br><br>9/13/2011 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL INTERNATIONAL FUND | 4223198<br><br>10/9/2012 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL GLOBAL FUND | 4223197<br><br>10/9/2012 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |

(Ex. D at ¶ 4.)  Exhibit L contains true and correct copies of each registration listed above.  (Ex. D at ¶ 5.)  Ariel refers to its federally registered marks in this Statement of Facts as the "ARIEL Marks."  (*Id.*)  The registrations for the ARIEL Marks are in full force and effect on the United States Patent and Trademark Office's Principal Register.  (Ex. D at ¶ 6.)  The registrations for ARIEL, ARIEL INVESTMENTS, ARIEL FUND,  ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration

pursuant to 15 U.S.C. § 1115(b).  (Ex. D at ¶ 6.)  Exhibit M includes true and correct copies of

the Notices of Acceptance and Acknowledgment of Use and Incontestability for the ARIEL,

ARIEL APPRECIATION FUND, ARIEL FUND, ARIEL INVESTMENTS, and ARIEL

FOCUS FUND marks.  (*Id*.)

      12.     Ariel Investments, LLC is the owner of record with the United States Patent and

Trademark Office for each of the ARIEL Marks.  (Ex. D at ¶ 6.)  The USPTO abstracts of title

for the registrations for ARIEL, ARIEL APPRECIATION FUND, ARIEL FUND and ARIEL

INVESTMENTS are attached to Ariel's Statement of Facts as Exhibit LL.  (*Id*.)  True and

correct copies of assignments and the certificate of amendment changing the name of Ariel

Capital Management, LLC to Ariel Investments, LLC which evidence the chain of title of the

federal registrations for ARIEL, ARIEL APPRECIATION FUND, ARIEL FUND and ARIEL

INVESTMENTS  are attached to Ariel's Statement of Facts as Exhibit MM.  (*Id*.)  Moreover,

True and correct copies of the Notices of Acceptance Under Section 8 & Notice of Registration

Renewal Under Section 9 from the USPTO for the federal registrations for ARIEL, ARIEL

APPRECIATION FUND and ARIEL FUND are attached to Ariel's Statement of Facts as

Exhibit NN.  (*Id*. at ¶ 7.)

      13.     Ariel advertises and extensively promotes its financial services under the ARIEL

Marks.  (Ex. F at ¶ 6.)  In addition to promoting its services under the ARIEL Marks on its

website at www.arielinvestments.com and in brochures, Ariel has promoted and advertised its

services under the ARIEL Marks in a wide variety of media and channels of trade, including

without limitation, in national publications, websites and advertising networks such as *Barron's*,

*Black Enterprise*, *Business Week*, *Chicago Tribune*, *Entrepreneur*, *Fast Company*, *Financial

Advisor*, *Fortune*, *Inc.*, *Money Magazine*, *Morningstar Advisor*, *Mutual Funds Magazine*, *The*

*New York Times*, *Pensions & Investments*, *Savoy*, *SmartMoney Magazine*, *USA Today*, *The Wall Street Journal*, *Investment Adviser*, *Investment News*, *Kiplinger's Personal Finance*, *Hispanic Executives Magazine*, *Chicago Sun- Times*, *Crain's Chicago Business*, *Investor's Business Daily*, *Morningstar.com*, *Forbes.com*, *CNNMoney.com*, *Blackamericaweb.com*, *WVON.com*, and via the Captivate advertising network in New York and Chicago. (Ex. F at ¶ 7.) Indeed, many Ariel advertisements, including those appearing in *Investment Advisor*, have included full-page ads and full-size "wrapped ads." (Ex. K at ¶¶ 6-7.) So-called "wrapper ads" literally wrap the cover of issues of a magazine. (Ex. K at ¶ 8.) Thus, it is not possible to open the magazine without seeing Ariel's advertisement as it was printed on a sleeve which needed to be removed before the magazine could be opened. (*Id*.)

14.      In addition to Ariel's advertising, Ariel has also been regularly discussed in articles and news stories in print and online versions of *Investment Advisor* since 2008. (Ex. K at ¶ 9.) For example, *Investment Advisor* featured Ariel's chief investment officer, Rupal Bhansali, on the cover of its June 2012 issue. (*Id*.)

