**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARIEL INVESTMENTS, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case Number: 15-cv-3717 |
| ARIEL CAPITAL ADVISORS LLC, | ) |
| | ) Hon. Judge Matthew F. Kennelly |
| Defendant. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT ARIEL CAPITAL ADVISORS
LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    **Defendant Ariel Capital Advisors LLC** .......................................................... 1

II.    **Plaintiff Ariel Investments, LLC** ................................................................ 2

III.    **Plaintiff Misrepresented its First Use in Commerce Date in its ARIEL Mark Application** ................................................................................................ 2

IV.    **Procedural History** ..................................................................................... 3

I.    **Plaintiff Limited Its Case to Two Trademarks: ARIEL and ARIEL INVESTEMENTS** ....................................................................................... 5

II.    **Plaintiff's Trademark Registration for ARIEL is Void** ................................. 6

    A.    Plaintiff Did Not Use the ARIEL Mark in Commerce Before It Filed its Trademark Application ................................................................................ 6

    B.    Misrepresenting the First Use in Commerce Date to the USPTO is a Material Misrepresentation that Warrants Cancelling the Mark ............................... 9

III.    **There is no Likelihood of Confusion Between Ariel Capital Advisors and ARIEL INVESTMENTS** .......................................................................... 11

    A.    "ARIEL INVESTMENTS" is More Dissimilar From "Ariel Capital Advisors".... 15

    B.    "ARIEL INVESTMENTS" is Even Weaker than the "ARIEL" Mark .................. 16

IV.    **Plaintiff's Third and Fourth Counts Fall with its Trademark Infringement Claims** ................................................................................................... 17

V.    **ACA Prevails on Plaintiff's Count V Because It Is Not Cybersquatting** .................. 18

# TABLE OF AUTHORITIES

## Cases

*Avakoff v. S. Pac. Co.*, 765 F.2d 1097 (Fed. Cir. 1985)....................................... 10

*Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041 (7th Cir. 2000)...................................... 15

*Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445 (S.D.N.Y. 1982)...................... 17

*Burger King of Fla., Inc. v. Hoots*, 403 F.2d 904 ............................................................. 6

*Burlington N. Santa Fe Corp. v. Purdy*, 204 F.3d 1114, 1999 WL 1328011 (5th Cir. 1999) ...... 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 5

*Cent. Mfg., Inc. v. Brett*, 492 F.3d 876 (7th Cir. 2007)..................................................... 9

*Couture v. Playdom*, 778 F.3d at 1380 ................................................................ 12, 14

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)..................................................... 14

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322 (2d Cir. 1997)............... 17

*Gay Toys, Inc. v. McDonald's Corp.*, 199 USPQ 722 (CCPA 1978).................................... 12

*Green v. Travis*, No. 00-CV-2230, 2000 WL 1409828 (N.D. Ill. Sept. 26, 2000) ....................... 7

*Greyhound Corp. v. Armour Life Ins. Co.*, 214 USPQ 473 (TTAB 1982) ................................ 11

*Haven Capital Mgmt. v. Havens Advisors, LLC*, 965 F. Supp. 528 (S.D.N.Y. 1997).................. 16

*Intermed Commc'n, Inc. v. Chaney*, 197 USPQ 501 (TTAB 1977) ............................................ 12

*ISP.Net, LLC v. Qwest Comm. Intern., Inc.*, 2013 WL 21254430 (S.D. Ind. May 27, 2003) ...... 13

*Knaack Mfg. Co. v. Rally Access., Inc.*, 955 F. Supp. 991 (N.D. Ill. 1997)................................ 21

*Lebewohl v. Heart Attack Grill LLC*, No. 11 CIV. 3153 PAE, 2012 WL 3839379, (S.D.N.Y. Sept. 5, 2012)................................................................................................. 18

*LeBouve v. Boeing Co.*, 387 F. Supp. 2d 845 (N.D. Ill. 2005) ...................................... 5

*Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*, No. 109-CV-15RM, 2009 WL 928993 (N.D. Ind. Apr. 2, 2009)................................................................................ 16

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) ........................... 22

*Majors v. General Elec. Co.*, 714 F.3d 527 (7th Cir. 2013) ...................................... 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................... 5

*Morningware, Inc. v. Earthware Home Prods., Inc.*, 673 F. Supp. 2d 630 (N.D. Ill. 2009)........ 21

*NetJets Inc. v. Intellijet Grp., LLC*, No. 2:12-CV-0059, 2013 WL 5675464, (S.D. Ohio Oct. 17, 2013) .................................................................................................................................................. 7

*Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382 (S.D.N.Y. 2006) ........... 19

*Packman v. Chi. Tribune Co.*, 267 F.3d 628  (7th Cir. 2001)...................................................... 16

*Parametric Tech. Corp. v. PLMIC, LLC*, 2010 TTAB LEXIS 64 (TTAB Feb. 12, 2010)........... 11

*Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722 (7th Cir. 1998) ............ 6

