## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ARIEL INVESTMENTS, LLC, | ) |
| Plaintiff, | ) |
| | ) Case No.: 1:15-cv-3717 |
| v. | ) |
| | ) Hon. Judge Matthew F. Kennelly |
| ARIEL CAPITAL ADVISORS LLC, | ) |
| Defendant. | ) |

### LOCAL RULE 56.1(b)(3) RESPONSE AND EVIDENTIARY OBJECTIONS OF DEFENDANT ARIEL CAPITAL ADVISORS LLC TO PLAINTIFF ARIEL INVESTMENTS, LLC'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY JUDGMENT; ARIEL CAPITAL ADVISORS LLC'S ADDITIONAL MATERIAL FACTS

Defendant Ariel Capital Advisors LLC ("ACA[1]") respectfully submits the following response and evidentiary objections to Plaintiff Ariel Investments, LLC's ("Plaintiff[2]") statement of undisputed material facts ("SUF") in support of its Partial Motion for Summary Judgment[3]:

### I.      Jurisdiction and Venue

1.      This is an action seeking damages and injunctive relief under the Lanham Act, 15 U.S.C. § 1051, *et seq*., the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/1 to 510/7, and Illinois common law. Therefore, this Court has subject matter jurisdiction over this matter. (Defendants' Answer, Dkt. 98, attached as Exhibit A, at ¶¶ 4-5.).

**RESPONSE:  UNDISPUTED.**

2.      A substantial part of the events giving rise to this action have occurred or will occur in the Northern District of Illinois. Therefore, this Court has personal jurisdiction over the defendant and venue is proper in this District. (Order dated October 29, 2015, Dkt. 44, attached as Exhibit B.)

---

[1] Plaintiff refers to ACA throughout its Motion for Partial Summary Judgment by "*Ariel Capital*." However, ACA only uses "Ariel Capital Advisors," or sometimes "ACA," in commerce.

[2] Plaintiff refers to ACA throughout its Motion for Partial Summary Judgment by "*Ariel Capital*." However, ACA only uses "Ariel Capital Advisors," or sometimes "ACA," in commerce.

[3] Defendant Ariel Capital Advisors LLC's Statement of Material Facts in Support of Its Motion for Summary Judgment begins on page 81.

**RESPONSE: DISPUTED.**

As more fully described in Dkts. 16, 17, 40, 49, 50 and 54, ACA maintains that

personal jurisdiction over it is improper in this venue because ACA does not have any clients

in Illinois, no property, no offices, no employees, no agents, no ACA employees have ever

traveled to Illinois for any purpose related to ACA, ACA has not advertised to or sought

clients in Illinois, nor did ACA intentionally target or direct its activities toward the forum.

(Dkt. at 17-2, ¶ 6-22; *see also* Ex. 5 ACA 30(b)(6) I at 19:2-3, 57:16-21, 88:18 – 89:12;

Dkts. 16, 17, 40, 49, 50 & 54; Ex. 1 at ¶¶ 9-22.)

## II.     The Parties

### A.  Plaintiff Ariel Investments, LLC

3.      Plaintiff Ariel is a limited liability company duly organized and existing under the
laws of the State of Delaware with its principal place of business at 200 East Randolph Street,
Suite 2900, Chicago, Illinois. (Declaration of Mareilé Cusack, attached as Exhibit D, at ¶ 3.)

**RESPONSE: UNDISPUTED.**

4.      John Rogers founded Ariel Capital Management, Inc. in January 1983.  (Ariel
Rule 30(b)(6) Deposition, attached as Exhibit E, at 18:10-12, 20:7-9.)  Ariel Capital
Management, Inc. reorganized as Ariel Capital Management, LLC in 2004.  (Declaration of
Merrillyn Kosier dated October 7, 2016, attached as Exhibit F, at ¶ 5.)  Ariel Capital
Management, LLC changed its name to Ariel Investments, LLC in 2008.  (Ex. E at 64:16-19.)
"Ariel Capital Management Holdings, Inc." remains as the assumed name of Ariel's holding
company, ACMI, Inc.  (*Id.* at 65:11-24, 66:1.)

**RESPONSE: UNDISPUTED.**

5.      Exhibit G is a photograph that fairly depicts the door of Ariel's office in January
1983.  (Ex. F at ¶ 3.)  Exhibit G shows Mr. Rogers using the "Ariel" name on the office door as
early as January 1983.  (*Id.*)  Exhibit H is a true and correct copy of a newsletter authored by
John Rogers, called *The Patient Investor*.  (Ex. E at 296:8-24, 297:1-24, 298:1-7; Deposition
Exhibit 10 to the Ariel Rule 30(b)(6) Deposition, attached as Exhibit H.)  This newsletter was
circulated to clients and prospective clients of Ariel.  (Ex. H; Ex. E at 298:8-10.)  Exhibit H
shows use of the Ariel name as of the date of that newsletter, May 6, 1983.  (Ex H at AI 5029.)

**RESPONSE: DISPUTED.**

**FIRST SENTENCE**[4] ("*Exhibit G is a photograph that fairly depicts the door of Ariel's office in January 1983. (Ex. F at ¶ 3.*"): **OBJECTED, move to strike; DISPUTED**[5].



---

[4] ACA's Response to Plaintiff's SUF No. 5 is separated into five parts because each sentence is separately objected to and disputed. ACA continues this format throughout its Response for added clarity and consistency, but is happy to modify that upon the Court's request.

[5] Pursuant to Honorable Judge Kennelly's statement about LR56.1 in his "Procedures to be followed" for "Summary Judgement Motions," ACA listed its evidentiary objections to inadmissible evidence, improper argument, or other objectionable material herein, and not in a separate motion to strike, as dictated in the Court's "Procedures to be followed" posting. If the Court would prefer a separate motion to strike rather than this format, ACA is happy to provide that upon the Court's request.

Otherwise, DISPUTED. ACA further disputes that "the door of Ariel's office" appeared that way in "January 1983." Plaintiff has not produced any admissible evidence of when the photograph of Ariel's office was taken, or when or where that door was, or when it got that inscription. (Ex. 9, at 301:10-16, 302:10-21.)

**SECOND SENTENCE** (*"Exhibit G shows Mr. Rogers using the "Ariel" name on the office door as early as January 1983. (Id.)"*): **OBJECTED, move to strike; DISPUTED.**



Otherwise, DISPUTED. ACA disputes that the door of Ariel's office appeared that way in "January 1983." Plaintiff has not produced any admissible evidence of when that the photograph of Ariel's office was taken, where that door was, or when it got that inscription. (Ex. 9, at 301:10-16, 302:10-21.)

**THIRD SENTENCE** (*"Exhibit H is a true and correct copy of a newsletter authored by John Rogers, called The Patient Investor. (Ex. E at 296:8-24, 297:1-24, 298:1-7; Deposition Exhibit 10 to the Ariel Rule 30(b)(6) Deposition, attached as Exhibit H.)"*): **OBJECTED. move to strike; DISPUTED.**





**FOURTH SENTENCE** ("*This newsletter was circulated to clients and prospective clients of Ariel. (Ex. H; Ex. E at 298:8-10.)*"):  **OBJECTED, move to strike; DISPUTED**.



- **FRE 403**- Exhibit H & Ms. Kosiers' testimony thereto is also inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial as testimony from a person who did not have knowledge on a piece of key information can unfairly sway opinion on this topic despite being highly unreliable.

    **Otherwise, DISPUTED.**  ACA further disputes the material fact that "[the] newsletter was circulated to clients and prospective clients of Ariel."  Plaintiff has not produced any evidence that the newsletter was "circulated to clients and prospective clients of Ariel."  Rather,                                              (Ex. 9, at 298:8-

299:18.).

ACA also disputes that Plaintiff had any clients during the purported date of newsletter, May 6, 1983. ACA requested such information, and Plaintiff never produced any such information. (Ex. 11, Plaintiff's Responses to Defendant's First Requests for Production at Request Nos. 7 & 8; *see also* Ex.12, Plaintiff's Response to Defendant's First Set of Interrogatories No. 2; *see also* Ex. 9, at 74-79:1-15.)

**FIFTH SENTENCE** ("*Exhibit H shows use of the Ariel name as of the date of that newsletter, May 6, 1983. (Ex H at AI 5029.)*"): **OBJECTED, move to strike; DISPUTED.**



- **FRE 403-** Exhibit H & Ms. Kosiers' opinion thereto is also inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial because the "Ariel" in this newsletter is only present on the last page in a copyright notice in a boiler plate paragraph, so was unlikely to be seen by consumers.

**Otherwise, DISPUTED.** ACA further disputes that the use of "Ariel" was relevant to the claim of "use in commerce" because this alleged "use" was not representative of what Plaintiff claims was the alleged use of their ARIEL trademark, which was "management of

investments and investment funds." Plaintiff's alleged use on non-trademark use because the

newsletter did not "manage[]" investments or funds, so thus the use was irrelevant to any

cause of action by Plaintiff. (FRE 402; *see also* Ex. 10 Plaintiff ARIEL TM App.); *see also*

*Gay Toys, Inc. v. McDonald's Corp.*, 199 USPQ 722, 723 (CCPA 1978) (because applicant

*did not use the mark in commerce in association with the goods at the time it filed the*

*application, its application is void); Avakoff v. S. Pacific Co.*, 765 F.2d 1097, 1098 (Fed. Cir.

1985) ("Mere advertising of a product and documentary use of a symbol apart from the

goods does not constitute trademark use for those goods. That is, advertising material is not

use within the meaning of the statute and therefore it is insufficient to support federal

registration."); *In re Canad. Pac. Ltd.*, 754 F.2d 992, 994 (Fed. Cir. 1985) ("a service must

be performed for the benefit of others"). And here, drafting or circulating a newsletter is not

"management of investments and investment funds," as the federal registration requires.

6.      Exhibit I is a true and correct copy of Ariel Capital Management, Inc.'s
application to register its Ariel mark in the U.S. Patent & Trademark Office. (Ex. E at 300:1-24;
Deposition Exhibit 11 to the Ariel Rule 30(b)(6) Deposition, attached as Exhibit I.) In Exhibit I,
Ariel Capital Management, Inc. states that it has been using the "Ariel" name since January 10,
1983, and using it in interstate commerce since March 23, 1983. (Ex. I.) Ariel, its predecessors,
and related companies have continuously used "Ariel" in their name in commerce since 1983.
(Ex. F at ¶ 4.)

**RESPONSE: OBJECTED, move to strike, in part; DISPUTED, in part.**

**FIRST SENTENCE: UNDISPUTED.**

**SECOND SENTENCE** ("*In Exhibit I, Ariel Capital Management, Inc. states that it has been
using the "Ariel" name since January 10, 1983, and using it in interstate commerce since March
23, 1983. (Ex. I.)*"): **DISPUTED.**

**Exhibit I** displays that the mark was used in commerce as of the day of its filing, but

Exhibit I does not make assertions about "using it" "since" that time. (Plt's Ex. I)

ACA further disputes the fact that "Ariel, its predecessors, and related companies

have continuously used 'Ariel' in their name in commerce since 1983." Plaintiff has not

shown any evidence that it used the ARIEL mark in commerce in 1983, and has

affirmatively stated that it had not used it in commerce before September 30, 1983. (Ex. 12

Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 13 Plaintiff's

Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 14 Plaintiff's

Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 9, at

98:4-22.) Plaintiff has stated on several occasions that its first "product or service was first

made available to consumers" on September 30, 1983. (Ex. 12, at No. 2; Ex. 13, at No. 2;

Ex. 14, at No. 2; *see also* Ex. 9 Plaintiff's 30(b)(6) at 74:18 – 79:15, 98:4-22.) Plaintiff's

founder John Roger's has further stated on several occasions that Plaintiff did not have its

first client until eighteen months after it opened. (Ex. 32, Exhibit No. 6 Plaintiff 30(b)(6) at

p. 2; *see also* Ex. 9, at 278:5 – 279:19, 285:3 – 286:14.)

**THIRD SENTENCE** ("A*riel, its predecessors, and related companies have continuously used "Ariel" in their name in commerce since 1983.* (*Ex. F at ¶ 4.)*"): **OBJECTED, move to strike; DISPUTED.**



**Otherwise, DISPUTED.** ACA disputes that "Ariel, its predecessors, and related

companies have continuously used 'Ariel' in their name in commerce since 1983." Plaintiff

has not shown any evidence that it used the ARIEL mark in commerce in 1983, and ███

███████████████████████████████████████████████████████████████████████. (Ex. 12,

at No. 2; Ex. 13, at No. 2; Ex. 14, at No. 2.)  Plaintiff has ████████████████████████

██████████████████████████████████████████████████████████████████████

(Ex. 12, at No. 2; Ex. 13, at No. 2; Ex. 14, at No. 2; Ex.9, at 98:4-22, 99:14 – 103:4.)

Plaintiff's founder John Roger's has further stated on several occasions that Plaintiff did not

have its first client until eighteen months after it opened.  (Ex. 32, Exhibit No. 6 Plaintiff

30(b)(6) at p. 2; *see also* Ex. 9, at 278:5 – 279:19, 285:3 – 286:14.)

      7.      Since 1983, Ariel and its predecessors-in-interest have provided investment services and financial and advisory services, and offered products including separate accounts and mutual funds, to investors, endowments, foundations, pensions, 401(k) plans, corporations, high net worth individual and family offices.  (Ex. E at 106:12-24; 107:1-12.)  In short, Ariel provides independent and objective investment management services to individuals and families throughout the United States. (Declaration of Todd Trubey, attached as Exhibit J, at ¶ 11.) Ariel searches for stocks that represent a style of investing (*e.g.*, mid-cap, value or large cap).  (Ex. J at ¶ 14.) Ariel groups stocks within the same style of investing, and these groups of stocks are offered to Ariel's clients via mutual funds or "separate accounts."  (*Id.*)

      **RESPONSE:  OBJECTED, move to strike, in part; DISPUTED, in part.**

**FIRST SENTENCE (**"*Since 1983, Ariel and its predecessors-in-interest have provided investment services and financial and advisory services, and offered products including separate accounts and mutual funds, to investors, endowments, foundations, pensions, 401(k) plans, corporations, high net worth individual and family offices.  (Ex. E at 106:12-24; 107:1-12.)*"**):**

      **DISPUTED.**  ACA disputes that "Ariel, its predecessors, and related companies have

continuously used "Ariel" in their name in commerce "since 1983."  Plaintiff has not shown any

evidence that it used the ARIEL mark in commerce in 1983, and ████████████████████████

██████████████████████████████. (Ex. 12, at No. 2; Ex. 13, at No. 2; Ex.

14 Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2.)

Plaintiff's founder has further stated on several occasions that Plaintiff did not have its first client

until eighteen months after it opened.  (Ex. 32 Exhibit No. 6 Plaintiff 30(b)(6) at p. 2; *see also*

Ex. 9, at 285:3 – 286:14.)  Plaintiff's first claimed date was at earliest September 30, 1983.  (Ex. 12 at No. 2; Ex. 13 at No. 2; Ex. 14 at No. 2; Ex. 9, at 98:4-22, 99:14 – 103:4.) 

(Ex. 12 at No. 2; Ex. 13 at No. 2; Ex. 14 at No. 2; Ex. 9, at 98:4-22, 99:14 – 103:4.)

**SECOND SENTENCE ("***In short, Ariel provides independent and objective investment management services to individuals and families throughout the United States. (Declaration of Todd Trubey, attached as Exhibit J, at ¶ 11.)***"):  OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 11 as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at Ex. J at ¶ 11 (submitted on October 7, 2016).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115, at Ex. J), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent."  (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- ACA also objects to the term "provide…*objective*…services" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "provide…*objective*…services."

- ACA further objects to the term "provides *independent*…services" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "provides *independent*…services."

**Otherwise, DISPUTED.**  ACA disputes that 

(Exh. 9, Plaintiff 30(b)(6) at 130:2-17, 132:3-6.)  Plaintiff's

.

(Ex. 9 Plaintiff 30(b)(6) at 111:2-4, 130:2-7.)  And of Plaintiff's

████████████████████████████████████████████████ (Ex. 9 Plaintiff 30(b)(6) at 110:4-12.)

**THIRD SENTENCE:  UNDISPUTED.**

**FOURTH SENTENCE:  UNDISPUTED.**

8.      A "separate account" is a client account invested in a group of stocks identified by Ariel.  However, there are several differences between mutual funds and "separate accounts." (Ex. J. at ¶ 15.)  Unlike a mutual fund, a "separate account" is one in which Ariel invests the client's money separately from other clients.  (Ex. J at ¶ 16.)  Mutual funds combine funds invested by multiple clients.  (Ex. J at ¶ 16.)  In some cases, a separate account will have a portfolio of investments that mirrors those offered under Ariel's mutual funds; in other cases, Ariel's clients' separate accounts look very different from Ariel's mutual funds.  (Ex. J at ¶ 17.) Unlike when investing in a mutual fund, an Ariel separate account client can restrict where Ariel invests the client's money (*e.g.*, no bank stocks, companies must be socially responsible, no more than a set percentage of funds may be invested in a given industry/company/country, *etc.*). (Ex. J at ¶ 18.)  In such cases, Ariel works with the client to make sure the portfolio of investments in a separate account suits the client's needs. (Ex. J at ¶ 18.)  Ariel primarily offers "separate accounts" to high net worth individuals, endowments, foundations, pension plans and family offices.  (Ex. E at 109:20-24; 110:1-17; Ex. J at ¶ 20.)

**RESPONSE:  UNDISPUTED.**

9.      Ariel's revenues are split about 50/50 between mutual funds and "separate accounts."  (Ex. E at 109:22-23.)

**RESPONSE:  UNDISPUTED.**

10.      Individual investors become clients of Ariel through Ariel's website, by calling or visiting Ariel, or through the client's financial advisor, such as Schwab, Fidelity, T. Rowe Price or another broker-dealer.  (Ex. E at 111:2-24, 112:1-21.)  The most common way individual investors first learn about Ariel is referrals, where someone has recommended Ariel to the new client. (Ex. E at 118:2-8, 119:1-12.) Today, Ariel is a well-known provider of investment services, managing over $10 billion in assets for its clients. (Declaration of Merrillyn Kosier dated Aug. 5, 2015, Dkt. No. 28, attached as Exhibit K, at ¶ 3.) Ariel offers its services in all fifty states and has over 300,000 mutual fund shareholders across the nation.  (*Id.*)  Ariel has non-institutional separate account clients across the country, including clients with addresses in Florida and Ohio. (Ex. J at ¶ 21.)

**RESPONSE: OBJECTED, move to strike; DISPUTED, in part.**

**FIRST SENTENCE: UNDISPUTED.**

**SECOND SENTENCE: UNDISPUTED.**

**THIRD SENTENCE** ("*Today, Ariel is a well-known provider of investment services, managing over $10 billion in assets for its clients. (Declaration of Merrillyn Kosier dated Aug. 5, 2015, Dkt. No. 28, attached as Exhibit K, at ¶ 3.)*"): **OBJECTED, move to strike; DISPUTED.**

- **FRE 901-** Exhibit K at ¶ 3 & Ms. Kosiers' opinion therein is inadmissible under FRE 901 because it lacks foundation as nothing in Exhibit K at ¶ 3& Ms. Kosiers' opinion therein supports the proposition that "Ariel is a well-known provider of investment services." (FRE 901)

- **FRE 702-** Exhibit K at ¶ 3 & Ms. Kosiers' opinion therein about who consumers consider "well-known provider of investment services" is inadmissible under FRE 702 because she has not been established as an expert by Plaintiff on this topic, her testimony has not been established by Plaintiff as expert testimony, nor is her opinion founded upon (a) her scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701-** Exhibit K at ¶ 3 & Ms. Kosiers' opinion therein is inadmissible under FRE 701 because it improperly speculates about the state of mind of consumers relating to who they consider "well-known provider of investment services." (FRE 701)

- **FRE 802-** Exhibit K at ¶ 3 & Ms. Kosiers' opinion therein is inadmissible under FRE 802 because it is hearsay about consumers' impressions about who they say is "well-known provider of investment services." (FRE 802)

- **FRE 403-** Exhibit K at ¶ 3 & Ms. Kosiers' opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial.

- ACA also objects to the term "well-known" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "well-known."

**Otherwise DISPUTED, in part.** ACA disputes that "Ariel is a well-known provider of

investment services." Plaintiff has not produced any evidence that it is a well-known provider of

investment services.  Rather, 

█████████. (Ex. 18, 2015 Turtle Talk Survey at AI005350.)  Furthermore, in Plaintiff's

███████████████████████████████████████

██████████████████ (Ex. 17, at AI017880; *see also* Ex. 9, at 267:17-24.)

