UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIEL INVESTMENTS, LLC | ) |
| Plaintiff, | ) |
| v. | ) Case Number: 15-cv-3717 |
| ARIEL CAPITAL ADVISORS LLC, | ) Hon. Judge Matthew F. Kennelly |
| Defendant. | ) |

**Reply to Plaintiff's Opposition to Defendant Ariel Capital Advisors'
Motion for Summary Judgement[1]**

---

[1] Citations to Defendant Ariel Capital Advisors' Statement of Facts (SOF) relate to its Reply to Plaintiff's Ariel Investments' Responses to ACA's SOF, filed herewith.

Plaintiff's ARIEL registration is void *ab initio* because it had not used its trademark *in commerce* when it filed its application. It does not dispute its answers to this in three interrogatory responses, its 30(b)(6) deposition, and on its website. Or that it failed to show prior use despite extensive discovery. Plaintiff instead lists examples of "uses" that are irrelevant (and inadmissible) because they are not *uses in commerce*. Its "incontestability" claims also do not shield it, nor do its claims to own other trademarks. Finally, Plaintiff's intent and materiality arguments are incorrect as a matter of law, and its cited cases support voiding the mark. In short, Plaintiff's own admissions and case law support voiding the registration.

The Parties' sophisticated consumers also can distinguish between the marks and Parties' offerings so are unlikely to be confused. Which, for one, is why no confusion has occurred.

**A. Plaintiff's ARIEL Registration is Void *ab initio* Because the Mark was Not Used "in Commerce" Prior to Plaintiff's Application Filing**

Plaintiff correctly notes that ACA is only seeking to invalidate the ARIEL trademark *registration*. But in its response, it conflates use of a mark in business with using it *in commerce*. Importantly, the Lanham Act requires that services actually be rendered in interstate commerce before filing. 15 U.S.C. § 1127; *2 McCarthy on Trademarks & Unfair Competition* § 19:103 (4th ed.) ("To qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services *and* that the services themselves have been rendered in interstate or foreign commerce."). And "the mark must be actually used [on] the services described in the application," otherwise the resulting registration is void *ab initio*. *Couture v Playdom, Inc.*, 778 F.3d 1379, 1381-82 (Fed. Cir. 2015); 15 U.S.C. §§ 1051, 1115(a) (use required). In other words, it is void from the onset because it never would have been registered to begin with. *Id.*[2]

---

[2] *See Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("'Use' is neither a glitch in the Lanham Act nor a historical relic. Trademark law requires firms to "use marks to obtain rights in them.").

1

Accordingly, the crux is whether Plaintiff used the ARIEL mark in commerce for "manag[ing] investments and investment funds" *before* it filed its application. If not, it is void.

### 1. No facts dispute that use in commerce was after filing the application

Plaintiff does not dispute that the ARIEL registration is for the "*management of investments and investment funds*" (SOF 28), or that it listed its earliest date "when [its] product or service was *first made available to consumers*" as September 30, 1983. (SOF 10.) Its supplemented answer was the same. (SOF 32.) But that use is months *after* its June 20, 1983 application. (SOF 27.)

Plaintiff argues that ACA mischaracterized its answer and that it was only responding about its first *fund*. Dkt. 144, at 25. But the interrogatory was not limited to only funds:

> Identify each product and/or service that you have provided or presently provide or offer for sale for use by consumers and for each, describe the product or service in detail and state when the product or service *was first made available* to consumers. (SOF 10) (emphasis added.)

Plaintiff repeated September 30, 1983 in two more interrogatory responses. (SOF 10, 32- 34.)

Plaintiff also admits that its first "public-facing separate account" was on September 30, 1983. (SOF 11.) Plaintiff's 30(b)(6) witness also did not know of any account or use earlier than September 30, 1983. *Id*. Plaintiff's website further confirms that its earliest product was released September 30, 1983. (SOF 32) (listing Ariel Small Cap as the earliest product).

Plaintiff also does not dispute that it produced all documents "relating to…selection, adoption, or *first use* of the word 'Ariel' in [Plaintiff's] name." (SOF 35) (emphasis added.) It further does not dispute that it agreed to produce all "document[s] related to the 'ariel' mark's first use in interstate commerce..." *Id*. Yet it failed to produce any documents showing *use in commerce* prior to the application filing. FRCP 56(e); FRE 803(7) (absence of evidence admissible).

