UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARIEL INVESTMENTS, LLC | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-3717 |
| | ) | |
| ARIEL CAPITAL ADVISORS LLC | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**Defendant Ariel Capital Advisors LLC's Reply Statement of Facts and Response to
Plaintiff Ariel Investments LLC's Statement of Additional Material Facts**

Defendant Ariel Capital Advisors LLC replies and responds to Plaintiff Ariel

Investments LLC's Responses and Additional Statements of Material Fact as follows:

**I.     Jurisdiction and Venue**

1.      This is an action seeking to invalidate Ariel Investments, LLC's ("Plaintiff")
ARIEL mark because it did not satisfy the first use requirement under Lanham Act, 15 U.S.C.
§ 1127, and it fraudulently misrepresented the first use in commerce in contravention to
Lanham Act, 15 U.S.C. 1115(b). Therefore, this Court has subject matter jurisdiction over this
matter. (Defendant's Second Amended Answer and Counterclaims, Dkt. 98, attached as
Exhibit 34, at ¶ 64-86.)

**RESPONSE:** Ariel disputes that it did not satisfy the first use requirement under the Lanham
Act, 15 U.S.C. § 1127 or that it fraudulently misrepresented the first use in commerce in
contravention to Lanham Act, 15 U.S.C 1115(b). (Exs. E at 296:8-24; 297:1-24; 298:1-10; G,
H, I, QQ, RR at 72:22-24; 73:1-2; 75:11-16; TT.)   Ariel does not dispute the remaining
statements in Paragraph 1.

**ACA's REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner that is

immaterial to the motion. While Plaintiff's application states the mark has been used since January

1983 and used in commerce since March 1983, and these dates coordinate with the date Rogers

allegedly founded Ariel Capital Management, this does not demonstrate Plaintiff was managing

investments in commerce at the time of its "Ariel" trademark application or "as soon as it opened

its doors in January, 1983." *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *See Couture*, 778 F.3d at 1381 (specimens and declarations submitted to the USPTO are not indicative of actual provision of a service as examiners take them at face value without verifying).

Plaintiff has not shown evidence that it used the ARIEL mark in commerce prior to June 20, 1983, and has affirmatively stated that it had not used it in commerce before September 30, 1983. (Ex. 12 Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 13 Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 14 Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 9, at 98:4-22.) ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ which is not enough to defeat summary judgment. (Exh. 9, at 74:4-17; 75:11- 16.) *See Cent. Mfg., Inc.,* 492 F.3d at 883 ("Self-serving deposition testimony is not enough to defeat a motion for summary judgment."); *Conroy*, 644 F. Supp. 2d at 1067 (striking testimony as hearsay where plaintiff had no supporting evidence other than her own deposition testimony that she was told this was the case). What is more, even its January 1983 date is contradicted by its trademark application, which states that it did not use the mark in commerce until *March 23, 1983*. (*See* Plaintiff's Response to SOF 10 *supra.*)

This fact is material and shows Plaintiff did not use the ARIEL mark in interstate commerce before it filed its June 1983 ARIEL trademark application. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when it was filed); *Couture,*

778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed). Moreover, it shows that Rogers, who instructed Berger to register the ARIEL trademark, knew it was false to represent to the USPTO that Plaintiff had used its ARIEL mark in interstate commerce when it did not do so. *See NetJets Inc. v. Intellijet Grp., LLC*, No. 2:12-CV-0059, 2013 WL 5675464, at *5 (S.D. Ohio Oct. 17, 2013) ("incontestable" trademarks that are void *ab initio* are invalid under Section 1115(b)(1)).

2.     While Plaintiff maintains its objections that jurisdiction and venue are improper in the Northern District of Illinois, this Court has previously ruled that a substantial part of the events giving rise to this action have occurred or will occur in the Northern District of Illinois and that this Court has personal jurisdiction over the plaintiff and venue is proper in this District. (Christopher Bray Declaration dated November 3, 2016, attached as Exhibit 1, at ¶ 3-4, 9-22; Order dated October 29, 2015, Dkt. 44, attached as Exhibit 35.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 2.

## II.     The Parties

### A.  Defendant Ariel Capital Advisors LLC

3.     ACA is a Florida limited liability company, founded by its current and then CEO Christopher Bray, having its principal place of business in Naples, Florida and a small satellite office in Cleveland, Ohio.  (Exh. 1, at ¶ 2-4.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 3.

4.     ACA provides private wealth management, including personalized investment management services, tax planning, cash flow planning, retirement planning, estate planning, and tax return preparation.  (Exh. 1, at ¶ 6.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 4.

5.     With limited exceptions for pre-existing relationships, ACA requires clients to have a minimum of a million dollars in investable assets to open an account.  (Exh. 1, at ¶ 7.)

**RESPONSE:** Ariel disputes the statements in Paragraph 5.  Ariel Capital reports to the SEC that a condition for starting and maintaining a client relationship is a minimum account of a million dollars, but Ariel Capital may accept clients with smaller portfolios.  (Ex. U at ACA 687; Ex J. ¶ 20.) As of April 8, 2016, the median value of Ariel Capital's clients' portfolios was considerably less than the stated million dollar minimum balance. (Ex. Q at 70:19-22; 71:20-22; Ex. S at pp. 5-6.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner that is

immaterial to the motion. Plaintiff's takes the evidence out of context. ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[1] Mr. Bray testified:



Q: ████████████████████████████████████████████████████████
███████
████████████████████

Q: ████████████████████████████████████████████████████████

A: "Yeah. And to clarify, Art, with regard to the conditions for managing accounts, I would guess that ██████████████████████████████████████████████████████
██████████████████████████

Q: "Uh-huh"

A: "████████████████████████████████████████████████████████
██████████████████████████████████████." *Id.* (bold added).

████████████████████████████████████████████████████████

████████████████████████. (Ex. 2, at 193:20 – 194:15.)

Q: "**How would you describe that primary client from your example**?"

A: "**Significant assets – significant investable assets**, significant – or complexity with regard to their income tax planning and compliance, likely estate tax exposure, state or federal, and substantial financial planning needs."

Q: "And when you say significant assets, what's – for the primary family member or client, what do you mean by that?"

A: ████████████████████████████████████████████████████████
████████████████████████ *Id.* (bold added).

These statements are material because ACA's large account minimum distinguishes its

services from Plaintiff's mutual funds, ████████████████████████████████████

████████████████████████████████ (Exh. 9, at 108:20; 134:18-19); *see*

---

[1]All citations to Exhibits 1-43 refer to exhibits filed in conjunction with the Declaration of Brian T. Noack in Support of Defendant's Motion for Summary Judgment and Defendant's Response to Plaintiff's Motion for Summary Judgment. (Dkts. 132-2 – 132-8.)

*Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 449 (S.D.N.Y. 1982) (finding that the plaintiffs who made small, $1500 loans to individual consumers served an *entirely different market* than defendant who made large, $50,000 business loans). It also shows customers are sophisticated. *See Haven Capital v. Havens Advisors*, 965 F. Supp. at 534 (where initial investments are over $1,000,000, buyers are sophisticated).

6.  ACA primarily gets clients through word-of-mouth advertising. (Exh. 1, at ¶ 8.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 6. Ariel Capital, however, also advertises its financial services in print, radio, through its website, via its business cards, by word of mouth, in advertisements in the Naples, Florida *Daily News* and *Crain's Cleveland Business*, and by sponsoring events involving local non-profits, community non-profits and charities so that Ariel Capital's name is included on event promotional materials. (Ex. R at 67:8-25; 68:1-4; Ex. Q at 57:13-15; 58:3-12; 212:24-25; 213:1-7; 215:16-20; 216:1-4.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 6, Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. All advertisements were locally concentrated in the Naples, Florida area, and only one advertisement was exhibited in Cleveland, Ohio in *Crain's Cleveland Business*. (Exh. 2, 56:16-20; 57:3-12; 58:12-16; 215:16-216:4).

These facts are material because the mere fact that the Parties advertise through the same *type* of outlets (i.e. media and public sponsorships) is irrelevant where neither Party advertises in the *same* outlets. *See Libman Co. v. Vining Indus.*, 69 F.3d 1360, 1362 (7th Cir. 1995) (distinguishing that while goods may be available in the same *type* of outlets, confusion is unlikely where the goods are never available in the *same* outlets).

7.  Bray named Ariel Capital Advisors after his daughter, Ariel Bray, and Ariel Ministries, which he and his wife have served for fifteen years. (Ariel Capital Advisors LLC's Second Rule 30(b)(6), attached as Exhibit 2, at 202:5 – 203:10.) "Ariel" is a Hebrew word that means lion of God. (Exh. 2, at 202:11-12; *see also* Bates Number ACA000819, attached as Exhibit 4.)

**RESPONSE:** Ariel does not dispute that Bray claims to have named Ariel Capital Advisors after his daughter. Ariel, however, contends that Bray selected the name "Ariel" for his firm with full knowledge of Ariel's prior use of the ARIEL mark. (Exs. B at 4; K ¶¶ 6-9, 11-13; R at 41:20-23; 47:12-13;67:3-6; 68:19-23; 69:7-10; HH.) Ariel does not dispute the remaining statements in Paragraph 7.

**ACA REPLY:** To the extent Plaintiff disputes SOF 7, Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. Mr. Bray testified he did not intend to use the "ARIEL" marks, as Plaintiff had defined them. (Ex. 2, at 151:19 – 152:8.) Furthermore, Mr. Bray's intent when choosing the name "Ariel Capital Advisors, LLC" was based on his daughter, Ariel Bray, and the ministries his family belongs to, Ariel Ministries, which Plaintiff concedes. (Ex. 5 ACA Dep. I at 72:21-75:9.) Indeed, Bray testified he "d[id]n't want to take another firm's name. (Id., at 75:16-25.) To the extent Plaintiff implies Mr. Bray saw Plaintiff's mark or advertising, Mr. Bray was unaware of Plaintiff or its advertising prior to this suit. (Ex. 5, at 69:11-23.) But even if Bray knew of Plaintiff, knowledge of another's name is not sufficient to show intent, especially where ACA had other inspirations for its name. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (finding no intent where defendant's name was inspired by a movie, even though defendant previously knew plaintiff's name and used its products).

This fact is material because it shows Mr. Bray named ACA after his daughter, not after Plaintiff, thus he did not have bad faith intent, intent refers to the *intent to confuse consumers*, not the intent to use a mark similar to one already in use. *AM Gen. Corp., v. DaimlerChysler Corp.*, 311 F.3d 796, 829 (7th Cir. 2002) ("Passing off means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off.") (internal citations omitted).

### B. Plaintiff Ariel Investments, LLC

8.     Plaintiff Ariel Investments, LLC ("Plaintiff") is a limited liability company duly organized and existing under the laws of the State of Delaware with its principle place of business at 200 E. Randolph Street, Suite 2900, Chicago, Illinois. It was originally founded as Ariel Capital Management, Inc. in 1983 and reorganized to Ariel Capital Management, LLC in 2004 and later changed its name to Ariel Investments, LLC in 2008 (Plaintiff's Complaint, attached as Exhibit 36, at ¶ 2, 9.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 8.

9.      Plaintiff and its predecessors-in-interest provide investment services, financial and investment advisory services, and mutual funds. (*Id*. at ¶ 8.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 9.

10.     Plaintiff stated in its Answers to Defendant's First Set of Interrogatories and its 30(b)(6) Deposition that its first public account was known as Ariel Small Cap and it launched on September 30, 1983. (Plaintiff's Answers to Defendant's First Set of Interrogatories, attached as Exhibit 12, at 2; Ariel Investments, LLC's rule 30(b)(6) Deposition, attached as Exhibit 9, at 93:2-4, 98:4-22, 339:12-24, 340:1-12, 341:21-342:8, 344:10-345:22.)

**RESPONSE:** Ariel disputes the statements in Paragraph 10 regarding the Ariel Small Cap separate account being Ariel's "first public account." The Ariel Small Cap separate account is Ariel's first "public-facing *separate account*[.]" (Ex. RR at 342:5-8 (emphasis added).) Moreover, Ariel offered and performed investment management services since its inception in January 1983. (Ex. RR at 74:4-17; 75:11-16.)

**ACA REPLY:** Plaintiff's Response does not display any new facts that dispute this fact.

Plaintiff offers mutual funds and separate accounts. (Exh. 9, at 106:12-13). ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ This is confirmed in

Plaintiff's Response to ACA's Interrogatory asking "Identify *each product and or service that*

*you have provided or presently provide* or offer for sale for use by consumers and for each,

describe the product or service in detail and state when the product or service *was first made*

*available to consumers,*" where Plaintiff responded with it earliest product or service of

September 30, 1983; none were provided before. (Exh. 12, at 2) (emphasis added).

Regarding the investment management services Plaintiff performed and offered since its

inception in January 1983, ACA requested "Each document related to the "Ariel" mark's first use

on January 10, 1983" and "Each document related to the "Ariel" mark's first use in interstate

commerce on March 23, 1983." But no documents were ever provided to show "use in

commerce". *See Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985) ("[A]dvertising

material is not use within the meaning of the [Lanham Act] and therefore is insufficient to support

federal registration."); *see also Cent. Mfg. v. Brett*, 492 F.3d 876, 882-83 (7th Cir. 2007) ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Plaintiff provides only its deposition testimony as proof it *performed services* before September 30, 1983. But this is not enough. *See Cent. Mfg.,* 492 F.3d at 883 ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof. **Self-serving deposition testimony is not enough to defeat a motion for summary judgment**.") (bold added); *Conroy v. City of Chicago*, 644 F. Supp. 2d 1061, 1067 (N.D. Ill. 2009) (striking testimony as hearsay where plaintiff had no supporting evidence other than her own deposition testimony that she was told this was the case). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).



This fact is material and shows Plaintiff did not provide services, and thus did not use its mark in interstate commerce, before it filed its June 1983 ARIEL trademark application.

11. ████████████████████████████████████████████

████████████████████

**RESPONSE:** Ariel does not dispute the statements in Paragraph 11. ████████████

████████████████████████████

    **ACA REPLY:** Plaintiff's Response does not display any new facts that dispute this fact. Plaintiff provides deposition testimony as its only proof it performed services before September 30, 1983, but this is not enough. *See Cent. Mfg.*, 492 F.3d at 883 ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof. **Self-serving deposition testimony is not enough to defeat a motion for summary judgment**.") (bold added); *Conroy*, 644 F. Supp. 2d at 1067 (striking testimony as hearsay where plaintiff had no supporting evidence other than her own deposition testimony that she was told this was the case) ████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████

████████████████████████

████████████

████████████████████████

████████████████████

    This fact is material and shows Plaintiff cannot provide any evidence that it provided its services, and thus used the ARIEL mark in interstate commerce, before it filed its June 1983 ARIEL trademark application. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when it was filed)

12. ████████████████████████████████████████████

████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 12. ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Moreover,

Ariel Capital does not present any evidence supporting its assertion that Ariel "could not accept public assets." Indeed, it is not even clear what Ariel Capital means by the phrase "public assets."

