# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARIEL INVESTMENTS, LLC | ) |
| Plaintiff, | ) |
| v. | ) Case Number: 15-cv-3717 |
| ARIEL CAPITAL ADVISORS LLC, | ) Hon. Judge Matthew F. Kennelly |
| Defendant. | ) |

# ARIEL CAPITAL ADVISORS LLC'S
# RESPONSE TO ARIEL INVESTMENTS, LLC'S MOTIONS *IN LIMINE*

**RESPONSE TO PLAINTIFF'S MOTION NO. 1: Alleged Fraud on Trademark Office[1]**

Plaintiff contends that ACA should not be permitted to argue that Ariel Investments engaged in fraud when applying for the registration of its ARIEL mark because it would be irrelevant and unfairly prejudicial under Rules 401 and 403, however, whether a trademark is valid is a threshold question and a required element of trademark infringement. *See Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (To recover under a trademark infringement claim, "the plaintiff must demonstrate: (1) ***the validity of its trademark***; and (2) the infringement of that mark.") (emphasis added). If Plaintiff has no federal registration for the ARIEL mark, then ACA could not have infringed the registered ARIEL mark.[2] Accordingly, whether Plaintiff has a valid registration to the ARIEL mark is highly relevant to any alleged trademark infringement by ACA and should not be barred by Rules 401 and 403.

Evidence of the validity of the ARIEL trademark is directly relevant to ACA's affirmative defense that the ARIEL trademark is void *ab initio*. If ACA is able to prove its affirmative defense, this would have a substantial effect on the outcome of this lawsuit, namely, it would show that Plaintiff has no rights in the registered ARIEL trademark and thus may not

---

[1] While this Court has previously denied ACA's Motion for Summary Judgment on whether Plaintiff committed fraud on the USPTO, ACA respectfully requests that this Court reconsider allowing evidence of fraud as explained more fully in this section.

[2] Plaintiff argues that if ACA's Motion for Summary Judgment is denied, that ACA should be precluded from presenting any evidence of fraud at trial. Not only would this reasoning also preclude Plaintiff from presenting any of its evidence at trial, given it lost its Motion for Summary Judgment, but it also misstates the purpose of summary judgment. Summary judgment is appropriate when the evidence provided shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015). Admission of evidence at trial is not based on whether a party succeeds on a summary judgment motion, but rather the Federal Rules of Evidence. Moreover, Plaintiff did not move on summary judgment that there was no fraud on the PTO; it only defended against ACA's motion.

assert it against ACA. ACA has compiled evidence that a reasonable fact finder could find that the ARIEL trademark is void *ab initio*. Indeed, not only would such a finding satisfy FRE 401 by making a finding of infringement more or less probable, but it is also consequential to this lawsuit. Further, given the high probative value of this evidence, its introduction will not be unfairly prejudicial under FRE 403.

Throughout this litigation, Plaintiff has responded to discovery with statements explicitly stating it did not use the ARIEL mark in commerce prior to its application, and has repeatedly failed to produce any evidence showing that it used its trademark in commerce prior to filing its trademark application. While Plaintiff misrepresented to the USPTO in its June 20, 1983, trademark application that it had been using the ARIEL mark in commerce since March 23, 1983, in fact, it had stated in an Interrogatory response that it had begun using the mark in commerce in September 30, 1983, at the earliest. For example, in its Answers to ACA's First Set of Interrogatories, Plaintiff stated that its first account was known as Ariel Small Cap and it launched on September 30, 1983. Ex. A at 3. Plaintiff repeated this assertion in its Supplemental Response to ACA's First Set of Interrogatories. Ex. B at 3. And also in its Third Supplemental Answers to ACA's First Set of Interrogatories. Ex. 3 at 2-3. Further, Plaintiff's CEO has stated in interviews, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that "[i]n 1983, at 24 years old, I founded Ariel Capital Management with $150,000 from family and friends," "[i]t took us over a year and a half before we got that first million-dollar account", and "had no money to manage, no clients" when the firm started. Ex. D at 277:1-283:13, 283:16-286:14; Ex E. at 2-3; Ex. F at 2, 4. This is consistent with Plaintiff's launching its first public-facing fund on September 30, 1983, enabling it to accept assets for management for the first time, over six months after its alleged first date of use in commerce. (Dkt. 130 ¶ 12.) Finally, in ACA's first requests for production,

