**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ARIEL INVESTMENTS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 15 C 3717** |
| ) | |
| **ARIEL CAPITAL ADVISORS LLC,** ) | |
| ) | |
| **Defendant.** ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MATTHEW F. KENNELLY, District Judge:

Ariel Investments, LLC sued Ariel Capital Advisors LLC, alleging trademark

infringement, unfair competition, and cybersquatting in violation of the Lanham Act and

unfair trade practices in violation of the Illinois Deceptive Trade Practices Act and Illinois

common law. Ariel Capital raised several affirmative defenses and asserted three

counterclaims against Ariel investments. Both parties moved for summary judgment.

The Court denied Ariel Investments' motion in its entirety and granted summary

judgment for Ariel Capital on the cybersquatting claim but otherwise denied Ariel

Capital's motion. *Ariel Invs., LLC v. Ariel Capital Advisors LLC*, No. 15 C 3717, 2017

WL 319251 (N.D. Ill. Jan. 21, 2017). Prior to trial, Ariel Capital withdrew its

counterclaims. The Court conducted a bench trial on the remaining claims on February

6–8, 2017. This decision constitutes the Court's findings of fact and conclusions of law.

**Facts**

**I.     Ariel Investments**

Ariel Investments is an investment management company headquartered in

Chicago, Illinois. The company is a registered investment advisor with the Securities and Exchange Commission (SEC). Mellody Hobson, the president of Ariel Investments, testified that the company offers both separate accounts and mutual funds for individuals and institutional clients. Separate accounts consist of a stock portfolio, managed by Ariel Investments, containing assets owned entirely by a single client. Hobson testified that Ariel Investments requires a targeted minimum of $10 million to open a separate account but frequently makes exceptions, sometimes going as low as several hundred thousand dollars. Because of this high minimum, Ariel Investments separate accounts usually are not available to retail investors. The company has hundreds of separate account clients. Mutual fund accounts, in contrast, involve the pooling of client assets. Ariel Investments has hundreds of thousands of mutual fund clients. On its website, Ariel Investments refers to both its separate accounts and its mutual funds as products. Between its separate account and mutual fund clients, the company has clients in all fifty states. Merrillyn Kosier, chief marketing officer for the company's mutual funds, testified that Ariel Investments does not prepare tax returns for its client, nor does it draft wills. Kosier testified at one point that whether the company prepares a financial plan for its investors depends on the circumstances. She also testified that the company does not prepare written financial plans for its clients.

John Rogers, the company's current chief investment officer, founded Ariel Investments in 1983. The company was originally called Ariel Capital Management Inc. In November 1986, the company introduced its first mutual fund, the Ariel Growth Fund. The company adopted its current name, Ariel Investments, in 2008. In order to protect its brand, Ariel Investments registered a number of trademarks beginning in 1984.

2

These include ARIEL, ARIEL INVESTMENTS, ARIEL FUND, ARIEL ABCS OF MONEY, ARIEL INTERNATIONAL FUND, ARIEL GLOBAL FUND, ARIEL DISCOVERY FUND, ARIEL FOCUS FUND, and ARIEL APPRECIATION FUND, referred to collectively as the "Ariel Marks."  Some of these marks, including ARIEL, have become incontestable under the Lanham Act.

Over the years, Ariel Investments has employed a number of strategies to attract customers.  it solicits clients directly and also receives referrals.  Hobson testified that Ariel Investments spends anywhere from half a million to a couple million dollars on advertising each year.  It has advertised in industry publications such as Investment Advisor, Pensions and Investments, and Kiplinger, as well as general publications such as the Wall Street Journal and the New York Times.  These ads typically include the word "Ariel" in all capital letters, the word "Investments" in smaller print below, a distinctive swirl underneath both words, and sometimes—but not always—an image of a turtle.  When the company advertises, it does so only with the Ariel Investments name; it does not advertise under its former name.  Ariel Investments also sponsors a number of industry conferences.  In 2008 and 2010, it sponsored a number of Schwab regional conferences throughout the United States.  Ariel Investments also sponsors community events, such as plays and athletic competitions, and it makes charitable contributions in the company's name.

Hobson testified that Ariel Investments considers as its competition all other investment firms.  In order to evaluate its progress, Ariel Investments periodically surveys the advisors who use (or might in the future use) the company's mutual funds. The surveys are called "turtle talk" surveys.  In the 2016 turtle talk survey, respondents

3

were asked to list the three firms they perceived to be most like Ariel Investments. The most common responses, in order, were Vanguard, Fidelity, Parnassus Investments, Calvert Investments, PAX World Investments, and T. Rowe Price. Kosier testified that respondents viewed the "Wal-Marts" of the financial industry as Ariel Investments' competitors. In the 2015 turtle talk survey, respondents were again asked to list three firms that they perceived to be most like Ariel Investments. The top three responses were Calvert, PAX, and Parnassus. When respondents were asked to select a word that best summarizes what is least attractive about Ariel Investments, the most common response was "unknown / small size." Ariel Investments listed as a key takeaway that advisors already invested in the company wished that it had more brand awareness among consumers. Further, when respondents were asked to indicate their degree of familiarity with Ariel Investments' philanthropic initiatives, over sixty percent of respondents stated that they were not familiar with these efforts.

Because of its concern for client trust, Ariel Investments tries to police use of the Ariel Marks. Hobson testified that when Ariel Investments learns of other investment services companies using its name, it generally sends a cease and desist letter. Mareile Cusack, general counsel for Ariel Investments, confirmed this procedure. Ariel Investments offered into evidence six letters it sent to various entities using "Ariel" in their name. Both Hobson and Cusack also recalled a specific incident in which a company calling itself Ariel Fund refused to stop using the name. That company was later tied to Bernard Madoff's fraudulent scheme. Numerous publications wrote about Madoff and those associated with him, including Ariel Fund. As a result, numerous clients of Ariel Investments called the company out of concern that it was associated

with Madoff. Ariel Investments had to reach out to each publication to ask them to include a disclaimer alongside references to Ariel Fund that it was not associated with Ariel Investments in Chicago.