15.      Ariel maintains electronic and written records of, and accounting data reflecting, its advertising and marketing expenditures. (Ex. F at ¶ 10.) Ariel employees familiar with the amount of money that Ariel spends on advertising and marketing make these expense records at or near the time Ariel incurs the expense in the ordinary course of their work for Ariel. (*Id*.) Ariel keeps these records in the ordinary course of its business. (*Id*.) Moreover, Ariel's accounting data, and its advertising and marketing expense data in particular, is voluminous, maintained in a computer database, and not easily examined in court. (*Id*.) Nevertheless, Ariel employees who are familiar with that data were able to examine the data and create a summary of Ariel's advertising and marketing expenditures for the years 2000 through 2015. (*Id*.) Exhibit

N is a true and correct summary of Ariel's advertising and marketing expenditures for the years 2000 through 2015. (*Id*.) The underlying data is available for inspection by Ariel Capital or the Court. (*Id*.) ████████████████████████████████████████████████

████████████████████████████████ (Ex. F ¶ 11.)

16.     Ariel's advertisements, making use of the ARIEL Marks, have earned critical acclaim. (Ex. F at ¶ 9.) Exhibit O contains a true and correct listing of the awards earned by Ariel for its advertising including the ARIEL Marks in the years 2000 to 2015. (Ex. F at ¶ 9; Ariel Investments' STAR Awards Summary, attached as Exhibit O.) Indeed, Since 2000, Ariel has received over 70 STAR Awards, recognizing Ariel's excellence in marketing and communications to investors and intermediaries. (Ex. F at ¶ 9; Ex. O.) The STAR Awards is the preeminent awards competition in the mutual fund industry and is designed to honor communication leaders in the industry. (Ex. F at ¶ 9.)

17.     Ariel also has promoted its ARIEL Marks in other media outlets, as certain of Ariel's officers have been featured contributors to such television programs as *Good Morning America* (ABC), *World News Tonight* (ABC), *In Focus* (Bloomberg TV), *Morning Call* (Bloomberg TV), *Open Exchange* (Bloomberg TV), *Morning Call* (CNBC), *Your World With Neil Cavuto* (Fox News), *Cavuto on Business* (Fox News), *Frontline* (PBS), *News Hour with Jim Lehr* (PBS), *Chicago Tonight* (PBS), *First Business* (WCIU), *DuSable Night of 100 Stars* (WBBM), and *Eye on Chicago* (WBBM), and such radio programs as *The First Word* (Bloomberg Radio), *All Things Considered* (NPR), *News and Notes* (NPR), the *Tom Joyner Morning Show* (nationally syndicated), and *The HistoryMakers* (PBS). (Ex. F ¶ at  8.) Indeed, John Rogers provides a regular column in <u>Forbes</u> Magazine. (Ex. K at ¶ 10; Ex. E at 240:6-8.)

Ariel's employees also regularly speak at panels and conferences.  (Ex. E at 239:17-24, 240:1-10, 241:16-24.)

18.    Additionally, Ariel promotes its services under the ARIEL Marks through high-profile sponsorships of cultural and civic events.  (Ex. F at ¶ 12; Ex. E at 205:7-15, 206:17-24, 207:1-13, 208:7-19.)  For example, Ariel was the lead sponsor of the Chicago and nationally touring productions of *The Color Purple*, a critically acclaimed and award winning musical.  (Ex. F at ¶ 12.)  Among other sponsorships, Ariel has also sponsored the Martin Luther King, Jr. National Memorial Project, the Chicago Sky WNBA basketball team, McDonald's All-American basketball games, various investment-focused conferences (including those organized by Charles Schwab and Morningstar), The Harris Theatre, Rainbow PUSH Coalition, the Chicago Symphony Orchestra, and Race Against Hate.  (Ex. E at 205:7-15, 239:17-24; Ex. P.)  Exhibit P contains true and correct lists of charitable causes and organizations supported by Ariel using the ARIEL Marks in 2012-2016.  (Ex. F at ¶ 12; Ex. P.)