*Rohr-Gurnee Motors, Inc. v. Patterson.*, No. 03 C 2493, 2004 WL 422525 (N.D. Ill. Feb. 9, 2004) ................................................................................................................................................ 22

*S Indus. v. JL Audio, Inc.*, 29 F.Supp.2d 878 (N.D. Ill. Dec. 9, 1998) ......................................... 9

*Sensient Techs. Corp. v. SensoryEffects Flavor, Co.*, 613 F.3d 754 (8th Cir. 2010).................... 10

*Specht v. Google Inc.*, 747 F.3d 929 (7th Cir. 2014) .................................................................... 7

*Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008)................................................................... 6

*Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004) ................................................................. 17

*Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633 (7th Cir. 1999).................................. 15

*Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213 (7th Cir. 1978) ................................................... 19

*UHS of Delaware, Inc. v. United Health Serv., Inc.*, No. 1:12-cv-485, 2015 WL 7294454 (M.D. Pa. Nov. 19, 2015) ........................................................................................................................... 13

*Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th Cir. 1992)........................................................ 6

**Statutes**

15 U.S.C. § 1115(b) ................................................................................................................. 7, 12

15 U.S.C. § 1125(d)(1)(A)(i).)................................................................................................... 21

15 U.S.C. § 1125(d)(1)(B) ......................................................................................................... 22

15 U.S.C. § 1125(d)(1)(B)(i)(VII) ............................................................................................. 22

15 U.S.C. § 1125(d)(1)(B)(ii).).................................................................................................. 21

**Secondary Sources**

McCarthy on Trademarks and Unfair Competition § 19:103 (4th ed. Supp. 2013) ............... 11, 14

Ariel Investments, LLC ("Plaintiff") accused Ariel Capital Advisors LLC ("ACA") of trademark infringement, but of the two marks remaining in this suit, one is invalid, and neither is likely to cause confusion with ACA's mark. Indeed, the ARIEL mark was obtained through misrepresentations because Plaintiff told the USPTO that it had used the mark in commerce when it filed its application, despite not having used it. Plaintiff even admitted that its first use was at least three months after it filed the application, thus making the mark void *ab initio*.

Plaintiff also had previously limited the scope of this lawsuit to two marks, and because the ARIEL mark is invalid, only the ARIEL INVESTMENTS mark remains. But it does not cause confusion with "Ariel Capital Advisors," and all the likelihood of confusion factors favor ACA.

ACA respectfully requests that this Court enter summary judgment on ACA's Amended Affirmative Defense I, no likelihood of confusion with the "ARIEL INVESTMENTS" trademark, and no infringement of the remaining three counts. As demonstrated below, and in ACA's accompanying Statement of Material Facts, Plaintiff's ARIEL mark is void *ab initio*, and accordingly, there can be no trademark infringement.

**UNDISPUTED FACTS**

I.    **Defendant Ariel Capital Advisors LLC**

ACA is a Florida company located in Naples that was founded in January 2014. (ACA's Statement of Material Facts ("SOF") 3.) ACA is a boutique firm providing tax, estate, and financial planning and trust administration services to individuals and families. (SOF 4.) Outside of a small office in Cleveland, Ohio, ACA almost exclusively operates in Florida. (SOF 3.) Christopher Bray is the owner and CEO of ACA. (SOF 3.) ACA's clients include individuals, IRAs, and family trusts, with all being highly sophisticated and having more than $1 million in aggregate investable assets. (SOF 4-5, 38, 49-51, 55.) ACA does not invest in mutual funds. (SOF 42.) ACA's clients come primarily from word of mouth and having worked with Mr. Bray previously. (SOF 6, 52.)

1

## II.     Plaintiff Ariel Investments, LLC

Plaintiff is a Delaware company with its principal place of business in Chicago. (SOF 8.)

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████  ███████████████████████████████████████

Plaintiff's first public account, Ariel Small Cap, was launched on September 30, 1983. (SOF 10,

12.) ███████████████████████████████████████████████████████

Plaintiff's first mutual fund, Ariel Fund, launched in November 1986. (SOF 13, 34.)

## III.    Plaintiff Misrepresented its First Use in Commerce Date in its ARIEL Mark Application

Plaintiff filed an application for the ARIEL mark for the "management of investments and

investment funds" with the USPTO on June 20, 1983. (SOF 27-28.) Plaintiff stated that it used the

mark prior to its filing, citing a first-use date of March 23, 1983. (SOF 24-26, 27-29.) The USPTO

registered the ARIEL mark based on this first-use in commerce. (SOF 30.)

However, in its response to an interrogatory asking "when [its] product or service was *first

made available to consumers*[,]" Plaintiff stated its earliest use was September 30, 1983. (SOF

10.) The next use Plaintiff provided was on November 6, 1986. (SOF 34.)