**FOURTH SENTENCE:  UNDISPUTED.**

**FIFTH SENTENCE** ("*Ariel has non-institutional separate account clients across the country, including clients with addresses in Florida and Ohio. (Ex. J at ¶ 21.)*"):  **OBJECTED, move to strike.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 21 as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at Ex. J at ¶ 21 (submitted on October 7, 2016).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016, and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent."  (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

11.     Ariel owns federally registered trademarks containing the term "ARIEL," including the marks at issue in this case:

| Mark | Reg. No. / Reg. Date | Goods/Services |
|---|---|---|
| ARIEL | 1286420 7/17/1984 | management of investments and investment Funds |
| ARIEL APPRECIATION FUND | 2772978 10/14/2003 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL FUND | 2772980 10/14/2003 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL INVESTMENTS | 3506141 9/23/2008 | printed publications, namely, reports, educational materials, newsletters, pamphlets and periodicals featuring investment news and |

| | | Commentary |
|---|---|---|
| | | investment advisory services; investment management; mutual fund brokerage, distribution and investment; financial sponsorship of cultural and performing arts events; providing on-line information in the field of investments |
| ARIEL FOCUS FUND | 3657317 7/21/2009 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL'S ABCS OF MONEY | 3897717 12/28/2010 | online information in the fields of investments and personal financial matters |
| ARIEL DISCOVERY FUND | 4025627 9/13/2011 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL INTERNATIONAL FUND | 4223198 10/9/2012 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |
| ARIEL GLOBAL FUND | 4223197 10/9/2012 | mutual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services |

(Ex. D at ¶ 4.) Exhibit L contains true and correct copies of each registration listed above. (Ex. D at ¶ 5.) Ariel refers to its federally registered marks in this Statement of Facts as the "ARIEL Marks." (*Id.*) The registrations for the ARIEL Marks are in full force and effect on the United States Patent and Trademark Office's Principal Register. (Ex. D at ¶ 6.) The registrations for ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration pursuant to 15 U.S.C. § 1115(b). (Ex. D at ¶ 6.) Exhibit M includes true and correct copies of the Notices of Acceptance and Acknowledgment of Use and Incontestability for the ARIEL, ARIEL APPRECIATION FUND, ARIEL FUND, ARIEL INVESTMENTS, and ARIEL FOCUS FUND marks. (*Id.*)

**RESPONSE: OBJECTED, in part, move to strike; DISPUTED, in part.**

- **FRE 402-** Exhibit D at ¶ 4-6 is inadmissible under FRE 402 to the extent it refers to "ARIEL FUND," " ARIEL FOCUS FUND," "ARIEL APPRECIATION FUND," "ARIEL'S ABCS OF MONEY," "ARIEL DISCOVERY FUND," "ARIEL INTERNATIONAL FUND" and "ARIEL GLOBAL FUND" marks because those marks are not at issue in this suit, so therefore do not make any fact at issue any more

or less likely. Plaintiff voluntarily limited its suit to these two trademarks, so it therefore cannot now pursue the other seven marks in the same suit. Plaintiff explicitly stated that "[o]nly the ARIEL and ARIEL INVESTMENTS marks are at issue in this case." Dkt. 79, at 6; *see al*so, Dkt. 68, at 1-2 (only addressing ARIEL and ARIEL INVESTMENTS marks) (FRE402)

**Otherwise, DISPUTED.** ACA disputes that this suit involves any of Plaintiff's trademarks other than "ARIEL" and "ARIEL INVESTMENTS." Plaintiff voluntarily limited its suit to these two trademarks, so it therefore cannot now pursue the other seven marks in the same suit. Plaintiff explicitly stated that "[o]nly the ARIEL and ARIEL INVESTMENTS marks are at issue in this case." Dkt. 79, at 6; *see al*so, Dkt. 68, at 1-2 (only addressing ARIEL and ARIEL INVESTMENTS marks).[6]

ACA further disputes that the "ARIEL" registration is valid. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when it was filed); *see also Couture v. Playdom*, 778 F.3d at 1381 (the "use in commerce must be as of the application filing date"); *Intermed Commc'n, Inc. v. Chaney*, 197 USPQ 501 (TTAB 1977) ("Mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient as a matter of law as a foundation for claiming ownership of and applying to register the mark.")[7]; *Gay Toys, Inc. v. McDonald's Corp.*, 199 USPQ 722, 723 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application is void). Plaintiff has provided no evidence that it used the ARIEL mark in commerce before it filed its trademark application. Rather, ███████████

████████████████████████████████████████████. (Ex.

---

[6] ACA disputes that Plaintiff can pursue or assert any trademark in this case except "ARIEL" and "ARIEL INVESTMENTS," and maintains this as a standing objection to the scope of this case rather object each time for the interest of brevity.

[7] *Steer Inn Sys., Inc. v. Langhner's Drive-In, Inc.*, 405 F.2d 1401-02 (CCPA 1969) (same); *Lucent Info. Mgmt. Inc. v. Lucent Tech. Inc.*, 186 F.3d 311, 318 (3rd Cir. 1999) (same).

9, Plaintiff 30(b)(6) at 93:2-4, 98:4-22, 339:12-24, 340:1-12, 341-42:21-24, 1-8, 344:10-13,

345:12-22; Ex. 14, Plaintiff's Third Supplemental Response to ACA's First Set of

Interrogatories, No. 2 at *2-5.) Plaintiff further reported, in its 30(b)(6) deposition, ███████

████████████████████████████████████████████████████████████████████████████

███████████ (Ex. 9 Plaintiff 30(b)(6) at 345:12-22, 346:23-24; see also (Ex. 14 Plaintiff's Third

Supplemental Answers to ACA's First Set of Interrogatories, No. 2.) And because the ARIEL

mark was filed with the USPTO on June 20, 1983, and it had not used the mark in commerce, it

is void *ab initio*. (Ex. 39, at 2, Exhibit A to Plaintiff's Complaint, Dkt. 1-1.)

 

12.    Ariel Investments, LLC is the owner of record with the United States Patent and
Trademark Office for each of the ARIEL Marks. (Ex. D at ¶ 6.) The USPTO abstracts of title
for the registrations for ARIEL, ARIEL APPRECIATION FUND, ARIEL FUND and ARIEL
INVESTMENTS are attached to Ariel's Statement of Facts as Exhibit LL. (*Id*.) True and
correct copies of assignments and the certificate of amendment changing the name of Ariel
Capital Management, LLC to Ariel Investments, LLC which evidence the chain of title of the
federal registrations for ARIEL, ARIEL APPRECIATION FUND, ARIEL FUND and ARIEL
INVESTMENTS  are attached to Ariel's Statement of Facts as Exhibit MM. (*Id*.) Moreover,
True and correct copies of the Notices of Acceptance Under Section 8 & Notice of Registration
Renewal Under Section 9 from the USPTO for the federal registrations for ARIEL, ARIEL
APPRECIATION FUND and ARIEL FUND are attached to Ariel's Statement of Facts as
Exhibit NN. (*Id*. at ¶ 7.)

**RESPONSE:  OBJECTED, in part, move to strike; DISPUTED, in part.**

- **FRE 402**- Exhibit D at ¶ 4-6 is inadmissible under FRE 402 to the extent it refers to
  "ARIEL FUND,"  " ARIEL FOCUS FUND," "ARIEL APPRECIATION FUND,"
  "ARIEL'S ABCS OF MONEY," "ARIEL DISCOVERY FUND," "ARIEL
  INTERNATIONAL FUND" and "ARIEL GLOBAL FUND" marks because those
  marks are not at issue in this suit, so therefore do not make any fact at issue any more
  or less likely.  Plaintiff voluntarily limited its suit to these two trademarks, so it
  therefore cannot now pursue the other seven marks in the same suit.  Plaintiff
  explicitly stated that "[o]nly the ARIEL and ARIEL INVESTMENTS marks are at
  issue in this case." Dkt. 79, at 6; *see al*so, Dkt. 68, at 1-2 (only addressing ARIEL
  and ARIEL INVESTMENTS marks) (FRE 402)

**Otherwise, DISPUTED.**  ACA disputes that this suit involves any of Plaintiff's

trademarks other than "ARIEL" and "ARIEL INVESTMENTS."  Plaintiff voluntarily

limited its suit to these two trademarks, so it therefore cannot now pursue the other seven

marks in the same suit. Plaintiff explicitly stated that "[o]nly the ARIEL and ARIEL

INVESTMENTS marks are at issue in this case." Dkt. 79, at 6; *see a*lso, Dkt. 68, at 1-2

(only addressing ARIEL and ARIEL INVESTMENTS marks).

13.    Ariel advertises and extensively promotes its financial services under the ARIEL
Marks. (Ex. F at ¶ 6.)  In addition to promoting its services under the ARIEL Marks on its
website at www.arielinvestments.com and in brochures, Ariel has promoted and advertised its
services under the ARIEL Marks in a wide variety of media and channels of trade, including
without limitation, in national publications, websites and advertising networks such as *Barron's*,
*Black Enterprise*, *Business Week*, *Chicago Tribune*, *Entrepreneur*, *Fast Company*, *Financial
Advisor*, *Fortune, Inc.*, *Money Magazine*, *Morningstar Advisor*, *Mutual Funds Magazine*, *The
New York Times*, *Pensions & Investments*, *Savoy*, *SmartMoney Magazine*, *USA Today*, *The Wall
Street Journal*, *Investment Adviser*, *Investment News*, *Kiplinger's Personal Finance*, *Hispanic
Executives Magazine*, *Chicago Sun- Times*, *Crain's Chicago Business*, *Investor's Business Daily*,
*Morningstar.com*, *Forbes.com*, *NNMoney.com*, *lackamericaweb.com*, *WVON.com*, and via the
Captivate advertising network in New York and Chicago. (Ex. F at ¶ 7.)  Indeed, many Ariel
advertisements, including those appearing in *Investment Advisor*, have included full-page ads
and full-size "wrapped ads." (Ex. K at ¶¶ 6-7.)  So-called "wrapper ads" literally wrap the cover
of issues of a magazine. (Ex. K at ¶ 8.)  Thus, it is not possible to open the magazine without
seeing Ariel's advertisement as it was printed on a sleeve, which needed to be removed before
the  magazine could be opened. (*Id*.)

**RESPONSE:  OBJECTED; DISPUTED, in part.**

- ACA objects to the term "extensively" as it is subjective and is vague, ambiguous and
subject to different interpretations or requires subjective knowledge by any party
other than Defendant because it does not define "extensively."

**Otherwise, DISPUTED.** ACA disputes SUF No. 13 to the extent it implies that

ACA or Bray have seen these advertisements. Rather, Mr. Bray testified that:

Q.  "Okay. When did you first become of [sic] Ariel Investments? I don't know if I
said that clearly.  When did you first become aware of Ariel Investments?

A.  When I received a letter from Ariel Investment's counsel last summer." (Ex. 5, at
69:7-23.)

ACA also disputes that the magazine could not have been viewed without seeing the

advertisement.  The "wrapper ads" could have been removed by anyone at any time prior to

viewing the magazine.

14.     In addition to Ariel's advertising, Ariel has also been regularly discussed in articles and news stories in print and online versions of *Investment Advisor* since 2008.  (Ex. K at ¶ 9.)  For example, *Investment Advisor* featured Ariel's chief investment officer, Rupal Bhansali, on the cover of its June 2012 issue.  (*Id*.)

**RESPONSE: OBJECTED.**

- ACA objects to the term "regularly" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "regularly."

15.     Ariel maintains electronic and written records of, and accounting data reflecting, its advertising and marketing expenditures.  (Ex. F at ¶ 10.)  Ariel employees familiar with the amount of money that Ariel spends on advertising and marketing make these expense records at or near the time Ariel incurs the expense in the ordinary course of their work for Ariel.  (*Id*.)  Ariel keeps these records in the ordinary course of its business.  (*Id*.)  Moreover, Ariel's accounting data, and its advertising and marketing expense data in particular, is voluminous, maintained in a computer database, and not easily examined in court.  (*Id*.)  Nevertheless, Ariel employees who are familiar with that data were able to examine the data and create a summary of Ariel's advertising and marketing expenditures for the years 2000 through 2015. (*Id*.) Exhibit N is a true and correct summary of Ariel's advertising and marketing expenditures for the years 2000 through 2015. (*Id*.) The underlying data is available for inspection by Ariel Capital or the Court.  (*Id*.)

**RESPONSE: OBJECTED, move to strike.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit N as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-2, at Ex. N (submitted on October 7, 2016).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-N, at Ex. N), and Plaintiff has not shown "good cause" for modifying the Order (Dkt. 65), nor did Plaintiff seek "the judge's consent."  FRCP 16(b)(4).  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit F at ¶ 10 and Ms. Kosier's opinion therein as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 71 of 103 (submitted on October 7, 2016).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 71), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek

"the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

16.     Ariel's advertisements, making use of the ARIEL Marks, have earned critical acclaim. (Ex. F at ¶ 9.) Exhibit O contains a true and correct listing of the awards earned by Ariel for its advertising including the ARIEL Marks in the years 2000 to 2015. (Ex. F at ¶ 9; Ariel Investments' STAR Awards Summary, attached as Exhibit O.) Indeed, Since (*sic*) 2000, Ariel has received over 70 STAR Awards, recognizing Ariel's excellence in marketing and communications to investors and intermediaries. (Ex. F at ¶ 9; Ex. O.) The STAR Awards is the preeminent awards competition in the mutual fund industry and is designed to honor communication leaders in the industry. (Ex. F at ¶ 9.)

**RESPONSE: OBJECTED, move to strike.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit F at ¶ 9 and Ms. Kosier's opinion therein as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 71 of 103 (submitted on October 7, 2016).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 70-71), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 402-** Exhibit F at ¶ 9 and Ms. Kosier's opinion therein inadmissible under FRE 402 because it does not make any issue in this suit any more or less likely.

- ACA also objects to the term "critical acclaim" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "critical acclaim."

17.     Ariel also has promoted its ARIEL Marks in other media outlets, as certain of Ariel's officers have been featured contributors to such television programs as *Good Morning America* (ABC), *World News Tonight* (ABC), *In Focus* (Bloomberg TV), *Morning Call* (Bloomberg TV), *Open Exchange* (Bloomberg TV), *Morning Call* (CNBC), *Your World With Neil Cavuto* (Fox News), *Cavuto on Business* (Fox News), *Frontline* (PBS), *News Hour with Jim Lehr* (PBS), *Chicago Tonight* (PBS), *First Business* (WCIU), *DuSable Night of 100 Stars* (WBBM), and *Eye on Chicago* (WBBM), and such radio programs as *The First Word* (Bloomberg Radio), *All Things Considered* (NPR), *News and Notes* (NPR), the *Tom Joyner Morning Show* (nationally syndicated), and *The HistoryMakers* (PBS). (Ex. F at ¶ 8.) Indeed, John Rogers provides a regular column in Forbes (sic) Magazine. (Ex. K at ¶ 10; Ex. E at 240:6-8.) Ariel's employees also regularly speak at panels and conferences. (Ex. E at 239:17-24, 240:1-10, 241:16-24.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 901-** SUF No. 17 lacks foundation under FRE 901 because Plaintiff did not produce evidence sufficient to support that relevant consumers saw these promotions.

- **FRE 402/403 & 901-** Exhibit F at ¶ 12 is inadmissible under FRE 402, 403 and 901 because it is lack foundation, is irrelevant, and is unduly prejudicial.  It does not support Plaintiff's claims of intent or strength of the Mark.  Plaintiff did not establish that ACA or Bray had seen any of those television programs, or if "Ariel" was displayed during those programs, so it is irrelevant to establishing knowledge of the Marks.  It is also does not establish the strength of the mark because it is unknown when, how, the amount, type or prominence of any of the promotions that were made or the "Ariel" term's use in those promotions.  It thus does not show they bore any influence in a relevant consumer's mind.  For instance, if these promotions were made twenty years ago, then their prominence in a relevant consumer's mind would be less than if the promotion was done recently.  Or if the promotions were minimal or not prominently displayed, then they may not have made an impact on a relevant consumer.  (FRE 402, 403, 901)

18.     Additionally, Ariel promotes its services under the ARIEL Marks through high-profile sponsorships of cultural and civic events.  (Ex. F at ¶ 12; Ex. E at 205:7-15, 206:17-24, 207:1-13, 208:7-19.)  For example, Ariel was the lead sponsor of the Chicago and nationally touring productions of *The Color Purple*, a critically acclaimed and award winning musical.  (Ex. F at ¶ 12.)  Among other sponsorships, Ariel has also sponsored the Martin Luther King, Jr. National Memorial Project, the Chicago Sky WNBA basketball team, McDonald's All-American basketball games, various investment-focused conferences (including those organized by Charles Schwab and Morningstar), The Harris Theatre, Rainbow PUSH Coalition, the Chicago Symphony Orchestra, and Race Against Hate.  (Ex. E at 205:7-15, 239:17-24; Ex. P.)  Exhibit P contains true and correct lists of charitable causes and organizations supported by Ariel using the ARIEL Marks in 2012-2016.  (Ex. F at ¶ 12; Ex. P.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit F at ¶ 12 as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 71 of 103 (submitted on October 7, 2016).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 71), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent."  (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit P as it is new evidence that

was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 71 of 103 (submitted on October 7, 2016).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 71), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 402-** Exhibit F at ¶ 12 is inadmissible under FRE 402, 403 and 901 because it is lack foundation, is irrelevant, and is unduly prejudicial. It does not support Plaintiff's claims of intent or strength of the Mark. Plaintiff did not establish that ACA or Bray had seen any of those television programs, or if "Ariel" was displayed during those programs, so it is irrelevant to establishing knowledge of the Marks. It is also does not establish the strength of the mark because it is unknown when, how, the amount, type or prominence of any of the promotions that were made or the "Ariel" term's use in those promotions. It thus does not show they bore any influence in a relevant consumer's mind. For instance, if these promotions were made twenty years ago, then their prominence in a relevant consumer's mind would be less than if the promotion was done recently. Or if the promotions were minimal or not prominently displayed, then they may not have made an impact on a relevant consumer. (FRE 402, 403, 901)

- **FRE 901-** Exhibit F at ¶ 12 lacks foundation under FRE 901 because Plaintiff did not produce evidence sufficient to support that relevant consumers saw these promotions.


19. Ariel has diligently protected its marks by sending cease-and-desist letters to people and entities misusing its marks, and taking legal action, when necessary. (Ex. D at ¶ 7.) By way of example, Ariel filed suit against the registrant of the arielinvestments.com domain name in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:07-CV-1475-P. (*Id.*) In each instance, other than the instant case, where Ariel has objected to another party's use of its ARIEL Marks, the matter has been resolved to Ariel's satisfaction. (*Id.*)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**


**FIRST SENTENCE** ("*Ariel has diligently protected its marks by sending cease-and-desist letters to people and entities misusing its marks, and taking legal action, when necessary. (Ex. D at ¶ 7[8].)*"): **OBJECTED, move to strike; DISPUTED.**

- ACA also objects to the term "diligently protected" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge

---

[8] Ex. D at ¶ 7 does not address sending cease-and-desist letters to people and entities misusing its marks, and taking legal action. ACA assumes and responds Plaintiff meant to write "Ex. D at ¶ 8."

by any party other than Defendant because it does not define "diligently protected."

- ACA further objects to the term "misusing its marks" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define what it classifies as "misusing its marks."

- And finally, ACA objects to the term "when necessary" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define "when necessary."

**Otherwise, DISPUTED.** There are over fifty-five companies who use the term "Ariel" in their names that Plaintiff did not send "cease-and-desist letters" to, nor which it took any other type of legal action against. (Ex. 28, Exhibit 22 Plaintiff 30(b)(6).) Plaintiff has even allowed companies in the financial services to use the term "Ariel," such as "Ariel Wealth Advisors." (Ex. 31, Plaintiff's Answers to ACA's Requests to Admit No. 17; *see also* Ex. 9, at 34:13 – 35:19.) Ariel Wealth Advisors has used the term "Ariel" for over a six years without any "cease-and-desist letters" from Plaintiff, or any other type of legal action from Plaintiff. (Ex. 31, Plaintiff's Answers to ACA's Requests to Admit No. 17.) Plaintiff has not produced any evidence that there was any consumer confusion with Ariel Wealth Advisors. Plaintiff has also not sent a cease-and-desist letter to, or any other type of legal action against, "Ariel Investment Properties, Inc." (Ex. 9, at 354:7 – 356:1, 394:4-19; *see also* Ex. 26 Exhibit 17 of Plaintiff 30(b)(6).)