### 2. Plaintiff's Examples are Irrelevant and Inadmissible

Plaintiff cites four examples of alleged pre-application use of "Ariel": (1) The Patient Advisor newsletter; (2) a picture of a door bearing "Ariel"; (3) its trademark application; and (4)

2

30(b)(6) testimony that John Rogers managed money for family and friends. However, none of this evidence is admissible or reliable, and would nevertheless only show that Plaintiff used the mark for its business, and not *in commerce* as required by the Lanham Act.

*First*, the newsletter is not admissible as no foundation for it was established, it is hearsay, and no admissible evidence was presented when or if it was circulated to the public.[3] A newsletter is nevertheless not evidence of "use in commerce" for "*manag[ing] of investments and investment funds*" as required by the registration. *Second*, the picture of a door bearing "Ariel" lacks foundation and is hearsay, and no evidence exists of when it was taken.[4] That picture also is not evidence of use in commerce for "*manag[ing] of investments and investment funds*."

*Third*, the ARIEL trademark application and its specimen are not evidence of use in commerce. *See Couture*, 778 F.3d at 1381 (specimens submitted to the PTO are not indicative of actual rendering of a service); *see also 2 McCarthy* § 19:103 (4th ed.) (the Lanham Act requires "both use[] in the sale or advertising of services *and* that the services themselves have been rendered in [commerce]" for registration).[5] Plaintiff argues that the mark is "incontestable," but

---

[3] **FRE 602, 802, 901-** The newsletter is inadmissible under FRE 602 because Ms. Kosier did not have personal knowledge that it was authored by John Rogers or when it was purportedly circulated. *Id.* It is also inadmissible under FRE 802 as hearsay because Ms. Kosier did not have direct knowledge of it, did not know how it would have been circulated, and even admitted not she but "[John Rogers] would have that knowledge." (Ex. 9, at 299:13-21.) She also was not employed by Plaintiff at the time the newsletter was allegedly "circulated," so could have only learned that information through other parties. (Ex. 9, at 73:3-13.) It is further inadmissible because it lacks foundation under FRE 901 because Ms. Kosier did not produce evidence sufficient to support a finding that it was authored by John Rogers, or when that document was drafted. (*See also* Ex. 9, at 297:2-298:7.)

[4] **FRE 602, 802, 901**- The photograph is inadmissible under FRE 602 because Ms. Kosier did not have personal knowledge of how "the door of Ariel's office" appeared "in January 1983," nor did she have personal knowledge of when the photograph was taken. *See also* Ex. 9, at 302:10-16, 302:13-21. It is also inadmissible hearsay under FRE 802 because Ms. Kosier did not see the door or see the picture taken of "the door of Ariel's office" appeared "in January 1983," so could have only learned that information from third party statements. *Id.* And it lacks foundation under FRE 901 because Ms. Kosier did not produce evidence sufficient to support a finding that it is what she claims it is or when it was taken. *Id.*

[5] *See also Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985) ("[A]dvertising material is not use" under the Lanham Act "and therefore is insufficient to support federal registration."); *Sensient Techs.*

3

this is irrelevant to whether it is void *ab intio*. Dkt. 144, at 25; *NetJets Inc. v. Intellijet Grp.*, 12-cv-0059, 2013 WL 5675464, at *5 (S.D. Ohio Oct. 17, 2013) ("incontestable" trademarks that are void *ab initio* are invalid under Section 1115(b)(1)).

*Fourth*, Plaintiff's 30(b)(6) testimony that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Moreover, Plaintiff's witness could not state to whom, when or where such a service was provided. (SOF 12.) She also did not know if Plaintiff's first trade occurred *before or after* March 23, 1983. (SOF 11.) Indeed, she testified she had no knowledge of any such transactions. (SOF 12); *see Cent. Mfg. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof. **Self-serving deposition testimony is not enough to defeat a motion for summary judgment**.") (bold added). Plaintiff's witness instead stated that she would get the answer, but did not. (SOF 12); *see* FRCP 56(e). In sum, Plaintiff provided no trade receipts, no deposit slips, no names, no dates, no affidavits, and no records of providing services prior to its application. *See* FRE 803(7).

Finally, Plaintiff argues that ACA improperly shifted the burden of proof, but absence of records of regular conducted activities, like trading and investing, is admissible against a party (FRE 803(7)), and it had already admitted its first use was at earliest months *after* its application.