**ACA's REPLY:** Plaintiff's Response does not display any new facts that dispute this fact. Plaintiff provides deposition testimony as its *only* proof it serviced clients or accepted public assets before September 30, 1983, but this is not enough. *See Cent. Mfg.,* 492 F.3d at 883 ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof. **Self-serving deposition testimony is not enough to defeat a motion for summary judgment**.") (bold added); *Conroy,* 644 F. Supp. 2d 1061, 1067 (N.D. Ill. 2009) (striking testimony as hearsay where plaintiff had no supporting evidence other than her own deposition testimony that she was told this was the case). ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████

███████

███████████████████████████████████████████████████████████

Plaintiff never produced any evidence of these clients. It did not produce any names, identity, or even relationship information. FRE 803(7); FRCP 56(e); (Exh. 9, at 75:11-77:24.) This fact is material and shows Plaintiff cannot provide any evidence that it provided its services, and thus that it used the ARIEL mark in interstate commerce, before it filed its June 1983 ARIEL trademark application. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark

was used in commerce when it was filed); *Couture v Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed.

Cir. 2015) (a trademark is void *ab initio* where mark holder had not yet provided services *when*

the application was filed).



**RESPONSE:** Ariel does not dispute the statements in Paragraph 13.

14. 

**RESPONSE:** Ariel does not dispute the statements in Paragraph 14.

15. In an interview for Spirit magazine, Mr. Rogers stated "[i]n 1983, at 24 years old, I founded Ariel Capital Management with $150,000 from family and friends." (Deposition Exhibit 8 to the Plaintiff 30(b)(6) Deposition, attached as Exhibit 37, at *3.)

**RESPONSE:** Ariel objects to the admission of the evidence on which Ariel Capital relies to support the statements in Paragraph 15 on the basis of Fed. R. Evid. 802.

**ACA REPLY:** Exhibit 37 is a true and correct copy of a document produced by Plaintiff to

ACA in discovery. It is admissible under FRE 803(3) because it was a statement of then-existing

state of mind, under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's

knowledge (Exh. 9, at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest

by an unavailable witness (*see* Dkts. 87, 96) because using or managing funds from family and

friends was not *use in commerce. See Burlington N. Santa Fe Corp. v. Purdy*, 204 F.3d 1114 (5th

Cir. 1999) (performing work for personal friends does "not fulfill[] the second part of the test – the actual rendition of services in interstate commerce"); *see also* 2 McCarthy on Trademarks and Unfair Competition § 16:7 (4th ed.) (sales to relatives and personal friends do not constitute commercial use of a trademark).

16. While being interviewed for N'Digo magazine, Mr. Rogers stated that he "had no money to manage, no clients", that he "g[ot] his first million-dollar account after 18 months," and that "[Plaintiff] offers [an investment plan] for as little as $50 a month." (Deposition Exhibit 5 to the Plaintiff 30(b)(6) Deposition, attached as Exhibit 15, at *2-3.)

**RESPONSE:** Ariel disputes the statements in Paragraph 16. Ariel objects to the admission of the evidence on which Ariel Capital relies to support the statements in Paragraph 16 on the basis of Fed. R. Evid. 802.

**ACA REPLY:** Exhibit 15 is a true and correct copy of a document produced by Plaintiff to ACA in discovery. It is admissible under FRE 803(16) as the produced document is greater than 20 years old, under FRE 803(3) because it was a statement of then-existing state of mind, under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9, at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest by an unavailable witness (*see* Dkts. 87, 96) because it relates to using or managing investment funds *in commerce* after the trademark application date, voiding the ARIEL trademark registration. *See Burlington,* 204 F.3d 1114 at *1 (performing work for personal friends does "not fulfill[] the second part of the test – the actual rendition of services in interstate commerce"); *see also*2 McCarthy on Trademarks and Unfair Competition § 16:7 (4th ed.) (sales to relatives and personal friends do not constitute commercial use of a trademark).

17. In an article for *Dollar & Sense*, Mr. Rogers stated that "[i]t took us over a year and a half before we got that first million-dollar account", that "[t]here were a lot of long lean days", and that "[Plaintiff] offers a one-time investment option where a minimum of $1,000 must be invested, with minimum subsequent investments of $50." (Deposition Exhibit 6 to the Plaintiff 30(b)(6) Deposition, attached as Exhibit 32, at *2, 4.)

**RESPONSE:** Ariel disputes the statements in Paragraph 17. Ariel objects to the admission of the evidence on which Ariel Capital relies to support the statements in Paragraph 17 on the basis of Fed. R. Evid. 802.

**ACA REPLY:** Exhibit 32 is a true and correct copy of a document produced by Plaintiff to

ACA in discovery. It is admissible under FRE 803(3) because it was a statement of then-existing state of mind, under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9, at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest by an unavailable witness (*see* Dkts. 87, 96.) because it relates to using or managing investment funds *in commerce* after the trademark application date, voiding the ARIEL trademark registration. *See Burlington*, 204 F.3d 1114 at *1 (performing work for personal friends does "not fulfill[] the second part of the test – the actual rendition of services in interstate commerce"); *see also*2 McCarthy on Trademarks and Unfair Competition § 16:7 (4th ed.) (sales to relatives and personal friends do not constitute commercial use of a trademark).

18. ████████████████████████████████████████
████████████████████████████████████████████
███████████

**RESPONSE:** Ariel objects to the admission of the evidence on which Ariel Capital relies to support the statements in Paragraph 18, including exhibits 15, 32, and 37, on the basis of Fed. R. Evid. 802. Moreover, the deposition testimony cited by Ariel Capital does not support the statements in Paragraph 18.

**ACA REPLY:** Exhibits 15, 32 and 37 are true and correct copy of documents produced by Plaintiff to ACA in discovery. They are admissible under FRE 803(3) because were submitted to show a statement of then-existing state of mind, under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9, at 184:9-21), and under FRE 804(b)(3) as statements against interest by an unavailable witness (*see* Dkts. 87, 96.) because they relate to using or managing investment funds *in commerce* after the trademark application date, voiding the ARIEL trademark registration. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when it was filed); *Couture v Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed. Cir. 2015) (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed). Exhibit 15 is further admissible under FRE 803(16) as the produced document is greater than 20 years old.

████████████████████████████████████████████████

Specifically:



This fact is material and shows Plaintiff had no clients, and thus did not use the ARIEL

mark in interstate commerce before it filed its June 1983 ARIEL trademark application. *See*

*Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in

commerce when it was filed); *Couture,* 778 F.3d at 1381 (a trademark is void *ab initio* where

mark holder had not yet provided services *when* the application was filed).

19.

**RESPONSE:** Ariel objects to the admission of exhibit 38 on which Ariel Capital relies to
support the statements in Paragraph 19 on the basis of Fed. R. Evid. 802.

**ACA REPLY:** Exhibit 38 is a true and correct copy of a document produced by Plaintiff

to ACA in discovery. It is admissible under FRE 803(16) as the produced document is greater

than 20 years old, under FRE 803(3) because it was a statement of then-existing state of mind,

under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9,

at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest by an unavailable

witness (*see* Dkts. 87, 96) because it relates to using or managing investment funds *in commerce*

after the trademark application date, voiding the ARIEL trademark registration. *See Aycock*, 560

F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when

it was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not

yet provided services *when* the application was filed).

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

This fact is material and shows Plaintiff had no clients until Howard University, and thus

did not use the ARIEL mark in interstate commerce before it filed its June 1983 ARIEL trademark

application. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio* unless the mark

was used in commerce when it was filed)

    20. ████████████████████████████████████

█████████████████████████████

**RESPONSE:** Ariel objects to the admission of the evidence on which Ariel Capital relies to
support the statements in Paragraph 20, including exhibit 38, on the basis of Fed. R. Evid. 802.
Moreover, the deposition testimony cited by Ariel Capital does not support the statements in
Paragraph 20.

    **ACA REPLY:** Exhibit 38 is a true and correct copy of a document produced by Plaintiff

to ACA in discovery. It is admissible under FRE 803(16) as the produced document is greater

than 20 years old, under FRE 803(3) because it was a statement of then-existing state of mind,

under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9,

at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest by an unavailable

witness (*see* Dkts. 87, 96) because it relates to using or managing investment funds *in commerce*

after the trademark application date, voiding the ARIEL trademark registration. *See Aycock*, 560

F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when

it was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not

yet provided services *when* the application was filed).

This fact is material because even if Plaintiff made sales to friends and family prior to its

ARIEL mark filing, they do not qualify as "uses in commerce" to support Plaintiff's alleged "first

use in commerce" date. *Burlington*, 204 F.3d 1114 at *1 1999 WL 1328011 ("nominal or token

sales to personal friends do not constitute a *bona fide* commercial use of a trademark"); *see also*

J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 16:7 (4th Ed. 1997) (same).

21.     An article published in Black Enterprise noted that Plaintiff's "first investment
came from the Howard University endowment fund" and was "helped by the fact that one of his
original investors was a Howard Medical School graduate, and that Rogers' mother, prominent
Chicago lawyer, Jewel Lafontant, was on the University's board of trustees."  (Exh. 38, at *3.)

**RESPONSE:** Ariel disputes the statements in Paragraph 21.  As an initial matter, Ariel objects
to the admission of exhibit 38 on which Ariel Capital relies to support the statements in Paragraph
21 on the basis of Fed. R. Evid. 802. Moreover, Paragraph 21 fails to accurately quote the article
published in *Black Enterprise*. The *Black Enterprise* article states, in part, that Ariel's "first
investment of $100,000 came from the Howard University endowment fund. Rogers' presentation
was helped by the fact that one of his original investors was a Howard Medical School graduate,
and that Rogers' mother, prominent Chicago lawyer Jewel Lafontant, was on the university board
of trustees." (Ex. 38, at bates no. AI20745.)  Moreover, the incomplete quotes contained in
Paragraph 21 incorrectly imply that the Howard University endowment fund was Ariel's first
investment. As the article itself states, there were multiple individuals who invested in Ariel prior
to Howard University, including a Howard Medical School graduate. (*Id.*; Ex. RR at 74:4-17;
75:11-16.)

**ACA REPLY:** Exhibit 38 is a true and correct copy of a document produced by Plaintiff

to ACA in discovery. It is admissible under FRE 803(16) as the produced document is greater

than 20 years old, under FRE 803(3) because it was a statement of then-existing state of mind,

under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's knowledge (Exh. 9,

at 184:9-21), and under FRE 804(b)(3) because it is a statement against interest by an unavailable

witness (*see* Dkts. 87, 96) because it relates to using or managing investment funds *in commerce*

after the trademark application date, voiding the ARIEL trademark registration. *See Aycock*, 560

F.3d at 1357 (trademark application is void *ab initio* unless the mark was used in commerce when

it was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not

yet provided services *when* the application was filed).



This fact is material because even if Plaintiff made sales to friends and family prior to its

ARIEL mark filing, they do not qualify as "uses in commerce" to support Plaintiff's alleged "first

use in commerce" date. *Burlington*, 204 F.3d 1114, at *1 ("nominal or token sales to personal

friends do not constitute a *bona fide* commercial use of a trademark"); *see also* J. McCarthy,

*McCarthy on Trademarks & Unfair Competition*, § 16:7 (4th Ed. 1997) (same).

22. ███████████████████████████████████████████████

**RESPONSE:** Ariel objects to the admission of the evidence on which Ariel Capital relies to support the statements in Paragraph 22, including exhibit 38, on the basis of Fed. R. Evid. 802. Moreover, the deposition testimony cited by Ariel Capital does not support the statements in Paragraph 22.

**ACA REPLY:** Exhibit 38 is a true and correct copy of a document produced by

Plaintiff to ACA in discovery. It is admissible under FRE 803(16) as the produced document

is greater than 20 years old, under FRE 803(3) because it was a statement of then-existing state

of mind, under FRE 803(5) because it accurately reflects Plaintiff's 30(b)(6) witness's

knowledge (Exh. 9, at 184:9-21), and under FRE 804(b)(3) because it is a statement against

interest by an unavailable witness (*see* Dkts. 87, 96) because it relates to using or managing

investment funds *in commerce* after the trademark application date, voiding the ARIEL

trademark registration. *See Aycock*, 560 F.3d at 1357 (trademark application is void *ab initio*

unless the mark was used in commerce when it was filed); *Couture,* 778 F.3d at 1381 (a

trademark is void *ab initio* where mark holder had not yet provided services *when* the

application was filed).

This is not a fact in dispute. Plaintiff's witness testified:



This fact is material because even if Plaintiff made sales to friends and family prior to its

ARIEL mark filing, they do not qualify as "uses in commerce" to support Plaintiff's alleged "first

use in commerce" date. *Burlington*, 204 F.3d 1114 at*1 ("nominal or token sales to personal

friends do not constitute a *bona fide* commercial use of a trademark"); *see also* J. McCarthy,

*McCarthy on Trademarks & Unfair Competition*, § 16:7 (4th Ed. 1997) (same).

23. ███████████████████████████████
████████████████████████

**RESPONSE:** Ariel does not dispute the statements in Paragraph 23.

24. ███████████████████████████████
████████████████████████████

**RESPONSE:** Ariel does not dispute the statements in Paragraph 24.

25. ███████████████████████████████
████████████████████████████████

**RESPONSE:** Ariel does not dispute that ████████████████████████
███████████████████████████████████ Ariel disputes the
remaining statements in Paragraph 25. As an initial matter, ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████ Moreover, Ariel's
application to register its ARIEL mark with the U.S. Patent and Trademark Office, filed on June
20, 1983, states that Ariel had been using the ARIEL mark since January 10, 1983, and using it
in interstate commerce since March 23, 1983. (Ex. I.) These dates are consistent with the date at

which John Rogers founded Ariel Capital Management, Inc. (Ex. E, at 18:10-12, 20:7-9; 64:16-19; Ex. F at ¶ 5.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 25, Plaintiff mischaracterizes the evidence in a manner that is immaterial to the motion. In response to whether Rogers would have filed Plaintiff's trademark application before opening for business, ███████████████████

███████████████████████████

███████████████████████████████████████████

When specifically asked whether Plaintiff would have filed its trademark before conducting business, ████████████████

███████████████████████████████████

███████████████████████

███████████████████████████████████████

Plaintiff's witness further testified that ████████████████████████

███████████████████████████████

█████████████████████████

███████████████████████████████████

████████████████████████████

██████████████████████████████████

This fact is material and suggests Rogers would have filed the ARIEL trademark application before Plaintiff had rendered its investment management services in commerce as a way to reserve the mark for his business. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007) (An applicant must "certify that the [service] is in use in commerce – defined as "bona fide use of a mark in the ordinary course of trade, and not to merely *reserve a*

*right* in a mark.") (emphasis added).

      26. ███████████████████████████████████████████
█████████████████████████████████████████████████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 26. As an initial matter, none of the citations provided by Ariel Capital support the statements in Paragraph 26. Moreover, Ariel's application to register its ARIEL mark with the U.S. Patent and Trademark Office, filed on June 20, 1983, states that Ariel has been using the ARIEL mark since January 10, 1983, and using it in interstate commerce since March 23, 1983. (Ex. I.) ██████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████

      **ACA's REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. While Plaintiff's application states the mark has been used since January 1983 and used in commerce since March 1983, and these dates coordinate with the date Rogers allegedly founded Ariel Capital Management, this does not demonstrate Plaintiff was managing investments in commerce at the time of its "Ariel" trademark application or "as soon as it opened its doors in January, 1983." *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *see Couture*, 778 F.3d at 1381 (specimens and declarations submitted to the USPTO are not indicative of actual provision of a service as examiners take them at face value without verifying).