ACA requested documents "relating to [Plaintiff's] selection, adoption, or first use of the word 'Ariel,'" "the 'Ariel' mark's first use on January 10, 1983," and, "the 'ariel' mark's first use in interstate commerce on march 23, 1983." Ex. G at 3, 5. Despite stating it would produce all such responsive documents, no documents demonstrating Plaintiff used the ARIEL mark in commerce prior to its trademark application were produced.

Because using a trademark in commerce is a requirement for registration, and because Plaintiff would not have been eligible for nor received a trademark but for the misrepresentation, such a misrepresentation is material. *See Couture v. Playdom*, 778 F.3d 1379, 1381 (Fed. Cir. 2015) (the "use in commerce must be as of the application filing date" and occurs on services "when [1] it is used or displayed in the sale or advertising of services **and** [2] **the services are rendered in commerce**.") (emphasis added); *see also* McCarthy on Trademarks and Unfair Competition § 19:103 (4th ed. Supp. 2013) ("To qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services *and* **that the services themselves have been rendered in interstate commerce**.") (bold added; italics in original). In short, if Plaintiff was not using its mark in commerce when it filed its application, it would never have been granted a trademark registration. *See Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) (trademark application is void *ab initio* unless the mark was used in commerce when it was filed); *and see Couture*, 778 F.3d at 1380 ("use in commerce must be as of the application filing date") *and see also ISP.Net, LLC v. Qwest Comm. Intern., Inc.*, 2013 WL 21254430, at *3 (S.D. Ind. May 27, 2003) ("Material facts are those which, if disclosed, would result in refusal by the Office to register the mark."); *and see also NetJets Inc. v. Intellijet Grp.*, 2013 WL 5675464, at *5-6 (S.D. Ohio Oct. 17, 2013) (obtaining a "registration and incontestability status through a false (i.e., fraudulent) statement" is grounds for cancellation);

*see also Aycock Eng'g, Inc.*, 560 F.3d at 1357 (holding that a trademark is void unless the mark was used "in commerce" when the application was filed).[3]

Plaintiff further claims that "it is indisputed that [Plaintiff's] founder and CEO, John Rogers, managed money and offered financial advice and investment management services upon opening [Plaintiff's] first office in January 1983…." (Dkt. 165 at 3.) But that is incorrect: as noted in greater detail in the preceding paragraphs, ACA has continually disputed this allegation throughout this lawsuit and Plaintiff's discovery has supported ACA's position.

Given that Mr. Rogers knew that the ARIEL mark was not being used in commerce when the application was submitted, such a material misrepresentation constitutes fraud, and the trademark is void. Evidence of such fraud goes to the heart of ACA's affirmative defense that the ARIEL registration is invalid, that effects an essential fact for a finding of trademark infringement, which makes trademark infringement less probable and is accordingly neither irrelevant nor unfairly prejudicial under Rules 401 and 403. The interrogatory admissions and admissions in periodicals place that first use after the application filing date. Such evidence is thus of substantial probative value in this litigation and is neither unfairly prejudicial nor is it irrelevant.

**RESPONSE TO PLAINTIFF'S MOTION NO. 2: John Rogers**

Plaintiff claims that ACA's evidence regarding Mr. Rogers and the formation of Ariel Investments is inadmissible hearsay, however, this evidence is admissible under FRE 803 and 804 to support ACA's fraud defense.

---

[3] *see also Intermed Commc'n, Inc. v. Chaney*, 197 USPQ 501 at *9 (TTAB 1977) ("Mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient as a matter of law" for "applying to register the mark."); *Gay Toys, Inc. v. McDonald's Corp.*, 199 USPQ 722, 723 (CCPA 1978) (because applicant did not use the mark in commerce in association with the goods at the time it filed the application, its application is void).