Hobson testified that she recently became aware of another company named Ariel Wealth Advisors that is located in New Jersey and performs wealth management services. She also learned around that time that others at Ariel Investments were already aware of Ariel Wealth Advisors. Cusack testified that sometime in 2009, one of Ariel Investments' junior salespeople met with Kevin Gibney, the owner of Ariel Wealth Advisors. This salesperson developed a relationship with Gibney, who then occasionally referred clients to Ariel Investments. Once Hobson and Cusack became aware of Ariel Wealth Advisors around 2014, Ariel Investments contacted the company. Cusack testified that, although Ariel Investments does not approve of Ariel Wealth Advisors' use of its name, it has not sent a cease and desist letter to Ariel Wealth Advisors because instead the two companies have been discussing a potential licensing agreement. In June 2016, Ariel Investments received a letter from Ariel Wealth Advisors that provided a general summary of the services that it provides to its clients. This list includes tax and estate planning, cash flow and retirement planning, life insurance planning, and investment advising.

## II.  Ariel Capital

Christopher Bray founded Ariel Capital Advisors in January 2014. Prior to founding Ariel Capital, Bray worked in the financial industry at Deloitte, National City Bank, and Willow Street Advisors. Bray considered a variety of names for his new financial company. Bray wanted to use the word "Ariel" because it is both the name of

5

his daughter and the name of a ministry with which he and his wife work. Bray also liked the word's symbolism, as it is a Hebrew word meaning lion of God. He and his wife created a list of thirty-one possible names for his firm, five of which included the word "Ariel." Bray originally wanted to name his firm Ariel Wealth Advisors. He ran a Google search for this name and discovered Ariel Wealth Advisors (discussed above), located in New Jersey and using a lion in its logo. Bray then decided to select a different name. He ran a Google search for "Ariel Capital Advisors." Bray testified that he did not find any other company using that name. Bray also performed a search for this name with the Florida Secretary of State. Bray estimates that his search turned up a list of over one hundred entities in Florida whose name contained "Ariel," none of which were named Ariel Capital Advisors.

Ariel Capital is headquartered in Naples, Florida and is described as a multistate private wealth management firm. The company is a registered investment advisor with the SEC, and its website states that the company provides customized investment management. The company has only one other office, in Cleveland, Ohio, but Bray is interested in expanding. Ariel Capital has six employees, including Bray, and it serves clients in twelve states and Washington, D.C. Bray is the managing director of Ariel Capital and is solely responsible for the company's marketing. As of March 2016, Ariel Capital had sixty-five client relationships. Bray testified that approximately sixty of Ariel Capital's sixty-five client relationships came over with him from Willow Street Advisors after he contacted them to say he was starting a new firm. The remaining five clients came as referrals from these sixty clients. A client relationship can be an account of a single individual, or it can be accounts for multiple individuals, typically within the same

6

family.  Ariel Capital requires a minimum investment of $1 million.  Clients can reach this minimum individually or, in the case of a family account, cumulatively.

Bray testified that Ariel Capital sells its clients only advice, not "things."  It provides services such as investment management, estate planning, income tax planning, retirement planning, stock option plans for corporate executives, and general financial planning.  In forms submitted to the SEC, Ariel Capital listed as one of its services the creation of portfolios for its clients.  It also listed types of investments that the portfolio might contain and included mutual funds.  Bray testified that, when Ariel Capital manages a client's portfolio, it uses only individual stocks and individual bonds.  Bray testified that Ariel Capital does not use mutual funds.  The only time that it deals with mutual funds is when a new client brings over a portfolio that already contains an investment in a mutual fund.  In those situations, Bray testified, Ariel Capital recommends eliminating the mutual fund investment.  Bray testified that the company lists mutual funds on the forms it submits to the SEC only to encompass those clients who come to the company with mutual funds already in their portfolios.

Ariel Capital occasionally runs print ads in various publications, such as Crain's Cleveland Business.  These ads typically include the words "Ariel Capital" in blue letters with "Advisors, LLC" in smaller, gray letters underneath.  These words are accompanied by a white and blue image of a lion within a blue shield.  Ads for Ariel Capital frequently appear in industry publications, particularly supplements on estate planning.  They occasionally appear alongside articles authored by Bray.  Bray testified that Ariel Capital does not advertise to get new clients and that the purpose of its advertising was merely to gain credibility.  As discussed later, the Court did not find this testimony credible.

### III.    The trademark dispute

Ariel Investments learned of Ariel Capital in the summer of 2014.  In August of that year, counsel for Ariel Investments sent a cease and desist letter to Bray asking Ariel Capital to cease use of its company name and internet domain name.  Ariel Investments indicated that it believed Bray was infringing on its registered trademarks and internet domain name and was concerned that consumers would confuse the two companies.

Bray testified at trial that he first learned of Ariel Investments from this letter.  He further testified that he had never seen advertisements for Ariel Investments prior to starting Ariel Capital.  Ariel Investments introduced evidence of its e-mail blasts, which Ariel Investments regularly sends out to a number of contacts in the financial industry, including friends and family, financial advisors, and separately managed clients and their consultants.  One particular e-mail highlighted an article in USA Today that discussed Ariel Investments as a prominent fund group.  The e-mail contained Ariel Investment's logo, a quote from the article, and a link to view the article.  Ariel Investments sent this e-mail to 11,000 addresses, including cpbray@willowstreetadvisors.com, Bray's e-mail address before he started Ariel Capital. Roger Schmitt, who is responsible for data and infrastructure at Ariel Investments, testified that e-mail analysis showed that the cpbray@willowstreetadvisors.com address opened the e-mail.  Ariel Investments also introduced a list of attendees of the 2010 Schwab conference in Atlanta, sent to Ariel Investments about ten days prior to the event, which listed Bray as an attendee.  Schmitt acknowledged that the list was of those who registered for the conference, and not necessarily those who attended.