19.    Ariel has diligently protected its marks by sending cease-and-desist letters to people and entities misusing its marks, and taking legal action, when necessary.  (Ex. D at ¶ 7.)  By way of example, Ariel filed suit against the registrant of the arielinvestments.com domain name in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:07-CV-1475-P.  (*Id.*)  In each instance, other than the instant case, where Ariel has objected to another party's use of its ARIEL Marks, the matter has been resolved to Ariel's satisfaction.  (*Id.*)

20.    As a result of Ariel using, promoting, and protecting its ARIEL Marks, it has acquired valuable goodwill in the ARIEL Marks.  (Ex. F at ¶ 13.)  The ARIEL Marks are

recognized by clients and potential clients as identifying services provided by Ariel. (*Id.*) The ARIEL Marks are distinctive and closely associated with Ariel and its services. (*Id.*)

### B.  Defendant Ariel Capital Advisors LLC

21.    Defendant Ariel Capital is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 9115 Corsea Del Fontana Way, Suite 200, Naples, Florida. (Ex. A at ¶ 3.) Ariel Capital also has an office in Cleveland, Ohio. (Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit Q, at 231:19-21.)

22.    Christopher Bray is the founder, sole owner, and ultimate decision-maker of Ariel Capital. (Ex. Q at 15:3-16.) Mr. Bray opened Ariel Capital on or about January 24, 2014. (Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit R, at 62:14-15; Ex. Q at 15:9-11.)

23.    Ariel Capital's services include private wealth management and personalized investment management (including buying and selling publicly traded securities held under custody with a brokered dealer), tax, retirement, estate and cash flow planning, and tax return preparation. (Ex. Q at 76:7-19.)

24.    Ariel Capital describes its services for the SEC in its annual Form ADV. (Ex. Q at 18:11-18.) Exhibit U is a true and correct copy of Ariel Capital's 2016 Form ADV Part 2A. (Ex. Q at 22:4-17, Deposition Exhibit 15 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit U.) Ariel Capital annually submits a brochure or brochure supplement, called Form ADV Part 2B, to the Securities and Exchange Commission to comply with regulations for registered investment advisory firms like Ariel Capital. (Ex. Q at 18:8-18; 19:1-23.) In its most recent Form ADV, dated January 14, 2016, Ariel Capital stated that it creates for its clients "a portfolio of all or some of the following investments in accordance with the investment

objectives of the client: mutual funds, exchange traded funds (commonly known as 'ETFs'), debt and equity securities, real estate, real estate investment trusts (commonly known as 'REITSs'), private placements, government securities, and alternative investments (e.g. hedge funds)." (Ex. U at ACA 682.) On page 4 of the ADV, Ariel Capital describes how "all fees paid to ACA for investment advisory services are separate and distinct from the fees and expenses charged by mutual funds and Exchange Traded Funds to their shareholders." (Ex. U at ACA685.) Finally, pages 10 through 12 describe the specific risks associated with "securities utilized" and includes a section pertaining to mutual funds. (Ex. U at ACA691-693.) As part of its services, Ariel Capital advertises that it will create an investment portfolio for its clients, including mutual funds. (Ex. U at ACA682, ACA685; Ex J. at ¶ 12.)

25. Ariel Capital also describes the scope of its services on its website at www.arielcapitaladvisors.com, and has done so since January 24, 2014. (Defendant's Supplemental Response to Plaintiff's Amended Second Set of Interrogatories (Nos. 4-16) attached as Ex. S, at p. 1.) According to such website, Ariel Capital "provides independent and objective investment management, tax and estate planning, financial planning, and trust administration services to clients throughout the United States." (Ex. A at ¶ 22; Ex J at ¶ 11.) Exhibit T contains true and correct print-outs from Ariel Capital's website. (Ex. Q at 58:19-25; 59:3-6, Deposition Exhibits 23-24 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit T.) In Exhibit T, Ariel Capital describes its "investment management" and "personal financial planning services." (Ex. T.) Ariel Capital states that it "focuses on providing customized investment management solutions." (*Id*.) Ariel Capital also states that it "provides comprehensive personal financial planning for clients including short-term and long-term

retirement cash flow and asset accumulation planning, liability management and risk

management planning." (*Id*.)

26.    Finally, on its website, Ariel Capital states that it provides "proprietary portfolio

management" and "customized investment management solutions designed and implemented

according to each client's unique circumstances. Every investment strategy is aligned with our

client's best interests and tailored to their financial goals and objectives." (Ex. J. at ¶ 19.)