ACA next requested more documents on Plaintiff's first uses of the "ARIEL" mark. (SOF

35.) Plaintiff then produced documents that stated Plaintiff did not service its first customer until

eighteen months after its January 1983 opening. (SOF 16-19.) In various interviews, Rogers also

stated he "had no money to manage, no clients," that "[t]here were a lot of long lean days," and

"[i]t took us over a year and a half before we got that first million-dollar account." (SOF 16-18.)

████████████████████████████████████████████████████████

██████████████████████████████████████ Rogers similarly stated in articles that founded

the company with funds "from family and friends." (SOF 15.)

Plaintiff supplemented its Interrogatory response on May 16, 2016, but again listed "September 30, 1983" as the first date its "product or service was first made available" (SOF 10.)

After receiving the second confirmation of the September 30, 1983 first-use date, and no documents contradicting this date, ACA filed a Motion to Amend its Answer on May 19, 2016. (Dkt. 85.) ACA stated that it sought to amend based on Plaintiff's responses to Interrogatories in which Plaintiff noted that it had not used the ARIEL mark in commerce until September 30, 1983, and failed to produce any documents showing it exercised quality control over its licensees. (*Id.*) This Court issued an Order allowing ACA to amend its Answer. (Dkt. 88.) ACA then added affirmative defenses asserting that Plaintiff's ARIEL trademark is void *ab initio* due to misrepresentations to the USPTO and that the ARIEL and ARIEL INVESTMENTS trademarks have been abandoned due to naked licensing and failure to police. (Dkt. 91.) Shortly thereafter, and with the leave of the Court, ACA filed its Second Amended Answer and Counterclaims. (Dkt. 98.) In ACA's Second Amended Answer, it alleged that the inequitable conduct was willful. (*Id.*)

Plaintiff then produced its First Supplemental Answer to ACA's Interrogatory No. 2, now listing several documents, none of which provided any evidence of use in commerce earlier than September 30, 1983. (SOF 32.) Plaintiff then provided yet another supplemental Answer to ACA's Interrogatory No. 2, and claimed for the first time that its first use "was at least as early as January 10, 1983," but did not support that with new facts and just pointed to its applications, which do not contain any evidence that the trademark was in use earlier than September 30, 1983. (SOF 33.)

## IV.    Procedural History

Plaintiff filed a complaint alleging trademark infringement on April 28, 2015. (Dkt. 1.) Defendant ACA filed a Motion to Dismiss for Lack of Personal Jurisdiction on June 10, 2015. (Dkt. 16.) On October 29, 2015, this Court denied Defendant's Motion to Dismiss. (Dkt. 44.) ACA

filed an Answer and Counterclaims to Plaintiff's Complaint on January 6, 2016. (Dkt. 64.) On March 19, 2016, after discovering new evidence regarding Plaintiff's misrepresentations to the USPTO in its ARIEL mark application, ACA filed a Motion for Leave to Amend its Answer. (Dkt. 85.) This Court granted the Motion to Amend on June 1, 2016. (Dkt. 90.) On June 7, 2016, ACA filed an Amended Answer and Amended Counterclaim. (Dkt. 91.) Plaintiff filed a Motion to Strike ACA's First Affirmative Defense on June 7, 2016, (Dkt. 92.) which was granted by the Court on June 23, 2016 with leave to amend. (Dkt. 96.) ACA amended and filed on July 7, 2016. (Dkt. 98.) Plaintiff Answered on November 2, 2016, a 104 days after it was due. (Dkt. 125.)

## LEGAL STANDARD

Summary judgment is warranted if "there is no genuine issue of material fact and…the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Although the moving party has the burden of demonstrating the absence of any genuine dispute as to material facts, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). The non-moving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 540 (7th Cir. 2013) (conclusory statements unsupported by evidence are insufficient to defeat summary judgment). *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (a "hunch" about what may have happened will not defeat summary judgment).

## ARGUMENT

Plaintiff limited this suit to two trademarks: "ARIEL" and "ARIEL INVESTMENTS." The registration for the ARIEL trademark is void *ab initio* because it did not use the ARIEL mark in commerce prior to filing its trademark application, despite representing to the USPTO that it had. Plaintiff's misrepresentation was material, so the trademark is invalid and should be cancelled. Because the ARIEL registration is invalid and ACA is the senior user of the mark in the Naples,

4

Florida and Cleveland, Ohio areas, the Court need not consider whether there has been any infringement of the mark. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (To recover under a trademark infringement claim, "the plaintiff must demonstrate: (1) ***the validity of its trademark***; and (2) the infringement of the mark.") (emphasis added); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("[u]nder the common law, one must win the race to the marketplace to establish the exclusive right to a mark."). Where "a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course." *Specht v. Google Inc.*, 747 F.3d 929, 936 (7th Cir. 2014); 15 U.S.C. § 1115(b) (all trademarks may be invalidated if obtained fraudulently); *NetJets Inc. v. Intellijet Grp., LLC*, No. 2:12-CV-0059, 2013 WL 5675464, at *5 (S.D. Ohio Oct. 17, 2013) ("incontestable" trademarks that are void *ab initio* are invalid under Section 1115(b)(1)).