**SECOND SENTENCE** ("*By way of example, Ariel filed suit against the registrant of the arielinvestments.com domain name in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:07-CV-1475-P. (Id.)*"):

- **FRE 402-** This sentence is inadmissible under FRE 402 because an unrelated company's use or ownership of the website domain "arielinvestments.com" is not relevant to ACA or any issue in this suit as it does not make any fact at issue any more or less likely. (FRE402)

**THIRD SENTENCE** ("*In each instance, other than the instant case, where Ariel has objected to another party's use of its ARIEL Marks, the matter has been resolved to Ariel's satisfaction. (Id.)*"):  **OBJECTED, move to strike; DISPUTED.**

- ACA objects to the term "resolved to Ariel's satisfaction" as it is subjective and is vague, ambiguous and subject to different interpretations, and requires subjective knowledge by any party other than Defendant because it does not define "resolved to Ariel's satisfaction."

**Otherwise, DISPUTED.**  There are over fifty-five companies who use the term

"Ariel" in their names that Plaintiff did not send "cease-and-desist letters" to, nor which it

took any other type of legal action against.  (Ex. 28 Exhibit 22 Plaintiff 30(b)(6).)  Plaintiff

has even allowed companies in the financial services to use the term "Ariel," such as "Ariel

Wealth Advisors."  (Ex. 31 Plaintiff's Answers to ACA's Requests to Admit No. 17; *see*

*also* Ex. 9, at 34:13 – 35:19.)  Ariel Wealth Advisors has used the term "Ariel" for over a six

years without any "cease-and-desist letters" from Plaintiff, or any other type of legal action

from Plaintiff.  (Ex. 31 Plaintiff's Answers to ACA's Requests to Admit No. 17.)  Plaintiff

has not produced any evidence that there was any consumer confusion with Ariel Wealth

Advisors.  Plaintiff has also not sent a cease-and-desist letter to, or any other type of legal

action against, "Ariel Investment Properties, Inc."  (Ex. 9, at 354:7 – 356:1, 394:4-19; *see*

*also* Ex. 26 Exhibit 17 of Plaintiff 30(b)(6).)

20.     As a result of Ariel using, promoting, and protecting its ARIEL Marks, it has acquired valuable goodwill in the ARIEL Marks.  (Ex. F at ¶ 13.)  The ARIEL Marks are recognized by clients and potential clients as identifying services provided by Ariel.  (*Id.*)  The ARIEL Marks are distinctive and closely associated with Ariel and its services.  (*Id.*)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

**FIRST SENTENCE** ("*As a result of Ariel using, promoting, and protecting its ARIEL Marks, it has acquired valuable goodwill in the ARIEL Marks.  (Ex. F at ¶ 13.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 702-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein about the value of the goodwill the "ARIEL Marks" acquired is inadmissible under FRE 702 because she

23

has not been established as an expert by Plaintiff on this topic, her testimony has not been established by Plaintiff as expert testimony, nor is her opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 701 because it improperly speculates about the state of mind of a consumer relating to the value of the goodwill the "ARIEL Marks" acquired. (FRE 701)

- **FRE 802-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 802 because it is hearsay about consumers' impressions of the value of the goodwill the "ARIEL Marks" acquired. (FRE 802)

- **FRE 403-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial.

**Otherwise, DISPUTED.** Plaintiff has not produced any evidence that it has

acquired any goodwill in its marks. Rather, 

(Ex. 18, at AI005350; *see also* Ex. 9, at 267:17-24.)

Furthermore, in Plaintiff's

." (Ex. 17, at

AI017880.)

**SECOND SENTENCE** ("*The ARIEL Marks are recognized by clients and potential clients as identifying services provided by Ariel. (Id.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 702-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein about the recognition of the "ARIEL Marks" by consumers is inadmissible under FRE 702 because she has not been established as an expert by Plaintiff on this topic, her testimony has not been established by Plaintiff as expert testimony, nor is her opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701**- Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 701 because it improperly speculates about the state of mind of consumers relating to their recognition of the "ARIEL Marks." (FRE 701)

- **FRE 802**- Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 802 because it is hearsay about consumers' impressions of the "ARIEL Marks." (FRE 802)

- **FRE 403**- Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial as testimony from a person who was speculating about a piece of key information can unfairly sway opinion on this topic despite being highly unreliable.

**Otherwise, DISPUTED.**  Plaintiff has not produced any evidence th*at* "[t]he ARIEL

Marks are recognized by clients and potential clients as identifying services provided by

Ariel."  Rather, 

(Ex. 18, 2015 Turtle Talk Survey at AI005350; *see also* Ex. 9, at 267:17-24.)

Furthermore, in Plaintiff's

(Ex. 17, at

AI017880; *see also* Ex. 9, at 267:17-24.)

**THIRD SENTENCE** ("*The ARIEL Marks are distinctive and closely associated with Ariel and its services.  (Id.)*"):  **OBJECTED, move to strike.**

- **FRE 702**- Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein about who consumers associate with the "ARIEL Marks" and their level of association with Plaintiff and its services is inadmissible under FRE 702 because she has not been established as an expert by Plaintiff on this topic, her testimony has not been established by Plaintiff as expert testimony, nor is her opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b)  testimony that is based on sufficient facts or data; (c)  testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701 (Speculation)**- Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 701 because it improperly speculates about the state of mind of consumers relating to who they associate with the "ARIEL Marks" and their level

of association with Plaintiff and its services.  (FRE 701)

- **FRE 802-**  Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 802 because it is hearsay about consumers' impressions about who they associate with the "ARIEL Marks" and their level of association with Plaintiff and its services.  (FRE 802)

- **FRE 403-** Exhibit F at ¶ 13 & Ms. Kosiers' opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial.

- This sentence is further objected to as calling for a legal conclusion.

**Otherwise, DISPUTED.**  Plaintiff has not produced any evidence that "[t]he ARIEL

Marks are distinctive and closely associated with Ariel and its services."  Rather, ▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 18, at

AI005350; *see also* Ex. 9, at 267:17-24.)   Furthermore, in Plaintiff's ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Ex. 17, at AI017880; *see also* Ex. 9, at 267:17-24.)


### B.  Plaintiff Ariel Investments, LLC

21.     Defendant Ariel Capital is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 9115 Corsea Del Fontana Way, Suite 200, Naples, Florida.  (Ex. A at ¶ 3.)  Ariel Capital also has an office in Cleveland, Ohio.  (Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit Q, at 231:19-21.)

**RESPONSE:  UNDISPUTED.**

22.     Christopher Bray is the founder, sole owner, and ultimate decision-maker of Ariel Capital.  (Ex. Q at 15:3-16.)  Mr. Bray opened Ariel Capital on or about January 24, 2014. (Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit R, at 62:14-15; Ex. Q at 15:9-11.)

**RESPONSE:  UNDISPUTED.**

23.     Ariel Capital's services include private wealth management and personalized investment management (including buying and selling publicly traded securities held under

custody with a brokered dealer), tax, retirement, estate and cash flow planning, and tax return preparation.  (Ex. Q at 76:7-19.)

     **RESPONSE:  UNDISPUTED.**

     24.    Ariel Capital describes its services for the SEC in its annual Form ADV.  (Ex. Q at 18:11-18.)  Exhibit U is a true and correct copy of Ariel Capital's 2016 Form ADV Part 2A. (Ex. Q at 22:4-17, Deposition Exhibit 15 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit U.)  Ariel Capital annually submits a brochure or brochure supplement, called Form ADV Part 2B, to the Securities and Exchange Commission to comply with regulations for registered investment advisory firms like Ariel Capital.  (Ex. Q at 18:8-18; 19:1-23.)  In its most recent Form ADV, dated January 14, 2016, Ariel Capital stated that it creates for its clients "a portfolio of all or some of the following investments in accordance with the investment objectives of the client: mutual funds, exchange traded funds (commonly known as 'ETFs'), debt and equity securities, real estate, real estate investment trusts (commonly known as 'REITSs'), private placements, government securities, and alternative investments (e.g. hedge funds)."  (Ex. U at ACA 682.)  On page 4 of the ADV, Ariel Capital describes how "all fees paid to ACA for investment advisory services are separate and distinct from the fees and expenses charged by mutual funds and Exchange Traded Funds to their shareholders."  (Ex. U at ACA685.)  Finally, pages 10 through 12 describe the specific risks associated with "securities utilized" and includes a section pertaining to mutual funds.  (Ex. U at ACA691-693.)  As part of its services, Ariel Capital advertises that it will create an investment portfolio for its clients, including mutual funds.  (Ex. U at ACA682, ACA685; Ex J. at ¶ 12.)

     **RESPONSE:  DISPUTED, in part.**

**FIRST SENTENCE:  UNDISPUTED.**

**SECOND SENTENCE:  UNDISPUTED.**

**THIRD SENTENCE:  UNDISPUTED.**

**FOURTH SENTENCE:  UNDISPUTED.**

**FIFTH SENTENCE** (*"As part of its services, Ariel Capital advertises that it will create an investment portfolio for its clients, including mutual  funds.  (Ex. U at ACA682, ACA685; Ex J. at ¶ 12.)"*):  **DISPUTED.**

     ACA disputes that it advertises mutual funds, and disputes that it would or has ever provided or sold its clients mutual funds. (Ex. 2, at 63:18-23; *see also* Ex. 5, ACA Dep. I at

25:4 – 27:2.)  Rather, ACA has repeatedly stated that it does not create investment portfolio

for its clients that include mutual funds.  (Ex. 2, at 63:18-23.)  When asked by Plaintiff's

counsel, ACA's 30(b)(6) witness stated:

> **Q: "Do you ever advise a client to include mutual funds in their asset allocation?**
> **A. Never.**
> **Q.** Okay. Do you ever advise a client **not to** include mutual funds?
> **A. Always."**  (Ex. 2, at 63:18-23; *see also* Ex. 5 ACA Dep. I at 25:4 – 27:2.)
> (emphasis added)


25.     Ariel Capital also describes the scope of its services on its website at
www.arielcapitaladvisors.com and has done so since January 24, 2014. (Defendant's
Supplemental Response to Plaintiff's Amended Second Set of Interrogatories (Nos. 4-16)
attached as Ex. S, at p. 1.)  According to such website, Ariel Capital "provides independent and
objective investment management, tax and estate planning, financial planning, and trust
administration services to clients throughout the United States."  (Ex. A at ¶ 22; Ex J at ¶ 11.)
Exhibit T contains true and correct print-outs from Ariel Capital's website.  (Ex. Q at 58:19-25;
59:3-6, Deposition Exhibits 23-24 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit
T.)  In Exhibit T, Ariel Capital describes its "investment management" and "personal financial
planning services."  (Ex. T.)  Ariel Capital states that it "focuses on providing customized
investment management solutions."  (*Id*.)  Ariel Capital also states that it "provides
comprehensive personal financial planning for clients including short-term and long-term
retirement cash flow and asset accumulation planning, liability management and risk
management planning."  (*Id*.)

**RESPONSE:  UNDISPUTED.**

26.     Finally, on its website, Ariel Capital states that it provides "proprietary portfolio
management" and "customized investment management solutions designed and implemented
according to each client's unique circumstances.  Every investment strategy is aligned with our
client's best interests and tailored to their financial goals and objectives."  (Ex. J. at ¶ 19.)

**RESPONSE:  UNDISPUTED** to the portion of Ex. J at ¶ 19 cited expressly in this

SUF, but disputed as to the remaining portion of Ex. J at ¶ 19.

**DISPUTED**, and **OBJECTED** to the remaining portion of Ex. J at ¶ 19 not quoted

herein and that does not relate to the express statements from ACA's website is, move to

strike as speculation, calling for a legal conclusion, and is inadmissible under FRE 702

because Plaintiff has not been established Mr. Trubey as an expert by Plaintiff on this topic,

his testimony has not been established by Plaintiff as expert testimony, nor is his opinion

founded upon (a) his scientific, technical, or other specialized knowledge that would help the

trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is

based on sufficient facts or data; (c) testimony that is the product of reliable principles and

methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE

702)

27.    Ariel Capital advertises its financial services in print, radio, through its website, via its business cards, by word of mouth, in advertisements in the Naples, Florida *Daily News* and *Crain's Cleveland Business*, and by sponsoring events involving local non-profits, community non-profits and charities so that Ariel Capital's name is included on event promotional materials. (Ex. R at 67:8-25; 68:1-4; Ex. Q at 57:13-15; 58:3-12; 212:24-25; 213:1-7; 215:16-20; 216:1-4.)

**RESPONSE:  DISPUTED**, to the extent that SUF No. 27 implies many

advertisements or any advertisements outside of small area in Naples, Florida, or that there

was more than one advertisement in Crain's Cleveland Business.

**Otherwise, UNDISPUTED.**

28.    Ariel Capital's clients are natural persons, trusts, partnerships, and a family foundation. (Ex. Q at 24:5-17; 25:5-8.) ██████████████████████████ ██████████████████         (Ex. S at pp. 6, 8.)  New clients often come to Ariel Capital as referrals from existing clients. (Ex. R at 83:14-16.)

**RESPONSE:  UNDISPUTED.**

29.    Ariel Capital reports to the SEC that a condition for starting and maintaining a client relationship is a minimum account of a million dollars, but Ariel Capital may accept clients with smaller portfolios. (Ex. U at ACA 687; Ex J. ¶ 20.) ████████████████████ ████████████████████████████████████████(Ex. Q at 70:19-22; 71:20-22; Ex. S at pp. 5-6.)

**RESPONSE:  DISPUTED, in part.**

**FIRST SENTENCE:  UNDISPUTED.**

**SECOND SENTENC** ████████████████████████████████████████
████████████████ (Ex. Q at 70:19-22; 71:20-22; Ex. S at pp. 5-6.)")**:  DISPUTED, as
clarified below.**

Mr. Bray's testimony is taken out of context.  99% of client portfolios are in excess

of $1 million.  Clients may have multiple accounts, but they nearly all total over $1 million**.**

(Ex. 2, at 71:23-72:16, 192:7 – 195:13.) Indeed, Mr. Bray testified that his typical client has

over $2 million with ACA:

> **Q.**· "You had testified in your example that maybe **the primary client had $2
> million.· Is that a typical primary client?**
> MR. GOLLWITZER:· Object to the form of the question.
> **A.· It's -- yes."**  (Ex. 2, at 193:13-18.)

## III.    Additional Witnesses

30.     Merrillyn Kosier is Ariel's Chief Marketing Officer.  (Ex. K at ¶ 1; Ex. E at 7:14-
16.)  Ms. Kosier's responsibilities include press relations, shareholder communications,
marketing communications, managing the call center, sponsorships, advertising, and supervising
third-party distributors.  (Ex. E at 17:18-24; 18:1-3.)

**RESPONSE:  UNDISPUTED.**

31.     Todd Trubey is the Vice President, Portfolio Strategies for Ariel.  (Ex. J at ¶ 1.)
Mr. Trubey has worked in the mutual fund and investment advisory industry for over 16 years.
(Ex. J at ¶ 3.)  Mr. Trubey has worked for Ariel since September 2007 and his duties include
writing monthly and quarterly commentaries about Ariel's mutual funds and separate accounts
for the benefit of Ariel's actual and prospective clients.  (Ex. J at ¶¶ 4-5.)  Mr. Trubey also
manages Ariel's analytics group and is responsible for providing various reports to Ariel's
mutual fund board of trustees and separate account clients.  (Ex. J at ¶¶ 6-7.)  Prior to joining
Ariel, Mr. Trubey worked for Morningstar, Inc., an independent investment research and
investment management firm that provides stock market analysis, research regarding mutual
funds and other investments, investment ratings and picks for both experienced and new
investors.  (Ex. J at ¶ 8.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 31 is irrelevant to any issue
  in this case, and does not make any fact at issue any more or less likely.

(FRE402)

32.    Exhibit W is a true and correct copy of the website biography of Ariel Capital employee, Marcie Rebardo.  (Deposition of Marcie Rebardo, attached as Exhibit V, at 6:21-25; 7:1; Deposition Exhibit 37 to Deposition of Marcie Rebardo, attached as Exhibit W.)  Ms. Rebardo is a Client Specialist at Ariel Capital.  (Ex. W.)  Ms. Rebardo's responsibilities include answering the phone, assisting with managing the office, handling client requests, and ordering stationery.  (Ex. V at 7:13-15; 8:4-24.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 32 is irrelevant to any issue in this case, and does not make any fact at issue any more or less likely. (FRE402)

**Otherwise, UNDISPUTED.**

33.    Exhibit Y is a true and correct copy of the website biography of Ariel Capital employee, Kimberly Wilmore.  (Deposition of Kimberly Wilmore, attached as Exhibit X, at 9:2-13; Deposition Exhibit 36 to Deposition of Kimberly Wilmore, attached as Ex. Y.)  Ms. Wilmore is Director of Operations for Ariel Capital.  (Ex. Y.)  Ms. Wilmore's responsibilities include account operations, client service, training staff, and working with Ariel Capital's outside custodian for client investments, Charles Schwab.  (Ex. X. at 14:10-14.)

**RESPONSE:   OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 32 is irrelevant to any issue in this case, and does not make any fact at issue any more or less likely. (FRE402)

**Otherwise, UNDISPUTED.**

**IV.    Confusion**

34.    Both Ariel and Ariel Capital are using the identical term "Ariel" in their names and promotional materials.  (Ex. F at ¶ 14.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 602-** Exhibit F at ¶ 14 is inadmissible under FRE 602 because Ms. Kosier did not have personal knowledge of ACA's promotional materials.  (FRE 602.)

- **FRE 802-**  Exhibit F at ¶ 14 is inadmissible hearsay under FRE 802 because Ms.

Kosier did not see all of ACA's promotional materials and would have gotten the information from an unnamed third-party. (FRE 802).

- **FRE 901-** Exhibit F at ¶ 14 lacks foundation under FRE 901 because Ms. Kosier did not produce evidence sufficient to support a finding that Plaintiff's and ACA's promotional materials used the term "Ariel" in all of their promotional materials. (FRE 901.)

- SUF No. 34 is further objected to as calling for a legal conclusion.

**Otherwise, DISPUTED.** ACA and Plaintiff uses of "Ariel" differ visually in fonts, capitalization, layout, coloring and design elements. They further differ in presentation and commercial impression. These distinctions significantly alter the general impression conveyed by each mark. *See Lincoln Fin. v. Sagepoint*, 2009 WL 928993, at *7 (discussing that customers quickly distinguish logos based on differences in color, layout, design, font and capitalization elements); *see also Barbecue Marx v. 551 Ogden*, 235 F.3d at 1044 (holding that despite the marks "SMOKE DADDY" and "BONE DADDY" "sound[ing] alike" and "evok[ing] similar imagery," the marks' "visually distinct" appearance "significantly undercuts" the plaintiff's claim that they are similar in appearance and suggestion); *see also Packman v. Chi. Tribune Co.*, 267 F.3d at 644 ("Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion."). For instance, ACA's mark always features a white, male lion's head enclosed in a royal blue shield, which signifies safety and protection. (Ex. 6, 000069, Ex. 7 000072, Ex. 8, 000081.) To the right of ACA's lion and shield, are the words "Ariel Capital Advisors, LLC" in a *sans-serif* font, with only the "A" in Ariel, "C" in Capital and "A" in Advisors capitalized, and the remaining parts in lowercase. (*Id.*)

In contrast, Plaintiff's marks appear as "ARIEL INVESTMENTS" (never simply "Ariel"), and the letters are all capitalized, and are presented in a lighter and whimsical *serif*

font. The Plaintiff "R" notably also loops under the mark in a calligraphy-like reverse-

swoop. (Ex. 20, at AI000007.) Plaintiff's marks are also typically accompanied by a

sketched, fable-like turtle holding a trophy, which further suggests "patience wins." (*Id*.; Ex.

9, at 26:21 – 27:6, 61:19-21.) Plaintiff has released promotional materials with just their

turtle. (Ex. 33 Exhibit 3 Plaintiff 30(b)(6) at AI018832; *see also* Ex. 9, at 269:14-22.)


35.     Both Ariel and Ariel Capital are in the same line of business, namely providing
investment management services to their clients and potential clients. (Ex. J at ¶¶ 9-10.) The
term "investment management services" is generally understood by individual investors to mean
professional services that help investors with their investing. (Ex. J at ¶ 10.) Ariel provides
mutual funds and separate accounts, each of which are considered investment management
services. (Ex. J at ¶ 13.) Ariel's separate accounts are very similar to Ariel Capital's investment
management services. (*Id*.) Both Ariel's separate accounts and Ariel Capital's services are
tailored to individual client needs and each client's funds are not combined with the funds of
other clients. (Ex. J at ¶ 19.)