---

*Corp. v. SensoryEffects Flavor, Co.*, 613 F.3d 754, 762-63 (8th Cir. 2010) (no use in commerce despite press release, public announcement, presentations and website because there was no evidence of any sale of goods bearing the mark).

(SOF 10,33-34.) And despite extensive discovery requests, Plaintiff failed to produce any evidence that it "manag[ed] investments" prior to its application. (SOF 10,32-35); FRCP 56(e); FRE 803(7).

### 3. Plaintiff Would Have Been Precluded from Getting a Registration *But For* its Misrepresentation to the PTO

Plaintiff argues that misrepresenting to the PTO that a trademark was used in commerce is not material, but it is because a registration cannot issue unless the mark had been used in commerce before filing the application. *ISP.Net, LLC v. Qwest Comm. Intern.*, 2013 WL 21254430, at *3 (S.D. Ind. May 27, 2003) ("Material facts are those which, if disclosed, would result in refusal…to register the mark."); *see also NetJets*, 2013 WL 5675464, at *5-6 (obtaining a "registration…through a false (i.e., fraudulent) statement" is grounds for cancellation).[6] In short, but for Plaintiff's false claim, the mark would not have been registered.

Plaintiff next argues that "cancellation…requires proof of a deliberate attempt to commit fraud on the USPTO," and cites *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868 (N.D. Ill. 2008) as support. But *Miyano* states in full that "[a]n incorrect date of first use is not a material representation that serves as grounds for cancellation ***so long as the first use preceded the application date***." *Id.* at 879-80 (emphasis added).[7] And unlike the plaintiff in *Miyano*, Plaintiff's first use in commerce *postdated* its application filing. (SOF 10-13, 32-34.)

Moreover, Plaintiff's misrepresentation to the PTO that it had used the ARIEL mark in commerce was knowing and deliberate.[8] Indeed, courts routinely find deliberate intent to deceive

---

[6] *See also Aycock*, 560 F.3d at 1357 (a trademark is void if not used "in commerce" before filing the application); *Couture*, 778 F.3d at 1381 (same); *Burlington N. Santa Fe v. Purdy*, 204 F.3d 1114 (same).

[7] Plaintiff also cites *Eco Mfg. v. Honeywell Int'l, Inc.*, 295 F. Supp. 2d 854 (S.D. Ind. 2003). But it is inapposite as it relates to an Examiner's request for competitor samples, and there was no fraud because the Examiner also could not find any samples, so the statements were not found to be misleading.

[8] *See Torres v. Cantine Torresella, S.r.l.,* 808 F.2d 46, 49 (Fed. Cir. 1986) (affirming summary judgment where the applicant made a material misrepresentation); *MPC Franchise v. Tarntino*, 826 F.3d 653, 661 (2d Cir. 2016) (affirming fraud where mark holder made a material misrepresentation in his application).

5

where mark holders withheld information from the PTO. *See Specialized Seating, Inc. v. Greenwich Indus.*, 472 F. Supp. 2d 999 (N.D. Ill. 2007) (fraudulent intent inferred from showing that information was not disclosed to the PTO).[9] Here, Plaintiff knew that it had not provided investment management services to the public yet it told the PTO it had. (SOF 24, 26); *see Torres,* 808 F.2d at 49 (voiding a mark where applicant knowingly made a material misrepresentation to the PTO). Plaintiff's knowing misrepresentation was accordingly sufficient to constitute fraud.

### 4. Plaintiff is Foreclosed from Asserting the ARIEL Mark under §§ 32 or 43(a)

Plaintiff finally argues that it has other marks it could assert if its ARIEL registration is voided. But that is irrelevant to whether *this* registration is invalid. Of course, Plaintiff could still own a common law ARIEL mark. But common law rights (unlike registered marks) are only gained by *first users* in those areas where the mark is used. *See Zazu Designs v. L'Oreal*, 979 F.2d at 503 (first to "the marketplace" establishes the "right to a [common law] mark."). And because Plaintiff failed to produce any evidence that it used its ARIEL *common law* mark in the Naples or Cleveland areas *prior to* ACA, it cannot demonstrate that it had priority to use the ARIEL mark in those areas. So because the ARIEL registration is invalid, and Plaintiff cannot succeed on its common law mark, the only remaining mark it can assert is ARIEL INVESTMENTS.[10]

## B. No Factual or Legal Arguments Dispute that Confusion is Unlikely

### 1. There has Been No Actual Confusion of Relevant Consumers

---

[9] *See Gaffrig Performance Indus. v. Livorsi Marine, Inc.*, 99-cv-7778, 2003 WL 23144859, at *14 (N.D. Ill. Dec. 22, 2003) (fraudulent intent reasonably inferred by evidence that owner knew that an opposing party was using the mark).