      Plaintiff has not shown evidence that it used the ARIEL mark in commerce prior to June 20, 1983, and has affirmatively stated that it had not used it in commerce before September 30, 1983. (Ex. 12 Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 13 Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 14 Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 9, at 98:4-22.) Plaintiff has stated on several occasions that its first separate account was made

available on September 30, 1983.  (Ex. 12, at No. 2; Ex. 13, at No. 2; Ex. 14, at No. 2; *see also* Ex.

9 Plaintiff's 30(b)(6) at 74:18 – 79:15, 98:4-22.) ██████████████████████████████████████

████████████████████████  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████  *See Cent. Mfg., Inc.,* 492 F.3d at 883 ("Self-

serving deposition testimony is not enough to defeat a motion for summary judgment."); *Conroy*,

644 F. Supp. 2d at 1067 (striking testimony as hearsay where plaintiff had no supporting evidence

other than her own deposition testimony that she was told this was the case).  What is more, even

its January 1983 date is contradicted by its trademark application, which states that it did not use

the mark in commerce until *March 23, 1983*. (*See* Plaintiff's Response to SOF 10 *supra*).

This fact is material and shows Plaintiff did not use the ARIEL mark in interstate commerce

before it filed its June 1983 ARIEL trademark application. *See Aycock*, 560 F.3d at 1357 (trademark

application is void *ab initio* unless the mark was used in commerce when it was filed); *Couture,*

778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services

*when* the application was filed). Moreover, it shows that Rogers, who instructed Berger to register

the ARIEL trademark, knew it was false to represent to the USPTO that Plaintiff had used its

ARIEL mark in interstate commerce when it did not do so. *See NetJets Inc. v. Intellijet Grp., LLC*,

No. 2:12-CV-0059, 2013 WL 5675464, at *5 (S.D. Ohio Oct. 17, 2013) ("incontestable"

trademarks that are void *ab initio* are invalid under Section 1115(b)(1)).

**III.    Plaintiff's Trademark Application**

27.    Plaintiff's ARIEL mark was filed on June 20, 1983. (Exhibit A to Plaintiff's
Complaint, Dkt 1-1, attached as Exhibit 39, at 2.)

**RESPONSE:** Ariel disputes the statements in Paragraph 27 as they are imprecise and
incomplete. Ariel filed its trademark application for the mark ARIEL with the U.S. Patent and
Trademark Office on June 20, 1983.  (Ex. I.)

**ACA REPLY:**  This fact is not in dispute.  Plaintiff's ARIEL mark was filed on June 20,

1983 with the United States Patent and Trademark Office ("USPTO").  (Exh. 39, at 2). This fact is

material as Plaintiff must establish it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).

28.     Plaintiff's trademark application was for use with the "management of investments and investment funds." (*Id.*)

**RESPONSE:** Ariel disputes the statements in Paragraph 28 as they are imprecise and incomplete. Plaintiff's trademark application for the mark ARIEL with the U.S. Patent and Trademark Office stated that Ariel was using the mark in connection with the "management of investments and investment funds." (Ex. I.)

**ACA REPLY:** This fact is not in dispute. Plaintiff's ARIEL application was for use in connection with the "management of investments and investment funds. (Exh. 39, at 2.) This fact is material as Plaintiff must establish it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock,* 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture,* 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.,* 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, there

is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence

of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7)

(absence of a record can prove the matter did not occur).

29.     In its application to the USPTO, Plaintiff claimed its date of first use as January 10, 1983 and its first use in commerce as March 23, 1983.  (*Id.*).

**RESPONSE:** Ariel does not dispute the statements in Paragraph 29.

30.     Plaintiff's ARIEL trademark was registered on July 17, 1984.  (Exh. 39.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 30.

31.     Plaintiff licenses its marks to its various corporate entities, third-party brokers in connection with offering Plaintiff's mutual funds, and to organizations and events that Plaintiff sponsors.  (Exh. 12, at 7-9.)

**RESPONSE:** Ariel does not dispute that Ariel licenses its marks to its various corporate entities or to some third-party brokers, in each case in connection with offering Ariel's services. Ariel disputes the remaining statements in Paragraph 31. Ariel does not license its marks to many third-party brokers or to organizations and events that Ariel sponsors. Instead, Ariel authorizes other third-party broker dealers to use certain of Ariel's marks for the purpose of identifying Ariel or its services. (Ex. TT at 7.) Further, Ariel authorizes some organizations and events that Ariel sponsors to use certain of its marks for the purpose of identifying Ariel's involvement with such organizations or events. (*Id.*)  Finally, Ariel objects to Ariel Capital's use of a non- authentic copy of Exhibit 12.  The version used by Ariel Capital is missing pages 7 – 9.

**ACA REPLY:** Plaintiff's Response does not display any new facts that dispute this fact.

This fact is material because trademark law recognizes no difference between licensing and letting

another use a mark; rather, its focus is on the extent the mark owner controls the quality of the

licensed goods. Indeed, Plaintiff has submitted no evidence of its efforts to control licenses or

sponsored use of its marks. *See Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 789

(7th Cir. 2011) (failure to exercise control over licensed mark and the goods or services it is used

with is naked licensing, and abandons a mark). Additionally, where many use a mark, the mark

weakens as an identifier.  *See S. Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 818

(N.D. Ill. 1998) (indiscriminate licensing programs that put a mark on all manners of goods

associates the mark with a vast number of brand names – diluting rather than building a source

affiliation). Finally, ACA presented only the relevant pages of Plaintiff's Responses to ACA's

First Set of Interrogatories for efficiency purposes but, in any event, is happy to present the full

document if the Court requests.[2]

---

[2] Continued on next page.

32.     Plaintiff lists its website and Bates Numbers AI000361-000411, AI000739-000771 in support of its first use date in its Supplemental Answers to Defendant's First Set of Interrogatories. (Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories, attached as Exhibit 13, at 2-3.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 32.  The statements in Paragraph 32, however, are incomplete. As noted above, Ariel has provided management of investments and investment fund services since January 10, 1983. (Ex. I; TT at 4.)  Indeed, Ariel's registrations for ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration pursuant to 15 U.S.C. § 1115(b). (Ex. M.) Further, Ariel's answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office.  (Ex. TT at 2-5.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 32, Plaintiff's Response mischaracterizes the evidence in a way immaterial to the motion. Plaintiff's website and Bates Numbers AI000361-000411, AI000739-000771 list the inception dates of all its products, none of which fall before its application filing date of June 20, 1983 let alone as early as January 10, 1983.

First, Plaintiff points to the declaration of Jessica Berger (Ex. I) to establish it provided investment management services since January 10, 1983 because her declaration states Plaintiff's first use of the mark was January 10, 1983. This is not evidence of services being rendered since that date. *See Couture,* 778 F.3d at 1381 (declarations submitted to the USPTO are not indicative of actual provision of a service as examiners take declarations at face value without verifying). Moreover, this date is contradicted by Plaintiff's own application, which states Plaintiff did not provide its services in commerce until March 23, 1983. Regardless, Plaintiff has not provided any evidence to show it has performed investment services since January 10, 1983, let alone March 1983 or by its application date, June 20, 1983. Plaintiff has stated on several occasions that its first "product or service was first made available to consumers" on September 30, 1983.  (Ex. 12, at No. 2; Ex. 13, at No. 2; Ex. 14, at No. 2; *see also* Ex. 9 Plaintiff's 30(b)(6) at 74:18 – 79:15, 98:4-22.) This was Plaintiff's first separate account, Ariel Small Cap. (Ex. 12 Plaintiff's Answers to

Defendant's First Set of Interrogatories at No. 2; Ex. 13 Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 14 Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 9, at 98:4-22.) ███████████████████ ███████████████████████████████████████████████ Indeed, its January 1983 date is even contradicted by its trademark application, which states that it had not used the mark in commerce until *March 23, 1983*. (*See* Plaintiff's Response to SOF 10 *supra*).

Moreover, ████████████████████████████████████████ ██████████████████████████████████████████████ This is not use for investment services, this is use for advertising, which is **not** use in commerce. *Avakoff*, 765 F.2d at 1098 ("[A]dvertising material is not use within the meaning of the [Lanham Act] and therefore is insufficient to support federal registration."); *Couture*, 778 F.3d at 1381 (advertising, even when combined with subsequent sales, is not sufficient for showing use in commerce); *and see Sensient Techs. Corp. v. SensoryEffects Flavor, Co.*, 613 F.3d 754, 762-63 (8th Cir. 2010) (finding no use in commerce where mark owner issued press release, made announcement, gave presentations, and constructed website but where there was no evidence of any sale or transport of goods bearing the mark).

Next, Plaintiff points to the incontestable status of its ARIEL mark to prove Plaintiff has been providing services since January 10, 1983, the date listed as the mark's first use. But where a defendant advances its theory that the registration is void due to a false statement of first use in commerce date, an incontestable designation of a mark itself cannot establish it was used in commerce by that date. *See NetJets Inc.*, 2013 WL 5675464, at *5 ("incontestable" trademarks that are void *ab initio* are invalid under § 1115(b). There must be actual evidence of the use in commerce. *See Cent. Mfg.,* 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing

specific transactions); *S Indus. v. JL Audio, Inc.*, 29 F.Supp.2d 878, 888 (N.D. Ill. Dec. 9, 1998) (granting Summary Judgment on invalidity where Plaintiff was unable to "put forth admissible evidence to establish sufficient use").

Lastly, Plaintiff's assertion that "*[Plaintiff]'s answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office*" still fails to list a single product that Plaintiff offers or previously offered that supports its first use date of January 10, 1983 *or* its first use in commerce date of March 23, 1983, let alone its application date of June 20, 1983. Instead, those documents list the Ariel Small Cap as Plaintiff's earliest investment management service, which is dated September 30, 1983. (Exh. 14, at 4).

This fact is material as Plaintiff has not established it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).

33.     In its Third Supplemental Answers to Defendant's First Set of Interrogatories, Plaintiff provided a Second Supplemental Answer to Interrogatory No. 2 stating that its "first use" in the "management of investments and investment funds" "was at least as early as January 10, 1983, based on [Plaintiff]'s U.S. Application No. 73-431,218 and Registration No. 1,286,420[,]" and "[Plaintiff]'s U.S. Application includes a specimen of use of the mark as of June 20, 1983." (Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories, attached as Exhibit 14, at 4.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 33. The statements in Paragraph 33, however, are incomplete. Ariel's answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office. (Ex. TT at 2-5.) Additionally, Ariel's registrations for ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration pursuant to 15 U.S.C. § 1115(b). (Ex. M.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 33, Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. First, Plaintiff's assertion that "*[Plaintiff]'s answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office*" still fails to list a single product, that Plaintiff offers or previously offered that supports its first use date of January 10, 1983 *or* its first use in commerce date of March 23, 1983, let alone its June 20, 1983 application date. Instead, those documents list the Ariel Small Cap as Plaintiff's earliest investment management service, which is dated September 30, 1983. (Exh. 14, at 4).

Second, Plaintiff points to the incontestable status of its ARIEL mark to prove Plaintiff has been providing services since January 10, 1983, the date listed as the mark's first use. But where a defendant advances that the registration is void due to a false statement of first use in commerce date, the incontestable mark itself cannot establish its was used in commerce by that date. *See NetJets Inc.*, 2013 WL 5675464, at *5 (even "incontestable" trademarks can be void *ab initio* and

thus invalid under § 1115(b) if a plaintiff has no proof it used the mark by filing). Also, there must be actual evidence of the use. *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *S Indus.*, 29 F.Supp.2d at 888 (granting Summary Judgment on invalidity where Plaintiff was unable to "put forth admissible evidence to establish sufficient use"). Furthermore, its January 1983 date is even contradicted by its trademark application, which states that it had not used the mark in commerce until *March 23, 1983*. (*See* Plaintiff's Response to SOF 10 *supra*).

This fact is material as Plaintiff has not established it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture*, 778 F.3d at 1381 (Fed. Cir. 2015) (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur.

34.     In its Third Supplemental Answers to Defendant's First Set of Interrogatories, Plaintiff provided a Second Supplemental Answer to Interrogatory No. 2 stating that its "first use" in the "[m]utual fund advisory and management services, mutual fund brokerage services, and mutual fund distribution services" "was at least as early as November 6, 1986, based on [Plaintiff]'s U.S. Application No. 73-228,021 and Registration No. 2,772,980[,]" and "[Plaintiff]'s U.S. Application includes a specimen of use of the mark as of March 21, 2001." (*Id.*)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 34.  The statements in Paragraph 34, however, are incomplete.  Ariel's answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office.  (Ex. TT at 2-5.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 34, Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. First, Plaintiff's assertion that "*[Plaintiff]'s answers to Defendant's First Set of Interrogatories, Interrogatory No. 2, include multiple pages of text and references to various current products and services, products and services that are no longer offered, and various applications and registrations filed with the U.S. Patent and Trademark Office*" still fails to list a single product, that Plaintiff offers or previously offered that supports its first use date of January 10, 1983 *or* its first use in commerce date of March 23, 1983, let alone its June 20, 1983 application date. Instead, those documents list the Ariel Small Cap – dated September 30, 1983 – as Plaintiff's earliest investment management service. (Exh. 14, at 4). Indeed, Plaintiff's January 1983 date is even contradicted by its trademark application, which states that it had not used the mark in commerce until *March 23, 1983*. (*See* Plaintiff's Response to SOF 10 *supra*).

This fact is material as Plaintiff has not established it rendered investment management services before June 20, 1983.  15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock,* 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.*, 492 F.3d

at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record, where ordinarily there would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).

35.    In ACA's first requests for production, ACA requested: "1. Each document relating to [Plaintiff's] selection, adoption, or first use of the word 'Ariel' in [Plaintiff's name; 7. Each document related to the 'Ariel' mark's first use on January 10, 1983. [and] 8. Each document related to the 'ariel' mark's first use in interstate commerce on March 23, 1983." (Ariel Capital Advisor LLC's First Set of Request for Production to Plaintiff, attached as Exh. 11, at *4-5.) To date, ACA has not received any documents that demonstrate Plaintiff's use of "Ariel" in commerce before it filed its trademark application on June 20, 1983. (Exh. 11.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 35 regarding Ariel Capital's requests for production. Ariel disputes the remaining statements in Paragraph 35 regarding Ariel's document production. Ariel began use of its ARIEL mark for management of investments and investment fund services as of January 10, 1983, and began use of such mark in commerce at least as early as March 23, 1983. (Ex. I.) Indeed, as part of its Application for Trademark/Service Mark Registration, the Vice President of Ariel, Jessica Berger, executed a declaration under oath stating, in part, that "all statements made herein of [her] own knowledge are true" which includes statements regarding dates of first use. (*Id.*) As noted above, several of Ariel's marks including ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration pursuant to 15 U.S.C. § 1115(b). (Ex. M.) The declaration of Jessica Berger and the incontestable nature of Ariel's marks provide evidence that Ariel used the mark ARIEL in commerce before it filed its trademark application. (Exs. I, M.) Moreover, Ariel's registration for the ARIEL mark includes specimen materials accepted by the U.S. Patent and Trademark Office as demonstrating first use. (Ex. QQ.) Finally, Ariel has also produced a photograph of Mr. Rogers using the name "Ariel" on the office door of Ariel Capital Management, Inc. in or about January 1983 (Ex. G), and a newsletter entitled *The Patient Investor* circulated to clients and prospective clients of Ariel dated May 6, 1983 (Ex. H).