Mr. Rogers' interviews with Spirit magazine and Dollar & $ense are admissible under FRE 803(3) because they were statements of then-existing state of mind, and under FRE 803(5) because they accurately reflect ████████████████████████. FRE 803(3), FRE 803(5); Ex. D at 184:9-21. They are also admissible under FRE 902(6) because they are periodicals, and periodicals are self-authenticating. FRE 902(6). They are further admissible under FRE 804(b)(3) because they are statements against interest by an unavailable witness (*see* Dkts. 87, 96) because using or managing funds from family and friends was not *use in commerce*, and using or managing investment funds *in commerce* after the trademark application date would void the ARIEL trademark registration. FRE 894(b)(3); *and see Burlington N. Santa Fe Corp. v. Purdy*, 204 F.3d 1114 (5th Cir. 1999) (performing work for personal friends does not "fulfill[] the second part of the test – the actual rendition of services **in interstate commerce**") (emphasis added); 2 McCarthy on Trademarks and Unfair Competition § 16:7 (4th ed.) (sales to relatives and personal friends do not constitute commercial use of a trademark).

Additionally, the N'Digo magazine interview is admissible under 803(16) as the produced document is greater than 20 years old, under FRE 803(3) because it was a statement of then-existing state of mind, and under FRE 803(5) because it accurately reflects ████████ ████████████████████ Ex. D at 184: 9-21. The John Rogers interview is also admissible under FRE 902(6) because it is captured in a periodical, and periodicals are self-authenticating. Additionally, it is admissible under FRE 804(b)(3) because it is a statement against interest by an unavailable witness (*see* Dkts. 87, 96) because it relates to first using or managing investment funds *in commerce* after the trademark application date, voiding the ARIEL trademark registration.

Plaintiff's objections to ACA's evidence are also contradictory. While it tries to keep out admissions that the first uses in commerce were after the trademark application, it seeks to include evidence to support pre-application uses. *See* Plaintiff's Proposed Exhibit Nos. 52 (Newsletter), 51 (Photograph); *and see* Plaintiff's Proposed Demonstrative Exhibit 2 (Timeline of use of ARIEL in commerce). Accordingly, ACA's evidence of Plaintiff's failure to use the trademark until after its application date is admissible under FRE 803 and FRE 804 to show that the ARIEL trademark is void.

**RESPONSE TO PLAINTIFF'S MOTION NO. 3: Ariel Wealth Advisors**

Plaintiff seeks to admit evidence of its enforcement against third-parties that use the "ARIEL" mark in order to demonstrate it is strong (*See* Plaintiff's Proposed Exhibit Nos. 69, 71, 72, 73, 74, 75, & 76), yet seeks to ban evidence of non-enforcement and acquiescence by other third-party users. In essence, it wants to use third-party enforcement as a shield, but preclude evidence of its non-enforcement. ACA's evidence of Ariel Wealth Advisors ("AWA") should not be precluded because AWA's long-time existence, use and promotion of "Ariel," and correspondence with Plaintiff are relevant, admissible, more probative than prejudicial, and should not be barred under any of the Rules Plaintiff cites.

First, evidence relating to AWA's use of "ARIEL" is relevant because courts routinely consider third party use of an asserted mark when evaluating a mark's strength.[4] FRE 401; *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1001-03 (N.D. Ill. 1997) (plaintiff's mark was not strong where third parties used the same mark); *Mile High Upholstery Fabric Co. v. Gen.*

---

[4] The likelihood of confusion factors are: (1) similarity between marks in appearance and suggestion; (2) similarity of products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) **strength of complainant's mark**; (6) evidence of actual confusion; and (7) intent of defendant to palm off his product as that of plaintiff's. *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (emphasis added).