8

Citing concern for consumer confusion between the two companies, Ariel Investments brought suit against Ariel Capital in April 2015, asserting trademark infringement, unfair competition, deceptive trade practices, and cybersquatting. Because of this, Bray asked his employees about any instances of confusion between Ariel Capital and Ariel Investments. One employee, Chris Squittieri, told Bray about a conversation he had with Justin Land. In April 2015, Squittieri attended a meeting of the Chartered Financial Analyst (CFA) Society of Naples where he spoke with Land, another CFA. Squittieri told Bray that Land asked him whether Ariel Capital had any affiliation with Ariel Investments.

Bray also received an e-mail in February 2016 from Marcie Rebardo, who is responsible for office management at Ariel Capital, about a phone call that she had just received. Rebardo testified that the male caller asked to speak to Cheryl Hagen, and Rebardo told the caller that no one at Ariel Capital went by that name. Rebardo testified that the caller asked, "Is this Ariel Investments?" When Rebardo said no, the caller hung up. The caller's telephone number was 908-400-8730. In a deposition prior to trial, David Boone testified that this is the phone number for his cellphone. Boone testified that he owns and runs TechSmart Trader, a digital publication that covers the trading industry. Boone stated that, in making the February 2016 phone call, he was trying to reach Cheryl Cargie, a trader at Ariel Investments, to speak to her about an article and advertising in his publication. He further testified that he would have found the number that he called by performing a Google search for "Ariel" or "Ariel Capital." During his deposition, Boone was also asked whether he was familiar with Ariel Capital. He testified that he has known Ariel Capital for about ten years and that the company is

9

headquartered in Chicago. Boone then stated that, prior to this lawsuit, he did not know that there was a difference between Ariel Investments and Ariel Capital and would have believed them to be the same.

Bray also testified about one of his clients named Monica Schandel, a certified financial planner and the owner of Blue Oceans Financial Planning. Schandel is a client of Ariel Capital and a personal friend of Bray's for twenty-five years. Her firm also shares a client in common with Ariel Capital. Bray testified that Schandel has never asked him about the relationship between Ariel Capital and Ariel Investments, nor has she asked about buying mutual funds for herself or her clients. In May 2016, Schandel received a letter from counsel for Ariel Investments. In her reply e-mail, Schandel stated that she has one joint client with Ariel Investments. In her deposition prior to trial, Schandel was asked where Ariel Investments is headquartered and she responded that she believed it was Naples, Florida. She was also asked whether she knew any employees of Ariel Investments. She named Bray, Squittieri, and Wilmore. When Schandel was asked when she first learned of Ariel Investments, she said she first learned of it when Bray told her she was dissolving his old partnership and starting a new company. When asked about her business relationship with Ariel Investments, Schandel responded that she was confused and might have used names in the wrong capacity. Schandel went on to clarify that she has a relationship with Ariel Capital, Bray, and Squittieri. Schandel also stated that, in her e-mail to Ariel Investments' counsel, she intended to refer to Ariel Capital and not Ariel Investments.

Phyllis Brady, vice president of human capital and public affairs at Ariel Investments, also testified about a phone call that she had received. In March 2015, an

unidentified female called Brady and asked to check the employment references of a particular individual. Brady testified that she looked up the name provided and discovered that the individual did not work at Ariel Investments. Brady told the caller this, who said that she thought she was speaking to Ariel. Brady asked if she meant Ariel Investments in Chicago, and the caller responded that she was actually looking for an Ariel in Naples, Florida.

Ariel Capital introduced evidence that an August 2016 search for the term "Ariel" on the website of the Illinois Secretary of State generated a list of close to fifty companies registered in Illinois. Further, Bray testified that at the time he was forming Ariel Capital, he ran a search on the Florida Secretary of State website for companies registered with the name Ariel. Bray testified that the search turned up well over a hundred businesses registered in Florida containing the word "Ariel." Ariel Capital provided the Court with the results from a similar search run in February 2017. Ariel Investments stipulated that it has not sent cease and desist letters to any of the companies on that list, with the exception of Ariel Capital. Cusack also testified that there are many entities in Illinois whose name contain the word "Ariel," including Ariel Investment Properties and Ariel Incorporated, to whom Ariel Investments has not sent cease and desist letters.

In its complaint, Ariel Investments alleged trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) (counts 1 and 2), unfair competition and deceptive trade practices in violation of the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/1–510/7 (count 3), unfair competition in violation of Illinois common law (count 4), and cybersquatting in violation of 15 U.S.C. § 1125(d)

11

(count 5). Ariel Investments also requested declaratory and injunctive relief, disgorgement of Ariel Capital's profits, an award of statutory and punitive damages, transfer of the www.arielcapitaladvisors.com domain name, and attorney's fees and costs. As mentioned earlier, the Court granted summary judgment in favor of Ariel Capital on count 5. Further, Ariel Investments has withdrawn its request for damages.