27.    Ariel Capital advertises its financial services in print, radio, through its website,

via its business cards, by word of mouth, in advertisements in the Naples, Florida *Daily News*

and *Crain's Cleveland Business*, and by sponsoring events involving local non-profits,

community non-profits and charities so that Ariel Capital's name is included on event

promotional materials. (Ex. R at 67:8-25; 68:1-4; Ex. Q at 57:13-15; 58:3-12; 212:24-25; 213:1-

7; 215:16-20; 216:1-4.)

28.    Ariel Capital's clients are natural persons, trusts, partnerships, and a family

foundation. (Ex. Q at 24:5-17; 25:5-8.) ███████████████████████████████████

██████████████████████. (Ex. S at pp. 6, 8.) New clients often come to Ariel Capital as referrals

from existing clients. (Ex. R at 83:14-16.)

29.    Ariel Capital reports to the SEC that a condition for starting and maintaining a

client relationship is a minimum account of a million dollars, but Ariel Capital may accept

clients with smaller portfolios. (Ex. U at ACA 687; Ex J. ¶ 20.) ████████████████████

████████████████████████████████████ (Ex. Q at 70:19-22; 71:20-22; Ex. S at

pp. 5-6.)

### III.    Additional Witnesses

30.    Merrillyn Kosier is Ariel's Chief Marketing Officer.  (Ex. K at ¶ 1; Ex. E at 7:14-16.)  Ms. Kosier's responsibilities include press relations, shareholder communications, marketing communications, managing the call center, sponsorships, advertising, and supervising third-party distributors.  (Ex. E at 17:18-24; 18:1-3.)

31.    Todd Trubey is the Vice President, Portfolio Strategies for Ariel.  (Ex. J at ¶ 1.)  Mr. Trubey has worked in the mutual fund and investment advisory industry for over 16 years.  (Ex. J at ¶ 3.)  Mr. Trubey has worked for Ariel since September 2007 and his duties include writing monthly and quarterly commentaries about Ariel's mutual funds and separate accounts for the benefit of Ariel's actual and prospective clients.  (Ex. J at ¶¶ 4-5.)  Mr. Trubey also manages Ariel's analytics group and is responsible for providing various reports to Ariel's mutual fund board of trustees and separate account clients.  (Ex. J at ¶¶ 6-7.)  Prior to joining Ariel, Mr. Trubey worked for Morningstar, Inc., an independent investment research and investment management firm that provides stock market analysis, research regarding mutual funds and other investments, investment ratings and picks for both experienced and new investors.  (Ex. J at ¶ 8.)

32.    Exhibit W is a true and correct copy of the website biography of Ariel Capital employee, Marcie Rebardo.  (Deposition of Marcie Rebardo, attached as Exhibit V, at 6:21-25; 7:1; Deposition Exhibit 37 to Deposition of Marcie Rebardo, attached as Exhibit W.)  Ms. Rebardo is a Client Specialist at Ariel Capital.  (Ex. W.)  Ms. Rebardo's responsibilities include answering the phone, assisting with managing the office, handling client requests, and ordering stationery.  (Ex. V at 7:13-15; 8:4-24.)

33.     Exhibit Y is a true and correct copy of the website biography of Ariel Capital employee, Kimberly Wilmore.  (Deposition of Kimberly Wilmore, attached as Exhibit X, at 9:2-13; Deposition Exhibit 36 to Deposition of Kimberly Wilmore, attached as Ex. Y.)  Ms. Wilmore is Director of Operations for Ariel Capital.  (Ex. Y.)  Ms. Wilmore's responsibilities include account operations, client service, training staff, and working with Ariel Capital's outside custodian for client investments, Charles Schwab.  (Ex. X. at 14:10-14.)

## IV.    Confusion

34.     Both Ariel and Ariel Capital are using the identical term "Ariel" in their names and promotional materials.  (Ex. F at ¶ 14.)

35.     Both Ariel and Ariel Capital are in the same line of business, namely providing investment management services to their clients and potential clients.  (Ex. J at ¶¶ 9-10.)  The term "investment management services" is generally understood by individual investors to mean professional services that help investors with their investing.  (Ex. J at ¶ 10.)  Ariel provides mutual funds and separate accounts, each of which are considered investment management services.  (Ex. J at ¶ 13.)  Ariel's separate accounts are very similar to Ariel Capital's investment management services.  (*Id*.)  Both Ariel's separate accounts and Ariel Capital's services are tailored to individual client needs and each client's funds are not combined with the funds of other clients.  (Ex. J at ¶ 19.)