Furthermore, Plaintiff's ARIEL INVESTMENTS mark does not cause confusion with "Ariel Capital Advisors." Indeed, all the likelihood of confusion factors favor ACA. ACA accordingly requests that this Court enter summary judgment in its favor on its affirmative defense that Plaintiff's trademark is void *ab initio*, cancel Plaintiff's trademark, and that there is no likelihood of confusion between "Ariel Capital Advisors" and ARIEL INVESTMENTS.

## I. Plaintiff Limited Its Case to Two Trademarks: ARIEL and ARIEL INVESTEMENTS

As a threshold matter, Plaintiff has limited its suit to two trademarks, "ARIEL" and "ARIEL INVESTMENTS," and therefore cannot now pursue the other seven marks. Indeed, Plaintiff explicitly stated that "[o]nly the ARIEL and ARIEL INVESTMENTS marks are at issue in this case." Dkt. 79, at 6; *see also*, Dkt. 68, at 1-2 (only addressing ARIEL and ARIEL INVESTMENTS marks). ACA relied upon Plaintiff's disavowal of the other seven trademarks in this suit, so it would be unfair for it to recapture what it gave up. *Green v. Travis*, No. 00-CV-2230, 2000 WL 1409828, at *2 (N.D. Ill. Sept. 26, 2000) ("no court would permit" a party to

reclaim a portion of a claim from their complaint after a party has already "disavow[ed]" that portion to the Court) (J. Kennelly).

## II. Plaintiff's Trademark Registration for ARIEL is Void

### A. Plaintiff Did Not Use the ARIEL Mark in Commerce Before It Filed its Trademark Application

Plaintiff admitted that its first use in commerce was, at earliest, months *after* it filed its trademark application for the ARIEL mark. (SOF 10, 11, 32-36.) However, trademarks must have been used in commerce at the time of the application's filing, otherwise they are void *ab initio*. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock Eng'g, Inc.*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" **when** the application was filed). When asked when it provided its "first products or services to consumers" in an interrogatory, the earliest date listed was September 30, 1983. (SOF 10.) In its second response, Plaintiff again stated the earliest date was September 30, 1983. (SOF 32.). ACA then filed a motion to amend its answer to include an affirmative defense that the ARIEL mark was void because it had not been used prior to Plaintiff filing its trademark application. (Dkt. 85.) After ACA filed its motion, Plaintiff amended its interrogatory response again, and for the first time stated that it used the mark in commerce before filing. (SOF 33.) Despite Plaintiff's Third Supplemented Interrogatory Answer now alleging that that the ARIEL trademark was used in commerce before the trademark application was filed, the documents it identifies as support do not show use prior to September 30, 1983. (SOF 33.) Accordingly, in all three iterations, Plaintiff listed its services as first provided in September 1983. (SOF 10, 32-33.)

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████

Plaintiff's CEO also repeatedly stated that "[i]t took us over a year and a half before we got that first million-dollar account," which would put the first time Plaintiff "manag[ed] investments and investment funds" in June 1984: a year after filing the application. (SOF 17-18.)

Tellingly, Plaintiff failed to provide any evidence to support that it used its trademark in commerce prior to filing its trademark application, despite numerous discovery requests. (SOF 32-35.) *See Cent. Mfg.. v. Brett*, 492 F.3d 876, 882-83 (7th Cir. 2007) ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *S Indus. v. JL Audio, Inc.*, 29 F.Supp.2d 878, 888 (N.D. Ill. Dec. 9, 1998) (granting Summary Judgment on invalidity where Plaintiff was unable to "put forth admissible evidence to establish sufficient use"). Plaintiff's lack of evidence, or any documentation, that it used the mark prior to June 20, 1983 is especially telling because Plaintiff is a large, sophisticated company in a highly regulated and document intensive field. *See Cent. Mfg., Inc.,* 492 F.3d at 883 ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales…for more than a decade would be unable to produce even a single purchase order or invoice as proof."). ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ *Id.* ("Self-serving deposition testimony is not enough to defeat a motion for summary judgment.").

Plaintiff had previously pointed to its ARIEL trademark application, specimens and registration to support its "use in commerce" dates of March 23, 1983. (SOF 29, 32-35.) However, these documents are insufficient to demonstrate "use in commerce" because they are brochures

and marketing newsletters. *Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985) ("[A]dvertising material is not use within the meaning of the [Lanham Act] and therefore is insufficient to support federal registration."); *Couture*, 778 F.3d at 1381 (advertising, even when combined with subsequent sales, is not sufficient for showing use in commerce); *and see Sensient Techs. Corp. v. SensoryEffects Flavor, Co.*, 613 F.3d 754, 762-63 (8th Cir. 2010) (finding no use in commerce where mark owner issued press release, made announcement, gave presentations, and constructed website but where there was no evidence of any sale or transport of goods bearing the mark). Nor do they show that Plaintiff was "manag[ing] investments and investment funds."