**RESPONSE:  OBJECTED, move to strike, in part; DISPUTED, in part.**


**FIRST SENTENCE** ("*Both Ariel and Ariel Capital are in the same line of business, namely
providing investment management services to their clients and potential clients.  (Ex. J at ¶¶ 9-
10.)*"):  **DISPUTED.**

Plaintiff are not in the same line of business.  Plaintiff only sells mutual funds and

"separate accounts," which are mutual funds, except not in a mutual fund framework, but in an

individual account framework for an individual investor.  (Ex. 5 ACA 30(b)(6) Dep I at 27:3-20.)

Plaintiff does not prepare tax returns for its clients.  (Ex. 9, at 152:22–153:5.)  Plaintiff does not

provide written financial plans for its clients. (Ex. 9, at 158:4–159:16.)

Whereas on the other hand, ACA does not sell mutual funds.  (Ex. 5, at 25:21-26:14; *see

also* Ex. 2, at 63:14-23, 177:7–180:7.)  When asked if ACA sells mutual funds, ACA's 30(b)(6)

stated:

**Q:  "Do you ever advise a client to include mutual funds in their asset allocation?**

**A. Never.**

**Q. Okay.· Do you ever advise a client not to include mutual funds?**

**A. Always.”** (Ex. 2, at 63:14-23.)

ACA also does not sell separate accounts.  (Ex. 5, at 27:11-20.)  ACA prepares tax

returns for its clients.  (Ex. 2 ACA 30(b)(6) Dep. II at 76:4-19, 177:7-18.)  ACA prepares written

financial plans for its clients.  (Ex. 2, at 177:7 – 180:7.)

**SECOND SENTENCE** (“*The term "investment management services" is generally understood by individual investors to mean professional services that help investors with their investing. (Ex. J at ¶ 10.)*”):  **UNDISPUTED.**

**THIRD SENTENCE** (“*Ariel provides mutual funds and separate accounts, each of which are considered investment management services.  (Ex. J at ¶ 13.)*”):  **DISPUTED.**

Plaintiff mutual funds and separate accounts are products that Plaintiff sells, not services.

(Ex. 21, Plaintiff Website.) Plaintiff does not provide services. (Ex. 21.)

**FOURTH SENTENCE** (“*Ariel's separate accounts are very similar to Ariel Capital's investment management services.  (Id.)*”:  **DISPUTED.**

ACA does not sell separate accounts, nor are Plaintiff's separate account similar to the

services ACA provides. (Ex. 5, at 27:11-20.)  Indeed, ACA testified that they are different:

Q  “Are you familiar with the phrase ‘separate accounts’?

A  I am.

Q  What does that mean to you?

A  I understand separate accounts to be like, basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor.

Q  And **do you create separate accounts for any of your clients?**

A.  So help me. I mean, with -- if you're using that nomenclature in which it's used in the investment profession, **I would say no**.

Q  Okay. And I was. Do you -- maybe "create" is the wrong word. **Do you work with**

any other entities to acquire separate accounts for any of your customers?

**A** No**.**"  (Ex. 5 ACA 30(b)(6) Dep 1, at 27:3-20.)

**FIFTH SENTENCE** ("*Both Ariel's separate accounts and Ariel Capital's services are tailored to individual client needs and each client's funds are not combined with the funds of other clients.  (Ex. J at ¶ 19.)*")**:  OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 19 & Mr. Trubey's opinion therein as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88 of 103).)  "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent."  (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 19 & Mr. Trubey's opinion therein about the similarity of Plaintiff's products and ACA's services is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case.  (FRE 702)

- **FRE 802-** Exhibit J at ¶ 19 & Mr. Trubey's opinion therein is inadmissible hearsay under FRE 802 because Mr. Trubey based his opinion on materials and opinions that were not his own, and which Plaintiff offers into evidence to prove the truth of the matter asserted.   (FRE 802)

- **FRE 602-** Exhibit J at ¶ 19 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about the similarity of ACA's services to Plaintiff's products.  (FRE 602)

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about ACA's services.  (FRE 602)

- **FRE 701-** Exhibit J at ¶ 19 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about ACA's services.  (FRE 701)

**Otherwise, DISPUTED**.  The products Plaintiff sells and the services ACA provide are very different.  Plaintiff "separate account" products are just like their mutual fund products, but are sometimes slightly modified to remove a particular investment from the mutual fund. (Ex. 5, at 27:10.)  Furthermore, ACA does not sell "separate accounts," or products like them. (*Id.* at 27:3-20.) ACA testified to that specifically:

Q  "Are you familiar with the phrase 'separate accounts'?

A  I am.

Q  What does that mean to you?

A  I understand separate accounts to be like, basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor.

Q  And **do you create separate accounts for any of your clients?**

A  So help me. I mean, with -- if you're using that nomenclature in which it's used in the investment profession, **I would say no**.

Q  Okay. And I was. Do you -- maybe "create" is the wrong word. **Do you work with any other entities to acquire separate accounts for any of your customers?**

**A  No."**  (Ex. 5, at 27:3-20.)


36.  Both Ariel and Ariel Capital offer their services to customers in and advertise in many of the same states, including Ohio and Florida.  (Ex. F at ¶ 15.)

**RESPONSE:  OBJECTED, move to strike** for lack of foundation, and **DISPUTED**, to the extent that Plaintiff has not established it has customers in Southwest Florida or Naples, Florida.  (Ex. 2, at 207:5 – 215:15; *see also* Ex. 9, at 230:21 – 230:10, 237:11-22.)

37.  Based on Mr. Trubey's experience in the investment services industry, investment advisors like Ariel Capital have started their own mutual funds, and the public is likely aware of that.  (Ex. J at ¶ 22.)  For example, according to an article in *Investment News* dated May 27, 2013, Aspiriant LLC is a registered investment advisor that has launched a mutual fund for its clients, which will invest in global equities.  (Ex. J at ¶ 22.)  There are other publicly-known links between investment advisors like Ariel Capital and companies like Ariel that offer mutual funds (among other services).  (*Id.*)  For example, according to an article in *Investment News* dated

June 6, 2015, some registered investment advisors such as HighTower Advisors are paid a percentage of the investors' assets held in certain mutual funds such as Charles Schwab & Co. Inc. and Fidelity Investments. ((*Id.*)  Because investment advisors often direct their clients' funds to mutual funds and both charge fees to the clients, this kind of relationship tends to blur any line between mutual fund providers and investment advisors that direct clients to invest in mutual funds.  (*Id.*)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

**FIRST SENTENCE** ("*Based on Mr. Trubey's experience in the investment services industry, investment advisors like Ariel Capital have started their own mutual funds, and the public is likely aware of that.  (Ex. J at ¶ 22.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 22 as it is new evidence that was impermissibly submitted after the discovery deadline ended.  (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).)  "Fact discovery [was] ordered closed by [May 27, 2016]."  (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent."  (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about what "investment advisors" do and their propensity to start "their own mutual funds" is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c)  testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about what "the public is aware of" is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c)  testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701 -** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated what "investment advisors" do and their propensity to start "their own mutual funds."  (FRE 701)

- **FRE 701-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated what "the public is aware of." (FRE 701)

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about their propensity to start "their own mutual funds." (FRE 602)

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge what "the public is aware of." (FRE 602)

**Otherwise, DISPUTED.** Mr. Bray testified that ACA does not sell mutual funds. (Ex. 5, at 25:21-26:14; *see also* Ex. 2, at 63:14-23, 177:7–180:7.) Similarly, when asked if ACA sells mutual funds, ACA's 30(b)(6) stated:

> **Q: "Do you ever advise a client to include mutual funds in their asset allocation?**
> **A. Never.**
> **Q. Okay.· Do you ever advise a client not to include mutual funds?**
> **A.    Always."** (Ex. 2, at 63:14-23.)

**SECOND SENTENCE** ("*For example, according to an article in Investment News dated May 27, 2013, Aspiriant LLC is a registered investment advisor that has launched a mutual fund for its clients which will invest in global equities. (Ex. J at ¶ 22.)*"): **OBJECTED, move to strike.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 22 as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about "investment advisors" and their propensity to start their own mutual funds is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his

opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about comparisons among investment advisors is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about the propensity of investment advisors to start their own mutual funds, and comparisons among investment advisors. (FRE 701)

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about the propensity of investment advisors to start their own mutual funds, and comparisons among investment advisors. (FRE 602)

- **FRE 802-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay. (FRE 802)


**THIRD SENTENCE** (*"There are other publicly-known links between investment advisors like Ariel Capital and companies like Ariel that offer mutual funds (among other services). (Id.)"*): **OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 22 as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about the public knows links between companies to be is inadmissible under FRE 702 because he has not

been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about propensity investment advisors to offer mutual funds is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about the public's awareness of investment advisors to offer mutual funds, and comparisons among investment advisors. (FRE 701)

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about the public's awareness of investment advisors to offer mutual funds, and comparisons among investment advisors. (FRE 602)

- **FRE 802-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay about the public's awareness of investment advisors to offer mutual fund, and is submitted as evidence to prove the truth of the matter asserted in the statement. (FRE 802)

- **FRE 901-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that the public was aware of investment advisors offering mutual fund.

**Otherwise, DISPUTED.** ACA disputes this sentence because ACA and Plaintiff are not competitors, and Plaintiff does not consider ACA its competitor. Nor do consumers think they are competitors. Indeed, ██████████████████████████████ (Ex. 9, at 378:11-379:8.) (bold added). Thus, its clients do not consider them competitors. ████████

████████████████████████████

"Q.



**FOURTH SENTENCE** ("*For example, according to an article in Investment News dated June 6, 2015, some registered investment advisors such as HighTower Advisors are paid a percentage of the investors' assets held in certain mutual funds such as Charles Schwab & Co. Inc. and Fidelity Investments. ((Id.)*)"): **OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 22 as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein on the investment company industry is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic in this industry, his testimony in this industry has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 402-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 402 because an unrelated company's compensation structure is not relevant to ACA or any issue in this suit. (FRE402)

- **FRE 802-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay as it is based on an article Mr. Trubey did not write,

and was about an unrelated company's compensation structure. The statement also is submitted as evidence to prove the truth of the matter asserted in the statement. (FRE 802)

- **FRE 901-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that an unrelated company's compensation structure is what it claims to be.

- **FRE 602-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about the unrelated company's compensation structure. (FRE 602)

**Otherwise, DISPUTED.** ACA disputes this sentence to the extent it implies it sells mutual funds or direct its clients to buy mutual funds because it does not direct its clients to buy mutual funds. (Ex. 5, at 25:21-26:14; *see also* Ex. 2 ACA Dep II at 63:14-23.) Upon questioning by Plaintiff, ACA even has explicitly stated that it would not sell mutual funds:

"Q: "**Do you ever advise a client to include mutual funds in their asset allocation?**

A. **Never.**

Q. Okay.· Do you ever advise a client **not to include mutual funds?**

A. **Always**."  (Ex. 2, at 63:14-23 (emphasis added).)

**FIFTH SENTENCE** ("*Because investment advisors often direct their clients' funds to mutual funds and both charge fees to the clients, this kind of relationship tends to blur any line between mutual fund providers and investment advisors that direct clients to invest in mutual funds. (Id.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 22 as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.)  This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).)  ACA also was not afforded the right to depose Plaintiff about this evidence.  Accordingly, it should be stricken.

- **FRE 702**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about what and where "investment advisors often direct their clients' funds" is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 702**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein about what "relationship tends to blur any line between mutual fund providers and investment advisors" is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about "what and where "investment advisors often direct their clients' funds." (FRE 701)

- **FRE 701**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about the public's awareness of investment advisors to offer mutual funds, and comparisons among investment advisors. (FRE 701)

- **FRE 602**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about what and where "investment advisors often direct their clients' funds." (FRE 602)

- **FRE 602**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 602 because Mr. Trubey did not have personal knowledge about what "relationship tends to blur any line between mutual fund providers and investment advisors." (FRE 602)

- **FRE 802**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay about what and where "investment advisors often direct their clients' funds." The statement also is submitted as evidence to prove the truth of the matter asserted in the statement. (FRE 802)

- **FRE 802**- Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay about what "relationship tends to blur any line between mutual fund providers and investment advisors." The statement also is submitted as evidence to prove the truth of the matter asserted in the statement. (FRE 802)

- **FRE 901-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that "investment advisors often direct their clients' funds." (FRE 901)

- **FRE 901-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that the "relationship tends to blur any line between mutual fund providers and investment advisors." (FRE 901)

- **FRE 403-** Exhibit J at ¶ 22 & Mr. Trubey's opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial.

**Otherwise, DISPUTED.** ACA does not sell mutual funds, direct its clients to buy mutual funds, and will not direct its clients to sell off their mutual funds. (Ex. 5, at 25:21-26:14; *see also* Ex. 2 ACA Dep II at 63:14-23.) Upon questioning by Plaintiff, ACA even has explicitly stated that it would not sell mutual funds:

> "Q: "**Do you ever advise a client to include mutual funds in their asset allocation?**
>
> A. **Never.**
>
> Q. Okay.· Do you ever advise a client **not to include mutual funds?**
>
> A. **Always**." (Ex. 2, at 63:14-23 (emphasis added).)

38. Given the overlap in investment services offered by both Ariel and Ariel Capital, and the statements made by Ariel Capital in marketing its services, an individual investor could conclude that Ariel Capital is related to, affiliated with, or sponsored by Ariel. (Ex. J at ¶ 23.)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- **FRE 403 (New Evidence)-** ACA moves to strike Exhibit J at ¶ 23 as it is new evidence that was impermissibly submitted after the discovery deadline ended. (Dkt. 65 (Fact Discovery Ends 5/27/16) *compare to* (Dkt. 115-1, at pg. 88-89 of 103).) "Fact discovery [was] ordered closed by [May 27, 2016]." (Dkt. 65.) This evidence was presented for the first time on October 7, 2016 (Dkt. 115-1, at pg. 89 of 103), and Plaintiff unduly delayed presenting this evidence, has not shown "good cause" for modifying the Order (Dkt. 65), nor did it seek "the judge's consent." (FRE 403; FRCP 16(b)(4).) ACA also was not afforded the right to depose Plaintiff about this evidence. Accordingly, it should be stricken.

- **FRE 702-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein about what an "individual investor could conclude" about affiliation or sponsorship between companies is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 702-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein about what constitutes "overlap [of] services offered" by companies is inadmissible under FRE 702 because he has not been established as an expert by Plaintiff on this topic, his testimony has not been established by Plaintiff as expert testimony, nor is his opinion founded upon (a) his scientific, technical, or other specialized knowledge that would help the trier of fact to understand the evidence or to determine a fact in issue; (b) testimony that is based on sufficient facts or data; (c) testimony that is the product of reliable principles and methods; and, (d) reliably applied the principles and methods to the facts of the case. (FRE 702)

- **FRE 701-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about what an "individual investor could conclude" about affiliation or sponsorship between companies. (FRE 701)

- **FRE 701-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein is inadmissible under FRE 701 because Mr. Trubey improperly speculated about what constitutes "overlap [of] services offered" by companies. (FRE 701)

- **FRE 802-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein is inadmissible under FRE 802 because it is hearsay about what an "individual investor could conclude" about affiliation or sponsorship between companies. The statement also is submitted as evidence to prove the truth of the matter asserted in the statement. (FRE 802)

- **FRE 403-** Exhibit J at ¶ 23 & Mr. Trubey's opinion therein is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial.

**Otherwise, DISPUTED.** Plaintiff are not in the same line of business. Plaintiff only sells mutual funds and "separate accounts," which are mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor. (Ex. 5, at 27:3- 10.) ████████████████████████████ (Ex. 9 Plaintiff 30(b)(6 at 152:22 –

153:5.) ███████████████████████████████ (Ex. 9, at 158:4 –

159:16.)

Whereas on the other hand, ACA does not sell mutual funds. (Ex. 5, at 25:4-26:14; *see also* Ex. 2 ACA Dep II at 63:14-23.) ACA does not sell separate acco████ (Ex. 5, at 27:11-20.)

ACA prepares tax returns for its clients. (Ex. 2 ACA 30(b)(6) Dep. II at 76:4-19, 177:7-18.)

ACA prepares written financial plans for its clients. (Ex. 2, at 177:7 – 180:7.)

Upon questioning by Plaintiff, ACA even has explicitly stated that it would not sell mutual funds:

**"Q: "Do you ever advise a client to include mutual funds in their asset allocation?**

**A. Never.**

**Q. Okay.· Do you ever advise a client not to include mutual funds?**

**A. Always."** (Ex. 2, at 63:14-23.)

ACA also does not provide "separate accounts." It testified:

Q  Are you familiar with the phrase "separate accounts"?

A  I am.

Q  What does that mean to you?

A  I understand separate accounts to be like, basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor.

Q  **And do you create separate accounts for any of your clients?**

A  So help me. I mean, with -- if you're using that nomenclature in which it's used in the investment profession, **I would say no**.

Q  Okay. And I was. Do you -- maybe "create" is the wrong word. **Do you work with any other entities to acquire separate accounts for any of your customers?**

**A  No.** (Ex. 5, at 27:3-20) (bold added).

39.   The ARIEL Marks are strong for all the reasons set forth in paragraphs 4 to 18 of this Statement of Facts.

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- ACA incorporates its objections and disputes from paragraphs 4 to 18 herein.

- SUF No. 39 is also objected to as calling for a legal conclusion.

**Otherwise, DISPUTED.** Plaintiff's marks are not strong because over 150 companies use "Ariel" in their name, including companies in the financial services industry. Ex. 29 Exhibit 25 of Plaintiff 30(b)(6).) Indeed, companies like Ariel Investment Properties, LLC, Ariel Inc., and Ariel Wealth Advisors all use "Ariel" without confusion or protest from Plaintiff. (Ex. 26, Exhibit 17 of Plaintiff 30(b)(6); Ex. 27, Exhibit 18 of Plaintiff 30(b)(6); Ex. 25, Email from Ariel Wealth Advisors AI075262; Ex. 31, Plaintiff's Responses to Defendant's First Set of Requests for Admission at No. 17.) In the financial services industry, a mark is considered weak where other investment services companies with the same name offer investment services. *See Haven Capital v. Havens Advisors*, 965 F. Supp. at 531 (calling plaintiff's mark weak where other investment advisory services used the name of "Haven").

In particular, the financial planning firm Ariel Wealth Advisors has existed for over six years with Plaintiff's knowledge and without any confusion between it and Plaintiff. (Ex. 24 Exhibit 24 of Plaintiff 30(b)(6); Ex. 25 Email from Ariel Wealth Advisors AI075262; Ex. 31 Plaintiff's Responses to Defendant's First Set of Requests for Admission at No. 17.) The existence of this other investment firm therefore narrows the scope of protection Plaintiff is entitled to claim. *Top Tobacco, L.P. v. N. Atl. Operating Co.*, No. 06 C 950, 2007 WL 118527, at *1 (N.D. Ill. Jan. 4, 2007) *aff'd,* 509 F.3d 380 (7th Cir. 2007) (the existence of other marks that incorporate the same term as plaintiff, especially in the same class of goods, demonstrates "that the scope of protection that should be afforded to these marks is *extremely* narrow.") (emphasis in original). Furthermore, "Ariel Investment Properties," an unrelated company, has existed since 2007 without any attempt by Plaintiff to stop it. (Ex. 26 Exhibit 17 of Plaintiff

30(b)(6).) Indeed, there are over fifty-five companies who use "Ariel" in their name. (Ex. 28

Exhibit 22 of Plaintiff 30(b)(6).) Because over a hundred companies share this name, including

those in the financial services industry, this is not a strong mark.

Second, Plaintiff does not have brand recognition for its "Ariel" mark among consumers.

*See Haven Capital v. Havens Advisors*, 965 F. Supp. 528, 531 (S.D.N.Y. 1997) (finding a weak

mark where customers associated the plaintiff with its low cost and style of investment rather its

name). Indeed, ████████████████████████████████████████████████████

████████████████ (Ex. 18, at AI005356.) Other Plaintiff ████████████████████████████

████████████████████████████████████████." (Ex. 9, at 267:13-21,

Ex. 17, at AI017880.) Plaintiff ██████████████████████████████████████████████████

████████ (Ex. 9, at 267:13-21) Accordingly, consumers are not associating Plaintiff's

products with "Ariel" or "Ariel Investments," but with its turtle and slow-and-steady mantra.


40.    There have been several instances of actual confusion.

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- SUF No. 40 is objected to as calling for a legal conclusion.

**Otherwise, DISPUTED.** There have been no instances of actual confusion of

relevant consumers pursuant to the Lanham Act, nor has Plaintiff presented any admissible

or relevant evidence of actual confusion.