[10] Plaintiff had previously limited its suit to "ARIEL" and "ARIEL INVESTMENTS", and so cannot now pursue the other seven marks. Dkt. 79, at 6 ("Only the ARIEL and ARIEL INVESTMENTS marks are at issue in this case."); *see also* Dkt. 68, at 1-2 (only addressing ARIEL and ARIEL INVESTMENTS); *Green v. Travis*, 00-cv-2230, 2000 WL 1409828, at *2 (N.D. Ill. Sept. 26, 2000) ("no court would permit" a party to reclaim a portion of a claim from their complaint after it had already "disavow[ed]" that portion to the Court) (J. Kennelly). But even if the other seven registered marks remained in this suit, ACA should prevail on non-infringement of those marks for the same reasons it does not infringe the ARIEL INVESTMENTS mark, as more fully described below and in ACA's Opening Brief.

There has been no actual confusion. Plaintiff's examples are hearsay, were not making purchasing decisions, and are nevertheless *de minimus*.

*First,* the two phone calls Ms. Brady and Ms. Cusack reported are inadmissible hearsay. Courts in this circuit reject vague summaries of statements by unidentified consumers. *See, e.g., Smith Fiberglass Prod., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993) (refusing to "craft[] a new hearsay exception to the FRE for paraphrases of **state of mind declarations by unknown declarants**") (emphasis added); *Bobak Sausage Co. v. A & J Seven Bridges, Inc*., 805 F.Supp.2d 503, 520 (N.D. Ill. 2011) (confusion by unknown customers must be rejected as hearsay). Furthermore, Plaintiff cannot provide the identities, phone numbers, or even exact quotes of the allegedly confused callers. *Smith Fiberglass*, 7 F.3d at 1330-31 (testimony must be stricken as hearsay and irrelevant where the testimony lacks an exact quote or the identity of the person making the statement). Plaintiff also does not dispute the callers were not relevant consumers, as one called to check a reference (i.e. not looking to buy any products), and the other inquired about real estate, a product neither company sold.[11] (SOF 59); *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (evidence of actual confusion irrelevant where confused callers were not trying to purchase goods). These two calls are thus inadmissible and from irrelevant consumers.

*Second*, David Boone ("Boone") is also not relevant because he was not a consumer attempting to purchase from either Plaintiff or ACA. FRE 402/403; *Packman*, 267 F.3d at 645 (only potential purchasers are relevant consumers). In fact, Boone testified that he did not remember the call, and if had, he was ***not*** shopping for investment or financial services, and had no intentions of buying such services, thus he is not a relevant consumer. *Id*.; (SOF 59.)

Plaintiff's contention that Boone's publication *may* target investment advisors, who *might*

---

[11]Real estate is sold by "Ariel Investment Properties," however, a Florida-based company who Plaintiff's 30(b)(6) witness conceded "could have been" the potential target of the call. (SOF 59).

7

be Plaintiff's customers someday is immaterial as infringement requires more than a possibility of confusion. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995) (mere possibility of confusion is insufficient for infringement). Additionally, because Boone **never** published an article about Plaintiff or ACA, theoretical readers could never have been confused.[12] The focus is thus only on Boone, who was not a relevant consumer.

**Third**, evidence of Justin Land ("Land") is inadmissible as it is double hearsay[13], and he was also not a relevant or "confused" consumer. FRE 402/403/803; *see also Packman*, 267 F.3d at 645 (plaintiff's evidence of actual confusion is irrelevant where confused callers had no intention to purchase goods). Even if admissible, Land allegedly asked at a conference "if ACA had any affiliation with Plaintiff." (SOF 59.) Thus, Land was socializing, not making a purchasing decision. *Id*. Plaintiff claims Land is a "direct conduit for Ariel customers," but it presents no evidence in support, and the Lanham Act does not protect against middle-man confusion. *Syndicate Sales v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999) (evidence of confusion was insufficient because person was not making direct purchasing decision).[14]

---

[12] Plaintiff cites *Road Dawgs Moto. Club of U.S. v. "Cuse" Rd. Dawgs, Inc.*, 679 F.Supp.2d 259 (N.D.N.Y. 2009) and *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925 (7th Cir. 1984), but the courts relied in part on *published* articles. Here, no publications exist that confuse ACA and Plaintiff. Further, the "actual confusion" from such an article would have been those theoretical readers, not Boone.