**ACA REPLY:** To the extent Plaintiff disputes SOF 35, Plaintiff's Response mischaracterizes the evidence in a manner that is immaterial to the motion. As an initial matter, Plaintiff's photograph of Rogers beside a door bearing the name "Ariel Capital Management" (Ex. G) is inadmissible under FRE 602 because Plaintiff's witness has no personal knowledge of how Plaintiff's door appeared in 1983 or when the photograph was taken, under FRE 802 because

Plaintiff's witness did not see the door thus could only have speculated how it appeared from third parties, an under FRE 901 because there is no evidence the photo is indeed of Plaintiff's door or when it was taken. Plaintiff's newsletter, the Patient Investor (Ex. H), is inadmissible under FRE 602 because Plaintiff's witness did not have personal knowledge of how the newsletter was sent or to whom it was sent, under 901 because Plaintiff failed to provide evidence sufficient to support the newsletter was ever circulated to clients or prospective clients, under 802 because no one with direct knowledge could attest to when the newsletter was circulated, and under 403 because its value is substantially outweighed by a danger that it is unfairly prejudicial as, absent testimony from a person with knowledge, the newsletter can unfairly sway opinion on this topic despite being highly unreliable.

Inadmissibility aside, Plaintiff first leans on the ARIEL mark's incontestable status to establish it used the mark in interstate commerce before it filed its ARIEL application. But the mark's incontestable status does not establish it was used in commerce by that date, especially where a defendant claims that mark is void due to a false statement regarding the mark's first use in commerce date. *See NetJets Inc.*, 2013 WL 5675464, at *5 (even "incontestable" trademarks can be void *ab initio* and thus invalid under § 1115(b) if a plaintiff has no proof it used the mark by time of filing). Also, a mark holder must produce actual evidence the mark was used before the application date. *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *S Indus.*, 29 F.Supp.2d at 888 (granting Summary Judgment on invalidity where Plaintiff was unable to "put forth admissible evidence to establish sufficient use").

**Second**, Plaintiff points to the declaration of Jessica Berger to establish it provided investment management services in commerce before it filed its ARIEL application on June 20,

1983, but this is not evidence of services being rendered since that date. *See Couture*, 778 F.3d at 1381 (declarations submitted to the USPTO are not indicative of actual provision of a service as examiners take declarations at face value without verifying). Plaintiff must provide evidence of its use of ARIEL in commerce before its application date. *See Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *see also Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions); *see also S Indus.*, 29 F.Supp.2d at 888 (granting Summary Judgment on invalidity where Plaintiff was unable to "put forth admissible evidence to establish sufficient use").

Plaintiff has not provided any evidence to show it has performed investment services since January 10, 1983, let alone June 20, 1983, its application date. Plaintiff has stated on several occasions that its first "product or service was first made available to consumers" on September 30, 1983. (Ex. 12, at No. 2; Ex. 13, at No. 2; Ex. 14, at No. 2; *see also* Ex. 9 Plaintiff's 30(b)(6) at 74:18 – 79:15, 98:4-22.) This was Plaintiff's first separate account, Ariel Small Cap. (Ex. 12 Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 13 Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 14 Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories at No. 2; Ex. 9, at 98:4-22). Plaintiff stated its first public-facing mutual fund, Ariel Fund, was established in **1986**. (Exh. 9, 86:5-7).

**Third**, the specimens Plaintiff submitted to the USPTO do not prove it had rendered its services in commerce at the time its application was filed. *See Couture*, 778 F.3d at 1381 (specimens submitted to the USPTO are not indicative of actual provision of a service). Plaintiff submitted a brochure as its specimen (Plaintiff's Ex. QQ). But a brochure is advertising material and thus not use, but preparation for use. *See Avakoff,* 765 F.2d at 1098 ("[A]dvertising material is not use within

the meaning of the [Lanham Act] and therefore is insufficient to support federal registration.").

Similarly, Plaintiff's photograph of the ARIEL mark on John Rogers' door does not demonstrate that Plaintiff had provided investment management services by June 20, 1983 because this is not evidence of any services being rendered. *See Sensient Techs.,* 613 F.3d at 762-63 (finding no use in commerce where mark owner issued press release, made announcement, gave presentations, and constructed website but where there was no evidence of any sale or transport of goods bearing the mark).

**Last**, to the extent Plaintiff relies on its May 1983 *Patient Investor* newsletter to demonstrate it had clients, Plaintiff never produced any evidence it had clients during the date of the newsletter or that its newsletter was ever circulated. (Ex. 11, Plaintiff's Responses to Defendant's First Requests for Production at Request Nos. 7 & 8; *see also* Ex.12, Plaintiff's Response to Defendant's First Set of Interrogatories No. 2; *see also* Ex. 9, at 74-79:1-15). And even if Plaintiff had subscribers to its newsletter, the newsletter's "use" was not representative of what Plaintiff claims was the alleged use of their ARIEL trademark, which was "management of investments and investment funds." The newsletter did not "manage[]" investments or funds thus its use is irrelevant here.  (FRE 402; *see also* Ex. 10 Plaintiff ARIEL TM App.); *see also Gay Toys, Inc. v. McDonald's Corp., 199 USPQ 722, 723 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application is void); Avakoff,* 765 F.2d at 1098 ("Mere advertising of a product and documentary use of a symbol apart from the goods does not constitute trademark use for those goods. That is, advertising material is not use within the meaning of the statute and therefore it is insufficient to support federal registration."); *In re Canad. Pac. Ltd.*, 754 F.2d 992, 994 (Fed. Cir. 1985) ("a service must be performed for the benefit of others"). Here, drafting or circulating a newsletter is not "management of investments and investment funds," as the federal registration requires.

This fact is material as Plaintiff has not established it rendered investment management

services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock*,

560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the

application was filed); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder

had not yet provided services *when* the application was filed); *see also See Cent. Mfg.,*, 492 F.3d t

882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the

goods involved were [the goods in the trademark application], it's not valid evidence"; finding no

use in commerce where plaintiff could not offer anything evidencing specific transactions).

36. ███████████████████████████████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 36, in part, because it is unclear what "its" refers to in the final clause of the sentence in Paragraph 36, making this statement vague and ambiguous. To the extent that "its" refers to use of the ARIEL mark, Ariel disputes the statement. Ariel began use of its ARIEL mark for management of investments and investment fund services as of January 10, 1983, and began use of such mark in commerce at least as early as March 23, 1983. (Ex. I.) Indeed, as part of its Application for Trademark/Service Mark Registration, the Vice President of Ariel, Jessica Berger, executed a declaration under oath stating, in part, that "all statements made herein of [her] own knowledge are true" which includes statements regarding dates of first use. (*Id.*) As noted above, several of Ariel's marks including ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL FOCUS FUND and ARIEL APPRECIATION FUND have become incontestable and constitute conclusive evidence of the validity of the marks shown therein, Ariel's ownership thereof, and of Ariel's exclusive right to use such registered marks in connection with the services set forth within each registration pursuant to 15 U.S.C. § 1115(b). (Ex. M.) The declaration of Jessica Berger and the incontestable nature of Ariel's marks provide evidence that Ariel used the mark ARIEL in commerce before it filed its trademark application. (Exs. I, M.) Moreover, Ariel's registration for the ARIEL mark includes specimen materials accepted by the U.S. Patent and Trademark Office as demonstrating first use. (Ex. QQ.) Finally, Ariel has also produced a photograph of Mr. Rogers using the name "Ariel" on the office door of Ariel Capital Management, Inc. in or about January 1983 (Ex. G), a newsletter entitled *The Patient Investor* circulated to clients and prospective clients of Ariel dated May 6, 1983 (Ex. H), and deposition testimony regarding Ariel offering and performing investment management services as soon as it opened its doors in January, 1983. (Ex. RR at 74:4-17; 75:11-16.) To the extent that "its" refers to the Patient Investor, Ariel does not dispute the date of first use contained in Paragraph 36.

**ACA REPLY:** Plaintiff's photograph of Rogers using the name "Ariel Capital Management" on a door (Ex. G) is inadmissible under FRE 602 because Plaintiff's witness has no personal knowledge of how Plaintiff's door appeared in 1983, nor of when the photograph was taken, under FRE 802 because Plaintiff's witness did not see the door thus could only have learned

how it appeared from third parties, an under FRE 901 because there is no evidence the photo is indeed of Plaintiff's door or when it was taken. Plaintiff's newsletter, the Patient Investor (Ex. H), is inadmissible under FRE 602 because ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████

To the extent Plaintiff relies on its May 1983 *Patient Investor* newsletter to demonstrate it had clients, Plaintiff never produced any evidence it had clients during the date of the newsletter or that its newsletter was ever circulated. (Ex. 11, Plaintiff's Responses to Defendant's First Requests for Production at Request Nos. 7 & 8; *see also* Ex.12, Plaintiff's Response to Defendant's First Set of Interrogatories No. 2; *see also* Ex. 9, at 74-79:1-15). And even if Plaintiff had subscribers to its newsletter, the newsletter's "use" was not representative of what Plaintiff claims was the alleged use of their ARIEL trademark, which was "management of investments and investment funds." The newsletter did not "manage[]" investments or funds thus its use is irrelevant here. (FRE 402; *see also* Ex. 10 Plaintiff ARIEL TM App.); *see also Gay Toys, Inc. v. McDonald's Corp., 199 USPQ 722, 723 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application is void); Avakoff,* 765 F.2d at 1098 ("Mere advertising of a product and documentary use of a symbol apart from the goods does not constitute trademark use for those goods. That is, advertising material is not use within the meaning of the statute and therefore it is insufficient to support federal registration."); *In re Canad. Pac. Ltd.*, 754 F.2d 992, 994 (Fed. Cir. 1985) ("a service must be performed for the benefit of others"). Here, drafting or circulating a newsletter is not "management of investments and investment funds," as

the federal registration requires.

This fact is material as Plaintiff has not established it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed); *Couture,* 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *see also See Cent. Mfg.,* 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions).

37.     Plaintiff filed an Answer to ACA's Second Amended Answer and Counterclaims on October 28, 2016. (Pl's Answer to ACA's Second Amended Answer and Counterclaims, Dkt. 122, attached as Exhibit 40.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 37.

## IV.     The Parties' Products and Services

### A.  Defendant's Services

38.     ACA provides private wealth management for individuals and families, including personalized investment management services, tax planning, cash flow planning, retirement planning, estate planning and tax return preparation. (Exh. 2, at 76:7-10.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 38.

39.     ACA accumulates a significant amount of data and consults with the client as part of its business. (Exh. 2, at 179:21-24. [sic] As part of the tax planning services ACA performs, ACA reviews clients' prior tax returns and performs income tax projections based on income data that clients provide. (Exh. 2, at 177:11-18.)  ACA then provides recommendations about how to reduce tax expenses for that specific client or family members of that client. (*Id*.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 39.

40.     ACA also performs estate planning services, and gathers documents such as wills, trusts, durable powers of attorney, healthcare powers of attorney, and living wills and reviews each to advise clients on their inheritance goals, like reducing estate taxes. (Exh. 2, at 177:19-178:2.) ACA often meets with the whole family to discuss estate plans, including with grandparents, children, and grandchildren. (*Id*. at 179:7-11.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 40.

41.     ACA also performs retirement planning for its clients, and evaluates clients' living expenses, projected living expenses after retirement, and savings accounts. (Exh. 2, at 178:3-14.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 41.

42.     ACA does not sell mutual funds, nor does it plan to offer mutual funds.  (Exh. 2, at 189:8-14.)  ACA never advises a client to include mutual funds as part of his or her plan.  (*Id.* at 63:18-20.)  Mutual Funds are provided in ACA's Form ADV in case an ACA client has mutual funds they received from a different advisor. (*Id.* at 66:17-20.) Mutual funds are listed in ACA's client brochure for disclosure purposes as fees for those types of investments, and are independent from ACA's advisory fee.  (*Id.* at 188:6-21.)

**RESPONSE:** Ariel disputes the statements in Paragraph 42.  Ariel Capital annually submits a brochure or brochure supplement, called Form ADV Part 2B, to the Securities and Exchange Commission to comply with regulations for registered investment advisory firms like Ariel Capital. (Ex. Q at 18:8-18; 19:1-23.)  In its most recent Form ADV, dated January 14, 2016, Ariel Capital stated that it creates for its clients "a portfolio of all or some of the following investments in accordance with the investment objectives of the client: mutual funds, exchange traded funds (commonly known as 'ETFs'), debt and equity securities, real estate, real estate investment trusts (commonly known as 'REITSs'), private placements, government securities, and alternative investments (e.g. hedge funds)." (Ex. U at ACA 682.) On page 4 of the ADV, Ariel Capital describes how "all fees paid to ACA for investment advisory services are separate and distinct from the fees and expenses charged by mutual funds and Exchange Traded Funds to their shareholders." (Ex. U at ACA685.) Finally, pages 10 through 12 of the ADV describe the specific risks associated with "securities utilized" and includes a section pertaining to mutual funds. (Ex. U at ACA691-693.) As part of its services, Ariel Capital advertises that it will create an investment portfolio for its clients, including mutual funds.  (Ex. U at ACA682, ACA685; Ex J. at ¶ 12.)

**ACA REPLY:** This fact is not in dispute. Plaintiff takes ACA's brochure, testimony and Form ADV out of context. ACA's witness, Mr. Bray, specifically testified that ACA does not create an investment portfolio for its clients that includes mutual funds.  (Ex. 2, at 63:18-23.)

When asked by Plaintiff's counsel, ACA's 30(b)(6) witness stated:

> **Q:"Do you ever advise a client to include mutual funds in their asset allocation?**
>
> **A:"Never."**
>
> **Q:"**Okay. Do you ever advise a client **not to** include mutual funds?"
>
> **A:"Always."**  (Ex. 2, at 63:18-23; *see also* Ex. 5 ACA Dep. I at 25:4 – 27:2.) (emphasis added).

Rather, ACA's witness stated ACA discloses mutual funds on its form ADV because:

> **A:** " – and on page 692 and 693, there are references to mutual funds."

**Q:** "Uh-huh."

**A:** "I would – my preference would be to eliminate all references to mutual funds, because we don't give advice. We advise the clients to not invest in mutual funds. **The reason this is in our ADV is because some clients have mutual funds**, very few, **that they have gotten from a bad advisor**." (Exh. 2, at 66:12-20.)

And ACA, in its brochure, has a section relating to mutual funds because customers need to know there are separate fees associated with any mutual fund:

**Q:** "Why does [ACA] have this section relating to mutual funds in its brochure?"
**A:** "To let a client know or let a prospective client know that if an investment portfolio included either exchange traded funds or mutual funds – and we do not recommend mutual funds, but I do – we probably have one or two mutual funds in some client portfolios that have transferred from another advisor, and the client doesn't want to sell at this point in time in any event.

And the – **for purposes of full disclosure,** if there are mutual funds in a client portfolio, which again, we would not recommend or exchange traded funds, **there are fees related to those types of investments** that would be separate and independent from our fee as a – as an advisor."