*Tire & Rubber Co.*, No. 83 C 3200, 1983 WL 51924, at *7 (N.D. Ill. Aug. 5, 1983) ("One factor in determining the strength of a mark is the frequency of its use as a trademark" by other companies); *Am. Soc'y of Oral Surgeons v. Am. Coll. of Oral & Maxillofacial Surgeons*, 201 U.S.P.Q. 531, at *2 (T.T.A.B. Mar. 23, 1979) ("[T]here can be no doubt that information concerning third-party uses … may be relevant to show that a mark, or a portion thereof, is weak."). Use of the "ARIEL" mark in its logo, its website, and articles of incorporation show AWA has been using "ARIEL" in the financial services industry and promoting its services to the public since 2009. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259-60 (5th Cir.), *cert. denied,* 449 U.S. 899 (1980) (Noting "[t]he greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion" and holding plaintiff's mark should be accorded limited protection outside specific uses based on evidence of third-party uses of disputed mark in plaintiff's industry and others). Accordingly, this evidence would enable the jury to determine whether Plaintiff's "ARIEL" mark is thus weak and only entitled protection for its niche services.

Second, Plaintiff and AWA's correspondence involving use of "ARIEL" is relevant to show Plaintiff's admission against interest and the limitations on Plaintiff's rights in its "ARIEL" mark. FRE 401, 804(b)(3); *Knaack Mfg. Co.*, 955 F. Supp. At 1003 (plaintiff's explicit consent to use of its mark by a third party, particularly in connection with products in the same industry, restricted the scope of its mark and limited its ability to assert infringement); *Am. Soc'y of Oral Surgeons*, 201 U.S.P.Q. 531, at *2 (communications or controversies between a party and third parties based upon the party's involved mark may be relevant to show admissions against interest and limitations on the party's rights in such mark); *Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, No. 92 C 5170, 1994 WL 529331, at *2 (N.D. Ill. Sept. 27, 1994) (correspondence between

7

plaintiff and third party was relevant to show the strength of the mark and whether plaintiff's policing was adequate). Plaintiff's correspondence with AWA will enable the jury to weigh whether Plaintiff has relinquished some of its rights to its "ARIEL" mark by allowing a third party to use "ARIEL" for wealth management services. Additionally, a jury should be allowed to consider whether Plaintiff's coexistence with AWA – who offers services in the same industry as ACA – weighs against likelihood of confusion. *See, e.g., FS Servs. Inc. v. Custom Farm Servs., Inc.*, 325 F. Supp. 153, 161 (N.D. Ill. 1970), *aff'd,* 471 F.2d 671 (7th Cir. 1972) (third party use of the mark and absence of any confusion between them weighed against likelihood of confusion). Accordingly, this evidence makes it less likely Plaintiff's mark is strong, or entitled to protection outside its specific uses, which is a fact at issue, thus it should not be precluded. FRE 401.

Third, AWA's website and logo are admissible because Bray has personal knowledge of each and testified during ACA's 30(b)(6) deposition that he had looked at both AWA's website and logo on the internet. FRE 602/901; Ex. H at 119:3-5; 151: 19–154:10. The logo and website reliably show what Bray saw and what is displayed on the internet, which is that a third party is operating, using, and promoting the "ARIEL" marks. *See Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 802 (N.D. Ill. 2007) (Kennelly) (website print out evidence is admissible where used to show use of a term or mark on that website). Additionally, as Plaintiff's 30(b)(6) witness testified, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. D at 394:4-395:1. Indeed, Ms. Cusack personally exchanged correspondence with the president of AWA, so she will presumably have personal knowledge of that correspondence. AWA's website and logo accordingly have foundation, have been authenticated, and are not hearsay, thus they are admissible.

8

Fourth, AWA's articles of organization is a certified copy of public records kept by the Secretary of State in New York, thus it is self-authenticating, inherently reliable, and should not be excluded. FRE 902(1 & 4). It is also shows that AWA organized in 2009, which is relevant because Plaintiff admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. I at No. 17; Ex. D at 394:9-19. This evidence thus enables the jury to see Plaintiff has not policed its "ARIEL" marks consistently. *Knaack Mfg. Co.*, 955 F. Supp. at 1002-03 (plaintiff's mark was not strong where third parties used the same mark, plaintiff's enforcement efforts were uneven, and plaintiff failed to produce any survey or direct testimony from relevant consumer group). Given that Plaintiff has produced no survey evidence or direct testimony on its mark's strength, evidence of AWA makes it less likely that Plaintiff's marks are strong, adequately policed, or entitled wide protection, which is a fact at issue, thus this evidence is relevant. FRE 401.