In its second amended answer, Ariel Capital asserted affirmative defenses and counterclaims. As mentioned above, Ariel Capital withdrew its counterclaims prior to trial. Ariel Capital raised as its first affirmative defense an allegation that Ariel Investments procured registration of the ARIEL mark through fraud on the U.S. Patent and Trademark Office (PTO) and therefore that the registration must be cancelled. In its order on the parties' motions for summary judgment, the Court granted summary judgment in favor of Ariel Investments on this affirmative defense. Ariel Capital asserted as its second affirmative defense a contention that Ariel Investments has abandoned two of its marks due to naked licensing and a failure to police the marks. Ariel Capital also appeared to include in its second amended answer a list of eight other affirmative defenses. At trial, Ariel Capital did not make any legal arguments based on the eight listed affirmative defenses. It has therefore forfeited these defenses, and the Court does not consider them in this ruling.

## Discussion

### I. Counts 1 and 2

Ariel Investments brings claims for trademark infringement under Sections 32 and 43 of the Lanham Act. "The Lanham Act established a federal right of action for trademark infringement to protect both consumer confidence in the quality and source of

goods and businesses' goodwill in their products." *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016) (internal quotation marks omitted). Section 32 creates a cause of action for the unauthorized use of a registered trademark. *Id.* The section imposes liability on a person who "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Section 43 creates a cause of action against those who engage in unfair competition by falsely designating the origin of a product or service. *Phoenix*, 829 F.3d at 822. This section imposes liability on

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, . . . which is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). The standard under both causes of action is the same. *Phoenix*, 829 F.3d at 822. To prevail, a plaintiff must show (1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers. *Id.*; *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001). Ariel Investments has alleged infringement of all nine of the Ariel Marks. At trial, Ariel Capital stipulated that Ariel Investments owns the Ariel Marks and has registered them with the U.S. PTO.. The only dispute, therefore, is whether Ariel Investments has demonstrated a likelihood of confusion between its registered marks and Ariel Capital's name.

Likelihood of confusion regarding the source, affiliation, or connection of goods

and services among the relevant class of consumers is the keystone of trademark infringement. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). It is a question of fact. *Id.* A court must decide whether the consumers of either company's products would be likely to attribute them to a single source. *Id.* To do this, a court considers seven factors: (1) similarity between the companies' marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by the companies' consumers; (5) strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the defendant's intent to "palm off" his product as that of another. *Id.* The Seventh Circuit has stated that no single factor is dispositive, but that three are especially important: similarity of the marks, intent of the defendant, and evidence of actual confusion. *See id.*

A. **Similarity of the marks**

Similarity of the marks concerns "whether the customer would believe that the trademark owner sponsored, endorsed, or was otherwise affiliated with the product." *Sorensen*, 792 F.3d at 726–27. The proper question is whether "the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Id.* at 726. Because of this, the Seventh Circuit has indicated that "[c]omparison of the *labels* rather than simply the trademarks is appropriate." *Id.*

The two companies' displays of the term "Ariel" in the marketplace take on significantly different forms. Ariel Investments' logo contains the single word "Ariel" in all capital letters, followed by "Investments" in smaller print underneath and a distinguishing swirl coming from the "R" in "Ariel." The words are also typically

14

accompanied by the image of a turtle holding a trophy cup.  In contrast, Ariel Capital's logo contains the words "Ariel Capital" in blue font, followed by the words "Advisors, LLC" in all capital letters underneath.  The logo also contains a white and blue image of a lion inside a blue shield.  Thus the logos themselves appear to be sufficiently distinct to contradict the contention that consumers might confuse the two.

But the Seventh Circuit's analysis in *Sorensen* addressed the similarity between two tangible products—rust-preventing tools and lubricant spray—each of which employed a crosshair logo in its marketing.  *Id.* at 717, 719.  Thus it made sense to focus on product labels, given that consumers were likely to encounter the logos as images when selecting products in, for example, a home improvement store.  Here, however, industry consumers are likely to come across one of the companies not only by viewing the companies' websites or their advertisements—which admittedly contain the distinctive logos—but also by seeing mention in a magazine article or television show, which likely would not include the logos.  Ariel Investments offered into evidence articles, such as one in USA Today, that reference the company without including the logo.  It also offered evidence that when Bray publishes articles in industry publications, his tagline includes the words "Ariel Capital" without any accompanying logo.  Thus, consumers in the market may be faced with nothing more than a written (or even verbal) reference to one of two financial services firms, both beginning with the word "Ariel." This situation is noticeably similar to the one the court encountered in *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.*, 128 F.3d 1111 (7th Cir. 1997).  There, the Seventh Circuit noted that both parties' marks contained the same "principal, eye-catching word," Meridian.  *Id.* at 1115.  The court found that the record demonstrated

15

that the parties do not "place their respective renditions of the word 'Meridian' in front of the public in a manner which would allow the general population to examine them and notice subtle differences." *Id.* at 1116. Instead, the marks were most likely to be used vocally and thus the visual distinctions—such as the use of a different color stationary or a distinctive "swoosh" when writing the word—were "of little consequence" as they are "irrelevant in the aural realm." *Id.* Thus the differences between the logos of Ariel Investments and Ariel Capital are not determinative when, as here, consumers are likely to encounter the marks either by hearing them or by seeing them without the accompanying logo.

Further, the Seventh Circuit has held that, "[i]f one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004); *Meridian*, 128 F.3d at 1115. Thus, the court in *Meridian* determined that "[a] person hearing the two parties' names would likely focus on the word 'Meridian' and gloss over the other words," requiring a conclusion that the parties were using essentially the same mark. *Meridian*, 128 F.3d at 1116. Granted, Ariel Investments did not provide conclusive evidence that the term "Ariel" is the salient portion of its trademark. Specifically, it did not offer any consumer surveys or testimony suggesting that consumers rely specifically on the "Ariel" designation to identify Ariel Investments. But there is evidentiary support for this conclusion. The first trademark that Ariel Investments registered was for the term "Ariel" standing alone, for use in connection with particular financial services. Ariel Investments went on to register at least eight additional trademarks, all of which begin with the term "Ariel." Hobson, the president of

16

Ariel Investments, testified that she introduces herself as being "from Ariel." And when she hears people talk about Ariel Investments, she often hears its employees referred to as "Ariel-ites." Finally, employees of the company are trained to answer the phone either "Ariel Investments" or just "Ariel."