36.     Both Ariel and Ariel Capital offer their services to customers in and advertise in many of the same states, including Ohio and Florida.  (Ex. F at ¶ 15.)

37.     Based on Mr. Trubey's experience in the investment services industry, investment advisors like Ariel Capital have started their own mutual funds, and the public is likely aware of that.  (Ex. J at ¶ 22.)  For example, according to an article in *Investment News* dated May 27,

2013, Aspiriant LLC is a registered investment advisor that has launched a mutual fund for its clients which will invest in global equities. (Ex. J at ¶ 22.) There are other publicly-known links between investment advisors like Ariel Capital and companies like Ariel that offer mutual funds (among other services). (*Id*.) For example, according to an article in *Investment News* dated June 6, 2015, some registered investment advisors such as HighTower Advisors are paid a percentage of the investors' assets held in certain mutual funds such as Charles Schwab & Co. Inc. and Fidelity Investments. ((*Id*.) Because investment advisors often direct their clients' funds to mutual funds and both charge fees to the clients, this kind of relationship tends to blur any line between mutual fund providers and investment advisors that direct clients to invest in mutual funds. (*Id*.)

38.     Given the overlap in investment services offered by both Ariel and Ariel Capital, and the statements made by Ariel Capital in marketing its services, an individual investor could conclude that Ariel Capital is related to, affiliated with, or sponsored by Ariel. (Ex. J at ¶ 23.)

39.     The ARIEL Marks are strong for all the reasons set forth in paragraphs 4 to 18 of this Statement of Facts.

40.     There have been several instances of actual confusion.

41.     In April 2015, Justin Land, a member of the Chartered Financial Analysts ("CFA") of Naples, Florida, during a CFA meeting, asked Chris Squitteri, an employee of Ariel Capital, "if Ariel Capital Advisors had any affiliation with Ariel Investments." (Ex. Q at 46:20-24; 47:15-17; 48:1-20; Ex. S at p. 3.)

42.     On February 5, 2016, Ariel Capital employee Marcie Rebardo received a telephone call at Ariel Capital's offices from an unknown male caller dialing from telephone number 908-400-8730, asking to speak with Cheryl Hagen and asking, "Isn't this Ariel

Investments?"  (Ex. Q at 51:1-20; Ex. S at pp. 3-4.)  Ms. Rebardo responded, "No.  We are Ariel Capital Advisors."  The caller replied, "Oh sorry" or laughed and hung up.  (Ex. V at 15:17-25; 16:1.)

43.     The telephone number 908-400-8730 is a cellular telephone number which belongs to Mr. David Boone.  (Deposition of David Boone, attached as Exhibit Z, at 20:12-20.)  Mr. Boone is the sole owner of TechSmart Trader, a digital publication that covers the financial trading industry.  (Ex. Z at 14:19-24; 15:3-6, 22-25.)

44.     On February 5, 2016, Mr. Boone was attempting to contact Cheryl Cargie, not Cheryl Hagen, an employee of Ariel.  (Ex. Z at 22:11-15; 23:24-25; 24:1-3.)  The purpose of Mr. Boone's call was twofold: to contact Ms. Cargie about an article to be published in TechSmart Trader and to see if Ariel would like to advertise in TechSmart Trader.  (Ex. Z at 24:4-14.)

45.     Mr. Boone has known Ms. Cargie for approximately ten years.  (Ex. Z at 24:21-25.)  Mr. Boone is aware that Ms. Cargie works at Ariel in Chicago, Illinois.  (Ex. Z at 23:14-17, 24-25; 24:1-3.)

46.     On February 5, 2016, Mr. Boone believes he attempted to contact Ms. Cargie by performing an internet search using the Google search engine.  (Ex. Z at 25:22-25; 26:1-9.)  Based on the search results Mr. Boone received, he mistakenly called Ariel Capital and spoke with Ms. Rebardo when he meant to contact Ms. Cargie at Ariel.  (Ex. Q at 51:1-20; Ex. S at pp. 3-4.)