████████████████████████████████████████

████████████ But Plaintiff failed to produce any admissible evidence when or if the newsletter was circulated. Even if it had, courts require "actual rendition of services in interstate commerce," and "business cards, flyers," and other advertising is not "use." *Burlington N. Santa Fe Corp. v. Purdy*, 204 F.3d 1114 (5th Cir. 1999); *Avakoff*, 765 F.2d at 1098 ("Mere advertising of a product and documentary use of a symbol apart from the goods does not constitute trademark use for those goods. That is, advertising material is not use within the meaning of the statute and therefore it is insufficient to support federal registration."); *In re Canad. Pac. Ltd.*, 754 F.2d 992, 994 (Fed. Cir. 1985) ("a service must be performed for the benefit of others").[1] And here, drafting or circulating a newsletter is nevertheless not "***management*** of investments and investment funds," as the federal registration requires. (SOF ¶.) (emphasis added).

---

[1] *See also Greyhound Corp. v. Armour Life Ins. Co.*, 214 USPQ 473, 474 (TTAB 1982) ("advertising of a service, without performance of a service, will not support registration…[t]he use in advertising which creates a right in a service mark must be advertising which related to an existing service which has already been offered to the public."); *Parametric Tech. v. PLMIC, LLC*, 2010 TTAB LEXIS 64, *30 (TTAB Feb. 12, 2010) (merely posting a mark and listing services on the Internet does not constitute "use in commerce" and, at most, is considered advertising and promotion of services, which "do[es] not encompass the rendering of those services" required for purposes of registration.); *Specht*, 758 F. Supp. at 579 (handing out business cards at social events does not demonstrate a bona fide use in commerce).

███████████████████████████

███████████████████████████

But even if it had made such sales, they do not qualify as "uses in commerce" to support Plaintiff's alleged "first-use" date. *Burlington N. Santa Fe*, 204 F.3d at1114 ("nominal or token sales to personal friends do not constitute a *bona fide* commercial use of a trademark"); *see also* J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 16:7 (4th Ed. 1997) (same).

So despite extensive discovery, Plaintiff has not provided any evidence of use in commerce prior to filing its trademark application. Its sole evidence of "use" are irrelevant advertisements and sales to friends and families. Plaintiff's interrogatory answer stands as the only evidence of the earliest use of ARIEL with services in commerce, which postdates its application date. Accordingly, Plaintiff's ARIEL mark is void *ab initio* and its infringement claim is meritless.

### B. Misrepresenting the First Use in Commerce Date to the USPTO is a Material Misrepresentation that Warrants Cancelling the Mark

Plaintiff's trademark registration would not have been granted if it had stated that it had not used the mark in commerce when it filed its application. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when it was filed); *Couture v. Playdom*, 778 F.3d at 1380 ("use in commerce must be as of the application filing date").[2] Falsely claiming that a trademark is being used in commerce to the USPTO is a material misrepresentation. *See ISP.Net, LLC v. Qwest Comm. Intern., Inc.*, 2013 WL 21254430, at *3 (S.D. Ind. May 27, 2003) ("Material facts are those which, if disclosed, would result in refusal by the Office to register the mark."). Because Plaintiff misrepresented that it had used the mark to the

---

[2] *See also Intermed Commc'n, Inc. v. Chaney*, 197 USPQ 501 (TTAB 1977) ("Mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient as a matter of law" for "applying to register the mark."); *Gay Toys, Inc. v. McDonald's Corp.*, 199 USPQ 722, 723 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application is void).

USPTO when it had not, it made a material misrepresentation that would have prohibited it from getting the trademark registration but for the misrepresentation.

While Plaintiff contends its mark is incontestable, this is irrelevant because even "incontestable" marks are invalidated by fraud. *See* 15 U.S.C. § 1115(b). Under Section 1115(b), the validity of Plaintiff's ARIEL registration may be challenged as void *ab initio*. *See NetJets Inc.*, 2013 WL 5675464, at *5 ("incontestable" trademarks that are void *ab initio* are invalid under § 1115(b)); *see also UHS of Del., Inc. v. United Health Serv., Inc.*, No. 1:12-cv-485, 2015 WL 7294454, at *5 (M.D. Pa. Nov. 19, 2015) ("[A]n applicant's misrepresentations concerning the use of a mark may provide the basis of a Section 1115(b) claim."). An example of a material misrepresentation includes falsely telling the USPTO that a trademark was used in commerce when its first use postdated the application's filing, as Plaintiff did. *See NetJets*, 2013 WL 5675464, at *5-6 (obtaining a "registration and incontestability status through a false (i.e., fraudulent) statement" is grounds for cancellation); *see also Aycock Eng'g, Inc.*, 560 F.3d at 1357 (holding that a trademark is void unless the mark was used "in commerce" when the application was filed).