41.    In April 2015, Justin Land, a member of the Chartered Financial Analysts
("CFA") of Naples, Florida, during a CFA meeting, asked Chris Squitteri, an employee of Ariel
Capital, "if Ariel Capital Advisors had any affiliation with Ariel Investments." (Ex. Q at 46:20-
24; 47:15-17; 48:1-20; Ex. S at p. 3.)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- **FRE 802-** Each statement in Plaintiff's SUF No. 41 is inadmissible under FRE 802 because it is hearsay about a third-party statement, to another party who did not testify to this statement. It is also presented to prove the truth of the matter asserted. (FRE 802)

- **FRE 602-** Each statement in Plaintiff's SUF No. 41 is inadmissible under FRE 602 because Mr. Bray did not have personal knowledge about the conversation. (FRE 602)

- **FRE 402-** Each statement in Plaintiff's SUF No. 41 is inadmissible under FRE 402 because Mr. Land was not a relevant consumer under the Lanham Act, so this does not make any fact at issue in this matter any more or less likely**.** (FRE 402; *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-** Each statement in Plaintiff's SUF No. 41 is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that Mr. Land was a relevant consumer. (FRE 901)

- **FRE 403-** Plaintiff's SUF No. 41 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial.

**Otherwise, DISPUTED.** Mr. Land was not a relevant or "confused" consumer.

Land allegedly asked "if ACA had any affiliation with Plaintiff" at a conference. (Ex. 2, at 48:7-8.) Even if true, Land's inquiry did not relate to *seeking* a company to invest his assets with, but was merely socializing at a conference. Thus he was not a relevant consumer for purposes of the "actual confusion" factor because he was not making a purchasing decision. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) ("persons were not relevant consumers absent evidence that they attempted to purchase [the] good").

Furthermore, Justin Land *thought* to inquire whether there was a relationship between

Plaintiff and ACA, not that he *assumed* they were related.  This distinction is key because trademark law only protects against certain species of confusion.  *See Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (trademark infringement protects only against mistaken purchasing decisions and not against confusion generally).

42.     On February 5, 2016, Ariel Capital employee Marcie Rebardo received a telephone call at Ariel Capital's offices from an unknown male caller dialing from telephone number 908-400-8730, asking to speak with Cheryl Hagen and asking, "Isn't this Ariel Investments?"  (Ex. Q at 51:1-20; Ex. S at pp. 3-4.)  Ms. Rebardo responded, "No.  We are Ariel Capital Advisors."  The caller replied, "Oh sorry" or laughed and hung up.  (Ex. V at 15:17-25; 16:1.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 802-**  Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 802 because it is hearsay as this references a third-party statement.  It is also presented to prove the truth of the matter asserted.  (FRE 802)

- **FRE 402-**  Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 402 because the caller was not a relevant consumer under the Lanham Act, so this does not make any fact at issue in this matter any more or less likely.  (FRE 402; *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-**  Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that the caller was a relevant consumer.  (FRE 901)

- **FRE 403-**  Plaintiff's SUF No. 42 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial.

43.     The telephone number 908-400-8730 is a cellular telephone number, which belongs to Mr. David Boone.  (Deposition of David Boone, attached as Exhibit Z, at 20:12-20.)  Mr. Boone is the sole owner of TechSmart Trader, a digital publication that covers the financial trading industry.  (Ex. Z at 14:19-24; 15:3-6, 22-25.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 43 is inadmissible under FRE 402 because Mr. Boone was not a relevant consumer under the Lanham Act, so this does not make any fact at issue in this matter any more or less likely.  (FRE 402; (Ex. 22 Boone Dep. at 51:7-22); *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-** Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that Mr. Boone was a relevant consumer.  (FRE 901)

- **FRE 403-** Plaintiff's SUF No. 42 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial. Mr. Boone does not remember making the call, so any testimony about this matter is unreliable.  (Ex. 22 Boone Dep. at 25:5-20, 27:5-7)

44.     On February 5, 2016, Mr. Boone was attempting to contact Cheryl Cargie, not Cheryl Hagen, an employee of Ariel.  (Ex. Z at 22:11-15; 23:24-25; 24:1-3.)  The purpose of Mr. Boone's call was twofold: to contact Ms. Cargie about an article to be published in TechSmart Trader and to see if Ariel would like to advertise in TechSmart Trader.  (Ex. Z at 24:4-14.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 43 is inadmissible under FRE 402 because Mr. Boone was not a relevant consumer under the Lanham Act, so this does not make any fact at issue in this matter any more or less likely.  (FRE 402; (Ex. 22 Boone Dep. 51:7-22); *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-** Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that Mr. Boone was a relevant consumer.  (FRE 901)

- **FRE 403-** Plaintiff's SUF No. 42 is inadmissible under **FRE 403** because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial. Mr. Boone does not remember making the call, so any

testimony about this matter is unreliable.  (Ex. 22 Boone Dep. 25:5-20, 27:5-7.)

**Otherwise, DISPUTED.**  David Boone testified that he did not remember his call with ACA. (Ex. 22 Boone Dep. at 25:5-20, 27:5-7)  Plaintiff's counsel called Mr. Boone five times before the deposition to discuss "the call," yet he could still only speculate. (Ex. 22 Boone Dep. at 52:23 – 62:9.)  Specifically, Mr. Boone testified that:

> "Q. "Do you remember making this February 5, 2016 phone call to Ariel Capital Advisors?
>
> A. Not until you brought it to my attention.
>
> Q. Okay.· Well, let me ask you this:· Do you -- now that we've discussed it, do you remember the phone call at all?
>
> A. **No, I still don't remember the call**·per se, because I make so many calls to companies and they may say, they're not here.· I might just·hang up the phone and keep -- and go on, just move·on from there.
>
> So if it was a brief call, didn't have·much of a conversation, didn't go any further than·that, no, I wouldn't have -- I don't remember making·that call."  (Ex. 22 Boone Dep. at 25:5-20.)
>
> **. . .**
>
> "Q. **Are there any other details about the telephone call on February 5, 2016 that you recall**?
>
> A. **No, no, not -- no, not at all**, **really**."  (Ex. 22 Boone Dep. at 27:5-7) (bold added).

Mr. Boone further testified that he was calling on behalf of his company, TechSmart Trader, and was not shopping for investment or financial services for his company, nor that it had any intentions of buying those services any time soon, thus it is not a relevant consumer. (Ex. 22 Boone Dep. at 51:7-22).  Specifically, Mr. Boone testified that:

> Q. "….**TechSmart Trader doesn't invest any money right now, does it?**
>
> A. **No**.
>
> Q. **Does it have any plans, in the next year, to invest any money?**
>
> A. **No**.
>
> Q. **Does TechSmart Trader, in the foreseeable future, have any plans to invest any**

**money**?

A. Say your question again, because I kind of lost you.

Q. **Does TechSmart Trader, LLC have any plans in the given future to invest any money?**

A. **No.**" (Ex. 22 Boone Dep. pg. 51:7-22) (bold added)

Because neither Mr. Boone nor his company TechSmart Trader were trying to purchase products or services from ACA or Plaintiff, they were not a relevant consumer under the Lanham Act, so his confusion – even if present – was irrelevant. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers); *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (trademark infringement protects only against mistaken purchasing decisions and not against confusion generally). Rather, Mr. Boone stated that he had never heard of Ariel Investments. (Ex. 22, Boone Dep at 67:12 – 68:13.) He further stated that he was actually just trying solicit advertisements for his magazine, not buy a product. (Id. at 51:1-6.)

In his call to ACA, Boone was purportedly attempting to contact an Plaintiff employee who he had only spoken to two or three times in the last ten years. (Ex. 22, at 36:19-25, 37:1 – 38:25.) Furthermore, Boone stated that he had never heard of Ariel Investments. (Ex. 22, at 67:12 – 68:13.)

45. Mr. Boone has known Ms. Cargie for approximately ten years. (Ex. Z at 24:21-25.) Mr. Boone is aware that Ms. Cargie works at Ariel in Chicago, Illinois. (Ex. Z at 23:14-17, 24-25; 24:1-3.)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 43 is inadmissible under FRE 402 because Mr. Boone was not a relevant consumer under the Lanham Act, so this does not make any fact at issue in this matter any more or less likely. (FRE 402; (Ex. _ Boone Dep. at 51:7-22); *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-** Each statement in Plaintiff's SUF No. 42 is inadmissible under FRE 901 because lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that Mr. Boone was a relevant consumer. (FRE 901)

- **FRE 403-** Plaintiff's SUF No. 42 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial.

**Otherwise, DISPUTED.** Mr. Boone testified that he was calling on behalf of his company, TechSmart Trader, and was not shopping for investment or financial services for his company, nor that it had any intentions of buying those services any time soon, thus it is not a relevant consumer. (Ex. 22 Boone Dep. at 51:7-22.) Specifically, Mr. Boone testified that:

Q. "….TechSmart Trader doesn't invest any money right now, does it?

A. **No**.

Q. Does it have any plans, in the next year, to invest any money?

A. **No**.

Q. Does TechSmart Trader, in the foreseeable future, have any plans to invest any money?

A. Say your question again, because I·kind of lost you.

Q. Does TechSmart Trader, LLC have any·plans in the given future to invest any money?

A. **No.**" (Ex. 22 Boone Dep. at 51:7-22) (bold added).

Because neither Mr. Boone nor his company TechSmart Trader were trying to

purchase products or services from ACA or Plaintiff, they were not a relevant consumer

under the Lanham Act, so his confusion – even if present – was irrelevant.  *See Packman v.*

*Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of

actual confusion irrelevant where confused callers were not trying to purchase her goods);

*see Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's

evidence of confusion was insufficient because the confusion did not occur among the

*relevant* group of consumers); *Lang v. Retirement Living Pub. Co., Inc*., 949 F.2d 576, 583

(2d Cir. 1991) (trademark infringement protects only against mistaken purchasing decisions

and not against confusion generally).  Rather, he stated that he was actually just trying solicit

advertisements for his magazine, not buy a product.  (Ex. 22 Boone Dep. at 51:1-6.)

     In his call to ACA, Boone was purportedly attempting to contact an Plaintiff

employee who he had only spoken to two or three times in the last ten years. (Ex. 22 Boone

at 36:14 - 38:23.  Furthermore, Mr. Boone stated that he had never heard of Ariel

Investments.  (*Id*. at 67:12 – 68:13.)

     46.    On February 5, 2016, Mr. Boone believes he attempted to contact Ms. Cargie by
performing an internet search using the Google search engine.  (Ex. Z at 25:22-25; 26:1-9.)
Based on the search results Mr. Boone received, he mistakenly called Ariel Capital and spoke
with Ms. Rebardo when he meant to contact Ms. Cargie at Ariel.  (Ex. Q at 51:1-20; Ex. S at pp.
3-4.)

     **RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** each statement in Plaintiff's SUF No. 46 is irrelevant to any issue in
  this case.  This SUF is irrelevant because David Boone was not a relevant
  consumer under the Lanham Act as neither he nor his company were trying to
  purchase either companies' goods or services. (Ex. 22 Boone Dep. at 51:7-22);
  *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding
  plaintiff's evidence of actual confusion irrelevant where confused callers were not
  trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*,

192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 403**- the probative value is outweighed by the danger it would confuse the issues and be highly prejudicial.  Mr. Boone testified that he does not remember the call, so any testimony about this matter is unreliable.  (Ex. 22 Boone Dep. at 25,:5-20, 27:5-7)

- **FRE 602**- Each statement in Plaintiff's SUF No. 46 is inadmissible under FRE 602 because it calls for speculation as Mr. Boone testified that he does not remember the call, so any testimony about this matter is unreliable.   (FRE 901)


**Otherwise DISPUTED.**  Mr. Boone's testimony is taken out of context.  Mr. Boone testified that he did not remember his call with ACA.  (Ex. 22 Boone Dep. at 25:5-20,  27:5-7.)  Plaintiff's counsel called Mr. Boone five times before the deposition to discuss "the call," yet he could still only speculate. (Ex. 22 Boone Dep. at 52:23 – 62:9.)  Specifically, Mr. Boone testified that:

> "Q. **Do you remember making this February 5, 2016 phone call to Ariel Capital Advisors**?
>
> A. Not until you brought it to my attention.
>
> Q. Okay.· Well, let me ask you this:· Do you -- now that we've discussed it, do you remember the phone call at all?
>
> A. **No, I still don't remember the call** per se, because I make so many calls to companies and they may say, they're not here.  I might just hang up the phone and keep -- and go on, just move on from there.
>
> So if it was a brief call, didn't have much of a conversation, didn't go any further than that, no, I wouldn't have -- **I don't remember making that call**.
> **…**
> Q. **Are there any other details about the telephone call on February 5, 2016 that you recall**?
>
> A. **No, no, not -- no, not at all**, **really**."  (Ex. 22 Boone Dep. at 25:5-20, 27:5-7) (bold added).

Mr. Boone further testified that he was calling on behalf of his company, TechSmart Trader, and was not shopping for investment or financial services for his company, nor that it

had any intentions of buying those services any time soon, thus it is not a relevant consumer.

(Ex. 22 Boone Dep. at 51:7-22.)  Specifically, Mr. Boone testified that:

> Q. "….TechSmart Trader doesn't invest any money right now, does it?
>
> A. **No**.
>
> Q. Does it have any plans, in the next year, to invest any money?
>
> A. **No**.
>
> Q. Does TechSmart Trader, in the foreseeable future, have any plans to invest any money?
>
> A. Say your question again, because I·kind of lost you.
>
> Q. Does TechSmart Trader, LLC have any·plans in the given future to invest any money?
>
> A. **No**."  (Ex. 22 Boone Dep. at 51:7-22) (bold added).

Because neither Mr. Boone nor his company TechSmart Trader were trying to purchase products or services from Plaintiff or ACA, they were not a relevant consumer under the Lanham Act, so his confusion – even if present – was irrelevant.  *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers); *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (trademark infringement protects only against mistaken purchasing decisions and not against confusion generally).  Indeed, if anything, Mr. Boone said he was actually just trying solicit advertisements for his magazine, not buy Plaintiff's or ACA's services. (Ex. 22 Boone Dep. at 51:1-6.)  Furthermore, Mr. Boone stated that he had never heard of Ariel Investments.  (*Id*. at 67:12 – 68:13.)

47.     Although Mr. Boone has been familiar with Ariel for approximately ten years, prior to this litigation he was not familiar with Ariel Capital.  (Ex. Z at 21:1-23.)  When asked if he knew the difference between Ariel and Ariel Capital, Mr. Boone testified that "I would think they would both be the same."  (Ex. Z at 21:17-18.)  Indeed, during his deposition Mr. Boone confused Ariel and Ariel Capital, initially believing that Ariel Capital was the name of the financial services firm in Chicago with which he was familiar.  (Ex. Z at 21:1-9.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** each statement in Plaintiff's SUF No. 46 is irrelevant to any issue in this case.  This SUF is irrelevant because David Boone was not a relevant consumer under the Lanham Act as neither he nor his company were trying to purchase either companies' goods or services. (Ex. 22 Boone Dep.at 51:7-22); *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 602-** Each statement in Plaintiff's SUF No. 46 is inadmissible under FRE 602 because it calls for speculation as Mr. Boone testified that he does not remember the call, so any testimony about this matter is unreliable.   (FRE 901)

- **FRE 403-** the probative value is outweighed by the danger it would confuse the issues and be highly prejudicial.  Mr. Boone testified that he does not remember the call, so any testimony about this matter is unreliable.  (Ex. 22 Boone Dep. at 25:5-20, 27:5-7.)

**Otherwise, DISPUTED.**  Mr. Boone's testimony is taken out of context.  Mr. Boone

testified that he did not remember his call with ACA. (Ex. 22 Boone Dep. at 25:5-20, 27:5-

7.)  Plaintiff's counsel called Mr. Boone five times before the deposition to discuss "the

call," yet he could still only speculate. (Ex. 22 Boone Dep at 67:12 – 68:13.)  Specifically,

Mr. Boone testified that:

"Q.**Do you remember making this February 5, 2016 phone call to Ariel Capital Advisors**?

A.  Not until you brought it to my attention.

Q. Okay.· Well, let me ask you this:· Do you -- now that we've discussed it, do you remember the phone call at all?

A. **No, I still don't remember the call** per se, because I make so many calls to companies and they may say, they're not here.  I might just hang up the phone and keep -- and go on, just move on from there.

So if it was a brief call, didn't have much of a conversation, didn't go any further than that, no, I wouldn't have -- **I don't remember making that call**.

…

Q. **Are there any other details about the telephone call on February 5, 2016 that you recall**?

A. **No, no, not -- no, not at all**, *really*.”  (Ex. 22 Boone Dep. at 25:5-20, 27:5-7) (bold added).

Mr. Boone further testified that he was calling on behalf of his company, TechSmart Trader, and was not shopping for investment or financial services for his company, nor that it had any intentions of buying those services any time soon, thus it is not a relevant consumer. (Ex. 22 Boone Dep. at 51:7-22.)  Specifically, Mr. Boone testified that:

Q. “….TechSmart Trader doesn't invest any money right now, does it?

A. **No**.

Q. Does it have any plans, in the next year, to invest any money?

A. **No**.

…

Q. Does TechSmart Trader, LLC have any·plans in the given future to invest any money?

A. **No.**” (Ex. 22 Boone Dep. at 51:7-22) (bold added)

Because neither Mr. Boone nor his company TechSmart Trader were trying to purchase products or services from Plaintiff or ACA, they were not a relevant consumer under the Lanham Act.  So his confusion – even if present – was irrelevant.  *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the confusion did not occur among the

*relevant* group of consumers); *Lang v. Retirement Living Pub. Co., Inc*., 949 F.2d 576, 583

(2d Cir. 1991) (trademark infringement protects only against mistaken purchasing decisions

and not against confusion generally). Indeed, if anything, Mr. Boone said he was actually

just trying solicit advertisements for his magazine, not buy Plaintiff's or ACA's services.

(Ex. 22 Boone Dep. at 51:1-6.)

Furthermore, Mr. Boone stated that he had never heard of Ariel Investments. (Ex. 22

Boone Dep at 67:12 – 68:13.)


48. Ms. Monica Schandel is the owner of Blue Oceans Financial Planning, LLC, ("Blue Oceans") which provides income tax preparation, tax planning services, and financial planning services. (Deposition of Monica Schandel, attached as Exhibit AA, at 21:9-25.) Prior to founding Blue Oceans, Ms. Schandel worked in a variety of accounting and financial services firms. (Ex. AA at 18:11-22.) Those firms include Deloitte & Touche, where Ms. Schandel first met Mr. Christopher Bray in 1990. (Ex. AA at 35:9-11.)

**RESPONSE. OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 48 is irrelevant to any issue in this case. (FRE 402.)


49. Ms. Schandel is a client of Ariel Capital. (Ex. AA at 33:4-7.) Ariel Capital performs investment management services for Ms. Schandel. (Ex. AA at 33:8-12; Ex. Q at 85:12-14.)

**RESPONSE: OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 49 is irrelevant to any issue in this case. (FRE 402.)


50. Blue Oceans also has a long-term business relationship with Mr. Bray and Ariel Capital wherein the two firms share a client. (Ex. AA at 34:8-17, 40:9-18.)

**RESPONSE: OBJECTED, move to strike.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 50 is irrelevant to any issue in

this case.  (FRE 402.)

51.     Exhibit BB is a true and correct copy of an email from Ms. Schandel to Arthur Gollwitzer, counsel for Ariel.  (Ex. AA at 26:4-25; Deposition Exhibit 2 to Deposition of Monica Schandel, attached as Exhibit BB.)  On May 26, 2016, Ms. Schandel, on behalf of Blue Oceans, wrote an email to counsel for Ariel in which she confused the names of Ariel and Ariel Capital. (Ex. BB.)  Moreover, during her deposition on June 6, 2016, Ms. Schandel confused Ariel and Ariel Capital multiple times.  (Ex. AA at 28:4-6; 29:1-8.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** Each statement in Plaintiff's SUF No. 48 is irrelevant to any issue in this case.  (FRE 402.)  It is further irrelevant because Ms. Schandel was not a confused consumer because she was not trying to purchase either Plaintiff's products or ACA's services, but was responding to a subpoena.

- **FRE 403**, the probative value is outweighed by the danger it would confuse the issues and be highly prejudicial.  Ms. Schandel's testimony is taken out of context, and she explicitly testified that she was not confused between the two companies.  (Ex. 23 Monica Schandel Dep. at 30:7 – 31:14, 32:17-20.)

**Otherwise, DISPUTED.**  Ms. Schandel's testimony was taken out of context.  She stated that she simply misspoke, but corrected her misstatement.  For instance, she stated:

Q. Okay, could you tell me about the nature of your business relationship with Ariel Investments.

A. Okay, you keep using the term Ariel Investments and I know this -- I'm sorry.· I know this is a suit about names and I'm a little confused about it because I guess maybe I've used it in the wrong capacity, so Ariel Capital Advisors is the company that I have a relationship with specifically as with Christopher Bray, Chris Squittieri who are the team that I work with my one common client and our relationship is simply that we do a joint product where they manage the money and I do the financial planning for the client.