[13] **FRE 402, 403, 802**- Evidence of Mr. Land's statements is hearsay as it is from a third-party statement to another party who also did not testify to the statement. It is also presented to prove the truth of the matter asserted. Plaintiff argues that Mr. Bray testified about it, but that does not change that Mr. Bray had no direct knowledge of this statement. Nonetheless, Plaintiff could have deposed or requested an affidavit from Mr. Land, or from the person that Mr. Land told that statement to, but chose not to.

[14] Moreover, Land *thought* to inquire whether there was a relationship, he did not *assume* they were related. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (inquiries are not actual confusion as they "are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.") (emphasis in original). Plaintiff cites *Virgin Enters. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003), however, for its position that inquiries into a relationship between parties are relevant to show actual confusion, but courts in the Second Circuit have rejected this holding and have continually cited to *Nora Beverages,* 269 F.3d at 124 instead, which holds that inquiries are premised upon a **lack** of confusion. *See, e.g., Advance Magazine Publ., Inc. v. Norris*, 627 F. Supp. 2d 103, 121

8

**Lastly**, Monica Schandel ("Schandel") is not a relevant consumer because she was not making a purchasing decision at the time of the alleged confusion. FRE 402/403; (SOF 59.) Rather, Schandel testified she accidentally referred to Plaintiff instead of ACA in her email because she was looking at Plaintiff's subpoena while responding, which listed Plaintiff's name. (SOF 59.) She further testified she misspoke in her deposition and was not confused between Plaintiff and ACA. *Id*. Indeed, trademark law only protects against certain species of confusion. *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) ("trademark infringement protects only against mistaken purchasing decisions and not against confusion generally"). In sum, Schandel made a mistake, but not a purchasing mistake that the Lanham Act protects against.

Even if Boone, Land and Schandel were relevant consumers, *and* confused, three instances of confusion is nevertheless *de minimis*. *See Packman*, 267 F.3d at 645 (even four calls from relevant consumers, which came at start of defendant's business, is *de minimis* confusion).[15]

Lastly, Plaintiff's argument that "there is often a vast undetected history of confusion" does not tilt this factor in its favor as Plaintiff must set forth specific facts showing a genuine issue exists, not some unsupported and unknown concern. *See* Fed. R. Civ. P. 56(e).

### 2. Plaintiff Concedes Bray Named ACA After His Daughter, which is *per se* Not Bad Faith Intent

Plaintiff does not dispute that Bray named ACA after his daughter and Ariel Ministries, and that Bray "d[id]n't want to take another firm's name." (SOF 7.) That is dispositive for this factor. *Rust Env.*, 131 F.3d at 1219 (no bad faith where no intent to trade on plaintiff's name).

---

(S.D.N.Y. 2008) ("inquiries are arguably premised upon a lack of confusion… such as to inspire the inquiry itself"); *Medici Classics Prods. v. Medici Grp.*, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008) (same); *LVL XIII Brands v. Malletier*, 14 CV. 4869, 2016 WL 4784004, at *40 (S.D.N.Y. Sept. 13, 2016) (same); *and see Smith Fiberglass*, 7 F.3d at 1330-31 (inquiry at a trade show stricken as irrelevant to confusion).

[15] *See also Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) (evidence that two consumers were misled by defendant's mark did not create contestable issue of likelihood of confusion); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1060 (7th Cir. 1995) (three "is not much confusion; indeed, it is remarkably low").

9

Plaintiff instead argues that Bray intended to use its name because Bray works in the financial services business, heard of John Rogers before founding ACA, attended conferences where Plaintiff had exhibits, and reads a periodical where Plaintiff has advertised. Dkt. 144 at 20-21. But even if Bray knew of Plaintiff, knowledge of another's name is insufficient to show intent, especially where ACA had other inspirations for its name. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (finding no intent where defendant's name was inspired by a movie, even though defendant previously knew plaintiff's name and used its products). Rather, intent refers to the *intent to confuse consumers*, not the intent to use a mark similar to one already in use. *AM Gen. Corp., v. DaimlerChysler Corp.*, 311 F.3d 796, 829 (7th Cir. 2002) ("Passing off means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off."). Therefore, because Plaintiff concedes Bray's intent was to name ACA after his daughter and to honor his faith, which is dispositive, and because his alleged knowledge of Plaintiff does not equate to a bad faith intent to confuse consumers, this factor favors ACA.