It is therefore not part of ACA's business plan to offer, sell, or manage mutual funds. This fact is material and shows ACA offers separate services from Plaintiff's products, differentiating their companies in the eyes of consumers. *Knaack Mfg. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1000 (N.D. Ill. 1997) ("If firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 391-92 (S.D.N.Y. 2006) (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Haven Capital Mgmt.*, 965 F. Supp. at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because the services the parties provided were significantly different).

43. 

**RESPONSE:** Ariel disputes the statements in Paragraph 43.

[REDACTED]

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. **First**, ACA's lack of plans to expand is irrelevant. Plaintiff cites no authority for its paradoxical position that ACA must put forth affirmative evidence to show it has *no* plans for something. Rather, it is Plaintiff's burden to show Plaintiff has "concrete" plans to expand into ACA's services. *See Lebewohl v. Heart Attack Grill LLC*, No. 11 CIV. 3153 PAE, 2012 WL 3839379, at *3 (S.D.N.Y. Sept. 5, 2012) *citing Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 395 (S.D.N.Y. 2006) (where a party has "no concrete plans to expand," "any assessment as to the likelihood of confusion presented by future expansion would be unacceptably conjectural").

**Second**, whether [REDACTED] This is first evidenced by Plaintiff's alleged fear that ACA may, someday, expand and offer separate accounts despite ACA never voicing this intention. It is second evidenced by Plaintiff's concession, (*See* Response 53 below) that "*Ariel Capital 'provides independent and objective investment management, tax and estate planning, financial planning, and trust administration services to clients throughout the United States'*" not separate accounts.

**Third**, ACA's services are not like Plaintiff's separate accounts. [REDACTED]

[REDACTED] Further, ACA's services are not similar to Plaintiff's

separate accounts. ACA's witness, Mr. Bray, specifically testified that ACA does not create an investment portfolio for its clients that includes any type of mutual funds. (Ex. 2, at 63:18-23.) When asked by Plaintiff's counsel, ACA's 30(b)(6) witness stated:



Furthermore, ACA does not sell separate accounts, ████████████████████████████ ████████████████████████ (Ex. 5, at 27:11-20.) Indeed, ACA testified that they are different:

> **Q:** "Are you familiar with the phrase 'separate accounts'?
> **A:** I am.
>
> **Q:** What does that mean to you?
> **A:** I understand separate accounts to be like, basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor.
>
> **Q:** And **do you create separate accounts for any of your clients?**
> **A:** So help me. I mean, with -- if you're using that nomenclature in which it's used in the investment profession, **I would say no**.
>
> **Q:** Okay. And I was. Do you -- maybe "create" is the wrong word. **Do you work with any other entities to acquire separate accounts for any of your customers?**
>
> **A:** No**."** (Ex. 5 ACA 30(b)(6) Dep 1, at 27:3-20.)

This fact is material and shows ACA offers separate services from Plaintiff's products, differentiating their companies in the eyes of consumers. *Knaack Mfg.,* 955 F. Supp. at 1000 ("If firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC*, 433 F. Supp. 2d at 391-92 (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Haven Capital Mgmt.*, 965 F. Supp. at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because the services the parties provided were significantly

different).

## B. Plaintiff's Products

44. Plaintiff offers mutual funds and separate accounts that can be ordered off its website. (Ariel Investments, LLC's Statement of Facts, attached as Exhibit 41, at ¶ 7; Exh. 9, at 112:5-10.) A "separate account" is "basically, mutual funds, except not in a mutual fund framework, but in an individual account framework for an individual investor." (Exh. 5, at 27:10.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 44 regarding Ariel offering mutual funds and separate accounts as services. Ariel disputes the remaining statements in Paragraph 44, including that Ariel offers separate accounts through its website. A "separate account" is a client-specific account in which funds are invested in a group of stocks identified by Ariel. (Ex. J at ¶ 16.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 44, Plaintiff's Response mischaracterizes the evidence in a way that is immaterial to the motion.

This fact is material and shows ACA offers separate services from Plaintiff's products, differentiating their companies in the eyes of consumers. Specifically,

(Exh. 9, at 109:22; 112:5-6); *see Knaack Mfg.*, 955 F. Supp. at 1000 ("If firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC*, 433 F. Supp. 2d at 391-92 (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Haven Capital Mgmt.*, 965 F. Supp. at 531-32

(finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because the services the parties provided were significantly different).

45. ███████████████████████████████████████████████████████████
████████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 45. ████████████████
█████████████████████████████████████████████████████████████████████

**ACA REPLY:** This fact is not in dispute. █████████████████████████████

████████████ (Dkt. 144, at 8.) This fact is material because consumers are less likely to be confused. *See Knaack Mfg.,* 955 F. Supp. at 1000 (stating "[i]f firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC*, 433 F. Supp. 2d at 391-92 (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Haven Capital Mgmt.,* 965 F. Supp. at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because the services the parties provided were significantly different). ██████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (Exh. 9, at 259:3-6).

46. ████████████████████████████████████████████████████████
█████████████████████

**RESPONSE:** Ariel does not dispute the statements in Paragraph 46.

47. ████████████████████████████████████████████████████████
██████████████████████

**RESPONSE:** Ariel does not dispute the statements in Paragraph 47 regarding the drafting of

wills or the preparation of clients' tax returns or filings.

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. As part of the tax planning services ACA performs, ACA reviews clients' prior tax returns and performs income tax projections based on income data that clients provide. (Ex. 2, at 177:11-18.) ACA then provides recommendations about how to reduce tax expenses for that specific client or family members of that client. (*Id.*) Plaintiff states tax questions are a part of its *discussions* with investors. (Exh. 9, at 107:20.) Tax planning, however, is not part of Plaintiff's *services*. (Id., at 106:12-17).

This fact is material because consumers are less likely to be confused because they can differentiate Plaintiff's and ACA's services easily. *See Knaack Mfg.,* 955 F. Supp. 1000 (stating "[i]f firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC,* 433 F. Supp. 2d at 391-92 (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Haven Capital Mgmt.*, 965 F. Supp. at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because the services the parties provided were significantly different).

48. (Exh. 9, at 416:22-417:4, 21-24.) A Dow Jones News Service article quotes John Rogers and reads, "Ariel wants to be a niche player and do 'one thing very well,' Rogers said, and that's value investing picking downtrodden and unloved stocks." (Bates Number AI020054, attached as Exhibit 42.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 48.

**V.       Customers and Advertising**

### A.  ACA's Clientele

49.      ACA provides its private wealth management services to natural persons, individuals and families. (Exh. 5, at 21:5-6.)  ACA does not "tak[e] on an investment relationship or a private wealth management relationship for an LLC in and of itself or a trust in and of itself." (*Id.* at 185:17-20.) ACA only accepts a charitable trust or a family LLC if its tied to an individual or family who is already an ACA client.  (Id. at 184:22-185:8.)

**RESPONSE:** Ariel disputes the statements in Paragraph 49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. Q at 24:5-17; 25:5-8.) ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. S at pp. 6, 8.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. Plaintiff does not provide any facts that place ACA's facts in dispute. Plaintiff states ACA's clients include persons, trusts, partnerships, and a family foundation. It however ignores that ACA does not take on an investment relationship for a trust, partnership, or foundation *unless* it is tied to an individual or family who is already an ACA client. (Exh. 5, 21:5-6; 185:17-20; 184:22-185:8.)

This fact is material because ACA and Plaintiff target separate types of customers. *Knaack Mfg.*, 955 F. Supp. at 1000 ("If firms do not compete directly, it is harder to show consumers are likely to be confused by similar terms"); *see also Omicron Capital LLC*, 433 F. Supp. 2d at 391-92 (finding confusion unlikely where two financial firms provided different services and thus did not compete); *see also Beneficial Corp.*, 529 F. Supp. at 449 (finding that the plaintiffs who made loans to individual consumers served an entirely different market than defendant who made business loans).

50.      ACA's typical client is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, someone with typically complex income tax planning and compliance needs, someone typically with possible state or estate tax exposure, complicated financial planning issues." (Exh. 2, at 195:8-13.)

**RESPONSE:** Ariel disputes the statements in Paragraph 50.  Ariel Capital reports to the SEC that a condition for starting and maintaining a client relationship is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. Q at 70:19-22; 71:20-22; Ex. S at pp. 5-6.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner that is

immaterial to the motion. Plaintiff takes the evidence out of context. ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ (Exh. 2, at 71:20-72:16.) Mr. Bray testified:



Bray further testified ████████████████████████████████████████████

█████████████████████ (Exh. 2, at 193:20 – 194:15.)

Moreover, Plaintiff does not present any facts that call into question whether ACA's typical client is "someone with typically complex income tax planning and compliance needs, someone typically with possible state or estate tax exposure, complicated financial planning issues." (Exh. 2, at 195:8-13.) Indeed, Plaintiff concedes ACA provides private wealth management, including tax return preparation, estate planning, retirement planning, investment management, cash flow planning, and tax planning. (*See* Plaintiff's Response 4 *supra.*)

These statements are material because ACA's large account minimum, and intimate,

personalized services ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████  *See Beneficial Corp.,* 529 F. Supp. at  449 (plaintiffs who made

small, $1500 loans to individual consumers served an *entirely different market* than defendant who

made large, $50,000 business loans) It also shows customers are sophisticated. *See Haven Capital,*

965 F. Supp. at 534 (buyers sophisticated where they made initial investments over $1,000,000).

51. ████████████████████████████████████████████████
████ (Bates Numbers ACA000679-ACA000687, attached as Exhibit 16.)
█████████████████████████████████████. (Exh. 2, at 176:15-19.) For example,

████████████████████████████████████████████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 51. ███████████████
█████████████████████████████████████████████████████████████
██████████████████████████████ (Ex. Q at 70:19-22; 71:20-22; Ex. S at pp. 5-
6.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial

to the motion. Plaintiff does not provide any facts that place ACA's facts in dispute. Plaintiff

additionally takes its evidence out of context. ██████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████



(Exh. 2, at 193:20 – 194:15.)

These statements are material because ACA's large account minimum distinguish its

services ████████████████████████████████████████████████████

██████████████████████████████ (Exh. 9, at 108:20; 134:18-19.)  *See*

*Beneficial Corp.,* 529 F. Supp. at 449 (plaintiffs who made small, $1500 loans to individual

consumers served an *entirely different market* than defendant who made large, $50,000 business

loans). It also shows customers are sophisticated. *See Haven Capital*, 965 F. Supp. at 534 (finding

buyers sophisticated where they made initial investments over $1,000,000).

52.      All of ACA's clients came from client referrals or employee referrals. (Exh. 2, at
216:14-16.) ACA and its employees personally know and have a relationship with each client.
(Exh. 5, at 18:25; Exh. 2, at 69:20-21.) For meetings, an ACA employee often meet [sic] its [sic]
client at ACA's office, the client's home, a restaurant, or at the client's business. (Exh. 2, at
180:10-18.) And when an ACA employee meets with a client, they often meet with members of
the client's family, like grandparents, parents, children, and grandchildren. (*Id.* at 179:7-11.) ACA
also provides this advice over conference calls or telephonically, but the primary way ACA
communicates to its clients is in person, face to face. (Exh. 2, at 181:8-18.)

**RESPONSE:** Ariel does not dispute that Bray testified consistent with the statements in
Paragraph 52. However, Ariel Capital advertises its financial services in print, radio, through its
website, via its business cards, by word of mouth, in advertisements in the Naples, Florida *Daily
News* and *Crain's Cleveland Business*, and by sponsoring events involving local non-profits,
community non-profits and charities so that Ariel Capital's name is included on event promotional
materials. (Ex. R at 67:8-25; 68:1-4; Ex. Q at 57:13-15; 58:3-12; 212:24-25; 213:1- 7; 215:16-20;

216:1-4.) Moreover, Ariel Capital advertises and describes the scope of its services on its website at www.arielcapitaladvisors.com, and has done so since January 24, 2014. (Ex. S, at p. 1.) According to such website, Ariel Capital "provides independent and objective investment management, tax and estate planning, financial planning, and trust administration services to clients throughout the United States." (Ex. A at ¶ 22; Ex J at ¶ 11.)

**ACA REPLY:** To the extent Plaintiff disputes SOF 52, Plaintiff's Response mischaracterizes the evidence in a way that is immaterial to the motion. All advertisements were locally concentrated in the Naples, Florida area, and only one advertisement was exhibited in Cleveland, Ohio in *Crain's Cleveland Business*. (Exh. 2, 56:16-20; 57:3-12; 58:12-16; 215:16-216:4).

These facts are material because that the Parties do not advertise in the same outlets. *See Libman Co. v. Vining Indus.*, 69 F.3d 1360, 1362 (7th Cir. 1995) (distinguishing that while goods may be available in the same *type* of outlets, confusion is unlikely where the goods are never available in the *same* outlets). Moreover, that ACA has a website does not mean it advertises in the same manner as Plaintiff. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:53.50 (4th ed.) *citing Parfums de Coeur, Ltd. v. Lory Lazarus*, 83 U.S.P.Q.2d 1012, 1021, 2007 WL 683784 (T.T.A.B. 2007) ("[T]he mere fact that goods and services may both be advertised and offered through the Internet is not a sufficient basis to find that they are sold through the same channels of trade. The Internet is such a pervasive medium that virtually everything is advertised and sold through the Internet.").

53.     ACA has advertised only a handful of times since opening its doors. And these ads have been through local non-profits and media, and once in Crane's Cleveland Business. (*Id.* at 68:1-3; Exh. 2, at 56:13-15; 67:11-13, 213:1-10.) ACA does not advertise on the internet. (Exh. 2, at 67:18-19.)

**RESPONSE:** Ariel disputes the statements in Paragraph 53. Ariel Capital advertises its financial services in print, radio, through its website, via its business cards, by word of mouth, in advertisements in the Naples, Florida *Daily News* and *Crain's Cleveland Business*, and by sponsoring events involving local non-profits, community non-profits and charities so that Ariel Capital's name is included on event promotional materials. (Ex. R at 67:8-25; 68:1-4; Ex. Q at 57:13-15; 58:3-12; 212:24-25; 213:1-7; 215:16-20; 216:1-4.) Moreover, Ariel Capital advertises and describes the scope of its services on its website at www.arielcapitaladvisors.com, and has done so since January 24, 2014. (Ex. S, at p. 1.) According to such website, Ariel Capital "provides independent and objective investment management, tax and estate planning, financial planning,

and trust administration services to clients throughout the United States." (Ex. A at ¶ 22; Ex J at ¶ 11.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a way that is immaterial to the motion. All advertisements were locally concentrated in the Naples, Florida area, and only one advertisement was exhibited in Cleveland, Ohio in *Crain's Cleveland Business*. (Exh. 2, 56:16-20; 57:3-12; 58:12-16; 215:16-216:4.)

These facts are material because Plaintiff and ACA do not advertise in the same channels. *See Libman Co.,* 69 F.3d at 1362 (distinguishing that while goods may be available in the same *type* of outlets, confusion is unlikely where the goods are never available in the *same* outlets). Moreover, that ACA has a website does not mean it advertises in the same manner as Plaintiff. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:53.50 (4th ed.) *citing Parfums de Coeur, Ltd.,* 83 U.S.P.Q.2d at 1021 ("[T]he mere fact that goods and services may both be advertised and offered through the Internet is not a sufficient basis to find that they are sold through the same channels of trade. The Internet is such a pervasive medium that virtually everything is advertised and sold through the Internet.").