And given its relevance and probative value, evidence relating to AWA will not be unfairly prejudicial under Rule 403 balancing. AWA's website and logo provide context and show that a third party is promoting the "ARIEL" mark in the financial service industry, which goes to the mark's strength. Further, Plaintiff's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Finally, Plaintiff's coexistence with AWA since 2009 bears on the likelihood of confusion because it is probative evidence of whether Plaintiff and ACA can coexist without confusion. *See Sam's Wines & Liquors, Inc.*, 1994 WL 529331, at *5 (evidence of coexistence may be probative of whether the parties' marks can coexist without confusion). ACA and AWA both offer wealth management services, and there has been no confusion between Plaintiff and AWA over the course

9

of many years. Based on this, a jury could find that consumers view Plaintiff's services to be sufficiently different from wealth management services to weigh against confusion in this case. The jury should thus be allowed to consider evidence of AWA's coexistence with Plaintiff in its own determination of whether there is a likelihood of confusion between Plaintiff and ACA.

For these reasons, the Court should admit this evidence at trial, including ACA's proposed exhibits D33-35 and D87.

**RESPONSE TO PLAINTIFF'S MOTION NO. 4: Turtle Talk Surveys**

The Court should admit the two "Turtle Talk Surveys" because the surveys are relevant, have foundation, are admissions against interest, and Plaintiff's witness testified ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, thus the surveys should not be barred under Rule 401 or 701.

Primarily, the survey results show that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬, which is relevant to show Plaintiff's mark is weak, and that its efforts through use and advertising ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (The likelihood of confusion factors consider the **strength of a complainant's mark).** Plaintiff argues these surveys are irrelevant because it is unknown what role, if any, the "ARIEL" marks had in the survey, but the surveys show that ▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. J at AI005366. Regardless of the "ARIEL" mark's involvement in the survey, the surveys show ▬▬▬▬ ▬▬▬▬▬▬▬

The survey results also show ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ *See Knaack Mfg.*, 955 F. Supp. at 1000 (where plaintiff and defendant did not

compete and were viewed as unlikely to compete, the parties' goods were not similar). Accordingly, the survey information makes the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both of these factors bear on the likelihood of confusion at issue and the surveys are accordingly relevant. FRE 401/402.

Furthermore, because the surveys admit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and that Plaintiff is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, these surveys are admissions by a party opponent (FRE 801(d)(2)), *and* against interest. FRE 804(b)(3).

Both surveys were also exhibits in Plaintiff's 30(b)(6) deposition. When presented with the exhibits, Plaintiff's witness testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ FRE 602/901; Ex. D at 360:15–361:10, 372:17–373:12. Plaintiff's witness also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, thus Plaintiff had personal knowledge of who its perceived competitors are, and admitted this information. FRE 602/701/801(d)(2).

Finally, the "Shareholder Communications: User Experience Survey" from May 2014 that Plaintiff sought to admit was never discussed during Plaintiff's 30(b)(6) deposition, therefore no foundation or authentication of that survey ever took place, and it is inadmissible. The two "Turtle Talk Surveys" from 2015 and 2016, on the other hand, were discussed at length in Plaintiff's 30(b)(6) deposition and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Given the surveys' relevance to the facts at issue, particularly the strength of Plaintiff's mark, its relevance to the similarity of Plaintiff's and ACA's services, and who Plaintiff views as competitors in its market, the two "Turtle Talk Surveys" should be admitted.

11

For these reasons, the Court should admit evidence of the 2015 and 2016 "Turtle Talk Surveys," including ACA's proposed exhibits D56-D57.

**RESPONSE TO PLAINTIFF'S MOTION NO. 5: Christopher Bray's Daughter, Ariel**

While Plaintiff argues Bray named ACA in bad faith because Bray knew of Plaintiff and allegedly saw Plaintiff's advertisements, it at the same time tries to bar any evidence that Bray acted in good faith in choosing his company's name. ACA's evidence relating to how and why Bray chose "Ariel" when naming ACA is relevant, not prejudicial, and should not be barred under Rule 401 or 403.