The Court therefore finds that consumers are likely to identify "Ariel" as the salient portion of Ariel Investments' trademarks and thus mistakenly believe that Ariel Capital is in some way affiliated with Ariel Investments. The Court further concludes that the differences in the companies' logos are insufficient to undercut this confusion, given the likelihood that consumers will encounter the entities' names in a way that does not include the logo. In sum, the Court concludes, this factor weighs strongly in favor of a finding of likelihood of confusion.

**B.      Similarity of the products**

When considering the similarity of the products, the relevant inquiry "is not whether the products are interchangeable, but whether the products are the kind the public might very well attribute to a single source." *Sorensen*, 792 F.3d at 728–29. First, there is direct overlap in the services provided by the two companies. Both offer individualized assistance to clients looking to invest their money. And both engage in investment advisory services: Ariel Capital for all of its clients, and Ariel Investments for, at least, its "separate accounts" clients. There are also differences between the two. Ariel Investments has created its own mutual funds, which it advertises as investment vehicles for both its own clients and clients who work through an intermediary like Vanguard or Fidelity. Ariel Capital does not create its own investment vehicles, and it offers some services, such as tax and estate planning, that Ariel

Investments does not provide. But "dissimilarity is not dispositive of the likelihood of confusion inquiry." *CAE*, 267 F.3d at 679. A likelihood of confusion can exist even if parties are not in direct competition or their products and services are not identical. *Id.* The rights of a trademark owner extend to any goods that might be, in the minds of the consumer, related to the goods of the mark owner. *Id.*

Ariel Capital argues that the companies' products and services are dissimilar because it offers services, whereas Ariel Investments offers products, namely its mutual funds. But as discussed above, Ariel Investments provides advisory services to its separate account clients. Therefore it is inaccurate to say that Ariel Capital provides services while Ariel Investments offers products. The fact that Ariel Capital does not offer products similar to Ariel Investments' mutual funds is insufficient to distinguish the two. And even if this distinction were accurate, the good or service provided by each company to the consumer need not be interchangeable for the public to believe that they came from a single source. In *CAE*, the court concluded that there was sufficient overlap between the plaintiff's products—"supervisory control, test and data logging equipment and systems"—and defendant's services—"designing and building data acquisition systems and control equipment"—for consumers to conclude that the defendant's products were affiliated with the plaintiff. *Id.* at 680. Likewise in this case, a reasonable consumer might well believe that the same sort of affiliation exists between Ariel Capital and Ariel Investments given that both deal with and advise individual investors, even though there is not a complete overlap in what the two companies do.

Further, the likelihood of confusion increases when consumers might reasonably expect the trademark holder to expand its business to offer the same products or

services as the alleged infringer. *See id.* Therefore the Lanham Act aims to protect the trademark owner's interest in potentially using its mark in new markets from such confusion. *Id.* at 681. Ariel Investments has presented evidence that it markets its products and services to individuals as well as institutional investors. Consumers might reasonably expect Ariel Investments to add services, such as tax and estate planning, to its current business.

In sum, the products and services offered by Ariel Investments and Ariel Capital are sufficiently similar to support a likelihood of confusion among consumers by Ariel Capital's use of the mark. This factor weighs strongly in favor of a finding of likelihood of confusion.

### C.      Area and manner of concurrent use

In assessing area and manner of concurrent use, courts consider whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties. *Sorensen*, 792 F.3d at 730. Courts look to whether "the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Id.* This factor weighs strongly in favor of Ariel Investments. Hobson testified that Ariel Investments has clients in all fifty states. Bray testified that Ariel Capital has clients in twelve states and the District of Columbia. Though Ariel Capital's clients are concentrated in Florida and Ohio, where its offices are located, there is still significant overlap in the companies' targeted geographical areas.

Further, the two companies use similar marketing procedures. The Court was presented with evidence that both companies advertise in industry publications and that employees of both companies write articles for these publications. Even if there is no

19

direct overlap between the publications in which they have advertised, this evidence bolsters the conclusion that the companies are targeting the same audience: consumers in the financial sector. Bray testified at trial that Ariel Capital does not run advertisements or articles to gain new clients but instead to strengthen Ariel Capital's reputation in the community in order to make it more credible to its current clients. The Court did not find this testimony credible. The evidence showed that Ariel Capital engages in these activities to market itself to potential new clients. Those efforts may not have borne fruit to date, but that is not the issue. The Court concludes that there is a significant overlap in the area and manner of use of the two companies' marks.

Ariel Capital argues that the companies do not share any area or manner of use because Ariel Investments' competitors are large investment firms and not smaller firms like Ariel Capital. Ariel Capital presented the results of marketing surveys that Ariel Investments conducted of current and potential advisor clients. In 2016, when asked to list the three firms most like Ariel Investments, respondents' most common answers were Vanguard, Fidelity, Parnassus, Calvert, PAX, and T. Rowe Price. Further, the survey indicated that one key takeaway from the results was that respondents viewed the "Wal-Marts" of the financial industry as Ariel Investments' primary competitors. Respondents to the 2015 survey provided similar responses. Ariel Capital argues that it is not a "Wal-Mart" and thus that this evidence demonstrates it does not compete with Ariel Investments. But "parties need not be in direct competition" to conclude that their marks are used in a concurrent area and manner. *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). Further, Hobson testified that Ariel Investments considers as its competition all other investment firms, and the Court found that

testimony credible. The fact that Ariel Investments' *primary* competitors are larger firms does not mean those are its *only* competitors. The services that Ariel Capital provides are sufficiently similar to create overlap with Ariel Investments.