47.     Although Mr. Boone has been familiar with Ariel for approximately ten years, prior to this litigation he was not familiar with Ariel Capital.  (Ex. Z at 21:1-23.)  When asked if he knew the difference between Ariel and Ariel Capital, Mr. Boone testified that "I would think they would both be the same."  (Ex. Z at 21:17-18.)  Indeed, during his deposition Mr. Boone

confused Ariel and Ariel Capital, initially believing that Ariel Capital was the name of the financial services firm in Chicago with which he was familiar. (Ex. Z at 21:1-9.)

48.    Ms. Monica Schandel is the owner of Blue Oceans Financial Planning, LLC, ("Blue Oceans") which provides income tax preparation, tax planning services, and financial planning services. (Deposition of Monica Schandel, attached as Exhibit AA, at 21:9-25.) Prior to founding Blue Oceans, Ms. Schandel worked in a variety of accounting and financial services firms. (Ex. AA at 18:11-22.) Those firms include Deloitte & Touche, where Ms. Schandel first met Mr. Christopher Bray in 1990. (Ex. AA at 35:9-11.)

49.    Ms. Schandel is a client of Ariel Capital. (Ex. AA at 33:4-7.) Ariel Capital performs investment management services for Ms. Schandel. (Ex. AA at 33:8-12; Ex. Q at 85:12-14.)

50.    Blue Oceans also has a long-term business relationship with Mr. Bray and Ariel Capital wherein the two firms share a client. (Ex. AA at 34:8-17, 40:9-18.)

51.    Exhibit BB is a true and correct copy of an email from Ms. Schandel to Arthur Gollwitzer, counsel for Ariel. (Ex. AA at 26:4-25; Deposition Exhibit 2 to Deposition of Monica Schandel, attached as Exhibit BB.) On May 26, 2016, Ms. Schandel, on behalf of Blue Oceans, wrote an email to counsel for Ariel in which she confused the names of Ariel and Ariel Capital. (Ex. BB.) Moreover, during her deposition on June 6, 2016, Ms. Schandel confused Ariel and Ariel Capital multiple times. (Ex. AA at 28:4-6; 29:1-8.)

52.    In or about March 2015, Phyllis Brady, who handles human relations for Ariel, received a telephone call from someone checking references for a job candidate the caller was considering hiring. (Plaintiff's Answers to Defendant's First Set of Interrogatories attached as

Exhibit CC at p. 5.)  The caller stated that someone at Ariel Capital told her that Ariel and Ariel Capital were related companies.  (Ex. CC at p. 5.)

53.    In or about March, 2015, Ariel's General Counsel, Mareilé Cusack, received a telephone call from a woman in Naples, Florida, inquiring about real estate located in Naples. (Ex. CC at p. 5.)  The woman stated that the real estate was listed under the name "Ariel" and that when she performed a Google search to contact the company listed on the real estate, she could only find Ariel.  (Ex. D at ¶ 8; Ex. CC at pp. 5-6.)  Ms. Cusack assured the caller that Ariel did not own or lease the property located in Naples, Florida.  (Ex. D at ¶ 8.)  The woman then stated she must have been mistaken and hung up.  (*Id*.)

54.    Finally, Mr. Bray does not know if Ariel Capital employees checked their e-mail accounts or other files to see if they ever received any other contacts that were intended for Ariel. (Ex. Q at 52:22-25.)  Indeed, Mr. Bray did not ask his employees to search their paper files for documents relevant to this case.  (Ex. Q at 106:16-18.)  In fact, Mr. Bray did not ask Ariel Capital employee Marcie Rebardo to search her emails or paper documents for relevant documents, including but not limited to the email in which she reported the February 5, 2016, caller who mistakenly called Ariel Capital seeking Cheryl Hagen/Cargie of Ariel.  (Ex. V at 16:17-25; 17:1-15.)  Likewise, Mr. Bray did not ask Ariel Capital employee Kimberly Wilmore to search her computer for documents or look for paper documents relating to this case.  (Ex. X at 34:1-12.)  Mr. Bray also does not recall instructing his employees not to destroy documents relevant to this case.  (Ex. Q at 195:21-25.)