Plaintiff misrepresented to the USPTO in its June 20, 1983 trademark application that it had been using the mark in commerce since March 23, 1983, when in reality, it did not begin using it in commerce until September 30, 1983, at the earliest. (Dkt. 85-1 ¶¶ 56, 59-63.) ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Because using a trademark in commerce is a requirement for registration, and because Plaintiff would not have been eligible for nor received a trademark but for the misrepresentation, such a misrepresentation is material. *See Couture*, 778 F.3d at 1381 (the "use in commerce must be as of the application filing date" and occurs on services "when [1] it is used or displayed in the sale or advertising of services **and** [2] **the services are rendered in commerce**.") (emphasis added); *see also* McCarthy on Trademarks and Unfair Competition §

19:103 (4th ed. Supp. 2013) ("To qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services **and that the services themselves have been rendered in interstate commerce**.") (bold added; italics in original).

Finally, even if a higher finding of fraud is required, ACA has met the "who, what, when, where and how" requirements for showing fraud by Plaintiff in its ARIEL trademark application. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Specifically, Plaintiff's CEO, John Rogers, knowingly and with intent to deceive, lied to the USPTO about the first use in commerce of the ARIEL trademark in order to get it registered before it was actually being used in commerce, thereby fulfilling the "who" (Plaintiff and its CEO John Rogers), "what" (first use date), "where" (to the USPTO), and "how" (misrepresenting first use in commerce) requirements. (SOF 24-26.)

## III. There is no Likelihood of Confusion Between Ariel Capital Advisors and ARIEL INVESTMENTS

As more fully briefed in ACA's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, there is no likelihood of confusion between the ARIEL and ARIEL INVESTMENT trademarks and Ariel Capital Advisors. As noted above, the ARIEL trademark is

void, and all of the likelihood of confusion factors favor ACA against the ARIEL INVESTMENTS mark.[3] *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (where the record shows no intent by the defendant, no actual confusion, and customers with a high degree of care, these factors weigh heavily against likelihood of confusion).

*First*, there is no actual confusion among *relevant* consumers. *Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (finding evidence of confusion insufficient as confusion did not occur among *relevant* consumers). Indeed, Plaintiff has submitted no evidence that consumers looking to purchase either ACA's or Plaintiff's products have been confused. *See Packman v. Chi. Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding evidence of actual confusion *irrelevant* where confused callers were not trying to purchase goods) (SOF 59.) And Plaintiff has submitted no surveys that show actual confusion among consumers. *Cent. Mfg.,* 2005 WL 2445898, at *12 (it is "proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion"). Moreover, a firm named **Ariel Wealth Advisors**, which provides services virtually identical to ACA's, has been coexisting with Plaintiff for over six years without a single instance of consumer confusion. (SOF 62-63); *Cent. Mfg.*, 2005 WL 2445898, at *12 (alleged concurrent use of a mark "without any incidents of actual confusion strongly weighs against finding any likelihood of confusion").

*Second*, ACA had no bad faith intent to palm off Plaintiff's name when it chose Ariel Capital Advisors because Bray named it after his daughter and his faith, not Plaintiff. (SOF 7); *see Barbecue Marx*, 235 F.3d at 1046 (finding no intent where defendant knew plaintiff's name and even used its products because defendant showed that a movie inspired its name, not plaintiff).

---

[3] The likelihood of confusion factors are: (1) similarity between marks in appearance and suggestion; (2) similarity of products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; and, (7) intent of defendant to palm off his product as that of another. *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000).

*Third*, Plaintiff's and ACA's customers are sophisticated consumers because consumers exercise a high degree of care with money management. *See Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*, No. 109-CV-15, 2009 WL 928993, at *9 (N.D. Ind. Apr. 2, 2009) ("One would expect that individuals and businesses seeking to invest their money would have a higher sophistication level and would exercise greater care in selecting a service."); *see also Haven Capital Mgmt. v. Havens Advisors, LLC*, 965 F. Supp. 528, 534 (S.D.N.Y. 1997) (finding sophistication of buyers weighed in defendant's favor where defendant's clients made $1,000,000 investments initially and where the smallest amount defendant accepted was $100,000). ███████ ███████████████████████████████████████████████████████████████. (SOF 56; *see Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 330 (2d Cir. 1997) ("It is hard to imagine a more sophisticated, street-wise, savvy buyer…than professional broker-dealers"). ACA's account minimums are $1,000,000, and thus these clients are likely to exercise a high degree of care when managing that amount of money. (SOF 51.)