Q. Miss Schandel, I appreciate the answer.· You mentioned a few different things.· Let me just back up for a second. With regard to the nature of the suit and the suit about names, let me direct you back to Exhibit Two.  In the second paragraph where you said, "I have one joint client with Ariel Investments that was a client prior to dissolution of the old partnership and the formation of this new LLC," are you now telling me that you meant to say Ariel Capital Advisors?

A. Yes, I am, sir.· I am. **I guess I did that incorrectly and I should have said Ariel**

**Capital Advisors**.

Q. Okay, that's fine.  Let me ask you this:· Why did you write Ariel Investments in your E-mail to Mr. Gollwitzer in Exhibit Two?

A. **I was trying to write in regards to the E-mail Ariel Capital Advisors.· Apparently my brain just didn't say that.· I was probably recently looking at this deposition and I probably just typed the first thing that was on the line which is Ariel Investments** who's the Plaintiff in this case.

Q. I understand.  Do you -- Well, let me ask you this:· Would·you then characterize putting Ariel Investments instead of Ariel Capital Advisors in as a mistake?

A. That is absolutely a mistake, yes.

Q. Okay, do you think it's possible that you made the mistake because the names are similar?

A. I actually honestly to be honest –

MR. WOLEK:· Objection, form.

THE WITNESS:· -- with you, sir, **I don't know who Ariel Investments is.· I understand you're a mutual fund company.· I probably just wrote it incorrectly.**

BY MR. WATTERS:

Q.· ·Okay, I was only able to hear part of your answer because Attorney Wolek was objecting, and that's just the reality of doing this via phone. ·Let me ask the question again and if you don't mind you can pause for a second, Attorney Wolek can make an objection and then I can hopefully hear your answer more completely.  Do you believe that you made the mistake of saying Ariel Investments and you meant Ariel Capital Advisors in part or in whole because the names are similar?

MR. WOLEK:· Objection, calls for a legal conclusion, objection, form.

THE WITNESS:· I'm sorry.· Do you still want me to answer that question even though they're objecting to it?

BY MR. WATTERS:

Q. Yes.  I'm sorry, and I should have provided you some instruction on that and from time to time Mr. Wolek may object to a question I ask and then when he's asking questions I may object as well.  After the objection you can go ahead and answer the question.  Would you like us to repeat everything or do you still remember the question?

A. No.· I remember the question. ·**I believe that I -- I know that I made a mistake.· I believe it's because I was looking at this deposition and I looked at the first thing on it which said Ariel Investments.** (Ex. 23 Monica Schandel Dep. at 29:16-32:20) (bold added).


Ms. Schandel was also not a confused consumer because she was not trying to

purchase either Plaintiff's products or ACA's services, but was responding to a subpoena.

52.　　In or about March 2015, Phyllis Brady, who handles human relations for Ariel, received a telephone call from someone checking references for a job candidate the caller was considering hiring. (Plaintiff's Answers to Defendant's First Set of Interrogatories attached as Exhibit CC at p. 5.) The caller stated that someone at Ariel Capital told her that Ariel and Ariel Capital were related companies. (Ex. CC at p. 5.)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- **FRE 802-** Each statement in Plaintiff's SUF No. 52 is inadmissible under FRE 802 because it is hearsay about a third-party statement, to another party who did not testify to this statement, which presented to prove the truth of the matter asserted. (FRE 802)

- **FRE 602-** Each statement in Plaintiff's SUF No. 52 is inadmissible under FRE 602 because Ms. Melody Hobson, who signed the interrogatory response, did not have personal knowledge about the conversation. (FRE 602)

- **FRE 402-** Each statement in Plaintiff's SUF No. 52 is inadmissible under FRE 402 because the caller was not a relevant consumer under the Lanham Act as they were not trying to purchase the product or make a purchasing decision about the product, so this does not make any fact at issue in this matter any more or less likely. (FRE 402; *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-** Each statement in Plaintiff's SUF No. 52 is inadmissible under FRE 901 because it lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that the caller was a relevant consumer. (FRE 901)

- **FRE 403-** Plaintiff's SUF No. 52 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial.

**Otherwise, DISPUTED.** ████████████████████████████

████████████████████████████████████████████████████

████████ (Ex. 9, at 250:24 - 251:20, 252:2-9, 252:13-18; Ex. 12 Plaintiff's Answers to

Defendant's First Set of Interrogatories at No. 4.)

53.     In or about March, 2015, Ariel's General Counsel, Mareilé Cusack, received a telephone call from a woman in Naples, Florida, inquiring about real estate located in Naples. (Ex. CC at p. 5.)  The woman stated that the real estate was listed under the name "Ariel" and that when she performed a Google search to contact the company listed on the real estate, she could only find Ariel.  (Ex. D at ¶ 8; Ex. CC at pp. 5-6.)  Ms. Cusack assured the caller that Ariel did not own or lease the property located in Naples, Florida.  (Ex. D at ¶ 8.)  The woman then stated she must have been mistaken and hung up.  (*Id.*)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 802-**  Each statement in Plaintiff's SUF No. 53 is inadmissible under FRE 802 because it is hearsay about a third-party statement, which presented to prove the truth of the matter asserted.  (FRE 802)

- **FRE 402-**  Each statement in Plaintiff's SUF No. 53 is inadmissible under FRE 402 because the caller was not a relevant consumer under the Lanham Act as they were not trying to purchase the product or make a purchasing decision about the product, so this does not make any fact at issue in this matter any more or less likely.  (FRE 402; *see Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused callers were not trying to purchase her goods); *see e.g. Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (plaintiff's evidence of confusion was insufficient because the confusion did not occur among the *relevant* group of consumers)

- **FRE 901-**  Each statement in Plaintiff's SUF No. 53 is inadmissible under FRE 901 because it lacks foundation because Plaintiff did not produce evidence sufficient to support a finding that the caller was a relevant consumer.  (FRE 901)

- **FRE 403-**  Plaintiff's SUF No. 53 is inadmissible under FRE 403 because its probative value is outweighed by danger it would confuse the issues and be highly prejudicial.  The caller's identification was not known.  The caller's intent was not known.  Nor was the background known.

**Otherwise, DISPUTED.** ████████████████████████████

███████████████████████████.  (Ex. 9, at 183:12-22, 184:9-21, 187:18-21; Ex. 12

Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 4).  It is therefore very

unlikely that this call was meant for either party because neither party sells real estate.  *See Nora*

*Beverages, Inc. v. Perrior Grp. of Am.*, 269 F.3d 114, 124 (2d Cir. 2001) (holding evidence of actual confusion must be due to confusion between the asserted mark and defendant's mark).

Moreover, ████████████████████████████████████████

███████████████████████████████████████████ ████████████████████████████████

██████ (Ex. 9, at 184:9-21.) Plaintiff's account of "actual" confusion, by this caller, is therefore doubly unreliable because the caller is not only unidentified, but was not actually confused as to a relationship between Plaintiff and ACA. Rather, the caller was confused about Plaintiff's relationship with a *third party*, ███████████████████ and accordingly is hearsay and unreliable.

54.     Finally, Mr. Bray does not know if Ariel Capital employees checked their e-mail accounts or other files to see if they ever received any other contacts that were intended for Ariel. (Ex. Q at 52:22-25.) Indeed, Mr. Bray did not ask his employees to search their paper files for documents relevant to this case. (Ex. Q at 106:16-18.) In fact, Mr. Bray did not ask Ariel Capital employee Marcie Rebardo to search her emails or paper documents for relevant documents, including but not limited to the email in which she reported the February 5, 2016, caller who mistakenly called Ariel Capital seeking Cheryl Hagen/Cargie of Ariel. (Ex. V at 16:17-25; 17:1-15.) Likewise, Mr. Bray did not ask Ariel Capital employee Kimberly Wilmore to search her computer for documents or look for paper documents relating to this case. (Ex. X at 34:1-12.) Mr. Bray also does not recall instructing his employees not to destroy documents relevant to this case. (Ex. Q at 195:21-25.)

**RESPONSE:  DISPUTED.**

Mr. Bray's testimony is taken out of context. Mr. Bray reviewed every relevant document in ACA's possession, custody or control that were relevant to any inquiry by Plaintiff, including all documents that were accessible by any employees. (Ex. 2 ACA Dep II at 195:21-196:20.) In short, Mr. Bray had all documents accessible to him, that cannot be destroyed, and reviewed all of the documents. (Ex. 2 ACA Dep II at 195:21-196:20.)

Q.  "…Have you communicated to employees in any way, whether through conversation, E-mail or phone calls, about not destroying documents that may

relate to subject matters in this litigation?

A. Not that I can recall, because of the fact that **since all of our documents in the firm are stored electronically, they can't be erased, they can't be destroyed**.

Q. Would it be fair to say that you would've been able to review any documents if you so chose, that your clients -- or your employees would have had access to?

MR. GOLLWITZER:· Object to the form of the question.

THE WITNESS:· Yes.

BY MR. WOLEK:

Q  So would it be fair to say that you had access to all the documents that ACA has?

A. Absolutely.

MR. GOLLWITZER:· Object to the form of the question.

BY MR. WOLEK:

Q. Do you have any reason to believe that your employees would've had access to documents that you wouldn't have been able to view?

A.      No**.**  (Ex. 2 ACA Dep II at 195:21-196:20) (bold added).


Mr. Bray further testified that <u>all of the documents created</u> by ACA are stored on a

cloud storage system, and that he searched them.  (Ex. 2 ACA Dep II at 103:22-104:11.)

Specifically, he stated:

Q. Okay.· **Do you have the ability to search your employees' E-mails?**

**A. I do.**

**Q. Okay.· Did you?**

**A. I did**.

Q. Okay.· And did you find anything?

A. I did not.

Q. Okay.· Did you look in -- beyond E-mails?· Did·you look for electronic documents stored on hard drives or network servers?

A. Any electronic document that is generated by the firm is held in a cloud storage platform, and I did do a search –

Q. Okay.

A. -- in that capacity.  (Ex. 2 ACA Dep II at 103:22-104:11) (bold added)

55.     Ariel Capital intended to use the ARIEL Marks as described below.

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- Plaintiff's SUF No. 55 is argumentative, and calls for a legal conclusion.

- **FRE 602-** Plaintiff's SUF No. 55 is inadmissible under FRE 602 because it calls for speculation about ACA's state of mind.   (FRE 901)

**Otherwise, DISPUTED.**  Mr. Bray testified he did not intend to use the "ARIEL"

marks, as Plaintiff had defined them.  (Ex. 2, at 151:19 – 152:8.)  Furthermore, Mr. Bray

intent in choosing the name "Ariel Capital Advisors, LLC" was based on his daughter, Ariel

Bray, and the ministries his family belongs to, Ariel Ministries.  (Ex. 5 ACA Dep. I at 72:21-

75:9.)

## V.     Ariel Capital's Intent

56.     Exhibit DD is a true and correct copy of Mr. Bray's LinkedIn page as of the time
he was deposed in July 2015.  (Ex. R. at 77:12-24.)  Mr. Bray's biography shown on Exhibit DD
provides that Mr. Bray has worked in the financial services business since at least 1991.  (Ex. R
at 77:12-24; Deposition Exhibit P-12 to Deposition of Christopher P. Bray, July 22, 2015,
attached as Exhibit DD.)

**RESPONSE:  UNDISPUTED.**

57.     Mr. Bray first became aware of Ariel's founder, John Rogers, before Mr. Bray
founded Ariel Capital by watching a television interview of Mr. Rogers.  (Ex. R at 68:19-23;
69:7-10.)

**RESPONSE:  DISPUTED**, to the extent that SUF No. 57 implies that Mr. Bray was

aware of Plaintiff, or that John Rogers was Plaintiff's founder or affiliated with Plaintiff in

any way.  Rather, Mr. Bray stated:

Q. Okay. How did you first become aware of John Rogers?

A. I'm not positive. It may have been through a television interview.

Q. Okay. When did you first become of [sic] Ariel Investments? I don't know if I said that clearly. When did you first become aware of Ariel Investments?

A. When I received a letter from       Ariel Investment's counsel last summer.

Q. So you did not -- **when you first became aware of John Rogers some time ago, you didn't know he was with Ariel Investments**?

A. **I did not know that**.

Q. **You did not know that was his company?**

A.       **I did not know that John Rogers was the CEO of Ariel Investments.** (Ex.

5, at 69:7-23.)


58.    Mr. Bray attended conferences at which Ariel had large exhibits bearing its mark. (Ex. R at 47:12-13; Ex. K ¶ 11.)

**RESPONSE: DISPUTED.**

Mr. Bray disputes SUF No. 58 to the extent it implies he saw Plaintiff's mark or

exhibit. Mr. Bray was unaware of Plaintiff or its advertising prior to this suit. (Ex. 5, at

69:11-23.)


59.    Mr. Bray regularly reads a periodical called *Investment Advisor*, and Ariel regularly advertises in *Investment Advisor.* (Ex. R at 41:20-23; Ex. K at ¶¶ 6-9; *see also* ¶¶ 12-13, above (describing Ariel's prominent presence in *Investment Advisor*.))

**RESPONSE:  OBEJECTED, move to strike; DISPUTED.**

- ACA objects to the term "regularly" as it is subjective and is vague, ambiguous and subject to different interpretations or requires subjective knowledge by any party other than Defendant because it does not define how often Mr. Bray "regularly" reads Investment Advisor, or how often Plaintiff "regularly" advertises" in that periodical.

- **FRE 901 & 402-** SUF No. 59 lacks foundation and is irrelevant under FRE 901 and 402 because **Plaintiff has not established that Mr. Bray seen or read any issues of the periodical editions that it purports to have advertised in. (FRE 901 & 402.)**

**Otherwise, DISPUTED.**  Mr. Bray also disputes SUF No. 59 to the extent it implies

he saw Plaintiff's mark or advertising, whereas he said he was unaware of Plaintiff or its

advertising prior to this suit.  (Ex. 5, at 69:11-23.)


60.    Exhibit FF is a true and correct copy several promotional emails sent from Ariel
to Christopher Bray on July 13, 2010.  (Ex. R at 67:3-6; Declaration of Roger Schmitt attached
as Exhibit EE, ¶¶ 3-9; Exhibits RS1-RS2 of Declaration of Roger Schmitt attached as Exhibit
FF.)

**RESPONSE:  OBEJECTED, move to strike; DISPUTED.**


- SUF No. 60 lacks foundation under FRE 901 because Plaintiff has not established
  that Mr. Bray seen or read any issues of the emails it purports to have sent, or that
  there is any indication that he opened more than one such email. (FRE 901.)

**Otherwise, DISPUTED.**  ACA disputes SUF No. 66 because Mr. Bray has no

recollection of receiving the emails or actually seeing the emails.  (Ex. 5 ACA 30(b)(6) I at

65:20-66:14.)  Rather, Mr. Bray stated:

Q  "Mr. Bray, the court reporter has handed you a document marked for
identification as P-8.  First of all, does that refresh your recollection -- no, that's
not the right one for that.  **Do you recall receiving this e-mail?**

**A  No**.

Q  Okay. Any reason to believe you didn't?

A  I have no idea.

Q  I mean, if I told you Ariel had a record of you opening this e-mail, would that
surprise you?

A  I mean, if you have some kind of record, I -- you know, I just have no basis to
even know **-- we get a zillion e-mails from a zillion different firms. And it
may have been opening in terms of deleting**.

MR. GOLLWITZER: Let's mark the next one.

THE WITNESS: So, just to elaborate, if we **-- a lot of times if we don't open an e-
mail before we delete it, it shows up as unread.  So it may have been opened to
delete so it doesn't show up as unread. This looks like junk mail**."  (Ex. 5 ACA
30(b)(6) I at 65:20-66:14.)

Furthermore, even if Mr. Bray had received and seen these emails, it does not go to

intent because he intended to name ACA after his daughter, Ariel Bray, and Ariel Ministries,

the ministry his family has belonged to for over a decade. (Ex. 5 ACA Dep. I at 72:21-75:9.)

*See Barbeque Marx v. Ogden*, 235 F.3d 1041, 1046 (finding no intent where defendant knew

plaintiff's name and even used its products, because defendant showed that a movie inspired

its name, not plaintiff).


61.     Mr. Bray claims that he picked the name ARIEL for his firm in or about January 2014. (Ex. R at 60:5-8; 72:22-25; 73:1-2.) Mr. Bray, along with his wife, chose the name. (Ex. R at 72:22-25; 73:1-2.) Mr. Bray wanted to name the firm based on the name of his daughter and by invoking the ministry he and his wife had been serving for a number of years. (Ex. R at 72:22-25; 73:1-25; 74:1-25; 75:1-9.)

**RESPONSE:  UNDISPUTED.**

62.     Initially, Mr. Bray wanted to use the name "Ariel Wealth Advisors." (Ex. R at 75:16-17.) Prior to selecting that name for his firm, Mr. Bray performed a search using Google for the name "Ariel Wealth Advisors" because he "was concerned … if there is another Ariel Wealth Advisors." (Ex. R at 75:18-20.) When he discovered that there was an Ariel Wealth Advisors in New Jersey, he thought, "I'd better not … I don't want to take another firm's name." (Ex. R at 75:20-25.)

**RESPONSE:  DISPUTED**, to the extent Mr. Bray testified that he and his wife had

discussed the name Ariel Wealth Advisors, not that they wanted that name. Mr. Bray stated:

> "My recollection is that the name my wife and I first discussed was Ariel Wealth Advisors. And I believe that we really liked that name. I Googled that name, because I was concerned that, well, what if there is another Ariel Wealth Advisors? And so when I discovered that there was an Ariel Wealth Advisors that's been operating out of New Jersey as a registered investment advisory firm since 2009, I thought, I'd better not – that's not going to be – you know, I don't want to take another firm's name." (Ex. 5, at 75:16-25.)

63.     Nevertheless, Mr. Bray chose to use the name "Ariel Capital Advisors." (Ex. R at 76:2-7.)

**RESPONSE:  UNDISPUTED.**

64.     Prior to selecting the name of his firm, Mr. Bray does not recall finding any other financial services firms using the name "Ariel" "but [he is] not 100 percent certain." (Ex. R at 76:8-13.) Mr. Bray performed no trademark search prior to selecting the name of his firm. (Ex. R at 75:10-12.)

**RESPONSE:  UNDISPUTED.**

65.     Ariel conducted Google searches in or about August 5, 2015. (Declaration of Luke DeMarte attached as Exhibit GG, at ¶ 3.) Ariel searched the term "Ariel Capital Advisors." (*Id*.) Exhibit HH contains true and correct copies of Ariel's search results. (Ex. GG at ¶ 3; Exhibit LD1 of Declaration of Luke DeMarte attached as Exhibit HH.) As shown in Exhibit HH, searching for the term "Ariel Capital Advisors" using the Google search engine, reveals "Ariel Investments" as the third search hit. (Ex. HH.) This Court has already observed that this search is sufficient "to give rise to an inference that Bray realized, or deliberately chose to ignore, that he was confusingly similar to that used by Ariel." (Ex. B at p. 4.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- **FRE 403-** Exhibit GG at ¶ 3 & Exhibit HH are inadmissible under FRE 403 because their probative value is substantially outweighed by a danger that it is unfairly prejudicial. Because Google tailors search results based upon what a user has searched previously, and because Plaintiff's counsel had likely searched his clients name previously, it was more likely that his clients name appeared in his search results, and at a higher location. *See* Exh. ___ (Google "***search results are not only based on*** the relevance of each web page to the search term, but also ***on which websites the user*** (or someone else using the same browser) ***visited through previous search results***") (emphasis added).

- **FRE 403-** Exhibit GG at ¶ 3 & Exhibit HH are inadmissible under FRE 403 because their probative value is substantially outweighed by a danger that it is unfairly prejudicial. Because Google search results change over time, Plaintiff's attorney's "replicated" search provides no support or reliability that "Ariel Investments" appeared in the search over a year and a half before when Mr. Bray performed his search. *See* Exh. ___ MOZ, Google Algorithm Change History, https://moz.com/google-algorithm-change (**Google's search algorithm is changed "500–600 times" yearly**, and that "[w]hile most of these changes are minor, Google occasionally rolls out a 'major' algorithmic update…that affects search results in significant ways.") (last visited Nov. 2, 2016) (emphasis added).