Plaintiff's other argument that ACA has not ceased using its name during this litigation is irrelevant for this factor. Dkt. 144 at 21. Indeed, mere awareness of another's mark "does not show fraudulent intent." *See, e.g.*, *Packman*, 267 F.3d at 644-45.[16]

### 3. Plaintiff's Marks are Not Strong and Have Very Narrow Protection

It is undisputed that "Ariel Wealth Advisors"– a firm with identical services to ACA – and over 150 other companies use "Ariel" in their names. (SOF 65.) The existence of this other financial firm and numerous companies thus narrows Plaintiff's scope of protection for its "Ariel" names. *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 06-cv-950, 2007 WL 118527, at *1 (N.D. Ill. Jan. 4, 2007) (J. Kennelly), *aff'd,* 509 F.3d 380 (7th Cir. 2007) (the existence of other marks using

---

[16] Or else each suit would trigger a bad faith inference if a defendant did not instantly abandon its name.

the same term and in the same class of goods demonstrates "that the scope of protection" should be "*extremely* narrow") (italics in original). So Plaintiff's protection, if any, is extremely narrow.

The relevant public also associates Plaintiff's products with other parts of Plaintiff's logo, and not with its asserted marks. In fact, it is undisputed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SOF 57); *see Haven Capital Mgmt. v. Havens Advisors, LLC*, 965 F. Supp. 528, 531 (S.D.N.Y. 1997) (finding a weak mark where customers associated plaintiff with its low cost and style of investment rather than its name). Indeed, Plaintiff produced no evidence consumers associate it with its marks.

Plaintiff argues that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 144 at 17-18. But Plaintiff offers no evidence that consumers recognize, buy its products because of, or that its advertisements have any effect on consumer recognition of its asserted marks. FRCP 56(e); *Co-Rect Prod. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) ("it is the *effect* of such advertising that is important, not its extent."); *Knaack Mfg. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1001-02 (N.D. Ill. 1997) (25 years of use and millions in advertising were *insufficient* to show the mark had gained brand recognition). Indeed, Plaintiff's own ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are not recognized. (SOF 57.)

**4. These Consumers Exercise Great Care Are Unlikely to Be Confused**

Plaintiff concedes investment decisions require great care, and that its buyers are sophisticated. Dkt. 144 at 21; (SOF 60); *Rust*, 131 F.3d at 1217 ("[W]here consumers are sophisticated, deliberative buyers, confusion is less likely."). Plaintiff argues these sophisticated consumers might be confused because the parties' services and potential clients allegedly overlap. Dkt. 144 at 21. But Plaintiff admitted otherwise: it does not offer ACA's services, no overlapping advertising, and that ACA's clients are families, while its clients are mainly brokers and corporations. (SOF 4, 44, 46-48, 54, 56.) And unlike in *CAE, Inc. v. Clean Air Eng'g*, 267 F.3d

11

660 (7th Cir. 2001) upon which it relies, Plaintiff and ACA do not share clients or advertise in the same journals. *Id.* at 678. Because the Parties admit that they do not target the "same general audience" and have sophisticated buyers, confusion is unlikely.

### 5. Plaintiff's Products and ACA's Services Are Different and Do Not Target the Same Markets or Customers

When two services do not compete, likelihood of confusion decreases. *Knaack v. Rally*, 955 F. Supp. at 1000 ("If firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 391-92 (S.D.N.Y. 2006) (finding confusion unlikely where two financial firms provided different services and thus did not compete); *Haven Capital,* 965 F. Supp. at 531-32 (finding that a company that provided investment advice and managed funds, and a company that provided advice and money management services, were not in competition because the services provided were significantly different). Here, Plaintiff sells mutual funds and separate accounts (modified mutual funds), while ACA does not offer *any* mutual funds or separate accounts. (SOF 42-43.) And it is also uncontested that ACA provides personalized financial plans, estate and retirement planning, and prepares tax returns, while Plaintiff does not provide written financial plans, estate plans, or prepare tax returns. (SOF 38, 43, 46-48.) Plaintiff argues, however, that ACA's ADV form also lists mutual funds, but that form only lists mutual funds in case a client transfers from a different advisor. (SOF 42.) As such, the Parties serve significantly different purposes. Coupled with the buyers' sophistication, confusion is unlikely.