54.     ACA also has never advertised in, and does not intend to advertise in Barons, Fortune, Mutual Funds Magazine, Morningstar Fund Investor, Morningstar Advisor, Investment Advisor, Value Investor Insight, Entrepreneur, Personal Finance, Savoy Magazine, Black Enterprise, Smart Money, Bloomberg Businessweek, Financial Advisor, Hispanic Executives, Ticker, Trader Magazine, Techsmart Trader, USA Today, Wall Street Journal, the New York Times, Pensions and Investments, Chicago Tribune, Chicago Sun-Times, Crain's Business Chicago, in elevators or on CNBC, Morning Call, Fox, Fox Markets Now, Your World with Neil Cavoto, Cavoto on Business, Nightly Business Report, ABC, Good Morning America, World News Tonight, Bloomberg TV, In Focus, Morning Call, Open Exchange, Frontline, New Hour with Jim Lehrer, Chicago Tonight, WCIU, First Business, WBBM, DuSable Night of 100 Stars, Eye on Chicago, Twitter, Facebook, Dow Jones, wellingtononwallstreet.com, Morningstar.com, forbes.com, cnnmoney.com, blackamericaweb.com, wvon.com, Green Money, or Fast Company. (*Id.* at 208:5-215:15, 216:17-219:15.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 54.[3]

---

[3] Continued on next page.

55.    ACA does not have any clients that are banks, institutional clients, investment companies, business development companies, pooled investments, pensions, profit-sharing plans, corporations, businesses, state governments, municipal governments, insurance companies, or other investment advisors.  (Exh. 2, at 226:2-227:16.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 55.

### B. Plaintiff's Customers

56.    Plaintiff's



(Exh. 9, at 374:5-7.)

**RESPONSE:** Ariel disputes the statements in Paragraph 56.  Ariel Capital confuses mutual funds and separate accounts. Ariel's investment management services are divided approximately 50-50 between mutual funds and separate accounts. (Ex. E at 109:20-23.) Ariel Capital, however, cites to deposition testimony ████████ (Ex. E at 109:24; 110:1-18.) Moreover, broker-dealers such as Schwab or Fidelity are not "individual customers." Finally, Ariel Capital relies on deposition testimony regarding the results of a survey to support its ████████ (Ex. RR at 374:5-7.) The participants in the cited survey, however, were not limited to Ariel's clients. Indeed, as Ariel's witness testified, the survey was conducted among clients as well as non-clients of Ariel. (Ex. RR at 376:9-16.)

**ACA REPLY:**  Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. ████████

████████

████████

(Exh. 9, at 109:20 – 110:13.) Specifically:

████████

████████

[REDACTED] Dealer–brokers are sophisticated and unlikely to be confused between ACA and Plaintiff, especially given the differences in Plaintiff's products and ACA's services. *See Franklin Resources, Inc. v. Franklin Credit Mngt. Corp.*, 988 F. Supp. 322, 330 (2d Cir. 1997) ("It is hard to imagine a more sophisticated, street-wise, savvy buyer. . . than professional broker-dealers").

Plaintiff's survey results also represent material facts not in dispute because the parties serve different markets and types of consumers. Even if Plaintiff's survey was conducted among clients and non–clients, it showcases the marked difference between Plaintiff's individual customers or target market and ACA's customers, who typically have over $1,000,000 in liquid investable assets. (Exh. 2, at 71:23-24.) Indeed, in the financial services industry, differences in the types of customers and transaction sizes is strong evidence of difference in the parties' respective markets. *See Beneficial Corp.,* 529 F. Supp. at 449 (plaintiffs who made $1500 loans to individual consumers served an *entirely different market* than defendant who made $50,000 business loans).[4]

---

[4] Continued on next page.

57.     These direct customers associate Plaintiff's products with "turtle" and "patient," and sometimes refer to Plaintiff as the "turtle people." (Exh. 9, at 267:13-21, Exhibit 20 to Ariel Investments LLC's Rule 30(b)(6) Deposition, attached as Exhibit 17, at AI017880.) Of the broker-dealers who comprise 80% of Plaintiff's individual customers, the number one way they heard about Plaintiff was through their own independent research. (Exh. 9, at 110:4-12; Exh. 17, at AI017878.) These broker-dealers also reported they "wished Plaintiff had more brand awareness among consumers." (2015 Turtle Talk Survey – Advisor Experience, attached as Exhibit 18, at AI005356.)

**RESPONSE:** Ariel disputes the statements in Paragraph 57.  Ariel Capital confuses mutual funds and separate accounts. Ariel's investment management services are divided approximately 50-50 between mutual funds and separate accounts.  (Ex. E at 109:20-23.)  Ariel Capital, however, cites to deposition testimony relating solely to Ariel's mutual fund services and not its separate accounts. (Ex. E at 109:24; 110:1-18.) Moreover, broker-dealers such as Schwab or Fidelity are not "individual customers." Ariel does not dispute the remaining statements in Paragraph 57.

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion.



(Exh. 9, at 109:20 – 110:13.) Specifically:

(Exh. 18, at AI005356.)

This is a material fact not in dispute because Plaintiff's ███████████████████████

█████████████████████████████████████████████████████████████████

*See Haven Capital*, 965 F. Supp. at 531 (finding a weak mark where customers associated the plaintiff with its low cost and style of investment rather than its actual name); *see also Co-Rect Prod., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) ("[I]t is the *effect* of such advertising that is important, not its extent.") (emphasis in original); *see also Knaack Mfg.,* 955 F.Supp. at 1001-02 (holding that using a mark for 25 years, and spending millions on advertising was *insufficient* to show the mark had gained brand recognition with consumers). Because marks that are not "well-known" cannot represent the "salient" portion of a mark, and because Plaintiff's ARIEL mark is not well-known, it cannot be considered the salient portion of the mark, thus it should not be given more weight. *See Lincoln Fin. v. Sagepoint*, 2009 WL 928993 *7 (N.D. Ind. 2009) (holding "Sage" was not the salient portion of "Sagemark Consulting" and "Sagepoint Financial" because plaintiff did not show its "sage" mark was well-known, thus the court considered the marks as a whole).

Moreover, ████████████████████████████████████████████

█████████████████████████████████████ thus confusion is unlikely given broker's sophistication and investigation. *See Franklin Resources, Inc.*, 988 F. Supp. at 330 ("It is hard to imagine a more sophisticated, street-wise, savvy buyer. . . than professional broker-dealers").

58. ████████████████████████ (Bates Number AI011119, attached as Exhibit 19.) ██████████████████████████████████████████

████████████████████████████████████████

**RESPONSE:** Ariel disputes the statements in Paragraph 58. Ariel Capital's statements confuse the concepts of mutual funds and separate accounts.



**ACA REPLY:** This fact is not in dispute. With regard to mutual funds, ███████████

████████████████████████████████████████████████████████████████

███████████████████████████ (Exh. 9, at 108:17-22; 139:21-140:1). Additionally,

these customers ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████ (Exh. 9, at 112:5-10). This fact is material. It shows that Plaintiff and ACA target

markedly different markets and asset classes, as ACA's customers typically must initially invest

███████. (Exh. 2, at 71:23-24). Indeed, in the financial services industry, differences in

transaction sizes is strong evidence of difference in the parties' respective markets. *See Beneficial*

*Corp.,* 529 F. Supp. at 449 (finding that the plaintiffs who made $1500 loans to individual consumers

served an *entirely different market* than defendant who made $50,000 loans). Because Plaintiff offers

its funds for immediate ordering, while ACA requires its customers to submit to extensive financial

discussions and often meet in person, this further supports that customers can easily distinguish

between Plaintiff's immediate products, and ACA's ongoing services.

████████████████████████████████████████████████████

████████████████████████████████████████████████, they are likely

to be sophisticated consumers, more likely to be discerning and more likely to research the

companies, so less likely to be confused, especially where the services provided by Plaintiff and

ACA serve significantly different purposes. This supports that confusion is unlikely among this

group of consumers. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir.

1997) ("[W]here consumers are sophisticated, deliberative buyers, confusion is less likely."); *see*

*also Lincoln Fin. Advisors Corp.,* No. 109-CV-15RM, 2009 WL 928993 at *7 ("One would expect

that individuals and businesses seeking to invest their money would have a higher sophistication

level and would exercise greater care in selecting a service."); *see also Haven Capital,* 965 F. Supp.

at 534 (finding buyers sophisticated where they made initial investments over $1,000,000).

### C.  Lack of Confusion

59.     There have been no instances of actual confusion among consumers attempting to purchase either Plaintiff's products or ACA's services.

**RESPONSE:** Ariel disputes the statements in Paragraph 59.  Ariel has offered several instances of confusion. For the sake of clarity and brevity Ariel will not re-state all of the instances here. Instead, Ariel refers to and incorporates as if set forth herein paragraphs 40-53 of Ariel's Statement of Material Facts in Support of its Motion for Partial Summary Judgment.  (Dkt. 130.)

**ACA REPLY:** Plaintiff's instances of alleged confusion are inadmissible.  Boone's testimony is inadmissible under FRE 402 as he is not a relevant consumer under the Lanham Act and so his testimony does not make any fact at issue more or less likely. Each statement Boone made is also inadmissible under FRE 901 and lacks foundation as Plaintiff did not produce evidence sufficient to support Boone is a relevant consumer.

Mr. Boone further testified that he was calling on behalf of his company, TechSmart Trader, and was not shopping for investment or financial services for his company, nor that it had any intentions of buying those services any time soon, thus it is not a relevant consumer. (Ex. 22 Boone Dep. at 51:7-22.)  Specifically, Mr. Boone testified that:

> Q.  "….**TechSmart Trader doesn't invest any money right now, does it?**
>
> A.  **No**.
>
> Q.  **Does it have any plans, in the next year, to invest any money?**
>
> A.  **No**.
>
> Q.  **Does TechSmart Trader, in the foreseeable future, have any plans to invest any money**?
>
> A.  Say your question again, because I kind of lost you.
>
> Q.  **Does TechSmart Trader, LLC have any plans in the given future to invest any money?**
>
> A.  **No.**"  (Ex. 22 Boone Dep. at 51:7-22.) (bold added).

Because neither Mr. Boone nor his company TechSmart Trader were trying to purchase products or services from ACA or AIL, they were not a relevant consumer under the Lanham Act, so his confusion – even if present – was irrelevant.  *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (holding plaintiff's evidence of actual confusion irrelevant where confused

callers were not trying to purchase her goods); *see Syndicate Sales v. Hampshire Paper Corp.*, 192

F.3d 633, 636 (7th Cir. 1999) (plaintiff 's evidence of confusion was insufficient because the

confusion did not occur among the *relevant* group of consumers); *Lang v. Retirement Living Pub.*

*Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (trademark infringement protects only against mistaken

purchasing decisions and not against confusion generally). Rather, Mr. Boone stated that he had

never heard of Ariel Investments. (Ex. 22, Boone Dep at 67:12 – 68:13.) He further stated that he

was actually just trying solicit advertisements for his magazine, not buy a product. (Id. at 51:1-6.)

Boone's testimony is further inadmissible under 403 because its probative value is

outweighed by the danger it would confuse the issues and be highly prejudicial. David Boone

testified that he did not remember his call with ACA. (Ex. 22 Boone Dep. at 25:5-20, 27:5-7.)

Plaintiff's counsel called Mr. Boone five times before the deposition to discuss "the call," yet Boone

could still only speculate. (Ex. 22 Boone Dep. at 52:23 – 62:9.) Specifically, Mr. Boone testified

that:

> Q. "Do you remember making this February 5, 2016 phone call to Ariel Capital Advisors?
>
> A. Not until you brought it to my attention.
>
> Q. Okay.· Well, let me ask you this:· Do you -- now that we've discussed it, do you remember the phone call at all?
>
> A. **No, I still don't remember the call** per se, because I make so many calls to companies and they may say, they're not here. I might just hang up the phone and keep -- and go on, just move on from there. So if it was a brief call, didn't have much of a conversation, didn't go any further than that, no, I wouldn't have -- I don't remember making that call." (Ex. 22 Boone Dep. at 25:5-20.)
>
> . . .
>
> "Q. **Are there any other details about the telephone call on February 5, 2016 that you recall**?
>
> A. **No, no, not -- no, not at all**, **really**." (Ex. 22 Boone Dep. at 27:5-7) (bold added).

Justin Land's statements are also inadmissible under FRE 802 because his statement was

made to a third party, who did not testify to this statement, and is offered for the truth of the matter

asserted, under FRE 602 as Mr. Bray did not have personal knowledge about the conversation,

under FRE 402 as Mr. Land is not a relevant consumer to make an issue here more or less likely,

under 901 as Plaintiff has not established Land is a relevant consumer, and under 403 as the probative value is outweighed by the danger it would confuse the issues and be prejudicial.

Mr. Land was not a relevant or "confused" consumer. Land allegedly asked "if ACA had any affiliation with AIL" at a conference. (Ex. 2, at 48:7-8.) Even if true, Land's inquiry did not relate to *seeking* a company to invest his assets with, but was merely socializing at a conference. Thus he was not a relevant consumer for purposes of the "actual confusion" factor because he was not making a purchasing decision. *See Packman*, 267 F.3d at 645 ("persons were not relevant consumers absent evidence that they attempted to purchase [the] good").

Furthermore, Justin Land *thought* to inquire whether there was a relationship between AIL and ACA, not that he *assumed* they were related. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc*., 269 F.3d 114, 124 (2d Cir. 2001) (inquiries do not constitute actual confusion as they "are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.") (emphasis in original); *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 121 (S.D.N.Y. 2008) ("inquiries are arguably premised upon a lack of confusion … such as to inspire the inquiry itself"); *Medici Classics Prods. LLC v. Medici Grp. LLC*, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008) (same); *LVL XIII Brands, Inc. v. Malletier*, No. 14 CV. 4869, 2016 WL 4784004, at *40 (S.D.N.Y. Sept. 13, 2016) (same). This distinction is key because trademark law only protects against certain species of confusion. *See Lang,* 949 F.2d at 583 (trademark infringement protects only against mistaken purchasing decisions and not against confusion generally).

Monica Schandel's testimony is inadmissible under FRE 402 as her testimony is irrelevant to any issue in this case. Ms. Schandel's testimony was taken out of context. She stated that she simply misspoke, but corrected her misstatement and stated. For instance, she stated:

> Q. Okay, could you tell me about the nature of your business relationship with Ariel Investments.
>
> A. Okay, you keep using the term Ariel Investments and I know this -- I'm sorry.· I know

this is a suit about names and I'm a little confused about it because I guess maybe I've used it in the wrong capacity, so Ariel Capital Advisors is the company that I have a relationship with specifically as with Christopher Bray, Chris Squittieri who are the team that I work with my one common client and our relationship is simply that we do a joint product where they manage the money and I do the financial planning for the client.

Q. Miss Schandel, I appreciate the answer.· You mentioned a few different things.· Let me just back up for a second. With regard to the nature of the suit and the suit about names, let me direct you back to Exhibit Two.  In the second paragraph where you said, "I have one joint client with Ariel Investments that was a client prior to dissolution of the old partnership and the formation of this new LLC," are you now telling me that you meant to say Ariel Capital Advisors?