First, evidence relating to Ariel Bray is relevant because when determining whether a defendant acted in good faith, courts consider details that shed light on what motivated a defendant to choose its mark. FRE 401; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 642 (7th Cir. 2001) ("The defendants' good faith can be judged only by inquiry into their subjective purpose in using the [mark].") (internal citations omitted); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (considering defendant's inspiration for its name came from an animated film, and weighed against a bad faith inference); *Hearthware, Inc. v. E. Mishan & Sons, Inc.*, No. 11 C 5233, 2012 WL 3309634, at *9 (N.D. Ill. Aug. 10, 2012) (finding the intent to "palm off" factor favored defendant where evidence indicated defendant named its product for innocent reasons); *Clarus Transphase Sci., Inc. v. Q-Ray, Inc.*, No. 06 C 4634, 2006 WL 4013750, at *14 (N.D. Ill. Oct. 6, 2006) (no bad faith intent where "mark was a natural choice stemming from [defendant]'s first name"). Here, Bray was motivated by not only his daughter, but also his faith and his ministry work at Ariel Ministries. These details are thus relevant for a jury to determine if Bray and ACA acted in good faith.

Second, given its substantial probative value, evidence relating to Ariel Bray will not be unfairly prejudicial under Rule 403 balancing. The photo of Ariel Bray is simply a photo that provides context of Bray's family and the reasoning for the choice he made, and is not likely to elicit a jury's sympathy or emotions in an unfairly prejudicial way.[5]

Third, even if Plaintiff will stipulate that Bray named ACA after his daughter, Plaintiff's stipulation does not make evidence supporting that stipulation irrelevant, especially when such evidence will give the jury the full picture and increase ACA's credibility. *Hare v. Zitek*, No. 02 C 3973, 2006 WL 2088427, at *8 (N.D. Ill. July 24, 2006) (allowing party to present evidence about a fact stipulated because it was "necessary to give the jury the full picture" and went to party's reliability); *Jones v. Sheahan*, No. 01 C 1844, 2003 WL 21654279, at *4 (N.D. Ill. July 14, 2003) (refusing to bar parties from eliciting evidence about a stipulated fact). The photo of Ariel Bray further increases the reliability that ACA is named after Bray's daughter because it enables the jury to see that Ariel Bray is young, and that she and ACA were named close together in time. Testimony about Ariel Bray, Bray's service in Ariel Ministries and the biblical origin of "Ariel," also shows the jury why Bray chose "Ariel" and ACA's lion logo. The photo and testimony all make it less likely ACA's name was influenced by Plaintiff, and accordingly less likely that ACA intended to pass itself off as Plaintiff. *See Packman*, 267 F.3d at 644 (the intent factor "looks primarily for evidence that [defendant is] attempting to "pass off" its product[] as having com[ing] from the plaintiff"); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (One of the facts courts consider in a likelihood of confusion analysis is the *intent of the*

---

[5] Indeed, when Plaintiff asked about Bray's daughter and Bray's ministry work in the 30(b)(6) deposition, Bray answered in a matter-of-fact tone rather than emotionally.

*defendant to palm off his product as that of plaintiff's*.). The evidence relating to Ariel Bray is therefore directly relevant to ACA's good faith.

For these reasons, the Court should deny Plaintiff's motion *in limine* on this evidence and testimony at trial, including on ACA's proposed exhibits D48-49, and Demonstrative Exhibit 1.


Dated:  January 26, 2017                                             RESPECTFULLY SUBMITTED,


                                              By:  s/   Brian T. Noack
Adam Wolek
Brian Noack
WOLEK & NOACK
333 S Wabash Ave., Suite 2700
Chicago, IL 60604
P: 312.860.9006
F: 708.843.0509
*Local Counsel for Defendant Ariel Capital Advisors LLC*


Christopher P. Bray
Christopher P. Bray Associates, LLC
9115 Corsea Del Fontana Way, Ste. 200
Naples, FL 34109
P: 239.651.6008
F: 239.431.3914
cpbray@cpbrayassociates.com
*Lead Counsel for Defendant Ariel Capital Advisors LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on January 26, 2017, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: January 26, 2017                WOLEK & NOACK


By: /s/ Brian T. Noack
Brian T. Noack