Ariel Capital also argues that each company targets a very precise—and very distinct—portion of the financial consumer audience and therefore that there is no concurrent use. It seems, however, that Ariel Capital is attempting to argue both sides of the coin by claiming that its minimum investment amount is both lower than Ariel Investments' separate account minimum and higher than Ariel Investments' mutual fund minimum. Ariel Capital first points to Hobson's testimony that Ariel Investments generally requires a $10 million minimum investment to open a separate account, apparently arguing that Ariel Investments' minimum for separate accounts is much higher than Ariel Capital's. But Hobson testified credibly that Ariel Investments makes exceptions to its minimum, and has a number of separate account clients who have invested several hundred thousand dollars. Therefore Ariel Investments' separate account clients could overlap with Ariel Capital's.

Ariel Capital next compares Bray's testimony that Ariel Capital requires a $1 million minimum investment from individual clients with that of Todd Trubey, vice president for portfolio strategies at Ariel, who stated that the minimum mutual fund investment is around one or two thousand dollars. But Bray also testified that Ariel Capital has some groups of investors, typically families, who individually do not meet the minimum but cumulatively have at least $1 million invested. Ariel Investments presented evidence showing that a number of these individuals have between $2,000 and $900,000 invested with Ariel Capital. Thus the evidence shows that both

companies take on investors with investments ranging from a few thousand dollars to over a million dollars. Any minor differences in the targeted audience are irrelevant given that parties need not be in direct competition, so long as their products or services are the kind the public might attribute to a single source. *See id.* In sum, Thus there is an area and manner of concurrent use between the two companies that is significant enough to create a likelihood of confusion. This factor therefore weighs strongly in favor of a finding of likelihood of confusion.

### D. Degree of care

In evaluating the degree of care exercised by consumers of the parties' products, courts assume that "the more widely accessible and inexpensive the products and services the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *Sorensen*, 792 F.3d at 730. Consumers using a lesser degree of care are more likely to be confused by similar trademarks.

Consumers of both Ariel Investments and Ariel Capital likely exercise a significant degree of care when selecting a financial investment firm. *See First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*, 153 F.3d 885, 889–90 (8th Cir. 1998) (affirming district court's conclusion that consumers exercise a high degree of care in selecting banking services); *Am. Nat'l Ins. Co. v. Am. Nat'l Inv. Advisors, LLC*, No. 11 C 4016, 2014 WL 6613342, *14 (N.D. Ill. Nov. 21, 2014) (finding that consumers use high degree of care when investing money); *see also Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 14–15 (1st Cir. 2012) (affirming district court's evidentiary finding that consumers exercise a high degree of care in selecting banking services but declining to adopt a bright-line rule). But, as the Seventh Circuit has noted, consumers'

22

"technical sophistication about their particular industry does not equate to trademark sophistication." *CAE*, 267 F.3d at 683. Thus even assuming that consumers of the two companies are discerning in selecting their financial advisor, this does not mean that they are able to recognize that Ariel Capital has no affiliation with Ariel Investments. And Ariel Investments presented evidence that at least one person in the financial industry, Justin Land, believed the two entities might be related. Because consumers are likely more vigilant but confusion is still possible, the Court concludes that this factor does not tilt strongly either way.

### E.  Strength of Ariel Investment's mark

The strength of a trademark "refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Sorensen*, 792 F.3d at 731. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008). The strength of the mark usually corresponds to its economic and marketing strength. *Id.* Just as in *AutoZone*, the evidence here supports the conclusion that the Ariel Marks have economic and marketing strength. Hobson testified that Ariel Investments spends anywhere from half a million to a couple million dollars per year on advertising for its brand. Ariel Investments places ads in both industry and general publications. The company also sponsors athletic and philanthropic events to increase brand awareness. It has clients in all fifty states and has sponsored national industry conferences.

Ariel Capital asserts that Ariel Investments' marks are weak. Ariel Capital first points to evidence that there are numerous entities in Florida and Illinois that contain the

23

word "Ariel." But Ariel Capital offered no evidence regarding how extensively, if at all, any of those companies have promoted their brands or how well they are recognized by consumers in the marketplace. *See id* (discussing other trademark registrations using the mark at issue). The Seventh Circuit has indicated that third-party trademark registrations negatively impact the strength of plaintiff's mark "only to the extent that the similar marks are promoted by their owners or recognized by the consuming public." *Id* (citing *CAE*, 267 F.3d at 685). The same logic applies to third-party entities with names that contain the plaintiff's mark: their existence weakens plaintiff's mark only to the extent that they are in use and recognized by the public. Further, use of a mark outside the relevant field "could not possibly cause confusion with plaintiffs' mark." *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 614 (7th Cir. 1965). Ariel Capital has offered no evidence that any entities from its list are in the financial field, that the entities market their names, or that consumers recognize the names.

Ariel Capital cites *Top Tobacco, L.P. v. North Atlantic Operating Co.*, No. 06 C 950, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007), for its contention that, because there are numerous other entities registered in Florida and Illinois that use the word "Ariel," the scope of protection given to this mark should be extremely narrow. First, though *Top Tobacco* was affirmed by the Seventh Circuit, that court did not directly address this Court's conclusion on scope. Further, this Court drew this conclusion in *Top Tobacco* because plaintiff itself, in its application to the U.S. PTO, had argued that the scope of marks using the word "top" were inherently narrow. *See id.* at *6–7. The Court refused to permit the plaintiff to have it both ways. And the claim in that case was focused on the word "top," which actually was not even in the defendant's mark but rather was

24

simply a word used on its packaging.  *See id.* at 2.