55.    Ariel Capital intended to use the ARIEL Marks as described below.

## V.    Ariel Capital's Intent

56.    Exhibit DD is a true and correct copy of Mr. Bray's Linkedin page as of the time he was deposed in July 2015.  (Ex. R. at 77:12-24.)  Mr. Bray's biography shown on Exhibit DD provides that Mr. Bray has worked in the financial services business since at least 1991.  (Ex. R at 77:12-24; Deposition Exhibit P-12 to Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit DD.)

57.    Mr. Bray first became aware of Ariel's founder, John Rogers, before Mr. Bray founded Ariel Capital by watching a television interview of Mr. Rogers.  (Ex. R at 68:19-23; 69:7-10.)

58.    Mr. Bray attended conferences at which Ariel had large exhibits bearing its mark. (Ex. R at 47:12-13; Ex. K ¶ 11.)

59.    Mr. Bray regularly reads a periodical called *Investment Advisor*, and Ariel regularly advertises in *Investment Advisor*.  (Ex. R at 41:20-23; Ex. K at ¶¶ 6-9; *see also* ¶¶ 12-13, above (describing Ariel's prominent presence in *Investment Advisor*.))

60.    Exhibit FF is a true and correct copy several promotional emails sent from Ariel to Christopher Bray on July 13, 2010.  (Ex. R at 67:3-6; Declaration of Roger Schmitt attached as Exhibit EE, ¶¶ 3-9; Exhibits RS1-RS2 of Declaration of Roger Schmitt attached as Exhibit FF.)

61.    Mr. Bray claims that he picked the name ARIEL for his firm in or about January 2014.  (Ex. R at 60:5-8; 72:22-25; 73:1-2.)  Mr. Bray, along with his wife, chose the name.  (Ex. R at 72:22-25; 73:1-2.)  Mr. Bray wanted to name the firm based on the name of his daughter and by invoking the ministry he and his wife had been serving for a number of years.  (Ex. R at 72:22-25; 73:1-25; 74:1-25; 75:1-9.)

62.     Initially, Mr. Bray wanted to use the name "Ariel Wealth Advisors." (Ex. R at 75:16-17.) Prior to selecting that name for his firm, Mr. Bray performed a search using Google for the name "Ariel Wealth Advisors" because he "was concerned … if there is another Ariel Wealth Advisors." (Ex. R at 75:18-20.) When he discovered that there was an Ariel Wealth Advisors in New Jersey, he thought, "I'd better not … I don't want to take another firm's name." (Ex. R at 75:20-25.)

63.     Nevertheless, Mr. Bray chose to use the name "Ariel Capital Advisors." (Ex. R at 76:2-7.)

64.     Prior to selecting the name of his firm, Mr. Bray does not recall finding any other financial services firms using the name "Ariel" "but [he is] not 100 percent certain." (Ex. R at 76:8-13.) Mr. Bray performed no trademark search prior to selecting the name of his firm. (Ex. R at 75:10-12.)

65.     Ariel conducted Google searches in or about August 5, 2015. (Declaration of Luke DeMarte attached as Exhibit GG, at ¶ 3.) Ariel searched the term "Ariel Capital Advisors." (*Id*.) Exhibit HH contains true and correct copies of Ariel's search results. (Ex. GG at ¶ 3; Exhibit LD1 of Declaration of Luke DeMarte attached as Exhibit HH.) As shown in Exhibit HH, searching for the term "Ariel Capital Advisors" using the Google search engine, reveals "Ariel Investments" as the third search hit. (Ex. HH.) This Court has already observed that this search is sufficient "to give rise to an inference that Bray realized, or deliberately chose to ignore, that he was confusingly similar to that used by Ariel." (Ex. B at p. 4.)

66.     In addition to being aware of John Rogers and Ariel at the time Mr. Bray selected a name for his firm, Mr. Bray has continued to ignore Ariel's requests that he change the name of his firm.

67.     On August 14, 2014, counsel for Ariel wrote to Mr. Bray advising him of Ariel's trademark rights and asking him to cease using the ARIEL Marks.  (Ex. A at ¶ 24.)  Exhibit II is a true and correct copy of the letter from Luke DeMarte to Christopher Bray dated August 14, 2014.  (Ex. R at 70:10-19; Deposition Exhibit 10 to Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit II.)