*Fourth*, ACA's and Plaintiff's products, markets, and customers are on different and non-overlapping spectrums of "financial services." *See Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 449 (S.D.N.Y. 1982) (finding the parties' financial services were not proximate products where the parties appeal to different customers, sell in different markets, and exist for different purposes); *see also Sullivan v. CBS Corp.*, 385 F.3d 772, 778 (7th Cir. 2004) (holding plaintiff's and defendant's CDs were not similar where plaintiff's CD was in the "rock" section and defendant's was with soundtracks). ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

ACA does not sell mutual funds, or any other products. (SOF 42.) It provides estate

planning services, asset protection, cash-flow planning, and tax preparation and planning that are specifically tailored to each client.[4] (SOF 38-41.) ACA meets each client in person prior to opening an account, and does not sell any products or services online. (SOF 37-42, 49, 47, 52.); *see Haven Capital*, 965 F. Supp. at 531-32 (finding that a company that provides investment advice and managed funds, and a company that provides advice and money management services are not in competition because the services they render to their investors are significantly different). Finally, ACA requires $1,000,000 to start an account and its clients are generally worth between $5-$20 million dollars. (SOF 51); *see Beneficial*, 529 F. Supp. at 449 (finding that plaintiffs that made small, $1500 loans to individual consumers served an *entirely different market* than defendant who made large, $50,000 business loans). These services, clients and markets are not the same.

Notably, Plaintiff coexisted with ***Ariel Wealth Advisors*** for six years without confusion, and Ariel Wealth Advisors provides the same services as Ariel Capital Advisors. (SOF 62-63.) In sum, Plaintiff's products and ACA's services are not similar enough for consumers to believe they are from the same source.

*Fifth*, ACA and Plaintiff do not compete nor do they advertise in the same channels. ACA has advertised only a few times. Indeed, ACA's and Plaintiff's advertisements have never overlapped or been displayed in the same places. (SOF 53-54.) ACA gets all of its clients from referrals, which keeps its market intimate and undermines any overlap claims. (SOF 52.) ████

████████████████████████████████████████████████████████

████████████████████████████████████ *Omicron Capital, LLC v. Omicron Capital, LLC,*

---

[4] *See Knaack v. Rally*, 955 F. Supp. at 1000 (rejecting calling both parties' products as similar despite both being "motor vehicle accessories," especially where purchasers do not see a commonality); *Omicron Capital LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 391 (S.D.N.Y. 2006) (lack of proximity of services provided by the parties favors a defendant in likelihood of confusion analysis).

433 F. Supp. 2d 382, 395 (S.D.N.Y. 2006) (where a party has "no concrete plans to expand," any risk "of confusion presented by future expansion would be unacceptably conjectural").

### A. "ARIEL INVESTMENTS" is More Dissimilar From "Ariel Capital Advisors"

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████ *See Barbecue Marx*, 235 F.3d 1041 at 1044 (finding SMOKE DADDY and BONE DADDY marks distinct based on their surrounding elements). Moreover, both marks give consumers different commercial impressions. *See Packman*, 267 F.3d at 643 (marks are compared for "similarity" based on how they are presented in the marketplace). For instance, the two logos differ in terms of fonts, capitalization, layout, coloring and design elements. (SOF 60-61.) *See Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978) (holding confusion unlikely between Telemed and Tel-Med because the public easily distinguishes slight differences in marks, as well as differences in the goods to which they are applied, even though the goods may be considered "related"). These distinctions significantly alter the general impression conveyed by each mark. *See Lincoln Fin.*, 2009 WL 928993, at *7 (noting customers quickly distinguishing logos based on differences in color, layout, design, font and capitalization elements); *see also Barbecue Marx, Inc.*, 235 F.3d at 1044 (holding that despite the marks SMOKE DADDY and BONE DADDY "sound[ing] alike" and "evok[ing] similar imagery," the marks' "visually distinct" appearance "significantly undercuts" that they are similar in appearance and suggestion).

ACA's mark is featured with a white, male lion's head enclosed in a shield, giving the impression of safety and protection, and displayed on a royal blue background. (SOF 60.) To the right of ACA's lion and shield are the words "Ariel Capital Advisors, LLC" in a *sans-serif* font, with only the "A" in Ariel, "C" in Capital, and "A" in Advisors capitalized, and the remaining parts are in lowercase. (SOF 60.)

15

In contrast, Plaintiff's marks appear as "ARIEL INVESTMENTS" and the letters are all capitalized and in a different, light and whimsical *serif* font. (SOF 61.) The ARIEL INVESTMENTS "R" loops under the mark in a calligraphy-like reverse-swoop. (SOF 61.)

| Plaintiff | ACA |
|---|---|
|  |  |

Plaintiff's marks are also usually accompanied by a sketched turtle holding a trophy, much like a turtle from a children's fable.[5] (SOF 61.) ███████████████████████

████████████████████ The marks "Ariel Capital Advisors" and "ARIEL INVESTMENTS" thus provide distinct impressions to consumers.

**B.**  **"ARIEL INVESTMENTS" is Even Weaker than the "ARIEL" Mark**

Just as the "ARIEL" mark is weak because over 150 companies use "Ariel" in their name, including companies similar to ACA like "Ariel Wealth Advisors, ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ (SOF 40, 57); *Top Tobacco, L.P. v. N. Atl. Operating Co.*, No. 06 C 950, 2007 WL 118527, at *1 (N.D. Ill. Jan. 4, 2007) *aff'd,* 509 F.3d 380 (7th Cir. 2007) (the existence of other marks that incorporate the same term as plaintiff, especially in the same class of goods, demonstrates "that the scope of protection that should be afforded to these marks is *extremely* narrow.") (emphasis in original); *Haven Capital*, 965 F. Supp. at 531 (finding a weak mark where customers associated the plaintiff with

---

[5] At times a true-to-life looking tortoise, which faces the viewer

its low cost and patient investment style rather its name). ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ They are thus less likely

to encounter "Ariel Investments," so it is weaker than the already weak "Ariel" mark.