- **FRE 701-** Exhibit GG at ¶ 3 & Exhibit HH is inadmissible under FRE 701 because its purposes in being offered into evidence is to speculate about what Mr. Bray could have seen in a Google search. (FRE 701)

**Otherwise, DISPUTED.**  Mr. Bray testified that he did not see "Ariel Investments"

when he searched the name "Ariel Capital Advisors." (Ex. 2 ACA 30(b)(6) Dep. II at 151:9 – 152:8; Ex. 5, at 75:13-76:3-13.) He further stated: "When we talked about, oh, Ariel Capital Advisors, my recollection is Googling Ariel Capital Advisors, not finding any other firm named Ariel Capital Advisors." (Ex. 5, at 76:3-6.) He then was asked:

> "Q: What about [finding Plaintiff];
> A: **I would say no**, but I'm not 100 percent certain." (Ex. 5, at 76:11-13.)

After being asked if he found any other financial services firms using the name "Ariel," Mr. Bray responded "not that I recall." (Ex. 5, at 76:8-10.)

But even if Bray knew of Plaintiff, knowledge of another's name is not sufficient to show intent, especially where defendant had other inspirations for its name. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (finding no intent where defendant's name was inspired by a movie, even though defendant previously knew plaintiff's name and used its products). Indeed, intent in trademark law refers to the *intent to confuse consumers*, not the intent to use a mark similar to one already in use. *AM Gen. Corp., v. DaimlerChrysler Corp.*, 311 F.3d 796, 829 (7th Cir. 2002) ("Passing off means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off.") (internal citations omitted).

66.    In addition to being aware of John Rogers and Ariel at the time Mr. Bray selected a name for his firm, Mr. Bray has continued to ignore Ariel's requests that he change the name of his firm.

**RESPONSE: DISPUTED.** SUF No. 66 implies that Mr. Bray was aware of Plaintiff, or that John Rogers was its founder or affiliated with Plaintiff in any way. ACA and Bray did not know of Plaintiff at the time Bray selected "Ariel Capital Advisors." (Ex.

5, at 69:7-23.)  Plaintiff has not produced any evidence that Mr. Bray knew of Plaintiff at the

time he selected the name of his firm. (Ex. 5, at 69:7-23.)

      Rather, Mr. Bray stated:

Q.  Okay. When did you first become of [sic] Ariel Investments? I don't know if I
said that clearly.  **When did you first become aware of Ariel Investments**?

**A.  When I received a letter from Ariel Investment's counsel last summer**.

Q.  So you did not -- **when you first became aware of John Rogers some time ago,
you didn't know he was with Ariel Investments**?

A.  **I did not know that**.

Q.  **You did not know that was his company?**

**A.     I did not know that John Rogers was the CEO of Ariel Investments**. (Ex.

5, at 69:11-23.)

      ACA further disputes Plaintiff's characterization that "Mr. Bray has continued to

ignore Ariel's requests that he change the name of his firm."  Mr. Bray has not ignored

Plaintiff's requests, he has disagreed that Plaintiff's position has merit, or that they own a

valid trademark registration to the ARIEL mark. (Dkts. 64, 91, 98; *see also* ACA's Opening

Memorandum for Summary Judgment.)  Furthermore, Plaintiff's argument here is

disingenuous as the parties have had discussions about potential resolutions to this suit.  (Ex.

43, Dkt. 105 at 3-4.)

      67.    On August 14, 2014, counsel for Ariel wrote to Mr. Bray advising him of Ariel's
trademark rights and asking him to cease using the ARIEL Marks.  (Ex. A at ¶ 24.)  Exhibit II is
a true and correct copy of the letter from Luke DeMarte to Christopher Bray dated August 14,
2014.  (Ex. R at 70:10-19; Deposition Exhibit 10 to Deposition of Christopher P. Bray, July 22,
2015, attached as Exhibit II.)

      **RESPONSE:  UNDISPUTED.**

      68.    Mr. Bray responded to Ariel by letter dated August 25, 2014, denying
infringement of the ARIEL Marks and stating that he would not stop using the ARIEL Marks.

(Ex. A at ¶ 25.)  Exhibit JJ is a true and correct copy of the letter from Christopher Bray to Luke DeMarte dated August 25, 2014.  (Ex. R at 71:15-25; Deposition Exhibit 11 to Deposition of Christopher P. Bray, July 22, 2015, attached as Exhibit JJ.)

**RESPONSE:  UNDISPUTED.**

69.     On October 30, 2014, counsel for Ariel spoke with Mr. Bray and asked him to stop using the ARIEL Marks.  (Ex R at 72:4-17; Ex. Q at 116:17-24, 117:1-5.)  During that conversation, Mr. Bray was unwilling to meaningfully discuss this matter with Ariel's outside counsel, instead demanding to speak with Ariel's general counsel.  (Ex. Q at 115:24, 116:1-10.) Upon being informed that Ariel's general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel's outside counsel, Mr. Bray told Ariel's attorney "later, boss" and hung up the phone.  (Ex. Q at 115:9-12.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED, in part.**

**FIRST SENTENCE:  UNDISPUTED.**

**SECOND SENTENCE** ("*During that conversation, Mr. Bray was unwilling to meaningfully discuss this matter with Ariel's outside counsel, instead demanding to speak with Ariel's general counsel.  (Ex. Q at 115:24, 116:1-10.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** SUF No. 69 is inadmissible under FRE 402 because it is irrelevant as it does not make any material fact at issue in this case more or less probable.  (FRE402) Moreover, Plaintiff lists this SUF as support for "[ACA's] Intent."  However, a conversation *after* ACA chose its name would be irrelevant on whether Mr. Bray intended to "pass of his services" for Plaintiff's *when he chose* the name ACA.  *Cf. Henri's Food Prod. Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983) (noting intent considers whether defendant, in selecting its name, intentionally and deliberately copied plaintiff's mark.)

- **FRE 408-** This SUF is further inadmissible pursuant to FRE 408 as it relates to conduct and statements made during negotiations.

**Otherwise, DISPUTED.**  Mr. Bray's testimony is taken out of context.  Mr. Bray

testified that he attempted to have a meaningful conversation with opposing counsel, but that

Plaintiff's attorney was being unprofessional and badgering.  (Ex. 2, at 114:2 -116:10.)  For

instance, Mr. Bray stated"

Q.  "Okay.· I'm going to move on to Paragraph 26. ·And this one is long.· So rather than read it, I will·just hand you --

MR. GOLLWITZER:· Let the record reflect I'm showing the witness Paragraph 26 from the complaint.

BY MR. GOLLWITZER:

Q.  And my question is, why did Ariel Capital deny that allegation?

MR. WOLEK:· I'd like the record to also reflect that counsel for defendant didn't have an opportunity to review this exhibit, nor was it presented to us prior to giving it to the witness.

MR. GOLLWITZER:· It's the complaint.

THE WITNESS:· So let me just read it.· On October 30th, 2014, outside counsel for Ariel Investments called Christopher P. Bray, a principal and attorney of Ariel Advisors, via telephone to try to resolve this matter.· Mr. Bray was unwilling to meaningfully discuss this matter with Ariel Investments's (*sic*[9])outside counsel, instead demanding to speak with Ariel Investments general counsel.· Upon being informed that Ariel Investments's general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel Investments's outside counsel, Mr. Bray told Ariel Investments's attorney, "Later, boss," and hung up the phone.

**I deny it**.

BY MR. GOLLWITZER:

Q.  Okay.· **So is all of it untrue**?

A.  **Most of it's untrue.**

Q.  Okay.· **Well, can you tell me what -- what can you admit**?

A.  I'll admit that Mr. Bray told the attorney,·"Later, boss," and hung up the phone.

Q.  Okay.

(Comment by the court reporter)

THE WITNESS:· So I will admit that Mr. Bray told Ariel Investments's attorney, "Later, boss," and hung up the phone.  **This is patently untrue.· This is a lie**.·Upon being informed that Ariel Investments's general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel Investments's outside counsel --·No.· I am -- Mr. Bray is the person who asked, a**fter not getting any kind of professional or courteous resolution with the attorney -- I believe it was either Luke or -- I think it was Luke, and it was one of the most unprofessional calls I've ever fielded.  And when I was realizing that this person wasn't going to speak English or wasn't going to have any kind of human conversation on a level of any kind of professional -- on any kind of professional level, I finally, out of exasperation, said, 'Can I talk to your general counsel?'**"  (Ex. 2, at 114:2 -116:10) (emphasis added.)

**THIRD SENTENCE** ("*Upon being informed that Ariel's general counsel referred this matter to*

---

[9] The spelling of "Investments's" was in the original transcript, and ACA does not change it herein.

*outside counsel for attention and that Mr. Bray should communicate with Ariel's outside counsel, Mr. Bray told Ariel's attorney "later, boss" and hung up the phone. (Ex. Q at 115:9-12.)*"):  **OBJECTED, move to strike; DISPUTED.**

- **FRE 402-** SUF No. 69 is inadmissible under FRE 402 because it is irrelevant as it does not make any material fact at issue in this case more or less probable.  (FRE402) Moreover, Plaintiff lists this SUF as support for "[ACA's] Intent."  However, a conversation *after* ACA chose its name would be irrelevant on whether Mr. Bray intended to "pass of his services" for Plaintiff's *when he chose* the name ACA.  *Cf. Henri's Food Prod. Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983) (noting intent considers whether defendant, in selecting its name, intentionally and deliberately copied plaintiff's mark.)

- This SUF is further inadmissible pursuant to FRE 408 as it relates to conduct and statements made during negotiations.

**Otherwise, DISPUTED.**  Mr. Bray's testimony is taken out of context.  Mr. Bray

testified that he attempted to have a meaningful conversation with opposing counsel, but that

Plaintiff's attorney was being unprofessional.  (Ex. 2, at 114:2 -116:10.) He testified:

Q.  "Okay.· I'm going to move on to Paragraph 26.  And this one is long.· So rather than read it, I will just hand you --

MR. GOLLWITZER:· Let the record reflect I'm showing the witness Paragraph 26 from the complaint.

BY MR. GOLLWITZER:

Q.  And my question is, why did Ariel Capital deny that allegation?

MR. WOLEK:· I'd like the record to also reflect that counsel for defendant didn't have an opportunity to review this exhibit, nor was it presented to us prior to giving it to the witness.

MR. GOLLWITZER:· It's the complaint.

THE WITNESS:· So let me just read it.· On October 30th, 2014, outside counsel for Ariel Investments called Christopher P. Bray, a principal and attorney of Ariel Advisors, via telephone to try to resolve this matter.· Mr. Bray was unwilling to meaningfully discuss this matter with Ariel Investments's outside counsel, instead demanding to speak with Ariel Investments general counsel.· Upon being informed that Ariel Investments's general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel Investments's outside counsel, Mr. Bray told Ariel Investments's attorney, "Later, boss," and hung up the phone.

**I deny it**.

BY MR. GOLLWITZER:

Q.  Okay.· **So is all of it untrue**?

76

A.  **Most of it's untrue.**

Q.  Okay.· **Well, can you tell me what -- what can you admit**?

A.  I'll admit that Mr. Bray told the attorney, "Later, boss," and hung up the phone.

Q.  Okay.

(Comment by the court reporter)

THE WITNESS:· So I will admit that Mr. Bray told Ariel Investments's attorney, "Later, boss," and hung up the phone.

**This is patently untrue.· This is a lie**.

Upon being informed that Ariel Investments's (*sic*) general counsel referred this matter to outside counsel for attention and that Mr. Bray should communicate with Ariel Investments's outside counsel --

No.· I am -- Mr. Bray is the person who asked, **after not getting any kind of professional or courteous resolution with the attorney -- I believe it was either Luke or -- I think it was Luke, and it was one of the most unprofessional calls I've ever fielded.  And when I was realizing that this person wasn't going to speak English or wasn't going to have any kind of human conversation on a level of any kind of professional -- on any kind of professional level, I finally, out of exasperation, said, 'Can I talk to your general counsel?'"**  (Ex. 2, at 114:2 -116:10) (emphasis added).


70.     Ariel filed this trademark infringement suit against Mr. Bray on April 28, 2015. (Complaint, Dkt. 1, attached as Exhibit C.)

**RESPONSE:  UNDISPUTED.**


71.     Mr. Bray has rejected all subsequent efforts to resolve this matter and has continued to use the name "Ariel Capital Advisors LLC" throughout this litigation.  (Ex. R at 87:14-25.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED, in part.**


- **FRE 402-** SUF No. 69 is inadmissible under FRE 402 because it is irrelevant as it does not make any material fact at issue in this case more or less probable.  (FRE402)  Moreover, Plaintiff lists this SUF as support for "[ACA's] Intent."  However, any conversations about resolving this matter would not have any bearing on ACA's intent to adopt any of the asserted trademarks.  *Cf. Henri's Food Prod. Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983) (noting intent considers whether defendant, in selecting its name, intentionally and deliberately copied plaintiff's mark.)

- **FRE 408-** This SUF is further inadmissible pursuant to FRE 408 as it relates to conduct and statements made during negotiations.

**Otherwise, DISPUTED.** ACA disputes Plaintiff's characterization that "Mr. Bray rejected all subsequent efforts to resolve this matter." Mr. Bray has not rejected all efforts to resolve this matter. (Ex. 43, Dkt. 105 at 3-4.) In fact, he has affirmatively reached out to Plaintiff on several occasions to attempt to find an amicable resolution, despite disagreeing that Plaintiff's position has merit, or that they own a valid trademark registration to the ARIEL mark. (Ex. 43, Dkt. 105 at 3-4; *see also* ACA's Opening Memorandum for Summary Judgment.). Furthermore, Plaintiff's argument here is disingenuous as the parties have had discussions about potential resolutions to this suit. (Ex. 43, Dkt. 105 at 3-4.)

ACA does not dispute that it continues to use the name Ariel Capital Advisors LLC.

## VI.    Damages

72.    It is important to Ariel Capital's success as a company that it has a reputation for integrity. (Ex. Q at 38:15-21; Ex. X at 22:18-20; 23:1-16; 24:6-23, 25:5-25.)

**RESPONSE:  UNDISPUTED.**

73.    If the SEC accused Ariel Capital of wrong doing, that would negatively affect Ariel Capital's clients' views of Ariel Capital, and Ariel Capital would have to take steps to repair its image or reputation with its clients. (Ex. Q at 39:6-21, 40:1-25; Ex. X at 25:4-25, 26:1-5.)

**RESPONSE:  UNDISPUTED.**

74.    By using the ARIEL Marks, Ariel Capital's reputational damage also would be imputed to plaintiff Ariel. (Ex. F at ¶ 16.)

**RESPONSE:  OBJECTED, move to strike; DISPUTED.**

- SUF No. 47 is inadmissible because it is argumentative and calls for a legal conclusion.

- **FRE 602-** Each statement in Plaintiff's SUF No. 74 is inadmissible under FRE 602 because it calls for speculation about a hypothetical situation where ACA's reputation would be damaged in some unknown name, and speculates about it being imputed onto

ACA.

**Otherwise, DISPUTED:** First, ACA does not use any protectable marks owned by

Plaintiff. (Ex. 2, at 204:24 – 205:21.) Secondly, consumers would not be confused between

ACA and Plaintiff, so there would be no reputational damage that could be imputed. *See*

*Knaack Mfg. v. Rally Acccessories, Inc.*, 955 F.Supp 991, 1000 (N.D. Ill. 1997) (finding no

likelihood of confusion where the parties customers would not associate defendant's

[services] with plaintiff). Third, there is no overlap of clients.

75.    Ariel Capital charges its clients fees as described in Exhibit U, ██████████
██████████████████████ (Ex. U at ACA684; Ex. X at 17:10-25, 18:4-
25, 19:1-14.) ██████████████
███████████████ (Ex. Q at 32:1-9.)

**RESPONSE:  UNDISPUTED.**

76.    Exhibit KK is a true and correct copy of Ariel Capital's client list including a
summary of assets under management and fees paid to Ariel Capital. (Ex. Q at 29:14-25, 30:1-5;
Deposition Exhibit 17 to Ariel Capital Rule 30(b)(6) Deposition, attached as Exhibit KK.)
Exhibit KK shows that Ariel Capital had approximately ███████████ under management at the
end of 2015. (Ex. KK.) Based on an average fee of ███████████ under management, Exhibit
KK reveals that Ariel Capital's total revenue for the year 2015 was about ███████████

**RESPONSE:  UNDISPUTED.**

77.    Consistent with the above revenue calculation, Mr. Bray testified that in 2015,
Ariel Capital's total revenue was approximately ███████████ and for 2014, its total revenue was
roughly three-fourths of the 2015 number. ███████████. (Ex. Q at 30:21-23, 31:1-4.)

**RESPONSE:  OBJECTED, move to strike.**

- **FRE 403**- This testimony is inadmissible under FRE 403 because its probative value
  is substantially outweighed by a danger that it is unfairly prejudicial as unreliable
  testimony from a person who stated that he was not prepared to answer this question
  because Plaintiff did not list or provide notice for a 30(b)(6) Deposition Topic
  "ACA's total revenue."

78.    Ariel Capital's approximate net income in 2015 after expenses and salaries was
███████████ (Ex. Q at 33:10-11.) Ariel Capital's approximate net income in 2014 was three- fourths
of the 2015 number, or about ███████████ (Id. at 33:12-19.) Ariel Capital's net income passes
through to Mr. Bray personally as he is the sole owner of the firm. (Id. at 33:1-7.)

**RESPONSE: OBJECTED, move to strike; DISPUTED.**

- **FRE 403-** This testimony is inadmissible under FRE 403 because its probative value is substantially outweighed by a danger that it is unfairly prejudicial as unreliable testimony from a person who stated that he was not prepared to answer this question because Plaintiff did not list or provide notice for a 30(b)(6) Deposition Topic on ACA's profits.

**Otherwise, DISPUTED.** Plaintiff's sole "evidence" of ACA's profits is from a deposition answer taken out of context. Plaintiff did not ask ACA to prepare for that topic in its Notice of 30(b)(6) Topics. (Ex. 30, Pltf's 30(b)(6) Notice to ACA.) Indeed, when asked about this topic, ACA's witness stated that he was only guessing. (Ex. 2, at 32:17 – 33:11.) Thus, Plaintiff's determination of ACA's profits are at best speculation, and unreliable. Nor did Plaintiff ask for ACA's profits in any of their interrogatories. Nor did Plaintiff provide a damages disclosure in its Rule 26(a) Disclosures.

**Defendant Ariel Capital Advisors LLC's Statement of Material Facts in Support
of Its Motion for Summary Judgment**

I.     **The Parties**

    **A.  Defendant Ariel Capital Advisors LLC**

1.     Defendant Ariel Capital Advisors ("ACA") is a Florida limited liability company having its principal place of business in Naples, Florida that was founded by its CEO, Christopher Bray ("Bray"), in January 2014. (Christopher Bray Declaration dated November 3, 2016, attached as Exh. 1 at ¶ 2-4.) ACA also has a satellite office in Cleveland, Ohio, (*Id.* at ¶ 2-4.)  and in total, has six employees. (Ariel Capital Advisors LLC's Second Rule 30(b)(6), attached as Exhibit 2, at 15:22 – 16:3.)

2.     Bray named Ariel Capital Advisors after his daughter, Ariel Bray, and Ariel Ministries, which he and his wife have served for fifteen years. (Exh. 2, at 202:5 – 203:10; *see also* Ex. 3 ACA000844.) "Ariel" is a Hebrew word that means lion of God. (Exh. 2, at 202:11-12; *see also* Bates Number ACA000818-ACA000820, attached as Exhibit 4.)

3.     Bray originally considered naming his firm Ariel Wealth Advisors, but decided not to after an online search showed an investment firm with that name. (Exh. 2, at 151:19-24.) Bray testified he "d[id]n't want to take another firm's name." (Ariel Capital Advisors LLC's First Rule 30(b)(6), attached as Exhibit 5, at 75:16-25.) Bray next checked to see whether any firms had the name Ariel Capital Advisors and found no firm with that name, so he put it on a list of potential firm names to show to his wife. (Exh. 2, at 152:4-8.) Out of Ariel Capital Advisors, Ariel Prime Advisors, and Ariel Wealth Management – names that no other firms were using – Bray's wife chose Ariel Capital Advisors. (*Id.* at 156:13-16, 157:20-23.)

4.     Since then, ACA has always advertised as "Ariel Capital Advisors" with a male white lion enclosed in a royal blue shield with a royal blue background next to the name to

represent the logo's meaning, lion of God. (Exh. 2, at 203:11-20; Bates Number 000069, attached as Exhibit 6; Bates Number 000072, attached as Exhibit 7; Bates Number 000081, attached as Exhibit 8.) ACA greets clients and answers phones by referring to itself as Ariel Capital Advisors, never Ariel. (Exh. 2, at 54:1-4.) ACA also never uses "Ariel Capital" as a shortened version of ACA. (*Id.* at 149:24 – 150:1.)