Plaintiff's and ACA's services are also sold to different markets and asset classes. Indeed, differences in the types of customers and transaction sizes are strong evidence of difference in the parties' respective markets. *See Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 449 (S.D.N.Y. 1982) (company with $1500 loans for individual consumers served an *entirely*

12

*different market* than defendant with $50,000 business loans). Here, it is undisputed that Plaintiff only requires its mutual fund clients to invest $50/month or $1000 total. (SOF 58.) ACA requires $1,000,000.[17] (SOF 51.) Plaintiff services largely institutional clients and professional broker-dealers, while ACA services individuals and families. (SOF 49.) Even if Plaintiff serves several millionaires like it claims (but produced no evidence of), such high net worth individuals are likely to be sophisticated consumers and less likely to be confused by the different services. *Rust Env.*, 131 F.3d at 1217 ("[W]here consumers are sophisticated, deliberative buyers, confusion is less likely."); *and see Haven Capital*, 965 F. Supp. at 534 (buyers were sophisticated where they invested over $1,000,000).[18] Because the *types* of consumers and *amounts* differ, sophisticated consumers would not confuse ACA's bespoke services with Plaintiff's mutual funds.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Plaintiff additionally concedes it wants to be in a niche market for mutual funds, and that it has no immediate plans to expand its business. (SOF 48.) It argues that ACA, however, may one day start its own mutual fund because ACA "has produced no evidence closing the door on its own future expansion." Dkt. 144 at 12. But Plaintiff cites no evidence or authority of this. *See Lebewohl v. Heart Attack Grill LLC*, 11-cv-3153, 2012 WL 3839379, at *3 (S.D.N.Y. Sept. 5, 2012) (where a party has "no concrete plans to expand," "any assessment as to the likelihood of confusion

---

[17] Plaintiff argues that certain of ACA's individual accounts were $312,000. These accounts are generally part of multi-million-dollar family portfolios, so are still associated with an even higher degree of consumer care. (SOF 23.) But regardless, even $312,000 accounts have a high degree of care.

[18] *Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*, 09-CV-15, 2009 WL 928993 at *9 (N.D. Ind. Apr. 2, 2009) (investors "have a higher sophistication level and…exercise greater care in selecting a service.").

13

presented by future expansion would be unacceptably conjectural"). Thus, Plaintiff's argument on this point is mere conjecture and must be ignored.

Because ACA's personalized, intimate services differ vastly from Plaintiff's mutual funds, and because ACA serves different markets and classes of consumers, this factor favors ACA.

### 6. "Ariel" is Not Well-Known, Thus it is Not the Salient Portion of Plaintiff's Mark so They Must Be Considered as a Whole

Plaintiff's contention that "Ariel" is the salient feature of its mark is unsupported as Plaintiff presented no evidence its mark is well-known. *See Lincoln Fin.*, 2009 WL 928993 *7 (holding "Sage" was not the salient portion of "Sagemark Consulting" and "Sagepoint Financial" because plaintiff did not show its "sage" mark was well-known). Indeed, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (SOF 57); *cf. Ty, Inc. v. Jones Grp.*, 237 F.3d 891 (7th Cir. 2001) ("Beanie" was deemed the salient portion because "Beanie" is a well-known and famous part of the Ty mark). "Ariel" thus is not entitled more weight than its surrounding elements, so Plaintiff's mark should be considered as a whole.

Here, the "ARIEL INVESTMENTS" and "Ariel Capital Advisors" marks use different fonts (*serif* v. *sans-serif*), capitalizations, layouts, coloring, design elements and logos (turtle v. lion). (SOF 60-61); *Lincoln Fin.*, 2009 WL 928993, at *7 (customers quickly distinguish logos based on differences in color, layout, design, font and capitalization elements). Even the case Plaintiff cites, *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 2013 WL 6839815 (N.D. Ill. Dec. 27, 2013), supports that marks are viewed as a whole. The court there looked at the similarities of fonts, capitalization and their presentations. *Id.* Plaintiff also argues ACA's lion does not distinguish its marks from Plaintiff's, but this again ignores that consumers encounter the marks wholly, and that the impression of a lion is substantially different from Plaintiff's turtle. (SOF 60-61); *see Barbecue Marx*, 235 F.3d at 1044 (because the "SMOKE DADDY" and "BONE

14

DADDY" marks had "visually distinct" appearances, it "significantly undercut[]" the claim that they were similar in appearance and suggestion, despite "sound[ing] alike" and "evok[ing] similar imagery").[19] Because consumers see these marks' *in their entirety,* and as they appear in the marketplace, they would see the distinctions and not confuse the two.