A. Yes, I am, sir.· I am.· **I guess I did that incorrectly and I should have said Ariel Capital Advisors**.

Q. Okay, that's fine.  Let me ask you this:· Why did you write Ariel Investments in your E-mail to Mr. Gollwitzer in Exhibit Two?

A. **I was trying to write in regards to the E-mail Ariel Capital Advisors.· Apparently my brain just didn't say that.· I was probably recently looking at this deposition and I probably just typed the first thing that was on the line which is Ariel Investments** who's the Plaintiff in this case.

Q. I understand.  Do you -- Well, let me ask you this:· Would·you then characterize putting Ariel Investments instead of Ariel Capital Advisors in as a mistake?

A. That is absolutely a mistake, yes.

Q. Okay, do you think it's possible that you made the mistake because the names are similar?

A. I actually honestly to be honest –

MR. WOLEK:· Objection, form.

THE WITNESS:· -- with you, sir, **I don't know who Ariel Investments is.· I understand you're a mutual fund company.· I probably just wrote it incorrectly.**

BY MR. WATTERS:

Q.· ·Okay, I was only able to hear part of your answer because Attorney Wolek was objecting, and that's just the reality of doing this via phone. ·Let me ask the question again and if you don't mind you can pause for a second, Attorney Wolek can make an objection and then I can hopefully hear your answer more completely.  Do you believe that you made the mistake of saying Ariel Investments and you meant Ariel Capital Advisors in part or in whole because the names are similar?

MR. WOLEK:· Objection, calls for a legal conclusion, objection, form.

THE WITNESS:· I'm sorry.· Do you still want me to answer that question even though they're objecting to it?

BY MR. WATTERS:

Q. Yes.  I'm sorry, and I should have provided you some instruction on that and from time to time Mr. Wolek may object to a question I ask and then when he's asking questions I may object as well.  After the objection you can go ahead and answer the question.

Would you like us to repeat everything or do you still remember the question?

A.  No.· I remember the question. ·**I believe that I -- I know that I made a mistake.· I believe it's because I was looking at this deposition and I looked at the first thing on it which said Ariel Investments.** (Ex. 23 Monica Schandel Dep. at 29:16-32:20.) (bold added).

Ms. Schandel was also not a relevant consumer because she was not trying to purchase either Plaintiff's products or ACA's services, but was responding to a subpoena and testifying in a deposition.

The calls reported by Ms. Brady and Ms. Cusack are inadmissible hearsay. These calls, from unidentified callers, are inadmissible under FRE 802 as third party statements, made to another party, who did not testify to this statement to prove the truth of the matter asserted; under FRE 602 because Ms. Hobson, who signed the interrogatory response, did not have personal knowledge of the calls; under FRE 402 because the callers were not relevant consumers and thus do not make any issue here more or less likely; under FRE 901 as the calls lack foundation without evidence to show the callers were relevant consumers; and under FRE 403 because the probative value of the calls is outweighed by danger they would confuse the issues and be highly prejudicial.

In the call ████████████████████████████████████████ ████████ (Ex. 9, at 183:12-22, 184:9-21, 187:18-21; Ex. 12 Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 4.)  It is therefore very unlikely that this call was meant for either party because neither party sells real estate.  *See Nora Beverages, Inc.,* 269 F.3d at 124 (holding evidence of actual confusion must be due to confusion between the asserted mark and defendant's mark).

Moreover, AIL conceded during its 30(b)(6) deposition that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ AIL's account of "actual" confusion, by this caller, is therefore doubly unreliable because ████████████████████████████████████████

(Ex. 9, at 250:24 - 251:20, 252:2-9, 252:13-18; Ex. 12 Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 4.)

These two unnamed callers are hearsay and inadmissible. *See Smith Fiberglass Prod., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993) (refusing to "craft[] a new hearsay exception to the FRE for paraphrases of ***state of mind declarations by unknown declarants***" because they are inadmissible) (emphasis added); *see also Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 520 (N.D. Ill. 2011) (holding instances of confusion by unknown customers must be rejected as hearsay during summary judgment).

Even if admissible, the three instances (Boone, Land, Schandel) are still *de minimus*. *See Packman*, 267 F.3d at 645 (even if the four calls, which came at the inception of defendant's business, had been relevant consumers, that is *de minimis* evidence of confusion); *see also Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) (evidence that two consumers were misled by defendant's mark did not create contestable issue of likelihood of confusion); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1060 (7th Cir. 1995) (stating three "is not much confusion; indeed, it is remarkably low given the normal state of human comprehension of advertising and corporate organization.")

This fact is material and Plaintiff provided neither admissible nor relevant actual confusion evidence. And even if it did, such evidence is *de minimus*.

### D.  The Parties' Marks

60.    ACA's mark always features a masculine white lion's head enclosed in a royal blue shield, with a royal blue background. (Bates Number 000069, attached as Exhibit 6; Bates

Number 000072, attached as Exhibit 7; Bates Number 000081, attached as Exhibit 8.) To the right of ACA's lion are the words, "Ariel Capital Advisors, LLC" in a sans-serif font, with only the "A" in Ariel, the "C" in Capital, and the "A" in Advisors capitalized. (*Id.*)

**RESPONSE:** Ariel disputes the statement in Paragraph 60 regarding Ariel Capital's mark always featuring a masculine white lion's head. Whenever Ariel Capital orally utilizes its mark it does not feature a masculine white lion's head or any other visual image. Moreover, there are many instances where Ariel Capital's mark does not include a masculine white lion's head. For example, Ariel Capital's own website (www.arielcapitaladvisors.com) features several instances of use of the name "Ariel Capital Advisors" without an accompanying lion head. (Ex. T.) Ariel does not dispute the remaining statements in Paragraph 60.

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. **First**, Plaintiff takes ACA's website out of context when it asserts the name "Ariel Capital Advisors" appears without the accompanying lion head. (Bates Number 000069, attached as Exhibit 6; Bates Number 000072, attached as Exhibit 7; Bates Number 000081, attached as Exhibit 8). Indeed, *on every page* of ACA's website, "Ariel Capital Advisors" appears with its accompanying lion. (*Id.*). **Second**, to the extent Plaintiff asserts ACA's URL does not showcase the lion, Plaintiff ignores that consumers do not see the URL alone, absent the website and accompanying lion's head. *Packman,* 267 F.3d at 643 (when determining similarity between marks, the comparison is made in light of what happens in the marketplace). **Third**, even if the lion's head does not accompany the mark in the oral realm, Plaintiff ignores that anyone referred to ACA or Plaintiff is likely to investigate further because the services are expensive, in which case the individual *will* encounter the lion's head, even if through a simple online search. *See Knaack Mfg.*, 955 F. Supp. at 1001 (holding that consumers inspect products and accompanying marks carefully where products are expensive). Indeed, Plaintiff even admits that its customers are sophisticated (Dkt. 144, at 21.) and that even its mutual fund customers investigate heavily before purchasing. Specifically, Plaintiff's witness stated, "the most popular choice that we have seen since I've worked at [Plaintiff], which is going on 17 years, is referrals, **where someone has told them about us, they've investigated, they've done their own homework, they've done their due diligence,** and they pick our funds for their retirement plan." (Exh. 9, at 119:2-9.) (bold added).

This fact is material and suggests that consumers will not confuse the marks, even if encountered orally, because consumers investigate marks, as well as services, and could easily distinguish them both.

| Plaintiff | ACA |
|---|---|
|  |  |

61.     Plaintiff's marks appear as "ARIEL INVESTMENTS," never "Ariel," and all the letters are capitalized and in a light and whimsical serif font. (Bates Number AI000007, attached as Exhibit 20.)  The Plaintiff "R" loops under the mark in a calligraphy-like, reverse-swoop. (Id.) Plaintiff's marks are also usually accompanied by either (i) a sketched turtle holding a trophy, much like a turtle one would see as a character in a children's fable, or (ii) a realistic tortoise, and who is directly facing its viewer. (Id.)

**RESPONSE:** Ariel disputes the statements in Paragraph 61.  Ariel does not understand what the term "light and whimsical" means and Ariel's marks, when spoken, are not accompanied by a[5]

---

[5] continued on next page

turtle or tortoise. There are many instances of Ariel utilizing the ARIEL mark without the word "investments." (*e.g.* Ex. FF at pp. 15, 19, 25, and 30.) Additionally, Ariel utilizes other marks including ARIEL FUND, ARIEL'S ABCS OF MONEY, ARIEL INTERNATIONL [sic] FUND, ARIEL GLOBAL FUND, ARIEL DISCOVERY FUND, ARIEL FOCUS FUND, AND ARIEL APPRECIATION FUND, none of which include the word "investments." (Ex L.)

**ACA REPLY:** Plaintiff's Response mischaracterizes the evidence in a manner immaterial to the motion. This fact is not in dispute and even if Plaintiff's turtle does not accompany its mark in the oral realm, Plaintiff ignores that anyone referred to ACA or Plaintiff is likely to investigate further because the services are expensive, in which case the individual *will* encounter the lion's head, even if through a simple online search. *See Knaack Mfg.,* 955 F. Supp. at 1001 (holding that consumers inspect products and accompanying marks carefully where products are expensive).

To the extent Plaintiff's ARIEL mark is accompanied by Fund, ABCS of Money, International Fund, Global Fund, Discovery Fund, Focus Fund or Appreciation Fund, those marks are still not well-known. (Exh. 9, at 267:13-21, Exhibit 20 to Ariel Investments LLC's Rule 30(b)(6) Deposition, attached as Exhibit 17, at AI017880; 2015 Turtle Talk Survey – Advisor Experience, attached as Exhibit 18, at AI005356.) █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ (*Id.*); *see Haven Capital Mgmt.*, 965 F. Supp. at 531 (finding a weak mark where customers associated the plaintiff with its low cost and patient investment style rather its name).

Plaintiff's marks for its mutual funds further differ in visual appearance from ACA's and are also different in suggestion. *See Henri's Food Prod. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983) (an examination of marks looks for similarity of sight and meaning). For one, Plaintiff's mutual fund marks are not stylized, but presented in the same font used everywhere

else on Plaintiff's website, thus little homogeneity, in terms of visual appearance, exists between these marks and ACA's mark and lion logo. (Exh. 21.) Second, Ariel Appreciation Fund, Ariel Discovery Fund, Ariel Fund, Ariel International Fund and Ariel Global Fund all suggest the marks are for products and specifically evoke images of large funds. The Ariel's ABCs of Money mark induces thoughts of financial information or pamphlets. By contrast, ACA's mark brings to mind images of people providing financial services – CPAs, accountants, attorneys – not a product. Because the purchasers of ACA's services and Plaintiff's products also proceed with greater examination than a typical product, they are even more likely to differentiate between these marks' given the differences in sight, sound and meaning.

Third, Plaintiff even admits that its mutual fund customers investigate heavily before purchasing. Specifically, Plaintiff's witness stated,



(Exh. 9, at 119:2-9) (bold added).

This fact is material and suggests that consumers will not confuse the marks, even if encountered orally, because consumers investigate marks and would notice the stylistic differences here.

### E. Other Firms Use Ariel, Including in Financial Services

62.    Ariel Wealth Advisors is a firm, established in 2010, located in New Jersey in the financial services industry that offers investment advice and execution, cash flow planning for today and tomorrow, family asset protection, estate and wealth transfer strategies, and tax planning. (Exhibit 24 to Ariel Investments LLC's Rule 30(b)(6) Deposition, attached as Exhibit 24.)

**RESPONSE:**  Ariel disputes the statements in Paragraph 62. Ariel objects to the admission of the evidence which supports the statements in Paragraph 62 on the basis of Fed. R. Evid. 802 and 901.

**ACA REPLY:** Exhibit 24 is a true and correct copy of a screenshot of Ariel Wealth Advisors, LLC's website. Exhibit 24 is admissible because Plaintiff's 30(b)(6) witness testified that

███████████████████████████████████████

██████████████████████████████████ Exh. 9, at 35:19-41:6; 48:18-49:13; 402:22-403:21).

Exhibit 24 is also admissible because ACA's 30(b)(6) witness testified that ██████████

██████████████████████████████████ (Exh. 2, at 119:3-8). Exhibit 24 is further admissible

because Brian T. Noack filed a declaration that he had personal knowledge of this website and its

appearance. (Declaration of Brian T. Noack).

This fact is material because Plaintiff ostensibly concedes that Ariel Wealth Advisors does

not pose a likelihood of confusion, but like Plaintiff's mark, ARIEL WEALTH ADVISORS is also

in all capitals, uses a *serif* font, extends its "R" under its name, and uses a sketched, not bold mascot.

(Exh. 24).

| Plaintiff | Ariel Wealth Advisors | ACA |
|-----------|----------------------|-----|
|  |  |  |

63.     Plaintiff admits it has never sent Ariel Wealth Advisors a cease and desist letter.
(Ariel Investments, LLC's Answers to Ariel Capital Advisors LLC's Requests for Admission No.
17, attached as Exhibit 31, at 4.)

**RESPONSE:** Ariel does not dispute the statements in Paragraph 63. ████████████████

███████████████████████████████

**ACA REPLY:**  Plaintiff 's Response does not display any new facts that dispute this fact.

64.     Over fifty other companies in Illinois use "Ariel" as the first word of their company
name. (Exhibit 22 to Ariel Investments LLC's Rule 30(b)(6) Deposition, attached as Exhibit 28.)

**RESPONSE:** Ariel disputes the statements in Paragraph 64.  Ariel objects to the admission of
the evidence which supports the statements in Paragraph 64 on the basis of Fed. R. Evid. 802 and
901.

**ACA REPLY:** Exhibit 28 is admissible because Brian T. Noack filed a declaration that he

had personal knowledge of the exhibit and its contents, and, if called upon to do so, could and would

competently testify to the matters set forth herein in a court of law. (Declaration of Brian T. Noack;

Exh. 9, at 10:22-11:22.) Exhibit 28 is further admissible because under FRE 803(8) because it is a

record of a public office, the Illinois Secretary of State, business division, which has a legal duty to

report this information, under FRE 803(15) because it reflects statements in the document that affect

an interest in the property, including the intellectual property relating to the companies' names, and

under FRE 803(18) as the Court could give judicial notice to publications and statements from the

Illinois Secretary of State as reliable.

       65.     Over one hundred and fifty other companies use "Ariel" in their name, including in
the financial services industry. (Exhibit 25 to Ariel Investments LLC's Rule 30(b)(6) Deposition,
attached as Exhibit 29.)

**RESPONSE:** Ariel disputes the statements in Paragraph 65. Ariel objects to the admission of
the evidence which supports the statements in Paragraph 65 on the basis of Fed. R. Evid. 802 and
901.

      **ACA REPLY:** Exhibit 28 is admissible because Brian T. Noack filed a declaration that he

had personal knowledge of the exhibit and its contents, and, if called upon to do so, could and would

competently testify to the matters set forth herein in a court of law. (Declaration of Brian T. Noack).

Christopher Bray further testified that he had personal knowledge of those companies during the

30(b)(6) deposition of ACA. (Exh. 2, at 161:12-162:1; Exh. 9, at 10:22-11:22).Exhibit 29 is further

admissible because under FRE 803(8) because it is a record of a public office, the Illinois Secretary

of State, business division, which has a legal duty to report this information, under FRE 803(15)

because it reflects statements in the document that affect an interest in the property, including the

intellectual property relating to the companies' names, and under FRE 803(18) as the Court could

give judicial notice to publications and statements from the Illinois Secretary of State as reliable.