The Seventh Circuit, when addressing the scope of a trademark, has said only that strong marks will have a broad scope, and weak marks have a narrow scope.  *See, e.g.*, *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978).  Thus a strong mark may be entitled to trademark protection even against non-competing products, if the brand is sufficiently distinctive.  *See Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627, 634 (7th Cir. 1968).  The scope of trademark protection for weak marks, on the other hand, is limited to "similar goods similarly marketed."  *Telemed*, 588 F.2d at 219.  Thus even if Ariel Capital is correct that Ariel Investments' marks are weak, they still receive protection from infringement by similar goods that are similarly marketed. And the Court has concluded that Ariel Capital and Ariel Investments provide similar goods and services and use similar channels of advertisement.

Ariel Capital also appears to raise an affirmative defense of abandonment by naked licensing or a failure to police, citing *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997), for the premise that a lack of enforcement against others may deprive the owner of the mark any remedy for infringing uses.  Ariel Capital points specifically to Ariel Wealth Advisors and the fact that Ariel Investments has had an ongoing relationship with the company for at least two years and has yet to send a cease and desist letter.  But Ariel Capital did not actually argue abandonment at trial and made no effort to explain to the Court how it has established the elements of this defense.  And Ariel Capital has offered no evidence that Ariel Investments has yet granted Ariel Wealth Advisors a license to use its mark, much less that any such licensing was uncontrolled.  In fact, Hobson testified that the two companies are

25

currently in negotiations to find a way for Ariel Wealth Advisors to continue using its name in a way that would not interfere with Ariel Investments' trademarks, suggesting that Ariel Investments is adamant about controlling use of its mark and is in the process of negotiating a controlled license.  Further, though Ariel Capital points to a series of entities using the word "Ariel" to which Ariel Investments has never sent a cease and desist letter, Ariel Capital has not offered evidence that any of these entities operate in the same field, and it cites no case law suggesting that this is sufficient to meet its burden on an abandonment defense.

Ariel Investments has provided evidence that it has been active in the market for over thirty years, that it has sent cease and desist letters to twelve entities in the same or similar fields over the years, and that it has spent significant sums on advertising and marketing its marks.  The Court finds that the Ariel Marks are strong and thus that this factor weighs strongly in favor of a likelihood of confusion.

### F.    Actual confusion

Courts considering actual confusion consider whether "reasonable and prudent consumers" would identify the infringing mark as coming from a company affiliated with the trademark holder.  *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 729 (7th Cir. 1999).  Ariel Investments has offered four instances of actual confusion between the two companies:  Land's inquiry of Chris Squittieri, Boone's phone call to Ariel Capital, an anonymous phone call to Ariel Investments, and Schandel's deposition testimony.

In considering evidence of actual confusion, courts typically look for confusion among relevant consumers, defined as those who attempt or intend to purchase goods

26

or services from either company. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001). Ariel Investments has presented evidence that Schandel, a client of Ariel Capital, repeatedly confused the two companies at her deposition and while communicating with attorneys. It is true that Schandel did not confuse the two companies while actually attempting to purchase investment services. But Schandel still found it difficult to keep straight the names of these two companies, despite her long-standing relationship with Ariel Capital.

None of the remaining instances of actual confusion offered by Ariel Investments involve consumers of either company. But the Seventh Circuit has previously concluded that evidence of telephonic and other inquiries into the relationship between the two parties is probative evidence of likelihood of confusion. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988). Ariel Investments has provided evidence of three such inquiries, two by individuals familiar with the financial industry. Both Land, a CFA, and Boone, a journalist in the financial industry, mistakenly associated the two companies. Land asked Squittieri directly whether Ariel Capital was associated with Ariel Investments, and Boone mistakenly contacted Ariel Capital while looking for Ariel Investments. Boone also testified that prior to this lawsuit, he did not realize that there was a difference between Ariel Capital and Ariel Investments. Ariel Investments also presented evidence that an unknown caller also contacted Ariel Investments when she was really looking for an Ariel in Naples, Florida. Although this evidence is less than overwhelming—given that none of these individuals were attempting to purchase products from either company—it nevertheless reflects actual confusion and therefore weighs in favor of Ariel

27

Investments.

### G.    Ariel Capital's intent

The intent factor addresses whether the defendant is attempting to pass of its product as having come from the plaintiff.  *Sorensen*, 792 F.3d at 731.  The evidence showed that, prior to Ariel Capital's founding, Bray received e-mail blasts sent by Ariel Investments and that his e-mail address opened the messages.  The evidence also showed that Bray attended at least one conference where Ariel Investments was a prominent sponsor and that Bray had seen a television interview of Rogers.  The Court therefore finds that Bray knew of Ariel Investments prior to founding Ariel Capital.  It follows from this, and the Court finds, that Bray was aware that he was adopting a name similar to the one Ariel Investments was already using in the same general field.

But "[m]ere knowledge of someone else's mark is insufficient to show intent to pass off."  *Id.* at 731.  And Ariel Investments has failed to provide evidence to support the contention that Bray's intent was to capitalize on consumer confusion between the two companies.  Bray testified credibly that he named his firm after both his daughter and the ministry in which he and his wife have served.  The evidence also shows that the majority of Bray's clients—at least sixty out of sixty-five—transferred with him from Willow Street Advisors to Ariel Capital.  Thus there is no basis to believe that Bray was using the "Ariel" name to lure consumers from Ariel Investments.  This factor weighs against a finding of likelihood of confusion, but only weakly given Bray's clear awareness that he was adopting a name similar to another significant player in the same general field.

In summary, the Court finds that five factors weigh in favor of Ariel Investments:

28

similarity of marks, similarity of products and services, area and manner of concurrent use, strength of mark, and actual confusion.  The Court finds that one factor weighs in favor of Ariel Capital:  intent.  Finally, the Court finds that the remaining factor—degree of care—does not weigh in favor of either party.