68.     Mr. Bray responded to Ariel by letter dated August 25, 2014, denying infringement of the ARIEL Marks and stating that he would not stop using the ARIEL Marks.  (Ex. A at ¶ 25.)  Exhibit JJ is a true and correct copy of the letter from Christopher Bray to Luke DeMarte dated August 25, 2014.  (Ex. R at 71:15-25; Deposition Exhibit 11 to Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit JJ.)

69.     On October 30, 2014, counsel for Ariel spoke with Mr. Bray and asked him to stop using the ARIEL Marks.  (Ex R at 72:4-17; Ex. Q at 116:17-24, 117:1-5.)  During that conversation, Mr. Bray was unwilling to meaningfully discuss this matter with Ariel's outside counsel, instead demanding to speak with Ariel's general counsel.  (Ex. Q at 115:24, 116:1-10.)  Upon being informed that Ariel's general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel's outside counsel, Mr. Bray told Ariel's attorney "later, boss" and hung up the phone.  (Ex. Q at 115:9-12.)

70.     Ariel filed this trademark infringement suit against Mr. Bray on April 28, 2015.  (Complaint, Dkt. 1, attached as Exhibit C.)

71.     Mr. Bray has rejected all subsequent efforts to resolve this matter and has continued to use the name "Ariel Capital Advisors LLC" throughout this litigation.  (Ex. R at 87:14-25.)

## VI.    Damages

72.    It is important to Ariel Capital's success as a company that it has a reputation for integrity.  (Ex. Q at 38:15-21; Ex. X at 22:18-20; 23:1-16; 24:6-23, 25:5-25.)

73.    If the SEC accused Ariel Capital of wrongdoing, that would negatively affect Ariel Capital's clients' views of Ariel Capital, and Ariel Capital would have to take steps to repair its image or reputation with its clients.  (Ex. Q at 39:6-21, 40:1-25; Ex. X at 25:4-25, 26:1-5.)

74.    By using the ARIEL Marks, Ariel Capital's reputational damage also would be imputed to plaintiff Ariel.  (Ex. F at ¶ 16.)

75.    Ariel Capital charges its clients fees as described in Exhibit U, unless Mr. Bray provides a reduction to a friend or family member. (Ex. U at ACA684; Ex. X at 17:10-25, 18:4-25, 19:1-14.) ███████████████████████████████████████████████████████████

███████████████████████.  (Ex. Q at 32:1-9.)

76.    Exhibit KK is a true and correct copy of Ariel Capital's client list including a summary of assets under management and fees paid to Ariel Capital.  (Ex. Q at 29:14-25, 30:1-5; Deposition Exhibit 17 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit KK.)

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████.

77.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ (Ex. Q at 30:21-23, 31:1-4.)

78. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████ (*Id*. at 33:12-19.)  Ariel Capital's net income

passes through to Mr. Bray personally as he is the sole owner of the firm.  (*Id*. at 33:1-7.)


By: /s/ Zachary J. Watters
Arthur Gollwitzer III (6225038)
   agollwitzer@michaelbest.com
Luke W. DeMarte (6269621)
   lwdemarte@michaelbest.com
Larry L. Saret (2459337)
   llsaret@michaelbest.com
Zachary J. Watters (6310675)
   zjwatters@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 N. Stetson Avenue, Suite 2000
Chicago, Illinois  60601

***Attorneys for Plaintiff***

## Certificate of Service

I, Zachary J. Watters, an attorney of record in this matter, certify that on October 7, 2016, I caused a copy of the following document:

**Plaintiff Ariel's Statement of Material Facts**
**in Support of Its Motion for Partial Summary Judgment**

to be filed with the Clerk of Court of the United States District Court for the Northern District of Illinois by electronic (ECF) filing, which provides service for the following counsel of record by email delivery:

Adam Wolek
Brian Noack
Wolek and Noack
333 South Wabash Avenue
Suite 2700
Chicago, IL 60604
adamw@wonoip.com
briann@wonoip.com

Christopher Paul Bray
Christopher P. Bray Associates, LLC
9115 Corsea Del Fontana Way, Suite 200
Naples, FL 34109
cpbray@cpbrayassociates.com

/s/ Zachary J. Watters
Zachary J. Watters

- 24 -