Furthermore, Plaintiff's advertising expenditures do not establish that Plaintiff has achieved recognition for its "Ariel Investments" mark. *See Knaack Mfg. v. Rally Access., Inc.*, 955 F. Supp. 991, 1001-02 (N.D. Ill. 1997) (holding general statements by the plaintiff's executives that its mark had been used for twenty-five years and the company had spent millions of dollars in advertising was *insufficient* to show that the mark had gained brand recognition). █████████

████████████████████████████████████████████████████████

██████████████ This further undercuts that the ARIEL INVESTMENTS mark is strong.

## IV. Plaintiff's Third and Fourth Counts Fall with its Trademark Infringement Claims

Courts in Illinois resolve state law unfair competition and deceptive trade practices claims "according to the principles set forth under the Lanham Act." *Morningware, Inc. v. Earthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009) (the legal inquiry is the same under Illinois Uniform Deceptive Trade Practices Act and the Lanham Act).[6] Because ACA is not infringing Plaintiff's marks, and because the legal standards for Illinois unfair competition and deceptive trade practices are the same, ACA succeeds on these claims as well.

---

[6] *Cigarette Racing Team, Inc. v. Donzi Marie Corp.*, No. 85 C 7947, 1985 WL 71995, at *9 (N.D. Ill. Sept. 16, 1985) ("The same conduct…under 43(a) also necessarily constitutes unfair competition and common law trademark infringement.").

17

## V.     ACA Prevails on Plaintiff's Count V Because It Is Not Cybersquatting

In addition to registering a protected mark as a domain name, for liability the ACPA requires "***a bad faith intent to profit from that mark***." *Rohr-Gurnee Motors, Inc. v. Patterson.*, No. 03 C 2493, 2004 WL 422525, at *5 (N.D. Ill. Feb. 9, 2004) (citing 15 U.S.C. § 1125(d)(1)(A)(i).) "Bad faith intent…**shall not be found** in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Rohr-Gurnee Motors*, 2004 WL 422525, at *5 (citing 15 U.S.C. § 1125(d)(1)(B)(ii)); *see also Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004) (granting defendant summary judgment because only registered one site and no evidence of "bad faith to profit" from confusion with the mark). Here, ACA was named for Ariel Bray, Mr. Bray's daughter, and Ariel Ministries.

Here, ACA did not have bad faith to profit off Plaintiff's trademark when it picked its name. Critically, Plaintiff has not presented any evidence of the requisite bad intent to profit off of the website. Indeed, ACA does not do business through its website, so cannot profit from it. And like the defendants in *Rohr-Gurnee Motors* and *Lucas Nursery & Landscaping*, ACA does not own multiple domains, only owns one website, and did not try to sell its website for a profit. *See* 15 U.S.C. § 1125(d)(1)(B); *and see Lucas Nursery*, 359 F.3d at 810 ("ACPA was enacted to eradicate the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark.''). Because ACA did not "cybersquat" under the Lanham Act, Plaintiff's Count V should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in ACA's favor and enter an order: (i) invalidating Plaintiff's ARIEL mark, permitting ACA to continue using ARIEL in its name; (ii) cancelling Plaintiff's ARIEL mark with the USPTO; (iii) that there is no likelihood of confusion between Ariel Capital Advisors and "ARIEL INVESTMENTS"; (iv) that ACA did

18

not violate Illinois unfair competition laws; (v) finding that ACA did not commit deceptive trade practices; (vi) finding that ACA did not cybersquat; and, (vii) awarding ACA damages, prejudgment interest, costs, and attorneys' fees.

Dated:  November 4, 2016                    RESPECTFULLY SUBMITTED,


                                            By: /s/ Brian T. Noack
                                            Brian Noack
                                            Adam Wolek
                                            WOLEK & NOACK
                                            333 S Wabash Ave., Suite 2700
                                            Chicago, IL 60604
                                            P: 312.860.9006
                                            F: 708.843.0509
                                            *Local Counsel for Defendant Ariel Capital Advisors LLC*


                                            Christopher P. Bray
                                            Christopher P. Bray Associates, LLC
                                            9115 Corsea Del Fontana Way, Ste. 200
                                            Naples, FL 34109
                                            P: 239.651.6008
                                            F: 239.431.3914
                                            cpbray@cpbrayassociates.com
                                            *Lead Counsel for Defendant Ariel Capital Advisors LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on November 4, 2016, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: November 4, 2016                    WOLEK & NOACK


                                          By:   /s/ Brian T. Noack
                                                Brian T. Noack