**B. Plaintiff Ariel Investments, LLC**

5. In 1983, John Rogers ("Rogers") was Founder, Chairman, chief investment officer and portfolio manager of Plaintiff. (Ariel Investments, LLC's Rule 30(b)(6) Deposition, attached as Exhibit 9, at 20:23 – 21:1.) When Rogers founded Plaintiff in 1983, he had one employee, Jessica Berger. (*Id.* at 20:6-18.) Rogers was Jessica Berger's boss and directed her activities. (*Id.* at 21:23 – 22:6.) Plaintiff's 30(b)(6) witness stated "[Rogers] was – he was the company." (*Id.* at 20:23 – 21:1.)

6. Plaintiff's ARIEL mark was filed with the USPTO on June 20, 1983. (Bates Number AI005142, attached as Exhibit 10.) The application stated that Plaintiff's first use of the ARIEL mark was January 10, 1983, and its first use in commerce was March 23, 1983. (*Id.*) Plaintiff stated that it would have been Rogers' decision to file the trademark, "the directive would have come from [Rogers]." (Exh. 9, at 102:16-17, 103:3-4.)

7. In ACA's first requests for production, ACA requested "1. Each document relating to [Plaintiff's] selection, adoption, or first use of the word 'Ariel' in [Plaintiff's] name.…7. Each document related to the 'Ariel' marks first use on January 10, 1983. [and] 8. Each document related to the 'Ariel' mark's first use in interstate commerce on March 23, 1983." (Plaintiff's Responses to Defendant's First Set of Request for Production Nos. 1, 7, 8, attached as Exhibit 11.) To date, ACA has not received any documents that demonstrate

Plaintiff's use of "Ariel" in commerce before it filed its trademark application on June 20, 1983.

8.      Plaintiff's first public account, Ariel Small Cap, launched on September 30, 1983. (Exh. 9 at 93:2-4, 98:4-22, 339:12-24, 340:1-12, 341:21-24, 342:1-8, 344:10-13, 345:12-22; Plaintiff's Answers to Defendant's First Set of Interrogatories, attached as Exhibit 12, at No. 2; Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories, attached as Exhibit 13, at No. 2; Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories, attached as Exhibit 14, at No. 2.) Prior to launching its first public account on September 30, 1983, Plaintiff could not accept public assets. (Exh. 9, at 98:4-22.)

9.      On August 4, 2016, ACA again asked Plaintiff in its 30(b)(6) deposition who Plaintiff's first clients were, and if Plaintiff has records of its first investors. (Exh. 9, at 75:20-21, 78:21 – 79:3.) Plaintiff "committed" to providing ACA with Plaintiff's first 1983 clients by the following Tuesday. (*Id.* at 80:11-16.) To date, ACA has still not received the information or documents.

10.      In an interview for N'Digo magazine, Rogers stated that when he started Plaintiff, he "had no money to manage, no clients". (Deposition Exhibit 5 to the Plaintiff 30(b)(6) Deposition, attached as Exhibit 15, at *2-3.) Plaintiff further reported, in its 30(b)(6) deposition, that it was not until September 30, 1983 that Plaintiff offered its first product to the public, which was Ariel Small Cap. (Exh. 9, at 345:12-22, 346:23-24; see also Exh. 12, at No. 2; Exh. 13, at No. 2; Exh. 14,  at No. 2.) Plaintiff's only use prior to September 30, 1983 was on advertisements, business cards, his office door, and communications to friends and family. (Ex. 9, at 93:2-4, 98:4-22, 289:2-10, 290-291:16-24, 1-16, 297:1-24, 301:10-16, 341:21-24, 342:1-8, 346:6-24.)

## II.    The Parties' Products and Services

### A.  Defendant's Services

11.    ACA provides private wealth management for individuals and families, including personalized investment management services, tax planning, cash flow planning, retirement planning, estate planning and tax return preparation. (Exh. 2, at 76:7-10.) It does not sell any products. (Exh. 5, at 21:12-14.)

12.    Clients submit to in-depth financial questioning when they open an account with ACA. (Exh. 2, at 179:21-24. As part of the tax planning services ACA performs, ACA reviews clients' prior tax returns and performs income tax projections based on income data that clients provide. (Ex. 2, at 177:11-18.) ACA then provides recommendations about how to reduce tax expenses for that specific client or family members of that client. (*Id.*)

13.    ACA also performs estate planning services, and gathers documents such as wills, trusts, durable powers of attorney, healthcare powers of attorney, and living wills and reviews each to advise clients on their inheritance goals, like reducing estate taxes. (Exh. 2, at 177:19 – 178:2.) ACA often meets with the whole family to discuss estate plans, including with grandparents, children, and grandchildren.  (*Id.* at 179:7-11.)

14.    ACA also performs retirement planning for its clients, and evaluates clients' living expenses, projected living expenses after retirement, and savings accounts. (Exh. 2, at 178:3-14.)

15.    ACA, in its cash flow planning services, caters to both pre- and post-retirement clients who are hoping to build an asset base that he or she can then either live off of, or pass on to legacies. (Exh. 2, at 178:22 – 179:2.) ACA provides clients with written reports either as an excel spreadsheet or a Microsoft PowerPoint.  (*Id.* at 184:4-21.)

16.     ACA does not sell mutual funds, nor does it plan to offer mutual funds. (Exh. 2 at 189:8-14.) ACA never advises a client to include mutual funds as part of his or her plan. (*Id.* at 63:18-20.) Mutual Funds are provided in ACA's Form ADV in case an ACA client has mutual funds they received from a different advisor. (*Id.* at 66:17-20.) Mutual funds are listed in ACA's client brochure for disclosure purposes as fees for those types of investments, and are independent from ACA's advisory fee.  (*Id.* at 188:6-21.)

17.     ACA does not create or provide separate accounts for any of its clients. (Exh. 5, at 27:11-15.) And ACA does not have plans to offer any kinds of additional services in the future. (Exh. 2, at 60:4-6, 60:13-16.)

B. **Plaintiff's Products**

18.     Plaintiff offers mutual funds and separate accounts that can be ordered off its website.  (Plaintiff's Statement of Facts, attached as Exh. 41, at ¶ 7; Exh. 9 at 112:5-10.) A "separate account" is "basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor." (Exh. 5, at 27:10.)

19.     Plaintiff competes with "The Wal-Marts," "with big firms and big names." (Exh. 9, at 378:11-12, 379:6-8). Plaintiff's main competitors are Vanguard, Fidelity, T. Rowe Price, Calvert Investments, Pax World Investments and Parnussus Investments. (*Id.* at 259:3-6, 261:11-23, 378:21-22.)

20.     Plaintiff does not provide written financial plans to its mutual fund clients or its separate accounts clients. (Exh. 9, at 158:4-23.) Plaintiff has no plans to provide written financial plans to its clients, and no plans to prepare tax returns for its clients. (*Id.* at 416:22 – 417:4, 417:21-24.)

21.     Plaintiff does not assist in drafting wills of its mutual fund clients or its separate

accounts clients. (Exh. 9, at 158:24 – 159:7.) Plaintiff does not provide tax advice and does not prepare clients' tax returns or filings. (*Id.* at 159:8-16.)

III.    **Customers and Advertising**

    **A. ACA's Clientele**

22.    ACA provides its private wealth management services to natural persons, individuals and families. (Exh. 5, at 21:5-6.) ACA does not "tak[e] on an investment relationship or a private wealth management relationship for an LLC in and of itself or a trust in and of itself." (Exh. 2, at 185:17-20.) ACA only accepts a charitable trust or a family LLC if its tied to an individual or family who is already an ACA client. (*Id.* at 184:22 – 185:8.) ACA does not have any clients that are banks, institutional clients, investment companies, business development companies, pooled investments, pensions, profit-sharing plans, corporations, businesses, state governments, municipal governments, insurance companies, or other investment advisors. (*Id.* at 226:2 – 227:16.)

23.    ACA's typical client is "someone with investable assets over a million dollars, someone with typically complex income tax planning and compliance needs, someone typically with possible state or estate tax exposure, complicated financial planning issues." (Exh. 2, at 195:8-13.) ACA imposes a minimum account size of $1,000,000 as a condition for managing accounts. (Bates Numbers ACA000679 at ACA000687, attached as Exhibit 16.) Any accounts that are less than ACA's minimum are generally related as a family in a relationship, and the relationship typically exceeds a million dollars. (Exh. 2, at 176:15-19.) For example, "mom and dad might have a portfolio of two million. And they may have established a custodial account that [ACA] manage[s] for daughter or son, and the value of that account may be less than a million dollars." (*Id.* at 72:10-16.) Most of these "primary" family members have accounts

86

ranging from five million to twenty million dollars. (*Id.* at 194:13-15.)

24.     All of ACA's clients came from client referrals or employee referrals. (Exh. 2 at 216:14-16.) ACA and its employees personally know and have a relationship with each client. (Exh. 5, at 18:25; Exh. 2, at 69:20-21.) For meetings, an ACA employee often meets its client at ACA's office, the client's home, a restaurant, or at the client's business. (Exh. 2, at 180:10-18.) And when an ACA employee meets with a client, they often meet with members of the client's family, like grandparents, parents, children, and grandchildren. (*Id.* at 179:7-11.) ACA also provides this advice over conference calls or telephonically, but the primary way ACA communicates to its clients is in person, face to face. (*Id.* at 181:8-18.)

25.     ACA has advertised only a handful of times since opening its doors. And these advertisements have been through local non-profits and media, and once in Crain's Cleveland Business. (Exh. 5, at 68:1-3; Exh. 2, at 56:13-15; 67:11-13, 213:1-10.) ACA does not advertise on the internet. (Exh. 2, at 67:18-19.) ACA also has never advertised in, and does not intend to advertise in Barons, Fortune, Mutual Funds Magazine, Morningstar Fund Investor, Morningstar Advisor, Investment Advisor, Value Investor Insight, Entrepreneur, Personal Finance, Savoy Magazine, Black Enterprise, Smart Money, Bloomberg Businessweek, Financial Advisor, Hispanic Executives, Ticker, Trader Magazine, Techsmart Trader, USA Today, Wall Street Journal, the New York Times, Pensions and Investments, Chicago Tribune, Chicago Sun-Times, Crain's Business Chicago, in elevators or on CNBC, Morning Call, Fox, Fox Markets Now, Your World with Neil Cavoto, Cavoto on Business, Nightly Business Report, ABC, Good Morning America, World News Tonight, Bloomberg TV, In Focus, Morning Call, Open Exchange, Frontline, News Hour with Jim Lehrer, Chicago Tonight, WCIU, First Business, WBBM, DuSable Night of 100 Stars, Eye on Chicago, Twitter, Facebook, Dow Jones,

wellingtononwallstreet.com, Morningstar.com, forbes.com, cnnmoney.com, blackamericaweb.com, wvon.com, Green Money, or Fast Company. (*Id.* at 208:5 – 215:15, 216:17 – 219:15.)

26. To terminate an account with ACA, clients must give thirty days written notice to ACA. (Bates Numbers ACA000679 at ACA000686, attached as Exhibit 16, at ¶4.)

### B. Plaintiff's Customers

27. Plaintiff's clients are institutions, like endowments, foundations, corporate, pension plans, Taft-Hartley, and unions, and a few individuals. (Exh. 9, at 111:2-4, 130:2-7.) Eighty percent of Plaintiff's *individual* customers are broker-dealers for entities like Schwab, or Fidelity. (*Id.* at 110:4-12.) The other twenty percent are individuals who contact Plaintiff directly. (*Id.* at 111:2-7.) Of Plaintiff's individual clients, the majority of them have household incomes of $50-$150,000 a year. (*Id.* at 374:5-7.)

28. These direct customers associate Plaintiff's products with "turtle" and "patient," and sometimes refer to Plaintiff as the "turtle people." (Exh. 9, at 267:13-21, Exhibit 20 to Plaintiff 30(b)(6), attached as Exhibit 17, at AI017880.) Of the broker-dealers who comprise 80% of Plaintiff's individual customers, they reported that the number one way they heard about Plaintiff was through their own independent research. (Exh. 9, at 110:4-12, Exh. 17, at AI017878.) These broker-dealers also reported they "wished Plaintiff had more brand awareness among consumers." (2015 Turtle Talk Survey – Advisor Experience, attached as Exhibit 18, at AI005356.)

29. Plaintiff's account minimum is $1,000. (Plaintiff Website Screenshot, attached as Exhibit 19.) But "[Plaintiff] offers [an investment plan] for as little as $50 a month" (Exhibit 5 to Plaintiff 30(b)(6), attached as Exhibit 15, at *2-3.) Customers can invest directly with Plaintiff

through the web (Exh. 9, at 112:5-6.) Or customers can call to "place an order." (*Id.* at 112:7-12.) Plaintiff does not have lockups, also known as lockout periods, or periods where a client cannot withdraw its money. (*Id.* at 151:22 – 152:6.)

### C. The Parties' Marks

30.     ACA's mark always features a male white lion's head enclosed in a royal blue shield, with a royal blue background. (Exh. 6, Exh. 7, Exh. 8.) To the right of ACA's lion are the words, "Ariel Capital Advisors, LLC" in a *sans-serif* font, with only the "A" in Ariel, the "C" in Capital, and the "A" in Advisors capitalized. (*Id.*)

31.     Plaintiff's marks appear as "ARIEL INVESTMENTS," never "Ariel," and all the letters are capitalized and in a light and whimsical *serif* font. (Plaintiff Advertisement Bates Number AI000007, attached as Exhibit 20.) The ARIEL INVESTMENT "R" loops under the mark in a calligraphy-like, reverse-swoop. (*Id.*) Plaintiff's marks are also usually accompanied by either (i) a sketched turtle holding a trophy, much like a turtle one would see as a character in a children's fable, or (ii) a realistic tortoise, and who is directly facing its viewer. (*Id.*) The turtle is from Plaintiff's logo "slow and steady wins the race" and signifies Plaintiff's "patient" approach to investing. (Exh. 9, at 26:21 – 27:6, 61:19-21.) Plaintiff also claims to own marks Ariel Appreciation Fund, Ariel Discovery Fund, Ariel Fund, Ariel International Fund, Ariel Global Fund and Ariel's ABCs of Money. (Bates Numbers AI007744 – AI007745, attached as Exhibit 21.)

### D. Lack of Confusion

32.     Subject to SUF 41 Objections and FRE 402, 403, 602, 802 and 901, Bray testified that an ACA employee, Chris Squitteri told him that Justin Land, a member of the Chartered Financial Analysts ("CFA") of Naples, Florida had asked him "if Ariel Capital Advisors had any

affiliation with Ariel Investments" while the two were at a CFA conference. (Exh. 2, at 48:1-20, 49:7-12.)

33.     Subject to SUF Objections 43-47 and FRE 402, 403, 602, and 901, the witness David Boone ("Boone") testified he was attempting to reach an Plaintiff employee, who he had only communicated with a couple times in the past ten years, to solicit an article and advertisements for his magazine, Techsmart Trader. (David Boone Deposition, attached as Exhibit 22, at 14:23-34, 22:12-15, 24:4-14, 36:14 – 38:11, 51:1-5.) Boone stated, "I don't remember making the call." (*Id.* at 25:12-20.) Boone also had five calls with Plaintiff's counsel to prepare for the deposition. (*Id.* at 52:23 – 62:9, 65:3-6.) Boone stated he had never heard of Ariel Investments, he didn't know about Plaintiff's name change. (*Id.* at 67:12 – 68:13.) Boone nor Techsmart Trader were looking to invest now or in the future at the time of the call. (*Id.* at 51:9-22.)

34.     Subject to SUF 48-51 Objections  and FRE 402 and 403, the witness Monica Schandel ("Schandel") testified that she started Blue Oceans Financial Planning, a firm that performs income tax preparation and planning as well as financial planning, in 2011. (Monica Schandel Deposition, attached as Exhibit 23, at 21:9-13, 21:19-25, 22:22 – 23:3.) Schandel did not confuse Plaintiff and ACA, but stated that she put Ariel Investments instead of Ariel Capital Advisors because "I know that I made a mistake. I believe it's because I was looking at this [subpoena] and I looked at the first thing on it which said Ariel Investments." (*Id.* at 30:18-25, 31:3-6, 32:17-20.) Schandel had never heard of Plaintiff until she received a subpoena for this case. (*Id.* at 31:11-12, 35:24 – 36:1.) In response to how she normally refers to ACA, Schandel stated, "I actually don't normally refer to Mr. Bray's company. I don't have much occasion to talk about it" and "I generally just speak with Chris Bray or Chris Squittieri." Bray also does not

normally refer to Schandel's company as Blue Oceans Financial Planning and in his own deposition he did not recognize Blue Oceans Financial Planning as a firm he works with until Schandel was mentioned. (Exh. 2, at 82:16 – 87:3.)

35.     Subject to SUF 52 Objections and FRE 402, 403, 602, 802, and 901, the unidentified person who phoned Phyllis Brady was allegedly doing a reference check, not looking to invest in Plaintiff's products or utilize ACA's services. (Exh. 9, at 250:24 - 251:20, 252:2-9, 252:13-18; Plaintiff's Answers to Defendant's First Set of Interrogatories, attached as Exhibit 12, at No. 4.)

36.     Subject to SUF 53 Objections and FRE 402, 403, 802 and 901, the unidentified person who phoned Mareilé Cusack was calling in regards to real estate or property, not Plaintiff's products or ACA's services. (Exh. 9, at 183:12-22, 184:9-21, 187:18-21; Exh. 12, at No. 4.)  Plaintiff's own witness stated that Ariel Investment Properties in Florida "rings a bell" and "it could have been the call to HR." (Exh. 9, at 184:9-21.) Plaintiff's witness also stated that person could have actually been confused between Plaintiff and Ariel Investment Properties rather than ACA. (*Id.* at 184:17-21, 187:18-21.)

### E.  Other Firms use Ariel, Including in Financial Services

37.     Ariel Wealth Advisors is a firm in the financial services industry that offers investment advice and execution, cash flow planning for today and tomorrow, family asset protection, estate and wealth transfer strategies, and tax planning. (Exhibit 24 of Plaintiff 30(b)(6), attached as Exhibit 24.) Ariel Wealth Advisors is located in New Jersey and has been in business since early 2010. (Email from Ariel Wealth Advisors, Bates Number AI075262, attached as Exhibit 25.) Plaintiff has known of Ariel Wealth Advisors since early 2010 and admits it has never sent Ariel Wealth Advisors a cease and desist letter. (*Id.*; Plaintiff's

and extends its "R" loop partially under its name. Ariel Wealth Advisors' mascot is a lion, lightly sketched. (Exhibit 24 of Plaintiff 30(b)(6), attached as Exhibit 24.)

38. Ariel Investment Properties, LLC is a Florida company with its principal office in Illinois. (Exhibit 17 of Plaintiff 30(b)(6), attached as Exhibit 26.) The company's status is active and the company has existed since 2007. (*Id.*) Plaintiff has provided no documents that demonstrate it has sent this company a cease and desist letter. Over fifty other companies in Illinois use "Ariel" as the first word of their company name. (Exhibit 22 to Ariel Investments LLC's Rule 30(b)(6) Deposition, attached as Exhibit 28.)

39. Ariel, Incorporated is an active Illinois corporation. (Ex. 27 Exhibit 18 of Plaintiff 30(b)(6).) The company has existed since 1984. (*Id.*) Plaintiff has provided no documents that demonstrate it has send this company a cease and desist letter.

40. Over fifty-five (55) Illinois companies use "Ariel" as the first word of their name. (Exhibit 22 of Plaintiff 30(b)(6), attached as Exhibit 28.) Over one hundred and fifty other companies use "Ariel" in their name, including in the financial services industry. (Exhibit 25 of Plaintiff 30(b)(6), attached as Exhibit 29.)

Dated:  November 4, 2016            RESPECTFULLY SUBMITTED,


By:__s/Adam Wolek_____
Adam Wolek
Brian Noack
WOLEK & NOACK
333 S Wabash Ave., Suite 2700
Chicago, IL 60604
P: 312.860.9006
F: 708.843.0509
*Local Counsel for Defendant Ariel Capital*
*Advisors LLC*


Christopher P. Bray
Christopher P. Bray Associates, LLC
9115 Corsea Del Fontana Way, Ste. 200
Naples, FL 34109
P: 239.651.6008
F: 239.431.3914
cpbray@cpbrayassociates.com
*Lead Counsel for Defendant Ariel Capital*
*Advisors LLC*

19

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on November 4, 2016, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: November 4, 2016                              WOLEK & NOACK


                                                     By: s/ Adam Wolek
                                                     Adam Wolek