Plaintiff finally argues that because ACA obtains its customers through referrals, that any designs or artwork will not distinguish the marks. Dkt. 144 at 3-4. First, ACA gets its clients from other clients, so they would not be confused. (SOF 52.) Second, because the services are expensive, any referred clients are likely to investigate further and see the visual appearance on the website. *See Knaack*, 955 F. Supp. at 1001 (consumers inspect products and accompanying marks carefully where expensive).[20] Finally, even speaking the words "Ariel Investments" and "Ariel Capital Advisors," as Plaintiff argues, does not create confusion because they sound differently and have different number of syllables. And Plaintiff admitted its customers investigate in-depth. (SOF 60.)

### 7. The Parties Do Not Advertise in the Same Manner or Areas

It is undisputed that ACA has never advertised in, and does not plan to advertise in, any of the same media outlets as Plaintiff. (SOF 54.) Plaintiff's argument that because both have websites they advertise in the same manner is inapposite. *See McCarthy* § 24:53.50 (4th ed.) (advertising and offering services "through the Internet is not a sufficient basis to find that they are sold through the same channels of trade [as] everything is advertised and sold through the Internet.").[21] As Plaintiff and ACA do not advertise in the same outlets, this factor favors ACA.

---

[19] *See also Sullivan v. CBS Corp.*, 385 F.3d 772, 777-78 (7th Cir. 2004) (use of "SURVIVOR" on both CDs not similar); *S Indus. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 889 (N.D. Ill. 1998) ("STEALTH" and "STEALTHBOX" not similar); *Haven Capital v. Havens Advisors*, 965 F. Supp. 528 (no confusion found between "Haven Capital" and "Havens Advisors").

[20] Plaintiff's cases for referred clients not seeing visual distinctions are outdated as they predate the internet, when consumers primarily used phonebooks and could not see the company's website.

[21] *See also Libman Co. v. Vining Indus.*, 69 F.3d 1360, 1362 (7th Cir. 1995) (goods that are available in the same *type* of outlets, confusion is unlikely where the goods are never available in the *same* outlets).

15

## CONCLUSION

For the reasons stated above and in Defendant Ariel Capital Advisors' Opening Brief (Dkt. 129), Defendant Ariel Capital Advisors requests this Court enter an Order: (i) finding Plaintiff Ariel Investments' ARIEL Trademark Registration No. 1286420 void *ab initio*; (ii) cancelling ARIEL Trademark Registration No. 1286420 with the PTO; (iii) finding no infringement of ARIEL INVESTMENTS, and no infringement of any other of Ariel Investments' trademarks, to the extent any remain in this case; (iv) finding that ACA did not violate Illinois unfair competition laws; (v) finding that ACA did not commit deceptive trade practices; (vi) finding that ACA did not cybersquat; and, (vii) awarding ACA damages, prejudgment interest, cost, and attorneys' fees.

Dated: December 9, 2016                                RESPECTFULLY SUBMITTED,


By: s/ Adam Wolek
Adam Wolek
Brian Noack
WOLEK & NOACK
333 S Wabash Ave., Suite 2700
Chicago, IL 60604
P: 312.860.9006
F: 708.843.0509
*Local Counsel for Defendant Ariel Capital Advisors LLC*


Christopher P. Bray
Christopher P. Bray Associates, LLC
9115 Corsea Del Fontana Way, Ste. 200
Naples, FL 34109
P: 239.651.6008
F: 239.431.3914
cpbray@cpbrayassociates.com
*Lead Counsel for Defendant Ariel Capital Advisors LLC*

**CERTIFICATE OF SERVICE**

  The undersigned certifies that, on December 9, 2016, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: December 9, 2016            WOLEK & NOACK

                    By: s/ Adam Wolek
                    Adam Wolek