**Defendant's Response to Plaintiff Ariel Investments' Statement of Additional Material Facts**

1.      Ariel Capital served its amended Rule 30(b)(6) Deposition Notice on Ariel on July 29, 2016. (Ex. OO.) Ariel Capital's Notice defined the term "ARIEL Marks" among its "Definitions and Instructions." (Ex. OO at 2.) Ariel Capital defined "ARIEL Marks" to mean the same as the definition provided by Ariel in its Amended Second Set of Interrogatories. (*Id*.) Ariel served its Amended Second Set of Interrogatories on Ariel Capital on January 8, 2016. (Ex. PP.) In its Amended Second Set of Interrogatories (Nos. 4-16), Ariel defined the term "ARIEL Marks" to include the following marks: ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL'S ABCS OF MONEY, ARIEL INTERNATIONAL FUND, ARIEL GLOBAL FUND, ARIEL DISCOVERY FUND, ARIEL FOCUS FUND, ARIEL APPRECIATION FUND. (Ex. PP at 1-2.)

**ACA RESPONSE 1**: Plaintiff mischaracterizes the evidence. Plaintiff had previously limited its suit to "ARIEL" and "ARIEL INVESTMENTS", and so cannot now pursue the other seven marks. Dkt. 79, at 6 ("Only the ARIEL and ARIEL INVESTMENTS marks are at issue in this case."); *see also* Dkt. 68, at 1-2 (only addressing ARIEL and ARIEL INVESTMENTS); *Green v. Travis*, 00-cv-2230, 2000 WL 1409828, at *2 (N.D. Ill. Sept. 26, 2000) ("no court would permit" a party to reclaim a portion of a claim from their complaint after it had already "disavow[ed]" that portion to the Court) (J. Kennelly). But even if the other seven registered marks remained in this suit, ACA should prevail on non-infringement of those marks for the same reasons it does not infringe the ARIEL INVESTMENTS mark, as more fully described below and in ACA's Opening Brief.

2.      This paragraph is intentionally left blank.

3.      When Ariel Capital uses its mark in speech it does not feature a masculine white lion's head or any other visual image. For example, when Ariel Capital employees answer the phone, they are instructed to say, "Ariel Capital Advisors." (Additional Pages of Ariel Capital

Rule 30(b)(6) Deposition, attached as Ex. SS at 150:7.) No lion logo can be heard or seen along with "Ariel Capital Advisors" in this context. Moreover, there are many instances where Ariel Capital's mark, as used in print, does not include a masculine white lion's head. For example, Ariel Capital's own website (www.arielcapitaladvisors.com) features several instances of use of the name "Ariel Capital Advisors" without an accompanying lion head. (Ex. T.)

**ACA RESPONSE 3:** Plaintiff mischaracterizes the evidence in a manner immaterial to the motion. **First**, Plaintiff takes ACA's website out of context when it asserts the name "Ariel Capital Advisors" appears without the accompanying lion head. (Bates Number 000069, attached as Exhibit 6; Bates Number 000072, attached as Exhibit 7; Bates Number 000081, attached as Exhibit 8.) Indeed, *on every page* of ACA's website, "Ariel Capital Advisors" appears with its accompanying lion. (*Id*.).

**Second**, to the extent Plaintiff asserts ACA's URL does not showcase the lion, Plaintiff ignores that consumers do not see the URL alone, absent the website and accompanying lion's head. *Packman*, 267 F.3d at 643 (when determining similarity between marks, the comparison is made in light of what happens in the marketplace).

**Third**, it is undisputed that ACA employees answer the phone "Ariel Capital Advisors" and, although no lion will be seen, "Ariel" does mean lion. (Exh. 2, 58:5-6.) **Fourth**, even if the lion's head does not accompany the mark in the oral realm, courts do not evaluate mere words in a vacuum. See *Packman*, 267 F.2d at 643 ("[T]he comparison is made in light of what happens in the marketplace."). Plaintiff ignores that anyone who calls ACA likely got ACA's phone number from its website, which showcases its lion's head on every page, or from a business card or advertisement, which also displays its lion's head, in which case the individual *did or will* encounter the lion's head and thus, could easily distinguish the marks.

4.     Ariel principally sells its separate account services via face-to-face meetings between Ariel and its customers. (Ex. E at 119:15-24; 120:1-17.) Sales of separate account

services generally involve a significant number of due diligence meetings, questionnaires,

surveys, and a significant amount of feedback from the client. (*Id.*)

**ACA RESPONSE:** Plaintiff mischaracterizes the evidence in a manner immaterial

to the motion. Specifically, Plaintiff's witness testified that:



This fact is material because it demonstrates both ACA's and Plaintiff's customers are

sophisticated and exercise a high degree of care, thus confusion is unlikely. *See Rust Env't &*

*Infrastructure,* 131 F.3d at 1217 ("[W]here consumers are sophisticated, deliberative buyers,

confusion is less likely."); *Lincoln Fin. Advisors Corp.,* No. 109-CV-15RM, 2009 WL 928993 at *7

("One would expect that individuals and businesses seeking to invest their money would have a

higher sophistication level and would exercise greater care in selecting a service."). Moreover, when

a customer is required to submit to financial questioning before opening an account, as ACA and

Plaintiff's separate account clients are, courts have held customers exercise a high degree of care.

(SOF 23, 27); *see Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F.Supp.2d 811, 831 (C.D. Ill.

2009) (a higher degree of care is seen for complex and intrusive banking transactions). Plaintiff's

and ACA's customers are thus the type who exercise a high degree of care, and confusion is unlikely.

    5.    Ariel's Rule 30(b)(6) witness testified that



(Ex. RR at 405:8-24; 406:1-24; 408:10-24; 416:14-24; 417:1-4, 21-24.)

**ACA RESPONSE 5:** Plaintiff mischaracterizes the evidence in a manner immaterial to

the motion. First, it is undisputed that Plaintiff wants to be in a niche market for mutual funds.

(ACA SOF 48.) Nevertheless, that Plaintiff's witness ███████████████████████████

████████████████████ *See Omicron Capita,l LLC*, 433 F. Supp. 2d at 395 (where a party

has "no concrete plans to expand…any assessment as to the likelihood of confusion presented

by future expansion would be unacceptably conjectural"). Thus Plaintiff's testimony is

irrelevant to the present motion.

6.      Mr. Boone owns a publication, TechSmart Trader, that covers the financial

trading industry and community, including investment advisors, brokers, and traders. (Ex. Z at

15:22-25; 16:1-10.)

**ACA RESPONSE 6:** Plaintiff mischaracterizes the evidence in a manner immaterial

to the motion. First, any evidence about Boone's publication, TechSmart Trader, is irrelevant

because he never published an article. Courts only consider confusion in media when its published.

*See Road Dawgs Motorcycle Club of U.S., Inc. v. "Cuse" Rd. Dawgs, Inc.*, 679 F.Supp. 2d 259

(N.D.N.Y. 2009) (relying in part on a **published** newspaper article that confused the parties); *Piper*

*Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925 (7th Cir. 1984) (same). But here, no publications

exist that confuse ACA and Plaintiff, thus mention of his publication is irrelevant.

Second, that Boone owns a publication that markets to the financial trading industry does not

change his status to that of a relevant consumer, thus this information is also irrelevant. *See Packman*

*v. Chi. Tribune*, 267 F.3d at 645 (only potential purchasers are relevant consumers). Because Boone

testified he was ***not*** shopping for investment or financial services and had no intentions of buying

such services, he is not a relevant consumer and his publication's subject matter does not change

that. (Exh. 22, at 51:9-22.)

Last, Plaintiff mischaracterizes Boone's testimony. Specifically, he stated:

> **A:** "So TechSmart Trader is a digital publication that covers the trading industry, and
> we – you know, we publish and we cover just about anything that's going on, in terms
> of technology and news and information in the trading community.

**Q:** "So you said trading industry and community. What are you referring to when you say those phrases?"

**A:** "So when I refer to the industry, meaning that comes across when we talk about equities, fixed income. When I talk about the community, I talk about the traders themselves who are actually doing the trading on the trading desk." (Exh. 22, 15:22 – 16:10).

Thus Boone never stated his publication covers a community that includes investment advisor or brokers. Either way, the subject matter of his publication is irrelevant because it does not make Boone a relevant consumer and he never published an article confusing the parties.

7. Ariel supplemented its Answers to Ariel Capital's First Set of Interrogatories to clarify that Ariel used the word mark ARIEL in commerce at the time of the registration in light of Ariel Capital's misunderstanding of Ariel's initial responses. (Plaintiff's Third Supplemental Answers to Defendant's First Set of Interrogatories attached as Ex. TT at 2-5.)

**ACA RESPONSE 7:** Plaintiff mischaracterizes the evidence in a manner that is immaterial to the motion. First**,** Plaintiff ignores that although **"***Ariel supplemented its Answers to Ariel Capital's First Set of Interrogatories to clarify that Ariel used the word mark ARIEL in commerce at the time of the registration in light of Ariel Capital's misunderstanding of Ariel's initial responses*" its response still failed to list a single product of Plaintiff's that was available before June 20, 1983, the date Plaintiff filed its ARIEL application, let alone a product that supports its first use in commerce date of March 23, 1983. FRCP 56(e). Instead, Plaintiff's response listed the Ariel Small Cap – dated September 30, 1983 – as Plaintiff's earliest investment management service. This is not before the date it filed its ARIEL application on June 20, 1983.

This fact is material as Plaintiff has not established it rendered investment management services before June 20, 1983. 15 U.S.C. §§ 1115(a)(2) & 1115(a)(3)(c) (use required); *Couture*, 778 F.3d at 1381 (a trademark is void *ab initio* where mark holder had not yet provided services *when* the application was filed); *Aycock*, 560 F.3d at 1357 (a trademark is void *ab initio* unless the mark was used "in commerce" *when* the application was filed). Indeed, there is not a shred of evidence showing Plaintiff rendered its services before June 20, 1983 and absence of a record,

where there ordinarily would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur); *Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions).

8.      Exhibit UU is the Declaration of Luke DeMarte dated November 21, 2016.  A true and correct copy of the specimen materials accompanying Ariel's June 20, 1983, U.S. Patent and Trademark Office application for the mark ARIEL (Serial No. 73/431218) is attached as Exhibit QQ.  (Ex. UU ¶ 3.)

**ACA RESPONSE 8:** It is undisputed that Plaintiff's Exhibit QQ is a true and correct copy of the specimen materials that accompanied Plaintiff's June 20, 1983 application for the ARIEL mark.  This specimen, however, is merely an advertising brochure that does not, alone, establish Plaintiff provided its investment management services in commerce before filing.  ***See Avakoff***, 765 F.2d at 1098 ("[A]dvertising material is not use within the meaning of the [Lanham Act] and therefore is insufficient to support federal registration."); *Couture*, 778 F.3d at 1381 (advertising, even when combined with subsequent sales, is not sufficient for showing use in commerce); *and see Sensient Techs.*, 613 F.3d at 762-63 (finding no use in commerce where mark owner issued press release, made announcement, gave presentations, and constructed website but where there was no evidence of any sale or transport of goods bearing the mark). This brochure merely demonstrates Plaintiff satisfied the first part of the Lanham Act's requirement, but not the second. *See 2 McCarthy on Trademarks and Unfair Competition* § 19:103 (4th ed.) ("To qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services *and* that the services themselves have been rendered in interstate or foreign commerce.") (emphasis in original). To demonstrate the second part of the test, Plaintiff needs to submit actual evidence of a sale before June 20, 1983. *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout

documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark application], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions). Indeed, Plaintiff has submitted no evidence it rendered its services before June 20, 1983 and the absence of such a record, where there ordinarily would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).

9. 

(*Id*. at 72:22-24; 73:1-2.)

**ACA RESPONSE 9:** Plaintiff mischaracterizes the evidence in a manner immaterial to the motion. First, it is undisputed that Plaintiff's witness testified ███████████████████ ███████████████████████████████ Specifically, it ignores four facts. First Plaintiff's witness █████████████████████████████ (Exh. 9, at 75:11-77:24.) Second, ███████████████████████████ ██████████████ (Exh. 9, at 310:11 – 311:10.) Third, Plaintiff's witness testified she ████████████████. (Exh. 9, at 75:20-21; 76:4-8; 77:3-10; 77:15-24.) And fourth, Plaintiff's witness stated ██████████████████████████ ███████████ (Exh. 9, at 76:9-16.)

This is material because her testimony is not only unreliable, but Plaintiff must submit more evidence than its own deposition testimony. FRCP 56(e); *see Cent. Mfg.*, 492 F.3d at 883 ("It is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof. **Self-serving deposition testimony is not enough to defeat a motion for summary judgment**.") (bold added); *Conroy*, 644 F. Supp. 2d at 1067 (striking testimony as hearsay where plaintiff had no supporting evidence other than her own deposition testimony that she was told this was the case).

Indeed, at the very least, Plaintiff must provide the names or a record of these alleged clients, which is has failed to do. *See Cent. Mfg.*, 492 F.3d at 882-83 ("[w]ithout documentation to show to whom the alleged sales were made or whether the goods involved were [the goods in the trademark app**lication], it's not valid evidence"; finding no use in commerce where plaintiff could not offer anything evidencing specific transactions)**. In fact, not a shred of evidence shows Plaintiff rendered its services before June 20, 1983 and the absence of a record, where there ordinarily would be one, shows it likely does not exist. *See* FRE 803(7) (absence of a record can prove the matter did not occur).

Second, even if Plaintiff's ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ *See Burlington*, 204 F.3d 1114 at *1 (performing work for personal friends does "not fulfill[] the second part of the test – the actual rendition of services in interstate commerce"); *see also* 2 McCarthy on Trademarks and Unfair Competition § 16:7 (4th ed.) (sales to relatives and personal friends do not constitute commercial use of a trademark). Thus Plaintiff has no evidence of any provision of its services before it filed its ARIEL application on June 20, 1983 and this is material because a trademark is void *ab initio* where the mark holder had not provided its services <u>when</u> its application was filed. *See e.g., Couture*, 778 F.3d at 1381 (Fed. Cir. 2015).

Dated:  December 9, 2016                         RESPECTFULLY SUBMITTED,


                                          By: _s/_____Adam Wolek_____
                                          Adam Wolek
                                          Brian Noack
                                          WOLEK & NOACK
                                          333 S Wabash Ave., Suite 2700
                                          Chicago, IL 60604
                                          P: 312.860.9006
                                          F: 708.843.0509
                                          *Local Counsel for Defendant Ariel Capital*
                                          *Advisors LLC*


                                          Christopher P. Bray
                                          Christopher P. Bray Associates, LLC
                                          9115 Corsea Del Fontana Way, Ste. 200
                                          Naples, FL 34109
                                          P: 239.651.6008
                                          F: 239.431.3914
                                          cpbray@cpbrayassociates.com
                                          *Lead Counsel for Defendant Ariel Capital*
                                          *Advisors LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on December 9, 2016, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.


Dated: December 9, 2016      WOLEK & NOACK


              By: s/   Adam Wolek
              Adam Wolek