As discussed previously, no single factor is dispositive in determining whether there is a likelihood of confusion.  *Sorensen*, 792 F.3d at 726.  But considering together the evidence on each factor, Ariel Investments has demonstrated a likelihood of confusion by a preponderance of the evidence.  It has shown that the two marks are similar, using the same identifying term to refer to financial services and products.  Both companies offer individualized investment services to individuals, with a wide range in the total dollars invested per client.  Further, Ariel Investments has been operating in the financial market for over thirty years and has repeatedly policed use of its marks by other financial companies.  Finally, there is evidence of actual confusion:  at least one client of Ariel Capital as well as two others in the financial industry have shown confusion as to the relationship between the two companies.  The Court concludes that Ariel Capital has infringed the Ariel Marks in violation of Sections 32 and 43 of the Lanham Act. and therefore finds in favor of Ariel Investments on Counts 1 and 2.

## II.    Counts 3 and 4

Counts 3 and 4 are state law claims for, respectively, deceptive trade practices under 815 ILCS §§ 510/1–510/7 and common law unfair competition.  Claims for unfair competition and deceptive business practices brought under Illinois statutes are resolved using the same standard established under the Lanham Act.  *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004) (citing *Gimix, Inc. v. JS&A*

*Grp., Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)). Because the Court has found in favor of Ariel Investments on both claims brought under the Lanham Act, the Court also finds in favor of Ariel Investments on counts 3 and 4 brought under Illinois law.

## III. Relief

### A. Disgorgement of profits

Ariel Investments has requested disgorgement of Ariel Capital's profits. When considering disgorgement of profits for trademark infringement, the burden is on the infringer to prove "that his infringement had no cash value in sales made by him." *WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008) (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942)). The infringer therefore must provide evidence that it did not earn its profits by infringing the owner's marks. *WMS Gaming*, 542 F.3d at 601. The Court finds that Ariel Capital has met this burden. Bray testified that at least sixty of Ariel Capital's sixty-five clients came over with him from Willow Street Advisors. Without any rebuttal evidence from Ariel Investments, this is sufficient to show that Ariel Capital's clients selected the company "because of [Bray's] recommendation or his reputation" and not because of his use of Ariel Investments' mark. *Mishawaka Rubber*, 316 U.S. at 206. The Court therefore denies Ariel Investments' request for disgorgement of Ariel Capital's profits.

### B. Permanent injunction

Ariel Investments has also asked the Court to issue an injunction ordering Ariel Capital to cease use of the Ariel Marks in association with its business. The Lanham Act enables a court to award an injunctions following a finding of trademark infringement, "according to the principles of equity and upon such terms as the court

may deem reasonable." 15 U.S.C. § 1116(a). The Illinois Deceptive Trade Practices Act also permits injunctive relief. 815 ILCS 510/3.

The Seventh Circuit has held that "[a] showing of a likelihood of confusion alone will suffice to support a grant of injunctive relief." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir. 1982). More recently, however, the Supreme Court held, in the patent infringement context, that there is no presumption of irreparable harm and courts should evaluate requests for an injunction under traditional principles of equity. *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–92 (2006). The Seventh Circuit has yet to decide whether this holding applies to claims of trademark infringement as well, but other circuits have held that it does. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). For this reason, the Court will evaluate Ariel Investments' request for an injunction under the traditional four-factor test. Ariel Investments must demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of hardships weighs in favor of Ariel Investments; and (4) the public interest would not be disserved by an injunction. *EBay*, 547 U.S. at 391.

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) (considering a preliminary injunction). Thus "[e]ven if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.* Like the plaintiff in *Re/Max*, Ariel Investments has no control over the services Ariel Capital provides or potential harm to the goodwill of the Ariel

31

Marks that might arise through mistaken association between the two companies. This conclusion is supported by testimony regarding a prior incident, in which many consumers mistakenly associated Ariel Investments with another entity, Ariel Fund, which was involved with Bernie Madoff's fraudulent scheme. Ariel Investments undertook substantial efforts to dissociate itself from this entity and to allay the concerns of its clients. The Court concludes that Ariel Investments has demonstrated that mistaken association with its marks can produce irreparable injury without an adequate remedy at law.

The remaining two factors likewise weigh in favor of granting a permanent injunction. First, Ariel Capital offered no evidence regarding any hardship an injunction would impose. And an appropriate injunction in this case would require only that Ariel Capital change its name, a process that, though perhaps not simple, will not drive the company out of business. This is particularly true given that most of Ariel Capital's clients have been with Bray through at least two firms and likely will be unaffected by a change in the company's name. On the other hand, denying an injunction would create a serious obstacle to Ariel Investments' attempts to protect its trademark from further infringement. Further, the public interest will not be disserved by an injunction. "[T]he public . . . has an interest in knowing with whom they do business" and therefore is best served by an injunction to avoid the possibility of confusion between Ariel Investments and Ariel Capital. *Id.* at 433.

## Conclusion

For the foregoing reasons, the Court finds in favor of plaintiff Ariel Investments and against defendant Ariel Capital on counts 1, 2, 3, and 4 of plaintiff's complaint and

in favor of defendant and against plaintiff on count 5, which the Court previously dismissed.   The Court denies plaintiff's request for disgorgement but grants its request for a permanent injunction.  Plaintiff is directed to file a proposed injunction order—which should, among other terms, require defendant to cease all use of the term Ariel no later than thirty days after entry, with an appropriate disclaimer of association with plaintiff in the interim—by 4:30 p.m. on March 6, 2017.  Any objections by defendant to the contents of the order are to be filed by 4:30 p.m. on March 8, 2017.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 3, 2017