```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3

 4   ARIEL INVESTMENTS, LLC,            )   Docket No. 15 C 3717
                                        )
 5                                      )
          Plaintiff/Counter-Defendant   )
 6                                      )
                   vs.                  )
 7                                      )   Chicago, Illinois
     ARIEL CAPITAL ADVISORS LLC,        )   February 2, 2017
 8                                      )   2:40 o'clock p.m.
                                        )
 9        Defendant-Counter-Plaintiff.  )

10             TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
11              BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
     APPEARANCES:
13

14   For the Plaintiff:      MICHAEL BEST & FRIEDRICH LLP
                             BY:  MR. ARTHUR GOLLWITZER, III
15                                MR. ZACHARY J. WATTERS
                                  LUKE W. DeMARTE
16                           444 West Lake Street, Suite 3200
                             Chicago, IL  60606
17                           (312) 222-0800

18
     For the Defendant:      WOLEK & NOACK
19                           BY:  MR. ADAM WOLEK
                                  MR. BRIAN T. NOACK
20                           333 South Wabash Avenue, Suite 2700
                             Chicago, IL  60604
21                           (312) 860-9006

22

23
     Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                           Official Court Reporter
                             219 S. Dearborn Street, Suite 2102
25                           Chicago, Illinois  60604
                             (312) 435-5639
```

1    (The following proceedings were had in open court:)

2         THE CLERK:  15 C 3717, Ariel Investments v. Ariel

3    Capital Advisors.

4         THE COURT:  I am going to need whatever lawyers are

5    talking up here.  So can I get the lawyers' names for the

6    record, please?

7         MR. GOLLWITZER:  Your Honor, Arthur Gollwitzer and

8    Zack Watters for plaintiff, Ariel Investments.

9         MR. WOLEK:  Good afternoon, your Honor.  Adam Wolek

10   on behalf of defendant, Ariel Capital Advisors.

11        THE COURT:  Is it one T or two T's?

12        MR. WATTERS:  Two T's, your Honor.

13        THE COURT:  All right.  Okay.  So I think the most

14   sensible place to start is with the motion to strike the jury

15   demand.

16        MR. WOLEK:  Could I make one request?

17        THE COURT:  Starting off with the motion to strike

18   the jury demand.  So I want to actually start off by trying to

19   clarify -- at least I think clarify -- a couple of things.

20        So in the response that's filed by the defendant, the

21   argument is made that, well, despite what you say in the

22   motion to strike, you're still asking for damages.

23        So I want to make clear -- I want to get some

24   clarification to the extent it's necessary from the plaintiff

25   on exactly what the relief is that you're asking for.  So

1    there's no question you're asking for an injunction, right?

2              MR. GOLLWITZER:  Yes, sir.

3              THE COURT:  Okay.  And as I've always understood in

4    my -- as I've always understood trademark law, and I am not

5    going to pretend to be an expert in trademark law, a party who

6    claims its trademark has been infringed can ask for damages --

7    in other words, whether the losses that I experienced as a

8    result of the alleged infringement -- and they can ask for

9    profits, and there may be some sort of an either/or in there,

10   and the profits are what profits did the defendant make

11   over -- or out of allegedly infringing the mark?  Is that

12   roughly right?

13             MR. WOLEK:  That's right, your Honor, and that's our

14   position, that --

15             THE COURT:  Yeah.  And they're both money, obviously,

16   but they're called different things.  One is called damages

17   and one is called profits or disgorgement.  Still right so

18   far?

19             MR. WOLEK:  Yes, your Honor.  It's slightly more

20   nuanced because we contend that the plaintiffs asked for all

21   three.

22             THE COURT:  Okay.  And I don't think there's any

23   doubt that they asked for all three in their complaint.

24             MR. WOLEK:  Sure.

25             THE COURT:  Okay.  So at this point -- and it maybe

1  asked for all three in the pretrial order, which you prepared
2  before I ruled on the motion for summary judgment or whenever
3  you prepared it.  So at this point, what are the form or forms
4  of relief that the plaintiff is asking for?

5          MR. GOLLWITZER:  Permanent injunction, disgorgement
6  of profits, not damages, attorneys' fees, costs.

7          THE COURT:  Okay.  Attorneys' fees and costs, that
8  happens afterwards.

9          MR. GOLLWITZER:  Right.  There's some other
10 declaratory relief, transferring the domain name, things like
11 that.

12         THE COURT:  So you're -- but you're -- to the extent
13 you ever had a claim for damages, as trademark law and related
14 law defines that term, the plaintiff is waiving that.

15         MR. GOLLWITZER:  There is no claim for damages at
16 this point.  That's right.

17         THE COURT:  So that's now clarified.  So they're
18 asking for disgorgement, and they're asking for injunctive
19 relief.

20         So the next question is how does that impact the
21 right to a jury trial?  I want to set aside the strategic
22 gamesmanship argument for a second.  I just want to talk about
23 let's -- we have a trademark case in which the plaintiff is
24 asking for two forms of relief, an injunction and associated
25 declaratory relief and disgorgement of profits.

1    Is it the defendant's contention that there's a right
2    to a jury trial when a party is asking for disgorgement of
3    profits.

4    MR. WOLEK:  Yes, and more so --

5    THE COURT:  Do you have a case that says that?

6    MR. WOLEK:  Well, plaintiffs actually cited one of
7    those cases.  It was the Black & Decker case.  That case, and
8    they actually briefed that a little bit --

9    THE COURT:  Remind me of the cite of the case.  I
10   want to get it up on my screen.  I tend not to print these
11   things out anymore.

12   MR. WOLEK:  It is 118 F.Supp.3d.

13   THE COURT:  118 F.Supp.3d what?  What's the rest of
14   it?

15   MR. WOLEK:  I have 1064 for the pin cite.

16   THE COURT:  So that's a district court decision by
17   Judge Dow.  1064.  Bear with me for a second.  I just want to
18   get to the right page.

19   So zero me in on what it is you think about this case
20   supports the contention that the claim for profits gives you a
21   right to damages -- or to a jury, rather.

22   MR. WOLEK:  Well, that case kind of summarizes some
23   of the law and admittedly kind of goes in several different
24   directions, depending on which circuit you look at.

25   But there's three views upon it, your Honor, and they

1    found two out of the three basically warrant jury because
2    they're legal damages.  They say one in the first instance,
3    all defendant's profits should be considered legal and should
4    go to a jury.  The third one takes the exact opposite view.
5    The second one says there are some circuits that say --
6            THE COURT:  When you say "one," you're meaning lines
7    of authority.
8            MR. WOLEK:  Exactly, your Honor.
9            THE COURT:  Okay.
10           MR. WOLEK:  And with the second one, they say if it's
11   separated, that the plaintiff is asking for compensation from
12   defendants' infringement, then it should go to a jury because
13   that's considered legal damages.
14           If they're considering unjust enrichment theory, then
15   it's a much tougher question and then it may go to a court
16   because it would be equitable relief.
17           Here, plaintiff's specify and differentiate the type
18   of relief they're seeking.  They're saying in one sense, we're
19   seeking this to compensate us, this is damages, and they even
20   put "and equitable relief" as a separate, different type of
21   relief.
22           THE COURT:  When you say the plaintiff is saying
23   that, do you mean before or do you mean right now at this
24   moment?
25           MR. WOLEK:  Both.

1      THE COURT:  Including right now, based on what
2    Mr. Gollwitzer just said?

3      MR. WOLEK:  Well, including in the final pretrial
4    order --

5      THE COURT:  No.  When I say "right now," I actually
6    -- it's literal.  I mean right now, based on what
7    Mr. Gollwitzer said about two minutes ago, you think they're
8    still asking for something that -- that they're asking for a
9    form of compensation as opposed to something else?

10      MR. WOLEK:  I do, despite what he says.  I think that
11    these defendants --

12      THE COURT:  Basically, your argument is based on the
13    proposition that I shouldn't believe what he says.

14      MR. WOLEK:  No, it's a little different, your Honor.
15    It's along the first set of case law that Black & Decker talks
16    about, that defendant's profits are considered a legal remedy
17    and that they are different than unjust enrichment, which in
18    itself is a different cause of action.

19      THE COURT:  Well, Judge Dow says -- and I'm looking
20    at -- I think this is on the page that you referenced.  Yeah,
21    it's page 1064 to 1065.  So he says, A plaintiff's label need
22    not control and courts must serve as gatekeepers where a
23    plaintiff contends that profits are a substitute for damages
24    but the evidence indicates otherwise, a Court may strike a
25    jury demand.

1    That's essentially -- and that's kind of the
2    governing principle I think that Judge Dow comes to that kind
3    of drives the rest of his decision in that case.

4    And can you sort of -- and, I mean, no district court
5    case is binding on any other district court case.

6    MR. WOLEK:  Sure.  Understood, your Honor.

7    THE COURT:  But Judge Dow is a very smart man --

8    MR. WOLEK:  Yes.

9    THE COURT:  -- and I take seriously what he says.  So
10   tell me -- in that analysis, tell me why it is you think that
11   as we stand here today, what the plaintiff is claiming right
12   now falls on the damages or on the right to a jury trial's
13   side of it as opposed to the no right to a jury trial side of
14   it.

15   MR. WOLEK:  Well, simply everything in the record
16   indicates that they're seeking damages.  They've stated it
17   multiple times.  Mr. Gollwitzer may be modifying it here, but
18   that doesn't change what they're seeking in the complaint --

19   THE COURT:  Isn't what's significant is what's going
20   to be asked for at trial?  I mean, it's not particularly
21   unusual for a party to ask for a bunch of things in its
22   complaint and when they get to trial, only ask for some of it.
23   And the question is what's the jury going to be told, isn't
24   it?

25   MR. WOLEK:  Yeah, but they're still asking for those

1   damages.  Just because -- and there's case law that says just

2   because you change the name of it from seeking monetary relief

3   from equitable relief shouldn't control whether -- your right

4   to a jury or whether a jury should hear it, which is what Mr.

5   Gollwitzer just did.

6           THE COURT:  So what is it about what -- the way

7   they're characterizing -- what is it about what they're asking

8   for in this case that makes it sound to you like it's a

9   request for compensation as opposed to a request for

10  disgorgement?

11          MR. WOLEK:  Well, there's several points.  The fact

12  that they say that to fully compensate Ariel Investments, in

13  quotes --

14          THE COURT:  Where are they saying -- each time you

15  say that, you have to tell me where they're saying it.

16          MR. WOLEK:  Absolutely, your Honor.  That's in

17  docket 177.

18          THE COURT:  What is the document?

19          MR. WOLEK:  Docket 177 is the final pretrial order.

20          THE COURT:  Okay.

21          MR. WOLEK:  At 3.  There's also several other

22  instances in that same pin cite where they say both injunctive

23  relief and damages.

24          And then they say "profits and unjust enrichment,"

25  thereby differentiating profits and unjust enrichment.  So by

1    their own terms, they're differentiating it.

2    THE COURT:  You don't think that that's just a

3    lawyer's normal using two terms where a normal, reasonable

4    person would use one?  And I am saying that not at all

5    facetiously.  It's pretty common for lawyers to use two,

6    three, or four terms where a normal, average person would use

7    one.

8    MR. WOLEK:  That's understood, your Honor, but when

9    you differentiate it like that, you're differentiating the

10   type of damages you're claiming, and the damages that they're

11   claiming is subject to a jury, even by that case they,

12   themselves, have cited.

13   THE COURT:  So as you understand it, what's the jury

14   going to be told about what -- how they're to figure out what

15   the damages are?

16   MR. WOLEK:  Your Honor, I don't think that they have

17   a very strong case for damages.

18   THE COURT:  No, no, I'm talking about what's the

19   instruction?

20   MR. WOLEK:  The instruction is several-fold.  So they

21   have two instructions asking for damages.

22   THE COURT:  All right.  Let me just pull this up

23   here.  Let me pull up this part of the pretrial order, so give

24   me just a second.

25   All right.  So I'm into the -- is this in the agreed

1    instructions or the plaintiff's proposed or where exactly?

2           MR. WOLEK:  Final instructions, your Honor,

3    plaintiff's instructions number 27 and 29.

4           THE COURT:  Okay.  Just give me a second to get

5    there.

6           MR. WOLEK:  Sure thing.

7           THE COURT:  You said 27 and 29.  So 27 says, Ariel

8    may recover the profits -- Ariel Capital Advisor's gain from

9    trademark infringement, profits determined by deducting

10   expenses from gross revenue.  Gross revenue is all the money

11   that Ariel Capital Advisors received through its use of,

12   quote, Ariel Capital Advisors, close quote.  Ariel Investments

13   is required to prove Ariel Capital Advisors' gross revenue.

14   Ariel Capital Advisors is required to prove any expenses that

15   it argues should be deducted.  That's 27.

16           29 is a -- that's punitives.  Did you say 27 and 29?

17           MR. WOLEK:  I did.  That was the other damages

18   instruction, your Honor.

19           THE COURT:  You are not asking for punitives at this

20   point, or are you?

21           MR. GOLLWITZER:  My understanding --

22           THE COURT:  If you are asking for punitive damages,

23   then this is going to be very simple.

24           MR. GOLLWITZER:  Yeah.  Well, I want to make sure

25   because there's enhanced damages under the Lanham Act.

1    THE COURT:  I am talking about your instruction

2   number 29, which is, I think, out of the Illinois Pattern

3   Instructions.  I assume it's on one of the state law claims.

4    MR. GOLLWITZER:  It is the Illinois Deceptive Trade

5   Practices claim.  Your Honor, the reason I'm having trouble

6   answering is my understanding is that's not a legal question

7   under the Illinois Deceptive Trade Practices Act, that it's --

8    THE COURT:  You are not in state court.  You are in

9   federal court where the Seventh Amendment applies.

10    MR. GOLLWITZER:  Okay.  Then we are not seeking

11   punitive damages under the Illinois Deceptive Trade Practices

12   Act.

13    MR. WOLEK:  It's common-law infringement, your Honor,

14   number 29.

15    THE COURT:  Fair enough.  He's not -- are you seeking

16   punitive damages for common law infringement?

17    MR. GOLLWITZER:  No, sir.

18    THE COURT:  Okay.  So we are really talking about

19   instruction number 27.

20    So what the jury would be told -- and this is what

21   the plaintiff is advocating is what I just quoted a second

22   ago.  So, to me, that doesn't sound like you're asking for a

23   compensatory measure.  The governing language is it's the

24   profits Ariel Capital Advisors gained from the trademark

25   infringement.

1            And I recognize that under the law, profits is

2 considered sort of a placeholder for damages and is used in

3 situations sometimes where damages are hard to measure or

4 whatever, but that, I don't think, affects whether it's a

5 legal or equitable remedy, because the jury is not going to be

6 told, figure out how much the plaintiff was hurt and give them

7 money accordingly.  What the jury would be told, if that

8 instruction is right, and that's pretty much right out of the

9 pattern instruction, the jury is going to be told, figure out

10 how much the defendant made from the infringement -- I'm

11 pointing to the wrong table, I understand; I am pointing to

12 you -- figure out how much the defendant made from the

13 infringement and award that amount of money.

14            MR. WOLEK:  So two things, your Honor.  I mean, they

15 still -- it depends on what their intent is.  If their intent

16 was unjust enrichment, which they separated out, that would

17 have been one thing.  But it wasn't, including -- and that's

18 why they included 29 in the final pretrial order.  This was

19 days ago.

20            And then with this profits, it's still consistent

21 with what they're asking.  They're asking for damages and

22 profits and unjust enrichment.  This is all a separation that

23 has legal consequences and intent of what they're seeking.

24            THE COURT:  In a jury trial, the thing that has legal

25 consequences is what the jury is told it has to do.  What is

1    in somebody's head is not communicated to the jury, or what is
2    in somebody's pleading that they filed before that that is
3    never shown to the jury --
4           MR. WOLEK:  Sure.
5           THE COURT:  -- to me, it's kind of beside the point.
6    It's what the jury is going to be asked to do.
7           MR. WOLEK:  And on that point, your Honor, though,
8    the Supreme Court has said that it shouldn't be a question of
9    gamesmanship if there's damages awards based upon how you
10   phrase it at the last second.  It is ultimately whether its
11   damages are based on this --
12          THE COURT:  That is a dramatic, drastic
13   oversimplification --
14          MR. WOLEK:  It's a complicated matter, I agree, your
15   Honor.
16          THE COURT:  Beacon Theatres v. Westover.
17          MR. WOLEK:  And, your Honor, there's also a second
18   component to this.  It's the prejudice aspect, which --
19          THE COURT:  Is what you want to tell me beyond what
20   you told me in your motion about that?  Because the motion was
21   pretty gosh darn vague and conclusory.
22          MR. WOLEK:  Well, your Honor --
23          THE COURT:  It just says, we planned for a jury
24   trial, now it's a bench trial, it's different.
25          MR. WOLEK:  We included an affidavit, and, I mean --

1          THE COURT:  The affidavit says pretty much what I

2     just said.

3          MR. WOLEK:  With a little bit more, your Honor.  It

4     does say, for instance, their demonstrative exhibits were

5     ordered ahead of time.  They've already arrived.  We planned

6     on this.  They ordered it before.

7          THE COURT:  You're saying that you wouldn't use the

8     demonstratives in a bench trial?

9          MR. WOLEK:  We would have dramatically altered our

10    whole case strategy based upon --

11         THE COURT:  Let's focus on my question.  You're

12    saying you wouldn't have used the demonstratives in a bench

13    trial?

14         MR. WOLEK:  I'm not sure, your Honor.  We just

15    learned --

16         THE COURT:  I think I would probably have the

17    authority to impose payment of the costs of preparing the

18    demonstratives as a condition of withdrawing the jury demand.

19         So what other things?  What else is there?

20         MR. WOLEK:  The depositions we took, the witnesses we

21    subpoenaed --

22         THE COURT:  Look, you can't -- you can't seriously

23    claim that because there was a jury demand at day one -- and

24    we are not talking about -- the depositions were taken how

25    long ago?  Six, eight months ago, probably?

1        MR. WOLEK:  Some five months ago, six months ago,
2    yes.
3        THE COURT:  Okay.  The fact that there was a jury
4    demand then and you took depositions based on the fact that
5    there was a jury demand then basically locks people in
6    forever --
7        MR. WOLEK:  No.
8        THE COURT:  -- and that's what you just contended; we
9    took the depositions based on the proposition that there was a
10   jury demand.  What would you have done differently?
11       MR. WOLEK:  We would have, for instance, filed a
12   motion to compel to get some of the answers we didn't in the
13   30(b)(6).  We felt for a jury trial, for instance, some of
14   those answers would be more persuasive for a jury rather than
15   the bench.  We would have run down some of those loose ends.
16       Furthermore --
17       THE COURT:  Still pretty vague.  You are telling me
18   what?
19       MR. WOLEK:  Well, the whole planning too about --
20       THE COURT:  What would you have done differently?  I
21   mean --
22       MR. WOLEK:  Our motions in limine might have been
23   different.  And we filed this all before --
24       THE COURT:  When did you file the motions in limine?
25       MR. WOLEK:  Two weeks ago.

1        THE COURT:  What would you have done differently?
2   Would you have filed more or less?  Because usually -- I speak
3   as somebody who practiced law for 18 years and has been a
4   judge for 17 and a half -- there's usually way fewer motions
5   in limine for a bench trial than for a jury trial.  Is this
6   the unusual case where you would have filed more?  And if so,
7   what would they have been?

8        MR. WOLEK:  Your Honor, the whole point is we would
9   have been strategizing this a little bit differently and we
10  would have had time to plan it.  This all happened about a
11  week and a half ago.  After nearly two years of trial, a week
12  and a half ago, all of a sudden, our whole strategy has to
13  change.  Whether it's the demonstratives, whether it's the
14  PowerPoints that we'd be presenting, there's a hundred
15  different exhibits right now, roughly, on both sides.  We
16  would have strategized those a little bit differently.

17       THE COURT:  Would you have more or less?

18       MR. WOLEK:  It would have been different, your Honor.
19  We would have planned it for a more sophisticated --

20       THE COURT:  If you want to add exhibits, then you can
21  add exhibits.

22       MR. WOLEK:  Well, part of it is also the time, your
23  Honor.  A week and a half in advance isn't exactly a lot of
24  notice to confront the Court.  You know, two years of trial --
25       THE COURT:  I assume you have cases in other

1    districts too, right?  You do, right?

2            MR. WOLEK:  Do we have cases in other districts?

3            THE COURT:  In the past, you've had cases in other

4    districts.

5            MR. WOLEK:  Yeah, like California, Georgia --

6            THE COURT:  You are familiar with districts in which,

7    for example -- this is an illustrative point.  You are

8    familiar with districts in which a judge will say -- this

9    is -- it's always been the case in the Northern District of

10   Indiana down in Hammond.  Judges would set cases, like six

11   cases, for trial on a particular day, and you really wouldn't

12   know until probably a week ahead of time whether your case was

13   going to go to trial or not.

14           So are you basically saying that all of those people

15   were denied some form of due process because they found out at

16   the last minute they were going to trial?

17           Have you ever had cases in the Circuit Court of Cook

18   County where sometimes you're finding out on the day of where

19   you're actually going then or whether you're going in two

20   weeks, depending on how you get assigned out in the law

21   division?

22           MR. WOLEK:  Your Honor, I don't want to speculate

23   about hypothetical cases, but the Seventh Circuit --

24           THE COURT:  The Seventh Circuit what?

25           MR. WOLEK:  The Seventh Circuit has said that the

1    preparation for a jury trial and a bench trial are
2    dramatically different.
3              THE COURT:  Of course they are different.  I have
4    tried both as a lawyer.  Okay?  Of course they are different.
5    The question is whether this is going to be some form of harm
6    that you can't cure in a week and a half.  I mean, it's
7    largely platitudes, Mr. Wolek.  It's largely platitudes.  It's
8    like, well, we would have, you know, taken different
9    depositions.  You haven't told me which ones.  We would have
10   had different exhibits.  You haven't told me which ones.  You
11   had an opportunity to file a written response to this motion
12   on a date, I might add, that you chose, that I got something
13   after they filed the motion that says, we will file a response
14   on X, X being Monday.
15             MR. WOLEK:  Yes, seven days.
16             THE COURT:  But you could have put all that stuff in
17   there, I mean, if --
18             MR. WOLEK:  We had pretrial and final orders.  We had
19   motions in limine due, your Honor.  We had -- there was a lot
20   of stuff going on, and we had virtually no time to do all of
21   that.
22             And, you know, maybe Michael Best has 300 attorneys
23   at their firm.  We have two.
24             THE COURT:  Yeah.  My experience, that's -- you're at
25   the advantage on that.

1    MR. WOLEK:  In my experience, it's probably the
2    opposite.

3    THE COURT:  My experience as a person who tried cases
4    on his own, including death penalty cases, for 18 years,
5    you're at an advantage on that because you know the whole
6    case.  You don't have it farmed out and parceled out and
7    structures and pyramids and people who know little bits and
8    pieces.  You know the whole case.

9    And, I mean, I have seen you operate during this
10   case.  And we only had one or two other cases together.  And
11   you know the case.  You're a smart person.  You can make
12   adjustment.  Every lawyer has to make adjustments.  You have
13   to make adjustments even during a trial.  And 10 days before a
14   trial, I mean, in some people's books, that's a world of time.

15   And these rules don't apply differently from court to
16   court.  If it applies here, it applies in Peoria, it applies
17   at 26th and California, and it applies in the law division.
18   And, I mean, I challenge you to come up with a case that says
19   when you find out 10 days before a trial that it's going to be
20   a bench versus a jury or vice versa, that that is something
21   that entitles you to whatever your expectation was 11 days
22   before the trial.  You haven't cited any of those cases for
23   me.

24   MR. WOLEK:  We cited two cases --
25   THE COURT:  That say that?

1          MR. WOLEK:  -- your Honor.

2          THE COURT:  That say that?

3          MR. WOLEK:  Okay.

4          THE COURT:  That's a question.  That say that?

5          MR. WOLEK:  I'm sorry.  Excuse me?

6          THE COURT:  The two cases you cited say what I just

7    said?

8          MR. WOLEK:  They said that prejudice should be taken

9    into account whether to strike a jury demand.

10         THE COURT:  What's the case that says that you're

11   prejudiced if it changes 10 days before the trial?

12         MR. WOLEK:  Well, now it's three days.

13         THE COURT:  But you were on notice after 10 days,

14   okay?  And in a minute here, it will be two and a half days,

15   and then it will be two days and 11 hours.  I mean, seriously.

16         MR. WOLEK:  I stand by our argument, your Honor.  We

17   are going to be prejudiced.  There is zero doubt about that.

18   Our PowerPoint presentations with a hundred exhibits, some of

19   which are multiple pages, developing that.  Developing

20   different opening arguments which are going to be

21   significantly different for a jury and for a judge.

22   Developing our cross-examination is going to be different for

23   a judge than it is for a jury.

24         You know, whether -- you mentioned that we didn't

25   mention a deposition, 30(b)(6) deposition.  There was 140 I

1   don't knows in that deposition from plaintiffs to questions

2   that we properly noticed.

3        This is -- if a bench trial was heading -- if we knew

4   a bench trial was where it was heading, that is definitely

5   something we would have followed up on.

6        THE COURT:  Why?

7        MR. WOLEK:  Why?  Because we would have definitely

8   wanted that answer.  Whereas, we think with a lay witness, the

9   simplicity of the I don't knows showing that there is --

10       THE COURT:  A lay jury?

11       MR. WOLEK:  A lay jury, yes, your Honor.

12       -- (continuing) would indicate something, because I

13   think, again, because a Court has a different understanding of

14   things --

15       THE COURT:  In what way?

16       MR. WOLEK:  -- and biases.

17       THE COURT:  In what way?  Be more specific.  I don't

18   understand what you are telling me.

19       MR. WOLEK:  Well, a lay jury is going to be less

20   sophisticated.  They're going to have different biases --

21       THE COURT:  Here is the way I heard it.  Just tell me

22   if I'm wrong.  You figured if you could put 140 I don't knows

23   in front of a jury, they would be bamboozled into thinking

24   that somebody was going to try to hide the ball, but the judge

25   wouldn't.  Is that the argument that --

1      MR. WOLEK:  No, that's not the argument, your Honor.

2      THE COURT:  So what is?

3      MR. WOLEK:  The argument is there's going to be a

4  natural implication for some people to view that as an

5  evasive; whereas, we think that the Court has a different type

6  of mentality on how they address --

7      THE COURT:  Really?

8      MR. WOLEK:  -- different I don't knows.  We don't

9  know, but this is some of the things that we would be

10  preparing for.

11      THE COURT:  You think that all jurors are alike on

12  this?

13      MR. WOLEK:  No.

14      THE COURT:  Of course they are not.  And there's 12

15  of them.

16      MR. WOLEK:  We agree.  And we think, one, we're

17  entitled, and, two, we're going to be prejudiced.

18      THE COURT:  So you would be -- which of the 12 of the

19  jury are you playing towards?  Everybody or just the one that

20  you think is different from the judge?

21      MR. WOLEK:  Your Honor, I --

22      THE COURT:  No, you're missing my point.  My point is

23  this.  I mean, you're saying, well, juries are going to

24  perceive these things differently than a judge.  Well, the

25  truth is that juries, like everybody else, perceive things in

1   a spectrum of ways.

2           MR. WOLEK:  We agree.

3           THE COURT:  There is no one way.  It's nothing like

4   automatically, you're a jury, you perceive a thing in a

5   particular way.  Somewhere on that spectrum, assuming that

6   it's right, is where the judge falls.  Unless you've decided

7   that you are going to target your case towards a particular

8   juror, which you've said nowhere in any of the written

9   submissions that you've filed and nowhere in the oral --

10  extensive oral comments that you've made here, then the

11  argument just doesn't -- it doesn't hold water.  It doesn't

12  hold water.

13          MR. WOLEK:  I'm sorry, your Honor.  Are -- just to be

14  clear, is the Court's position that the juror and the court

15  would hold the same exact --

16          THE COURT:  My position is that there is -- that in

17  the spectrum of views that you would have on the jury on the

18  thing you discussed, which is the 140 I don't knows, the judge

19  is going to be somewhere in that spectrum.  Okay?  And so

20  presumably, if you're like most decent lawyers, you have to

21  anticipate that there's going to be people in the jury that

22  are on all parts of that spectrum.

23          MR. WOLEK:  Your Honor, I mean, respectfully, we

24  believe that a jury has just different comprehension and

25  different biases and a different understanding of the world

1   than any Court can, which is why we have the jury system in

2   the first place.  And not only --

3              THE COURT:  That's a nice way of saying --

4              MR. WOLEK:  -- out of two years -- sorry, your Honor.

5              THE COURT:  Go ahead.

6              MR. WOLEK:  Out of two years we planned for this

7   instance, less than two weeks before the jury trial, they

8   changed -- they filed a motion without any hint.  I mean, they

9   filed a final pretrial order indicating damages.  They filed

10  their complaint.  They never amended to eradicate this.  The

11  very first time we're hearing --

12             THE COURT:  Well, they can't amend their complaint

13  now because it's too late, but it doesn't mean you can't

14  withdraw something.

15             Anything else you want to tell me?

16             MR. WOLEK:  Yeah, I mean, overall, your Honor, and

17  very respectively to our last point in our brief, I mean, we

18  would have just done this differently; whether it was a

19  mediation or not, we would have gone to a third party neutral

20  or just not had it.

21             You know, the problem --

22             THE COURT:  Why didn't you do that?  I mean, the

23  request --

24             MR. WOLEK:  Why didn't --

25             THE COURT:  -- the request for a settlement

1    conference -- and, I mean, it is important to say this --

2              MR. WOLEK:  Sure.

3              THE COURT:  -- because you have also made the

4    argument that I am somehow tainted by having conducted a

5    settlement conference, which if we get to that point, I'll

6    discuss -- but the settlement conference was -- hang on a

7    second -- so it was the defense that initially asked for a

8    settlement conference in this case.

9              MR. WOLEK:  That's right, your Honor.

10             THE COURT:  I will just say that the reason -- at

11   that point, it was September, if I recall correctly.  Yeah.

12   And I'm going to tell you the reason, which I explained to you

13   at the time why I didn't refer it for a settlement conference.

14             The designated magistrate judge on the case was Judge

15   Danny Martin.  Judge Martin has been -- or had been, at least

16   at that point in time, down for a serious illness for an

17   extended period of time, so what would have had to happen is

18   that the case -- and I explained all this at the time -- but

19   the case would have had to have been reassigned to somebody

20   else.

21             And all of our magistrate judges are extremely backed

22   up at this point, because we have been down two, Judge Martin

23   and one other judge, and so all of them have had extra

24   settlement conferences.  And the normal time lag, which even

25   in the best of circumstances is, you know, 60 days to 90 days,

1    it's increased.  The time lag between when you refer a case

2    for a settlement conference and when you get it, I had one a

3    couple weeks ago in front of one of the magistrate judges, it

4    was a five-and-a-half-month time lag.  There was just

5    essentially no opportunity to do a settlement conference

6    before the trial date, which had been set, I think, pretty

7    much from when I denied the motion to transfer.

8            And so really the only option if you were going to do

9    it here was for me to do it myself.  So it wasn't like I

10   reached out and grabbed this thing like I would -- I had to do

11   a settlement conference.  I did it as an accommodation to

12   everybody.

13           And I'll just say -- and, I mean, I might elaborate

14   on this later -- this is not -- I mean, first of all, I

15   remember next to nothing from the settlement conference other

16   than you didn't settle the case.  The one thing I do remember,

17   because I say it at every settlement conference that I do, as

18   I said at the beginning with all of the lawyers and the party

19   representatives who were there present, that I didn't care

20   whether the case settled or not, that I have 275-some-odd

21   civil cases, and whether I have 274 or 275 doesn't make much

22   difference to me.  It would make much more difference to you,

23   and if the case doesn't settle, that's just fine.  And that's

24   absolutely true.

25           And this is also not the case -- and it's rare where

1  this happens -- this is not a case where I learned anything
2  during the settlement conference that was some deep, dark
3  secret of something that wouldn't have otherwise come out.

4            And I have to say I have to take issue with one thing
5  that you said in this motion.  I mean, I don't agree with a
6  lot of it, but this one thing I do have to point out.

7            And not in the motion; in the response to the motion.

8            This is docket number 180.  It's on page 10.  To
9  avoid any prejudice, and because any trial would necessarily
10 rely on facts discussed during the settlement conference,
11 defendant, ACA, respectfully requests reassignment for trial
12 if the Court should grant the plaintiff's motion.

13           So I don't know whether this was what was intended by
14 that, but if the intention -- if the thrust of that was that
15 if I conduct a bench trial, I'm going to rely on something
16 that was told to me at a settlement conference as opposed to
17 what I hear in court, that is just absolutely untrue.  Because
18 if it was true, I would be in the wrong line of work, and I am
19 not in the wrong line of work.

20           MR. WOLEK:  And if I may, your Honor, to address
21 that -- and by no means did we try to implicate that or intend
22 that -- the pure intention of that is, why we try to generally
23 spread out -- for instance, magistrate judge should do the
24 settlement conference from the ultimate arbiter of the case --
25 is because in that room when people are together, there are

1   sometimes unknown, subconscious bonds that they form.
2   Sometimes people tell each other different things that start
3   forming some type of bonds or impressions of these people.
4   And, you know, it's very much unconscious, but it does
5   definitely play into a person's psyche.
6          For instance, I mean, there's been plenty of
7   instances and experiments done on when people warm somebody
8   with a warm hand -- meet somebody with a warm hand versus a
9   cold hand and how they --
10         THE COURT:  Say again?
11         MR. WOLEK:  I'm going a little bit off on a tangent.
12         THE COURT:  When I shake hands with somebody, if they
13  have a warm hand as opposed to a cold hand --
14         MR. WOLEK:  There's been studies that indicate --
15         THE COURT:  If your argument is that unconscious
16  bias, okay, that unconscious bias --
17         MR.  WOLEK:  Unconscious bias.
18         THE COURT:  Everybody agrees that there's unconscious
19  bias, but if that's the basis to effect rulings that judges
20  should make on motions, then we might as well do away with the
21  courts, do away with lawyers, and we all kind of go back out
22  in the streets and start duking it out over how to resolve
23  disputes, because I suspect that everybody in the entire world
24  has unconscious biases and we don't know what they are.
25  That's what "unconscious" means.

1          MR. WOLEK:  We a hundred percent agree, your Honor.

2   And the difference in this situation is when we are in a

3   confidential settlement conference, sometimes we bear our

4   souls about this, about our fears, which definitely happened

5   in this case, sometimes when --

6          THE COURT:  Seriously?  I honestly don't remember.

7          My takeaway from the settlement conference is that

8   the two sides had honest differences of opinion --

9          MR. WOLEK:  That --

10         THE COURT:  -- about what happened.  That's my

11  takeaway.  It didn't settle.  Fine.  We are going ahead and

12  going to trial.

13         MR. WOLEK:  Well, that also happened, your Honor.

14         THE COURT:  Yeah.

15         MR. WOLEK:  But we also did -- there were several

16  instances, without putting it on the record, about where we

17  did make -- you know, the emotional aspects.  And we don't

18  know what happened in the other room, so we don't know what

19  type of unconscious connections have been made.  And this is

20  also why we separate, generally, the magistrate from the Court

21  in these situations.

22         THE COURT:  When you say "we" do that, there is no

23  formal rule to that effect, and I will point out that you

24  didn't cite any cases on this, and that's largely because

25  there are none.  I mean, the law -- there is not much law on

1   this, and the law to the extent it exists goes the other way.

2             I mean, certainly, if the judge has displayed bias in

3   some way or another, that's a basis to have a different judge

4   try a case.  This is not a case in which I tried to arm twist,

5   bang heads against the wall, or anything else.  I gave it my

6   level best, see if the case could settle.  There were honest

7   differences of opinion.  It didn't settle.  That's fine.  I

8   moved on to the next thing.

9             And the law, to the extent there is any other than

10  that, essentially says that, no, there is no prohibition like

11  this.

12            Mr. Wolek has been talking for a little while.

13  Mr. Gollwitzer, why don't you talk to me about the law on

14  this -- and when I say the "this," I mean the legal versus

15  equitable thing in Judge Dow's decision in Black & Decker.

16            MR. GOLLWITZER:  You want -- you were quoting from

17  Judge Dow's decision, or paraphrasing from it.  He identifies

18  three lines of cases, one in which profits and damages are

19  treated as legal, one in which profits are always treated as

20  equitable, and a middle line, he calls it the second line,

21  where the claim for profits is examined and assessed -- you

22  know, we determined whether it's just a proxy for damages,

23  whether it is just a word, or whether it's a different thing

24  in kind.

25            And Judge Dow says -- the first two lines are the

1    best.  So he rejects the line that says it's always equitable.
2    So in Judge Dow's opinion, you have line one where it's always
3    legal and line two where we are going to look behind the
4    curtain.  And then in his case, he does not choose which is
5    best.  He just applies -- he goes with a jury trial, he errs
6    on the side of a jury, in part because he had patent
7    infringement claims as well, so there was going to be a jury
8    either way.  And, understandably, I suppose it's a matter of
9    judicial economy at that point; if we have a jury, let's let
10   the jury decide everything.

11          In our case, we don't have any legal issues, and most
12   importantly, we don't have any evidence that we've lost sales,
13   that we have actual damages.  This isn't a proxy.  This is
14   disgorgement of unjust enrichment.  In fact, this is how this
15   all came to our attention.  There is a motion in limine number
16   10 filed by the defendant to exclude evidence of our alleged
17   damages.  And in preparing the response to that and working on
18   the jury instructions, we realized this is purely an equitable
19   claim.  This doesn't go to the jury.  And that's when we
20   thought, well, wait, then why are we having a jury at all?
21   There's nothing that goes to the jury in this case.  So we
22   made our motion.

23          THE COURT:  Hang on one second.

24          So this -- what you're saying -- and I am looking at
25   pages 4 and 5 of the motion.  What you are saying is that the

1    demand for profits in this case is, as you put it, you're

2    seeking an equitable -- quote, unquote, an equitable

3    accounting for Ariel Capital's unjust enrichment, close quote.

4    You are not saying that this is a proxy for your actual

5    damages because you are not contending that you can prove any

6    actual damages.

7         MR. GOLLWITZER:  That's exactly right.

8         THE COURT:  Let me just finish reading something

9    here.

10        Mr. Wolek, what else would you like to tell me?

11        MR. WOLEK:  Well, two things.  One, they

12   differentiated that very line of arguing.  It only changed

13   today.

14        Two, they filed this motion --

15        THE COURT:  Slow down.  Back up and elaborate on that

16   a bit.  I mean, I read him something out of the brief that he

17   filed on the 23rd of January.  That's not today.

18        MR. WOLEK:  Yeah, but the final pretrial order

19   separates unjust enrichment and other damages.  It

20   differentiates between the two.

21        THE COURT:  Just so I can eyeball what you are

22   talking about, what page of the pretrial order?

23        MR. WOLEK:  3, your Honor, of the final pretrial

24   order, docket 177, seeking damages and injunctive relief.

25        THE COURT:  Are you talking about the first bullet

1   point on page 4 there?  Disgorgement of Ariel Capital

2   Advisors' profits and unjust enrichment to Ariel Investments

3   in the amount of $435,000 or, alternatively, an equitable

4   accounting of Ariel Capital Advisors' profits and unjust

5   enrichment?

6               MR. WOLEK:  So --

7               THE COURT:  Is that what you're talking about?

8               MR. WOLEK:  -- it's in the relief sought section all

9   the way on the bottom of page 3 of 177, both --

10              THE COURT:  Yeah, yeah.  I'm at the top of page 4.

11  So I want you to zero in on -- zero in on what you're

12  referring to that you consider to be --

13              MR. WOLEK:  Sorry, your Honor.  I meant page 3.

14              THE COURT:  So you're saying it's that sentence that

15  says, Ariel Investments is requesting both injunctive relief

16  and damages; specifically, Ariel Investments is seeking, and

17  there's a series of bullet points?

18              MR. WOLEK:  That, and then --

19              THE COURT:  The use of the word "damages" there?

20              MR. WOLEK:  That, and the very next bullet point,

21  disgorgement of --

22              THE COURT:  That's the thing I just read.

23              MR. WOLEK:  Yes, that as well.

24              THE COURT:  Is there something about that

25  disgorgement bullet point that suggests to you that that is

1  something other than unjust enrichment, seeing as how it says
2  "unjust enrichment"?

3  MR. WOLEK:  Well, it says "and unjust enrichment"
4  right after profits," your Honor.  It differentiates the two.
5  And on page 1 where they say jurisdiction --

6  THE COURT:  You might have some form of unjust
7  enrichment other than profits, I suppose would be the
8  contention.

9  Anyway, what was the point you were about to make?
10  MR. WOLEK:  And then the other place that they say
11  it is on page 1.  In the very first line of paragraph 1, "This
12  is an action seeking damages and injunctive relief," again,
13  splitting the two.

14  THE COURT:  So, you know, in employment
15  discrimination law, it's pretty common for a complaint to say,
16  I want damages and an injunction.

17  Now, in reality, what people can get in employment
18  cases in the form of money is you can get compensation for
19  what's -- for, typically, emotional distress, you can get back
20  pay, and you can get front pay.  Colloquially, people refer to
21  those as damages.

22  And so when you typically see a complaint like this,
23  you don't see someone that says, I want damages, back pay,
24  front pay, and an injunction.  They say, I want damages and an
25  injunction.

1    The Seventh Circuit has held the compensatory part of
2 that is damages for jury trial purposes, but the back pay and
3 front pay part, even though it's money, is equitable, and that
4 there's no right to a jury trial on that.

5    And so I make this -- I say this by way of I think
6 saying that the fact that somebody has put -- that they have
7 put two generic labels on these things, injunctive relief and
8 damages, does not mean that they have now essentially admitted
9 that the appropriate characterization of the request for
10 profits is it's a form of damages as the Seventh Amendment
11 uses that term for purposes of right to a jury trial.

12    MR. WOLEK:  Well, your Honor, they have
13 differentiated it because they have said to fully compensate
14 Ariel Investments -- if you look on page 4, the fourth bullet
15 point, they're not saying to, you know, punish defendant.
16 They're saying to compensate.

17    THE COURT:  Well, now it says what they didn't say.
18    MR. WOLEK:  Excuse me?
19    THE COURT:  Now you're saying it's not what they
20 said, it's what they didn't say?  They use the word "punish,"
21 and, therefore --
22    MR. WOLEK:  Well, they're saying to compensate.  The
23 second -- I mean, compensate is --
24    THE COURT:  Where?  Not in that bullet.
25    MR. WOLEK:  The second bullet point on top of --

1    THE COURT:   That's the enhanced damages thing which
2    Mr. Gollwitzer just gave up a second ago.  Well, actually,
3    more like 15 minutes ago now.
4          MR. WOLEK:   It's an indication of what they were
5    seeking with those profits.
6          THE COURT:   It's been withdrawn, though.   The
7    enhanced damages, nobody would ever call profits enhanced
8    damages.   The profits was instruction number 29 which you
9    called to my attention, which was the thing about -- the
10   Illinois law thing.
11         MR. WOLEK:   Sure.  Well, that's definitely an
12   indication of what they meant by it if they're seeking it in a
13   jury instruction.
14         THE COURT:   Okay.  So what I have to deal with is
15   what's before me right now.  What's before me right now is a
16   request for two forms of relief:  injunctive, I guess the
17   associated declaratory relief, and disgorgement of the
18   defendant's profits.
19         The plaintiff's attorney, the plaintiff's
20   representative sitting in the room, has expressly given up any
21   request for entitlement or right to any other form of monetary
22   relief.  The fact that profits is money doesn't mean that
23   it's -- that a request for that is something that would
24   entitle somebody to a jury trial.
25         I think the law is to the contrary.  Most of the

1   circuit cases that discuss this say that disgorgement of
2   profits is an equitable form of relief.

3           I don't accept the argument -- or I don't agree with
4   the argument that the fact that the word "damages" has been
5   used at earlier points in the case or even in the final
6   pretrial order suggests that this is, you know, some sort of
7   just a recharacterization of something.

8           The way profits would be determined in this case is
9   by determining what the evidence is about what -- put it in
10  words -- the terms of the jury instruction -- that it's given,
11  even though it's not always submitted to the jury, profits
12  defendant gained from the alleged infringement.  Here's how
13  it's determined, deduct expenses from gross revenue.  And I
14  think that is an equitable form of relief on which there is no
15  right to a jury trial.

16          I don't find the argument about last-minute changes
17  or being taken by surprise persuasive.  There is no question
18  that there was a change of positions here towards the last
19  minute, 10 days ago or whatever it was.  I think, and I still
20  think, even after having given defense counsel an opportunity
21  to elaborate, that there really hasn't been a showing of
22  any -- any kind of a particularized or supported or focused
23  showing of prejudice other than the general, well, jury trials
24  are different from bench trials, we do things differently.
25  And so I don't think that kind of a showing has been made, and

1   so I don't have to decide the question, I guess, about

2   whether -- if it had been made, whether that would make a

3   difference.  I am honestly not sure that it would.

4          And on the question of whether the fact that I

5   conducted a settlement conference at the request of the

6   parties is a reason to disqualify myself from the trial or

7   assign it to somebody else, I don't find that persuasive

8   either.  The law is to the contrary.

9          Certainly, if there had been some form of -- if I had

10  exhibited some form of hostility towards anybody, which has

11  not been claimed -- and if it was claimed, it wouldn't be

12  true -- during the settlement conference or after the

13  settlement conference, that might be a different question, but

14  that's not the case.  As I said, the settlement conference was

15  conducted in an extremely professional way by all the people

16  on both sides, representatives and the lawyers.  I regarded it

17  as an honest difference of opinion.  I did not try to push my

18  position on anybody.

19         Yeah, I did try to tell people the considerations in

20  favor of settlement, which is what's commonly done.  Those are

21  kind of things that you can get out of a Law Review article --

22  or not like a Law Review article; more like an article in a

23  practical trial practice thing.  So I don't think that that's

24  a good reason for it.

25         And there is not a lot of law on this, but Judge

1    Williams, when she was a district judge, wrote an opinion back

2    in 1993 called Geneva Assurance Syndicate v. Medical Emergency

3    Services Associates, 1993 WL 384566, which talks about this.

4         I don't have any extra judicial facts.  I am only

5    going to rely on what the evidence is at trial.  And the

6    motion to strike the jury demand is granted, and the plaintiff

7    is going to be held to the concessions it's made both before

8    the motion was -- or both in the motion and since the motion

9    was filed about the forms of relief that are going to be

10   requested.

11        So the case will proceed as a bench trial.

12        MR. WOLEK:  Your Honor, I have a couple follow-up

13   questions with that.

14        THE COURT:  Absolutely.

15        MR. WOLEK:  Does that mean that plaintiff's jury

16   instruction 29 is stricken?

17        THE COURT:  All the jury instructions are stricken.

18   There aren't going to be any.

19        MR. WOLEK:  Oh, that's -- good point.

20        THE COURT:  They're all stricken.  But that type of

21   relief, I mean, if Mr. Gollwitzer opens his mouth and starts

22   saying punitive or enhanced damages, you will find out how

23   quickly his mouth gets closed.

24        MR. WOLEK:  Okay.  With that, one other request, for

25   an additional two weeks.

1     THE COURT:  Can't do it.  Can't do it.  The trial
2   date has been set for a long time, and I just don't have the
3   flexibility given other things that have been set.

4     And, honestly, I mean, I just have to say -- and I
5   think there's a case cited in the plaintiff's submission that
6   talks about this -- I understand that it's different preparing
7   for a jury trial than a bench trial.  It's typically more
8   difficult to prepare for a jury trial because there's
9   typically more to do and more things to worry about.  And, you
10   know, you have to deal with jury selection.  You have to deal
11   with jury instructions.  None of that is going to be
12   necessary.

13     You know, I think that there's sufficient time to
14   make whatever adjustments are necessary, and, you know, if you
15   don't want to start on Monday, we can start on Tuesday, but I
16   am not going to continue it a week or two weeks or whatever it
17   was you just asked for.  I think you said two.  So, no.

18     And, largely, the reason is that I have another case
19   set for the week of the -- let's see.  I have a case set for
20   trial the week of the 13th.  I have a case set for trial the
21   week of the -- if it goes, it's going to go more than a week.
22   I have other cases set after that.  I have other hearings that
23   I have set around it.  And a lot of these are on criminal
24   cases and frankly can't be moved.

25     So there we go.  So we are going to talk about the

1    rest of the motions in limine at this point.

2         So starting -- I think what I'd like to do is start

3    with the defendant's motions in limine because they concern

4    things in the plaintiff's case.

5         MR. WOLEK:  And just to follow up real quick, your

6    Honor, about the Monday or Tuesday start date, could I confer

7    with my client what's -- about his timing --

8         THE COURT:  So long as I know before we leave the

9    room today, since it's two business days from now, yeah,

10   that's fine.

11        MR. WOLEK:  Thank you.

12        THE COURT:  So let's see.  Motions in limine.

13   Defendant's motions in limine.  Okay.

14        So I acknowledge that the motions were prepared

15   before I ruled on the summary judgment motion, but on the

16   first -- I think it's the first five, the Brady call, the

17   Cusack call, C-u-s-a-c-k, the evidence about Justin Land,

18   L-a-n-d, evidence of David Boon, and the evidence relating to

19   Ms. Schandel, S-c-h-a-n-d-e-l, I mean, I think I ruled on all

20   of those things in the summary judgment motion.

21        MR. WOLEK:  You addressed them, your Honor, but I'd

22   like a ruling for the record as well.

23        THE COURT:  Okay.  Those motions are all denied for

24   the reasons that I said in the summary judgment motion.

25        So now we're to number 6.  Preclude testimony of

1   potential confusion.  So give me just a second here to get to
2   the right spot in my notes.  Sorry.

3           I guess I need you to explain this motion a little
4   bit better to me.  What is it exactly that you're trying to
5   keep out?

6           MR. WOLEK:  Trying to keep out plaintiff's witnesses
7   from drawing the connection about what a consumer could
8   potentially be thinking as far as confusion.  So that is
9   testimony for an expert witness.  It should have been
10  introduced through a survey.  It should have been vetted under
11  Daubert.

12          THE COURT:  It helps usually on these things to have
13  some context.  Is there something in particular you have in
14  mind that I can use as kind of an example -- or that you can
15  use as kind of an example?

16          MR. WOLEK:  An example would be like, oh, I think
17  that consumers could be confused because they know -- they've
18  seen our advertisements.

19          THE COURT:  It's like opinion testimony from a lay
20  witness on that subject.

21          MR. WOLEK:  On a specialized topic, yes.

22          THE COURT:  Is there any other topic other than what
23  you just described?  In other words, you don't want somebody
24  who is not an expert to come up and say, well, I think people
25  can be confused, right?  I get that so far.  Are you planning

1    to introduce anything like that?

2          MR. GOLLWITZER:  Not like that.  I did plan to ask

3    witnesses why they care about enforcing their mark.  In other

4    words, why --

5          THE COURT:  And give me sort of a preview of what the

6    answer is likely to be or what an answer is likely to be to

7    that.

8          MR. GOLLWITZER:  Because we spent 30 years building

9    our brand, and if something bad happens to the defendant, it

10   could be imputed to us and damage our reputation that we built

11   up over 30 years.  I was not planning on asking any witness,

12   you know, do you believe that these marks are so similar that

13   people will be confused.  That's a term of ultimate --

14         THE COURT:  I mean, honestly, a question like that

15   would be pretty clearly inadmissible.  There is just no

16   question about it.  So on that, you're right.

17         I guess -- and you're going to hear this, I think, as

18   we go through some of these on both sides -- I mean, it just

19   seems to me that this is -- this is kind of one of these

20   things, maybe even from your perspective, that you'll know it

21   when you hear it.  So I think the thing for me to do on this

22   is -- I mean, I think conceptually, you're right.  I mean, a

23   person who isn't qualified to give an opinion can't come give

24   an opinion about something that's not a matter of fact.  And

25   the thing you just described, I think, falls into that

1  category.  And it seems to me that if you hear a question or
2  if you hear an answer that you think runs afoul of that, you
3  will make an objection at the time, and I will deal with it.
4       MR. WOLEK:  Sure.  Which is -- not to go back, but
5  that's like, for instance, one of those motions in limine we
6  wouldn't have probably written if but for the --
7       THE COURT:  I understand.  Listen, I get that you
8  would have done less, which was kind of my point, actually.
9  Anyway, so we're done arguing about the jury trial thing.
10      MR. WOLEK:  I know.  I'm just --
11      THE COURT:  We had about a half an hour to talk about
12  it.  So we have moved on to other things.
13      MR. WOLEK:  Got it.
14      THE COURT:  Motion in limine number 7, evidence of
15  advertising awards, advertising expenditures, and
16  sponsorships.
17      So, again, I want to make sure I have a handle on
18  exactly what it is that you're concerned about that you're
19  wanting to exclude.  So, again, can you give me a for
20  instance, because that tends to be pretty helpful, much more
21  helpful.
22      MR. WOLEK:  Yes, your Honor.  There's really two main
23  reasons why we think that evidence of, for instance,
24  advertising awards or expenditures should be excluded.  One,
25  there's not necessarily a correlation with a consumer

1    recognizing their mark or being likely to confuse it with

2    expenditures.  For instance, you could spend a billion dollars

3    advertising this, but if the relevant consumer doesn't see it,

4    it's just, frankly, one, not relevant, but it may confuse,

5    well, the Court that --

6            THE COURT:  I thought I was supposed to be smarter

7    than a jury?

8            MR. WOLEK:  Well, this is -- so going back --

9            THE COURT:  I say that facetiously.

10           MR. WOLEK:  I a hundred percent actually believe --

11   well, let me backtrack, I'm not going to say --

12           THE COURT:  You don't have to adopt anything.  That's

13   just fine.

14           MR. WOLEK:  But the point is why, without showing

15   effective advertisement, it's too hard and virtually

16   impossible to conclude that there's any type of effect on

17   consumers of that advertising.

18           THE COURT:  So let me -- my reaction to the motion is

19   that the point that I get from it is that evidence that you

20   spent a lot of money on advertising isn't enough to prove your

21   case, but that's a different question from whether it's

22   admissible.  In other words, not every evidence has to be --

23   not every piece of evidence has to be a smoking gun to be

24   admissible.

25           MR. WOLEK:  Absolutely, your Honor.

1          THE COURT:  It's a weight question, in other words.

2          MR. WOLEK:  Yeah.  The two points that it ultimately

3    leads to is that it's unfairly prejudicial because it could

4    sway the fact-finder to believe that there is a causal effect

5    and a correlation between spending and effect.  Whereas, the

6    case law time and time again -- and, granted, the case law we

7    found is mainly in district courts -- has found that the

8    effect is a whole different area, which is why usually a

9    plaintiff would file -- get some type of survey evidence to

10   substantiate, here is the advertising, here is the correlation

11   of confusion.  They never drew that.  But with only this first

12   part, this precursor, it could be unfairly prejudicial.

13         Two, to be able to draw that type of connection, you

14   would need some type of expert testimony to say, hey, this is

15   correlated to relevant consumer and potential confusion or

16   likelihood of confusion and we've seen it with X, Y, and Z,

17   and they just haven't presented any evidence of that.

18         THE COURT:  Mr. Gollwitzer?

19         MR. GOLLWITZER:  Your Honor, what the defendant's

20   essentially saying here and in number 6 and number 8 is that

21   you have to have an expert to prove likelihood of confusion,

22   and that's not the law.  This is a weight -- this is -- we

23   have seven likelihood of confusion factors.  We plan to

24   present evidence on those factors.  The Court actually, I

25   think, took into account, or maybe at least acknowledged, this

1 particular one, the brand building in the summary judgment
2 opinion.  So we plan to present evidence on the factors and
3 then argue in closing that all that adds up to likelihood of
4 confusion.

5          THE COURT:  I think this is a weight issue, not an
6 admissibility issue.  I don't find the motion persuasive.
7 That one is denied.

8          Number 8 has to do with testimony about similarity of
9 products and services.  So, again, I mean, I assume what's
10 going to happen here is that the plaintiff is going to elicit
11 testimony about what Ariel Investments does, and it's going to
12 elicit testimony about what Ariel Capital Advisors does, and
13 then there's going to be argument about whether that's similar
14 enough or not similar enough or how similar it is and how much
15 overlap there is, and so on.  Am I pretty much right about
16 that?

17          MR. GOLLWITZER:  Yes.

18          THE COURT:  Okay.  That is like standard
19 par-for-the-course stuff in trademark cases.

20          MR. WOLEK:  Not precisely, your Honor.  So the
21 closing argument is one thing, and they're fair to make that
22 correlation, but their witnesses aren't fair to make that
23 correlation.  Knowing and -- about our client's products and
24 the industry in general is specialized knowledge under 701
25 and 702.  To be able to draw the association of the similarity

1   of products and how that would pertain to a relevant
2   consumer's thinking --

3          THE COURT:  I get your point.  I get your point.  But
4   I think you're saying -- I think there's two different
5   concepts in what you're saying.

6          So first of all, first of all, there is a question of
7   whether what the kinds of things that the defendant does and
8   the kinds of things that the plaintiff does are similar or
9   overlapping or not.  I can certainly imagine a person having
10  sufficient background in the field of investments and
11  investment advising and investment counseling and investment
12  management to qualify to give a lay opinion under Rule 701.  I
13  don't know whether that's going to happen.  That seems to me
14  that that's a question more appropriately addressed when it
15  happens at the trial.

16         On the question of whether that's -- on the question
17  of whether some layperson can testify about how that's going
18  to affect what consumers do, I agree with you.  I mean, I
19  don't think -- I mean, that's likely to be, unless I hear
20  something that I'm not figuring that I'm going to hear, that
21  strikes me as something that's likely to be outside the
22  701-type expertise of anybody who is likely to be testifying
23  in this case, seeing as how there's no expert.

24         But, again -- and I -- and I'm just going to say on
25  this, because you made the point earlier, there's nothing

1   unique about this case and the motions in limine about how,
2   oh, if I had known it was going to be a bench trial, I
3   wouldn't have filed this.  It's pretty common for me and for
4   most judges, or many judges, at least, to say on a motion in
5   limine, look, I really can't rule on this until I hear
6   something, and so that's the time to raise the argument.

7           And I'm going to say that here.  I will tell you that
8   actually that's easier in a bench trial rather than in a jury
9   trial because you don't have to worry about unringing bells.

10          So I'm deferring ruling on number 8.  It's an issue
11  that's more properly raised or more appropriately raised in
12  dealing with specific questions and answers.

13          Number 9, to preclude past testimony of ACA's profit
14  -- of the plaintiff's profits -- no, of the defendant's
15  profits.  I'm sorry.  Okay.

16          And so there's an argument that this wasn't in the
17  30(b)(6) notice, and, therefore, the witness -- Jason was
18  Mr. Bray?

19          MR. WOLEK:  Mr. Bray, that's right.

20          THE COURT:  -- (continuing) wasn't really prepared to
21  testify on it, and that's -- that sets the first argument
22  that's made in response to the -- yeah, sorry.  I turned the
23  wrong thing here.

24          That's the first argument that's made in support of
25  this particular motion, number 9.

1    So talk to me about -- so if I'm reading the response
2  correctly, I'm looking at page 6, you're not disagreeing that
3  profits were not a designated topic, but you're saying that if
4  there was -- if there was an objection to that, that's
5  something that ought to have been raised at the time.

6    But that aside, whether it was in the 30(b)(6) notice
7  or not, Mr. Bray is kind of the guy.  He was a fact witness as
8  well, right?

9    MR. GOLLWITZER:  Yes, sir.  We had --

10    THE COURT:  Who else would you ask, in other words,
11  other than Mr. Bray about what the profits were?

12    MR. GOLLWITZER:  Potentially other people at his
13  company, but he's the sole owner, and his personal deposition
14  was noticed for the same day.

15    THE COURT:  So what about that?

16    MR. WOLEK:  Your Honor, they had plenty of
17  opportunity to learn this through discovery, through more
18  reliable means.  Not one interrogatory was about this, not one
19  discovery request, not one document request.  It wasn't --

20    THE COURT:  So what is the evidence that you're
21  trying to preclude, though?

22    MR. WOLEK:  Oh, Mr. Gollwitzer asked in -- you know,
23  it was a seven-hour deposition of run time, maybe --

24    THE COURT:  Which is what the rules permit, by the
25  way.

1      MR. WOLEK:  Excuse me?

2      THE COURT:  Which is what the rules permit.

3      MR. WOLEK:  Exactly.  Exactly.

4      And Mr. Gollwitzer, on the record, you know, after

5 asking about these questions, he says, what is your profit?  I

6 don't know off the top of my head, is the answer.  I would

7 have to work through this.  Uh-huh.  Because I'd have to

8 refresh my recollection.  He didn't prepare for it, we didn't

9 ask him to, it wasn't noticed, and he said, so I'm just

10 guessing.  This is just unreliable like guesswork to hold a

11 defendant --

12      THE COURT:  I get your point.  It's a weight issue.

13 I mean, that's about as clear of an issue that goes to weight

14 as opposed to admissibility as anything that I can imagine.

15 Because if what the plaintiff tries to offer is that Mr. Bray

16 says something, gave an amount in his deposition, you're going

17 to be able to elicit exactly what you have just described to

18 me; that he wasn't prepared for this, he didn't have an

19 opportunity to look at documents, he was guessing, it was

20 pulled out of his ear, whatever.  That's a weight issue.

21 That's not an admissibility issue.

22      And, I mean, he was a regular witness too as

23 opposed -- in addition to being a 30(b)(6) witness, and there

24 is no requirement to give advance notice on 30(b)(1)

25 depositions.

1    MR. WOLEK:  There is a 30(b)(6) deposition, your

2  Honor.

3    THE COURT:  Wasn't it taken in both capacities?

4    MR. WOLEK:  No, it was -- the personal deposition was

5  taken after.  It was a whole separate --

6    THE COURT:  Did you ask him again?

7    MR. GOLLWITZER:  I did not ask him again.

8    THE COURT:  Ah.  So they were two different

9  depositions of Mr. Bray?

10    MR. WOLEK:  Exactly.  No --

11    THE COURT:  I take back what I said.

12    MR. GOLLWITZER:  There was no objection, your Honor,

13  and I did ask more questions than Mr. Gollwitzer just

14  described.

15    THE COURT:  Yeah, but the fact that there's no

16  objection, why should he have to be going and flyspecking your

17  30(b)(6) notice at a 30(b)(6) deposition?

18    MR. GOLLWITZER:  Oh, I'm sorry, not to the notice.

19  Am I correct?  I don't -- I took the deposition.  I don't

20  recall --

21    THE COURT:  So your argument is that he should have

22  objected to it because it was outside the scope of the

23  30(b)(6) notice.

24    MR. GOLLWITZER:  Yes, sir.

25    THE COURT:  And that because he didn't, he's

1    forfeited the objection.

2              MR. GOLLWITZER:  I think so, your Honor, because --

3              THE COURT:  I don't agree.  So that's the ruling on

4    that one.  He didn't forfeit the objection.  You can't

5    introduce that as a 30(b)(6) admission.

6              MR. GOLLWITZER:  Yes, sir, but can I clarify?

7              THE COURT:  You can ask him at trial what his profits

8    are.

9              MR. GOLLWITZER:  And I can cross-examine with the

10   transcript.

11             THE COURT:  We will worry about that when we get to

12   that point.

13             But you are not saying that he can't ask Mr. Bray on

14   the witness stand what profits did you make.

15             MR. WOLEK:  No.  Just pass us money in that instance.

16             THE COURT:  Fine.  There we go.

17             Number 10 --

18             MR. WOLEK:  So just to clarify, your Honor, number 9

19   was granted?

20             THE COURT:  Number 10.  I'm not going to go back and

21   rake over everything.

22             Number 10, to exclude evidence of plaintiff's alleged

23   damages.  That seems to me that it's moot because you are not

24   asking for damages.  So number 10 is moot because the

25   plaintiff is not requesting damages.

1       Number 11, to preclude new evidence of use and

2   commerce of Ariel before June 20th of 2018.

3       So this, I think, maybe starts to touch on an issue

4   that runs through a bunch of other motions.  So what -- I just

5   want to be clear on something.  So in ruling on the summary

6   judgment motion, I concluded that you had not presented

7   evidence that was sufficient to put the -- what I'll call the

8   fraudulent registration issue into play.  So that's out of the

9   case.  It's out of the case as a result of the summary

10  judgment ruling.  You had the burden of proof on it.  It's

11  discussed in the opinion.  I am not going to go over it again.

12  You had the burden of proof on it.  The evidence you offered

13  wasn't sufficient to persuade any -- to persuade any kind of a

14  reasonable fact-finder on that point, and so I ruled against

15  you on that, so that issue is out of the case.

16       MR. WOLEK:  Okay.

17       THE COURT:  And that's true whether it's a bench

18  trial or a jury trial or anything else.  So I think that this

19  whole issue of when the mark was used in commerce and whether

20  there can be new evidence or not, it's essentially a moot

21  point.

22       MR. WOLEK:  So just to be clear, all the

23  affirmative -- the whole affirmative defense -- because this

24  is going to address a lot of our actually points for --

25       THE COURT:  The other motions in limine --

1       MR. WOLEK:  The other motions in limine and some of
2   the evidentiary issues.  So if that affirmative defense is out
3   and if Judge --
4       THE COURT:  Just so we make sure -- so you want to be
5   precise.  So am I.  Make sure we are all talking about the
6   same thing.  So when you say "that affirmative defense" --
7       MR. WOLEK:  That's right.
8       THE COURT:  -- tell me which -- I'm looking at your
9   second amended answer.  No, I am not looking at your second
10  amended answer.
11      I need to pull up -- what's the document that you're
12  relying on?
13      MR. WOLEK:  The second amended answer, your Honor.
14      THE COURT:  Okay.  It is the second amended answer.
15      MR. WOLEK:  Yes.
16      THE COURT:  So let me pull it up on the screen here.
17  It's just going to take me a second to do that.
18      Can you help me out and remind me, ballpark, when it
19  got filed so I know kind of where to look on the docket?
20      MR. WOLEK:  About May, your Honor, maybe April.
21      MR. GOLLWITZER:  Your Honor, the most recent answer
22  is July 7th, docket 98.
23      THE COURT:  Okay.  July 7th, corrected second amended
24  answer to the complaint.  There it is.  It's docket number 98.
25  Give me just a second to get to the right part of it.

1       Okay.  I'm now on page 6, which is where the

2    affirmative defenses start.  So which affirmative defense are

3    you talking about?

4       MR. WOLEK:  Fraud on the US PTO.  I believe we

5    phrased it slightly differently --

6       THE COURT:  Be specific.  I want you to tell me --

7    and I am asking these questions for a reason.  Tell me exactly

8    what part of the answer in affirmative defenses are you

9    relying on.  Are you talking amended affirmative defense 1

10   entitled Plaintiff's Inequitable Conduct Before the U.S. PTO?

11      MR. WOLEK:  That's the one, your Honor.

12      THE COURT:  So this is the one where it says that

13   Mr. Rogers directed the filing of the trademark application,

14   he knew that the -- that Ariel had not been used in commerce,

15   et cetera, et cetera.  Right?

16      MR. WOLEK:  That's it, your Honor.

17      THE COURT:  That issue is out of the case.

18      MR. WOLEK:  Okay.

19      THE COURT:  Because it's an -- well, it's explained

20   in the summary judgment ruling.  It's an affirmative defense

21   on which you had the burden of proof, and you didn't have

22   evidence from which a reasonable fact-finder could make a

23   finding in your favor.

24      So I think that deals with motion number --

25      MR. GOLLWITZER:  11.

1          MR. WOLEK:  11, your Honor.

2          THE COURT:  Yeah, I got to get back to the thing

3   now.  11.  Okay.

4          So now we're on number 12.  All right.  Preclude

5   purported bad faith evidence.

6          So am I right that what this is largely about is the

7   activity that happened -- it's the cease-and-desist letter

8   going forward?

9          MR. WOLEK:  Yes, your Honor.

10         THE COURT:  Okay.  That's what I thought it was

11  about.  I just wanted to be sure.

12         So give me a second to get to the right page of the

13  defendant's -- or the plaintiff's response to the motion.

14         So you have told me that intent is important, and,

15  obviously, I get that.  That's one of the factors.

16         MR. WOLEK:  Um-hmm.

17         THE COURT:  I'm asking Mr. Gollwitzer this question.

18  I don't see a case that says that if somebody doesn't knuckle

19  under when they get a cease-and-desist letter, that that's

20  evidence that would come in at a trial.  Do you have a case

21  that says that?

22         MR. GOLLWITZER:  I don't have a case that says that

23  or that says it doesn't come in.

24         THE COURT:  Yeah, but it strikes me as just like an

25  odd proposition, because if you can imagine -- because, again,

1  the rules aren't supposed -- the rules of evidence don't
2  differ from whether it's a jury trial or a bench trial.  That
3  would mean that this would be admissible in a jury trial too.
4           MR. GOLLWITZER:  Yes, sir.
5           THE COURT:  I mean, in fact, when these motions got
6  filed, it was going to be a jury trial.  So that would mean
7  that you would be putting in cease-and-desist letters in
8  response to it in front of a jury.
9           MR. GOLLWITZER:  Yes, sir.  I can explain.
10          THE COURT:  Yeah, I'm not getting it.
11          MR. GOLLWITZER:  Our thinking is how someone
12  reacts -- if there's a good-faith dispute, and -- in fact,
13  they might want evidence if it was -- you know, if it was a --
14  if there was a polite exchange and an agree to disagree, that
15  may be evidence of good faith.  But what we have here --
16          THE COURT:  So what is it you're trying to derive
17  from how they responded to it?  You got hung up -- somebody
18  hung up the phone on you?
19          MR. GOLLWITZER:  There was a letter -- there was a
20  return letter and a phone conversation, and then continued --
21          THE COURT:  And what is it about those things that
22  you think has bearing on intent?
23          MR. GOLLWITZER:  It shows his continued infringement
24  in spite --
25          THE COURT:  I'm asking, what is it about those

1 | things?  What's the evidence that bears on intent?  What is it
2 | about the way he responded?
3 |         MR. GOLLWITZER:  It was --
4 |         THE COURT:  You assume I know all this stuff.
5 |         MR. GOLLWITZER:  Yeah, no, I'm sorry.  I'm trying to
6 | find the right words.  He was impolite.  I mean, it was
7 | just -- there was no regard for the assertion for -- there was
8 | no discussion --
9 |         THE COURT:  So it was kind of like a
10 | go-jump-in-the-lake response.
11 |         MR. GOLLWITZER:  Right.
12 |         THE COURT:  That's not relevant.  I mean, if it was
13 | relevant, it wouldn't be -- it wouldn't even come close to
14 | getting past Rule 403.  It would be unfairly prejudicial in a
15 | way that would outweigh its probative value.
16 |         But we don't even get to that point.  It's not
17 | relevant.  That one's granted.
18 |         Number 13, online search evidence.
19 |         So to me, this is going to be -- this is going to
20 | depend on how it comes in or how it's attempted to get put in.
21 | And so I'm going to defer this until the evidence is offered.
22 |         MR. WOLEK:  To ask for clarification from the Court,
23 | how would that separate one way or another?
24 |         THE COURT:  You are asking me to tell you how to do
25 | it or how not to do it?

1    MR. WOLEK:  Your Honor, we have three days to change
2  our strategy.

3    THE COURT:  Wait, you are going to have actually a
4  lot more time than you thought you were going to have because
5  what you would have been doing tomorrow and over the weekend
6  would have been responding to my drafts of the jury
7  questionnaire and responding to each other's comments on that
8  because that's what you would have been getting from me
9  tomorrow, and you would have been responding to my drafts of
10  the preliminary jury instructions and having to object to
11  those because you would have been getting all of those
12  tomorrow.

13    And so you're not going to have to do any of that
14  now, and so I have just added several hours onto your day, so
15  to speak.

16    The answer is I'll know it when I see it.  I mean,
17  it's a question of how it comes in and if it's put in right,
18  and I'll decide it when it gets put in, and make your
19  objection at the time.

20    So that gets us to 14 and 15.  Do we really care what
21  everybody calls each other?  I mean, I know that the plaintiff
22  is Ariel Investments, and I know that the defendant is Ariel
23  Capital Advisors.  I took great pains -- actually, before I
24  saw any of this stuff, because I hadn't looked at the motions
25  in limine, I took great pains in the ruling on the summary

1    judgment motion to call the plaintiff Ariel Investments, to

2    call the defendant Ariel Capital Advisors, and I'll call one

3    side or another Ariel, and I continue to do that to the extent

4    that I don't slip up at some point in time.

5         But this strikes me as the kind of motion, yeah, this

6    is the kind of motion that might make more sense in a jury

7    trial than a bench trial. So I don't care what anybody calls

8    anybody else.

9         Is there going to be any testimony about George

10   Lucas?

11        MR. GOLLWITZER:  No, sir.

12        MR. WOLEK:  We were hoping it's unnecessary, your

13   Honor.  With a jury, there's reasons why we wanted that out,

14   obviously.  He is a very beloved figure, and --

15        THE COURT:  It depends on who you ask.  You know, if

16   you ask Friends of the Parks, probably not so much.

17        MR. WOLEK:  That may be true, your Honor, that may be

18   true, but this is why.  We had actually come to somewhat of an

19   agreement on this after we drafted this, that depending on

20   some of your judge's -- judge's rulings and how we structured

21   the jury form, we would strike this.  Obviously, it's moot now

22   because we can't unring the bell.

23        THE COURT:  It's moot, yeah.

24        So I think that was the last one in the defendant's

25   motions in limine, so we are going to move over -- flip over

1    to the other ones.

2           So number 1, I mean, I have just said what I was

3    going to say on that.  That's alleged fraud on the Trademark

4    Office.  I told you that I -- that that's not an issue in the

5    case anymore based on the summary judgment ruling.

6           Number 2, I think, if I'm recalling it correctly, it

7    kind of boils down to the same issue.  So the reason for

8    which -- was there any reason for which you wanted to call

9    John Rogers to testify other than -- actually, no.  I'm

10   confusing the motion to quash the subpoena and the motion in

11   limine.  My mistake.  We'll get to that in a second.

12          MR. GOLLWITZER:  They go hand in hand.  They are both

13   our motions, and they go hand in hand.

14          THE COURT:  Okay.  So -- well, but your motion --

15          MR. GOLLWITZER:  The motion goes further, I'll admit.

16          THE COURT:  The motion goes further than just a

17   question of whether Mr. Rogers is a witness.

18          MR. GOLLWITZER:  Yes, sir.

19          THE COURT:  So let me ask the question -- tell me

20   what it is, Mr. Gollwitzer, that you have to say after seeing

21   the response to this.

22          So the response basically says that the interviews

23   with these magazines -- if I'm recalling it correctly, the

24   interviews with these magazines should come in or shouldn't

25   come in?

```
 1          MR. GOLLWITZER:  We didn't think they should come in.
 2   We were objecting --
 3          THE COURT:  Give me your response to Mr. Wolek's --
 4   give me your reply to Mr. Wolek's response.
 5          MR. GOLLWITZER:  There was one response that I agreed
 6   with.  There was a magazine that was old enough to fit the
 7   ancient documents rule, and I think that would cure the --
 8          THE COURT:  Which one is that?
 9          MR. GOLLWITZER:  Oh, it's called Dinogo (sic).
10          THE COURT:  N'DGO, N-'-D-G-O.
11          MR. GOLLWITZER:  Thank you.  It was -- it's not
12   spelled "indigo."
13          That one is old enough where the ancient documents
14   rule combined with admission by party opponent cures the
15   double hearsay.  In all the other instances, we have a
16   reporter who isn't here to be questioned --
17          THE COURT:  Yeah.
18          MR. GOLLWITZER:  -- purportedly quoting Mr. Rogers.
19          THE COURT:  So this is where I give somebody a little
20   lecture about consider the implications of your actions.  So
21   you can either let the interview come in.  If the interview
22   doesn't come in, then Mr. Wolek's pretty ready response to
23   that is, Judge, I've asked to subpoena the guy.  If he's here
24   on the stand, I can ask him, didn't you say this, this, and
25   this to the person who wrote the article in Spirit magazine
```

1    and the person who wrote the article in Dollars & Sense.

2           MR. GOLLWITZER:  They won't let him in.  We'll waive

3    the objection.

4           I'd also point out that whether it's the subpoena or

5    these articles, I think they all go to the fraud issue because

6    the quotes --

7           THE COURT:  I don't know.  So what issues do the

8    articles go to?  Does it have to do with -- if it's the use in

9    commerce issue, it's not admissible at that point.  Does it go

10   to something else?

11          MR. WOLEK:  Your Honor, it is to the use of -- in

12   commerce issue, and we'll be candid, we don't want your Honor

13   to find out later that, wait, the only purpose that these

14   articles were --

15          THE COURT:  If that's what it's about, then I am

16   excluding it.  That's an easy answer.

17          Motion in limine number 3 has to do with Ariel Wealth

18   Advisors, and let me just refresh my memory for a second here.

19          Okay.  And my initial request is for Mr. Wolek.  Tell

20   me exactly what you want to put in about that, in a nutshell.

21          MR. WOLEK:  Okay.  We want to introduce it for two

22   reasons.  We want to --

23          THE COURT:  The "it" is what I'm -- what's the "it"?

24          MR. WOLEK:  The "it" is the existence that they do --

25   they are in the exact same market as Ariel Capital Advisors,

1  and plaintiff has found them not to be infringing.

2  Here's where it's different under trademark law than

3  it would be under, let's say, copyright or patents.  You have

4  to enforce your trademark in trademark law; otherwise, it goes

5  to two things:  Strength, the less people you enforce it

6  against, or if you're shown not to enforce it particularly in

7  cases where somebody has a similar function, it shows that you

8  don't believe that consumers are likely to confuse --

9  THE COURT:  Got it.  Pause for a second.

10  Mr. Gollwitzer, why isn't this something that your

11  objection -- why isn't your objection something that just goes

12  to the weight of the evidence as opposed to its admissibility?

13  MR. GOLLWITZER:  I'll start with in the summary

14  judgment order, your Honor, on page 21, the Court said it

15  wasn't relevant.

16  THE COURT:  Page 21.  Hang on.

17  Again, words matter.  Okay?  So what I said there

18  was, and I'm quoting myself, the question of whether other

19  financial services' firms such as Ariel Wealth Advisors are

20  also infringing on the Ariel marks is equally irrelevant.

21  Okay.  It strikes me that -- I mean, maybe it's a nuance, but

22  it strikes me that what Mr. Wolek is arguing here is the

23  purpose that varies a little bit from what I said was

24  irrelevant.

25  MR. WOLEK:  That's right, your Honor.

1    THE COURT:  So what else do you have to tell me,
2  Mr. Gollwitzer?

3    MR. GOLLWITZER:  Your Honor, there are cases that we
4  cited in the summary judgment brief and in our motion in
5  limine response holding that a -- that isolated uses that --
6  whether they are pursued or not pursued by the trademark
7  holder do not materially dilute the mark.

8    And I want to correct one statement here.  There's no
9  evidence that we don't think Ariel Wealth Advisors infringes.
10  There's -- Mr. Wolek doesn't know, necessarily, what's going
11  on between Ariel Investments and Ariel Wealth Advisors.

12    So the one instance of a company using the Ariel name
13  does not materially dilute the mark, so it's not relevant.

14    MR. WOLEK:  A couple points to that, your Honor.

15    THE COURT:  You don't have to say anything.  I think
16  it goes to weight, not admissibility.

17    Now, there are some other issues raised in there
18  about foundational stuff.  I am going to deal with the
19  foundational stuff when the foundation is laid.

20    MR. GOLLWITZER:  Your Honor --

21    THE COURT:  So the relevance argument, I don't -- I
22  mean, I think it's a weight issue.

23    Anyway, what were you saying?  You were about to say
24  something?

25    MR. GOLLWITZER:  I had a comment about someone on

1  their witness list that relates to this, but I will wait until
2  then.

3              THE COURT:  Let's pause and -- let's put that on
4  pause.

5              Okay.  So the next thing is these -- referred to as
6  Turtle Talk surveys.  So are these the big -- there were a
7  couple of big PowerPoints, right?  Is that what we're talking
8  about?

9              MR. WOLEK:  Yes, your Honor.  They appear to be
10  PowerPoints or some type of Slidex.

11             THE COURT:  Okay.  I'm just refreshing my memory here
12  on one thing, so give me a second.

13             MR. WOLEK:  Now, your Honor, I do want --

14             THE COURT:  Give me a second.

15             MR. WOLEK:  Yep, no problem.

16             THE COURT:  Wait until I'm ready.  Hang on a second.

17             I don't know enough about these things yet, so this
18  was something that was produced by Ariel Investments?

19             MR. GOLLWITZER:  Yes, sir.

20             THE COURT:  So tell me a little bit about it.

21             MR. GOLLWITZER:  They are -- as far as I understand
22  them, they are surveys not of ultimate customers, ultimate --
23  ordinary people buying shares of mutual funds or whatnot.
24  It's advisors, like financial advisors, who would serve as a
25  middleman between Ariel Investments and end users.  And

1   there's a variety of questions that apparently were asked.

2   There's no evidence in the record about the mechanics of the

3   survey, the scientific controls, all the things that an expert

4   witness would testify about if, for instance, we were to

5   present survey evidence in this case.  These were apparently

6   done by my client's marketing department, but there is very

7   little background on them.

8           Mr. Wolek did ask questions of our rule 30(b)(6)

9   witness about them, so there's some information, but it's --

10  it's not --

11          THE COURT:  Let me ask Mr. Wolek a question.  What is

12  it that you -- so I can read -- I can see the things on their

13  face.  So what's the testimony surrounding it going to be?

14          MR. WOLEK:  Let me preface this with permission from

15  opposing counsel.  They designated it highly confidential, and

16  I want to be respectful.

17          THE COURT:  I am going to disabuse everybody of

18  anything.  The courtroom is not going to be closed during the

19  trial.

20          MR. WOLEK:  Okay.  And Mr. Bray is president, and

21  they prohibited him from -- as we notified, I believe, the

22  Court --

23          THE COURT:  I keep thinking that I'm supposed to look

24  over there for your people.

25          MR. GOLLWITZER:  Because we are on the wrong sides.

1          THE COURT:  Right.

2          So, look, yeah, we're here -- I am not going to kick

3    Mr. Bray out of the room.  Go ahead and answer the question.

4          MR. WOLEK:  All right.  I just wanted to make sure

5    the Court and opposing counsel was okay with that.

6          MR. GOLLWITZER:  We talked about that.

7          MR. WOLEK:  Yeah, but you said he couldn't see him.

8          THE COURT:  But I said you could, so just keep

9    talking.

10          MR. WOLEK:  Okay.  So the surveys revealed several

11    things.  One, they showed that customers --

12          THE COURT:  No, I'm not asking what the survey says.

13    I'm asking what's the other evidence surrounding them going to

14    be?  In other words, is there going to be a witness on the

15    stand that you're going to ask questions about this, or --

16          MR. WOLEK:  Yes.

17          THE COURT:  Who is it?

18          MR. WOLEK:  We actually -- we noticed two

19    witnesses --

20          THE COURT:  Okay.

21          MR. WOLEK:  Mareilé Cusack and Ms. Kosier, who is

22    also --

23          THE COURT:  Both people who are with Ariel

24    Investments.

25          MR. WOLEK:  That's right, your Honor.  And one showed

1 the foundational basis.  She was familiar with the surveys and
2 their responses.

3 THE COURT:  Okay.  And so talk to me about
4 Mr. Gollwitzer's argument that there is not enough evidence
5 about the methodology or whatever for these to be terribly
6 significant.

7 MR. WOLEK:  This is admissions against interest, your
8 Honor.  It shows several points.  One, it shows that their
9 charitable contributions which they admitted don't make any
10 type of impact on consumer relevance, which is also,
11 incidentally, tied to one of our motions in limine, and also
12 that consumers aren't very familiar or at least they don't
13 believe that consumers are very familiar with their branding
14 or name, which also kind of goes with the weight of
15 familiarity.  They're saying that, hey, you know, we have all
16 of this evidence, but their own evidence kind of cuts and
17 admits -- is an admission against interest against them.

18 THE COURT:  Pause for a second.

19 MR. WOLEK:  Sure.

20 THE COURT:  I am looking for something in the summary
21 judgment ruling, but I need to find it here.

22 Am I right or am I wrong that one of the instances of
23 alleged actual confusion offered by the plaintiff that was
24 addressed in the summary judgment motion included not somebody
25 who was an ultimate consumer but somebody who was an advisor?

1          MR. GOLLWITZER:  That's correct.

2          THE COURT:  So why would that be different from -- I

3   mean, it seems to me you've argued both sides of this

4   question.

5          MR. GOLLWITZER:  I don't mean to -- I don't mean

6   to -- that is not the basis for objecting to these surveys.

7   The basis for objecting to these surveys is it would require

8   an expert or at least someone to explain the survey.

9          We don't -- I mean, I truly don't know as I stand

10  here, and I don't think the testimony was ever developed, that

11  explains how this survey was conducted, what the point was,

12  what the questionnaires looked like.

13         THE COURT:  So that's the second best example I've

14  heard of recently of a classic weight issue.

15         MR. GOLLWITZER:  Okay.

16         THE COURT:  So it goes to weight.  The motion to

17  exclude it is denied.  So that's No. 4.

18         And now we're to No. 5.  So give me one second to get

19  to the right thing here.

20         Okay.  This is evidence regarding Mr. Bray's

21  daughter, Ariel.  So I've looked at this, and I've

22  considered -- I'm just going to tell you what it is that you

23  get to put in and what you don't get to put in.

24         You can put in a picture.  That's fine.  I mean,

25  it's -- maybe you will, maybe you won't if it's -- since it's

1   not a jury trial anymore.

2           The whole issue about -- well, the second part of the

3   motion -- this is a three-part motion.  The second part has to

4   do with we'll just say the circumstances leading up to

5   Mr. Bray's daughter's birth.  Is that something you're

6   planning to introduce?

7           MR. WOLEK:  Oh, absolutely, your Honor.

8           THE COURT:  Why?

9           MR. WOLEK:  Why?  Because it goes to intent.  There's

10  several Seventh Circuit cases that say that the idea behind

11  how the name came about is very relevant.  For instance, the

12  barbecue marks case, the Court there differentiated Smoke

13  Daddy and Bone Daddy's simply by the origin of how the founder

14  of Bone Daddy got his name.  It's considered one of the three

15  most important likelihood of confusion factors.

16          THE COURT:  So what I'm deriving from what you're

17  telling me now, the way that this comes in is this is part of

18  Mr. Bray's explanation:  It's not just that I named the

19  company after my daughter, it's that this is why I named the

20  company after my daughter.

21          MR. WOLEK:  Both.  Yeah, it goes to intent, it goes

22  to motive.

23          THE COURT:  I'm trying to help you.

24          MR. WOLEK:  I'm sorry, your Honor.  Yeah.

25          THE COURT:  Don't fight me.

1           MR. WOLEK:  Yes.

2           THE COURT:  It goes to weight.  Okay?  It's a 403

3   issue, the balance doesn't tip against admissibility.

4           So that one is denied.

5           I think I have now dealt with all the motions in

6   limine, right?

7           MR. GOLLWITZER:  Yes.

8           THE COURT:  Okay.  As far as objections to exhibits,

9   my guess is a lot of exhibits that have been objected to

10  aren't going to get used.  It's a bench trial.  We are going

11  to deal with those as we go.

12          As far as objections to witnesses, what I'd like to

13  do is confine it, if there are any, and I don't recall whether

14  there are or not.  If there are any objections aside from

15  Mr. Rogers, who I think I've already dealt with at this point,

16  were there any objections to the calling of the witness as

17  opposed to the subject of the witness' testimony?

18          MR. GOLLWITZER:  There is one other, your Honor.

19          THE COURT:  What's the one.

20          MR. GOLLWITZER:  The plaintiff -- I'm sorry, Ariel

21  Capital, the defendant, has purported to serve a subpoena on

22  Mr. Gibney from Ariel Wealth Advisors, who lives in New

23  Jersey.

24          THE COURT:  Can't do that.  I don't have -- there is

25  no authority to subpoena him for trial if he is coming from

1    New Jersey.

2         MR. WOLEK:  That's right, your Honor.  He doesn't

3    have to appear.

4         THE COURT:  But you can't even serve it on him

5    because the subpoena -- I mean, it's null and void.  I mean,

6    you can't do it, because a federal court can't compel a

7    subpoena outside of the jurisdiction, which is the state of

8    Illinois in this situation, plus a hundred-mile bulge, and New

9    Jersey's a little bit farther than a hundred miles.

10        You have to withdraw that -- well, I am just going to

11   quash it.  The subpoena is quashed.  You --

12        MR. GOLLWITZER:  Are we -- we have -- is someone

13   allowed to inform --

14        THE COURT:  Somebody must inform him.  In fact, I am

15   going to direct Mr. Wolek to, you know, immediately and when

16   you get a chance call him and say that the subpoena has been

17   quashed.  And then you can confirm verbally between the two

18   sides that that's happened.  I mean, there is just no --

19   federal courts don't have unlimited subpoena power.

20        So what else do we need to deal with?

21        MR. GOLLWITZER:  There's some logistical questions we

22   have, presentation.

23        THE COURT:  Yeah, go ahead.

24        Is there anything non-logistical that anybody wants

25   to deal with?

1    MR. GOLLWITZER:  Yes, there's one that's a gray -- I
2   don't know how the defendant characterizes it, but there was
3   an objection when preparing the pretrial order to us
4   calling -- the plaintiff calling Mr. Bray during our case in
5   chief --

6        THE COURT:  Okay.  I am going to tell you what the
7   rules are on this.  Honestly, same for a bench trial as for a
8   jury trial.  If you want to do your due diligence and find
9   this, you can find it.  You can do that.

10        I am exercising my authority under Rule 611 to direct
11   that when a witness is called, they can be called -- they are
12   on the stand for all purposes.  There is not going to be any
13   restriction on scope of cross.

14        And so when the -- you can call Mr. Bray in your
15   case, of course you're entitled to do that, and you're going
16   to do your examination of him then.  If there's something --
17   if there's something that happens later on that couldn't be
18   anticipated and it wasn't reasonably anticipated and you need
19   to call him back, that's fine; but, otherwise, a witness is
20   going to be on the stand once and once only.  And that's true
21   for both sides.

22        MR. WOLEK:  Your Honor, we did offer to the other
23   side to call him in our case in chief and then open it up
24   for -- to go outside of the scope.  That way, it would be
25   efficiency and it wouldn't sandwich our witness in between

1   theirs and we'd have an opportunity to put our main witness on
2   without their --
3           THE COURT:  It's going -- you think I have the
4   authority to tell them they can't call him in their case?
5           MR. WOLEK:  Absolutely, your Honor.  We have case law
6   that many courts have said that very thing.
7           THE COURT:  Okay.  I don't agree with that.
8           MR. WOLEK:  Okay.
9           THE COURT:  Okay?  I don't think that's accurate.  I
10  suppose Mr. Bray doesn't have to be here, but, I mean, I
11  suppose that if he were to absent himself from the first day
12  of trial and show up from the second, that wouldn't be the
13  best way to win friends and influence people.
14          MR. WOLEK:  No, we agree, your Honor --
15          THE COURT:  I have ruled.  What's the next issue?
16          MR. GOLLWITZER:  I think beyond logistics, that's it.
17          THE COURT:  Any other non-logistical issues that you
18  want to talk about?
19          MR. WOLEK:  Your Honor, the -- if I may have one
20  minute?
21          THE COURT:  That's fine.  Take your time.
22          MR. GOLLWITZER:  I'm sorry.  I thought of another
23  substantive issue, your Honor, with the help of my colleague.
24          THE COURT:  Just wait for Mr. Wolek.  He is reviewing
25  his notes.

1       MR. WOLEK:  We've objected to some of their

2    witnesses, your Honor, and I don't know if we want to address

3    them now.

4       THE COURT:  Hang on a sec.  Let me find it here.

5    Defendant's objection -- I'm there.  So, again, what I want to

6    confine it to is keeping a person off the stand altogether --

7    oh, that's right.  This is that part of the final pretrial

8    order, the one where you've got five pages of single-spaced

9    objections to each of the witnesses called by the --

10   designated by the other side?

11      MR. WOLEK:  Well, your Honor, we --

12      THE COURT:  That's a little over the top, Mr. Wolek.

13      MR. WOLEK:  Your Honor, we think we're very much

14   entitled to prohibit testimony on various topics that they

15   never presented or various --

16      THE COURT:  Make those objections when -- the intent

17   of this part of the pretrial order isn't for you to have to

18   give -- isn't to require anybody to give or even ask them to

19   give an objection to everything in a person's testimony that

20   you think they're going to object to.  It's a question about

21   whether the person should be able to even take the stand or

22   not.  And the laundry list, the extremely detailed laundry

23   list, I might add, that you gave me on literally each and

24   every one of the plaintiff's witnesses, the reasons -- if the

25   intent of that was that the plaintiff shouldn't get to call

1   any witnesses, okay, then it's something other than that, and

2   so we're going to deal with those objections as they come.

3          If you hear a question that seeks to elicit something

4   that's not admissible, you'll object.  If you hear testimony

5   that you think is inadmissible, then move to strike it.

6   That's the way we're going to deal with that.

7          Okay.  And now we're going to talk about logistics.

8          MR. GOLLWITZER:  Your Honor --

9          MR. WOLEK:  Your Honor, if I may, just to clear that

10  up for the Court.  So the purpose of this was because they

11  noticed some of these witnesses to testify about some of these

12  topics that they never produced evidence on, particularly

13  with --

14         THE COURT:  Make that objection at the time.

15         MR. WOLEK:  And we -- we agreed --

16         THE COURT:  Look, you are going to be with me for two

17  days, three days, four days, whatever.  So you're going to be

18  with me two days, three days, or four days.  Here's the deal.

19  No different from any other judge.  No different, bench trial,

20  jury trial, just to make it clear.  I have made a ruling.  We

21  are moving on to the next thing.

22         MR. WOLEK:  Okay.

23         THE COURT:  Okay?  Some other non-logistical thing?

24         MR. GOLLWITZER:  Yes.  And you know what?  This may

25  be my fault for forgetting where we left it, but it was the

1    motion to quash the subpoena of Mr. Rogers.

2         THE COURT:  He just said he wasn't going to call him

3    for any reason other than the fraud issue, which I ruled is

4    inadmissible because it's out of the case based on the summary

5    judgment ruling, so the motion to quash is granted.

6         MR. GOLLWITZER:  Okay.  Thank you.

7         THE COURT:  All right.  So on Monday -- so do we

8    think that this is -- that this can get done in four days as

9    opposed to five?

10        MR. GOLLWITZER:  I think it can be faster than that,

11   your Honor.

12        THE COURT:  Do you agree?

13        MR. WOLEK:  That's very well possible, your Honor.

14        THE COURT:  Would you rather start Tuesday rather

15   than Monday?

16        MR. WOLEK:  Could I confer really quickly with my

17   client, your Honor?

18        THE COURT:  Both of you can confer.  If it's going to

19   cause some hardship on one side or another, I won't do it, but

20   if it's not, then I can and will.

21     (Brief pause.)

22        MR. GOLLWITZER:  Your Honor, may we call a witness by

23   telephone just to make sure --

24        THE COURT:  Was it somebody you were planning to

25   call --

1      MR. GOLLWITZER:  It was our first witness, making

2  sure she's available --

3      THE COURT:  Do it quickly.

4    (Brief pause.)

5      MR. GOLLWITZER:  We can start Tuesday.

6      THE COURT:  We are starting Tuesday.

7      MR. WOLEK:  We'd prefer Monday, your Honor.

8      THE COURT:  Oh, okay.  Fine.  We start Monday.  So go

9  back out and tell the person Monday.

10      Okay.  That's fine.

11      MR. GOLLWITZER:  We wouldn't have called.

12      THE COURT:  All right.  Never mind.  I should have

13  asked before you went out of the room.

14      In terms of -- and so here's what I would like from

15  you on exhibits.  I would like actually two things.  Again,

16  nothing different from what you would have to have at a jury

17  trial.

18      I want a hard copy, which I always tell lawyers in

19  jury trials to give because the electronic systems sometimes

20  break down, and they have, in fact; and I want a thumb drive

21  that has all of your exhibits on it.  If you want to -- if you

22  can get those to me tomorrow, it's fine.  You don't have to.

23  Monday is just fine.  Okay?

24      We will start at 9:45.  I might need a smidgen bit of

25  leeway in there.  We won't go past 4:30.  Generally speaking,

1    we will break for lunch at 12:30 for an hour.  There's a

2    couple of those days where I might have to do something in a

3    criminal case right after lunch, like take a guilty plea or

4    something like that.  If that's the case, it will be a longer

5    lunch break, but, otherwise, it will be an hour.  And as I

6    say, we won't go past 4:30.  And we will take other breaks as

7    necessary.

8              In terms of presenting exhibits, I am going to have a

9    hard copy.  Have you guys come in and talked to people about

10   how the system works and all that kind of stuff?

11             MR. WOLEK:  We're scheduled for 11:00 a.m. tomorrow

12   morning.

13             THE COURT:  Good.  Then they can explain it to you.

14             The one thing I would just -- the one thing I would

15   point out is that if you're planning to project stuff through

16   a laptop, you got to make sure you have the right kind of

17   connector.  I am pointing over there because under this end of

18   each table, there is a box, and I believe the connector you

19   need is a male HDMI connector --

20             MR. WOLEK:  Okay.

21             THE COURT:  -- to get into that to be able to

22   project.

23             No, it's not there.  It's under.  But ask -- but just

24   make sure you've cleared with -- just make sure you've talked

25   to -- not so much Pam, but the tech people, because somebody

1 will come up and show you how to do it.  Just make sure you

2 have all the right connectors.  If not, I have all sorts of

3 connectors flying around up here.

4         MR. GOLLWITZER:  Given that it's a bench trial, we

5 were plan on displaying -- planning on displaying our exhibits

6 electronically.  Do you still like that?

7         THE COURT:  Yes, please do.  Yeah.  I have a screen

8 up here too.  I mean, if I think I need to look at something

9 in paper, that's why I want the paper.

10         MR. GOLLWITZER:  We will have both.

11         THE COURT:  Honestly, I can't think of much else.

12         Oh, I am not going to ask you to submit written

13 proposed findings and conclusions.  You are just going to

14 argue this in closing argument, just like you would have done

15 if it was a jury trial.

16         MR. WOLEK:  Do you want opening --

17         THE COURT:  Yes.

18         MR. GOLLWITZER:  Do you want opening statements?

19         THE COURT:  Yeah.

20         MR. GOLLWITZER:  We had a number --

21         THE COURT:  But I will tell you this.  If you

22 collectively prefer just to forego that and jump right in,

23 that's fine too.  I'll go with whatever way you want to do it.

24         So if it would be -- I mean, I know what the issues

25 are in a trademark case, so -- and I have some familiarity

1   with the background, obviously, from working on the SJ

2   motions.  So if you want to forego the openings, that would be

3   just fine.  You could just start off with witnesses.

4            MR. GOLLWITZER:  We can talk about it or I can tell

5   you our position now.  We are willing to forego --

6            THE COURT:  What's your position?

7            MR. WOLEK:  We are inclined to proceed with the

8   opening statements, your Honor.

9            THE COURT:  Okay.  So how long do you want?  Now we

10  are going to talk about length.  So how long would your

11  opening be, Mr. Gollwitzer?

12           MR. GOLLWITZER:  Thirty minutes.

13           MR. WOLEK:  The same, your Honor.  We probably won't

14  have to use that much.

15           THE COURT:  There you go.  Nobody gets more than 30,

16  and I will just quote the judge that I clerked for however

17  many years ago.  No souls are saved after the first 15

18  minutes.

19           MR. GOLLWITZER:  There you go.

20           THE COURT:  He was quoting a Presbyterian minister, I

21  believe.  And the rumor was actually 35, 34 years ago.

22           Anyway, go ahead.

23           MR. GOLLWITZER:  There were four very short

24  depositions that we were going to play by video for the jury.

25  Would your Honor prefer just to have the transcripts or would

1    you like to see them?

2          THE COURT:  I'd actually like to see them.  I'd like

3    to see them.  Are there any that you were going to present

4    just by reading stuff?

5          MR. GOLLWITZER:  No.

6          MR. WOLEK:  We were, your Honor.

7          THE COURT:  So just -- there's not going to be any

8    need to use up time in the courtroom to do that.  If you have

9    one that's just on paper, what I'd prefer to have you do is

10   give it to me like a couple of days before when you wanted to

11   present it and I'll read it.

12         MR. WOLEK:  Okay.  That's fair.

13         MR. GOLLWITZER:  They're short.

14         THE COURT:  I'm guessing they're not terribly long,

15   any of them, anyway.

16         What else can you think of?

17         MR. GOLLWITZER:  This might not matter without a

18   jury, but there were -- there are objections from the

19   defendant to some of the designated testimony.  If I had to

20   edit the video clips, I'd want to try to resolve those.

21         THE COURT:  No, I am glad you brought that up because

22   I noticed that.  So let me just --

23         MR. GOLLWITZER:  We can fast forward past -- if you

24   want to rule on it on the fly, we can fast forward --

25         THE COURT:  I don't want to rule on those on the fly.

1    And so what I would like -- so how many depositions are there
2    where there are objections to designated testimony?
3              MR. GOLLWITZER:  All four.
4              THE COURT:  Okay.
5              MR. WOLEK:  Sorry, which --
6              THE COURT:  Wilmore -- it looks like Wilmore, Boon,
7    Schandel, and --
8              MR. GOLLWITZER:  Rebardo.
9              MR. WOLEK:  Rebardo.
10             THE COURT:  Yeah.  And are those the ones that are
11   video depositions?
12             MR. GOLLWITZER:  Yes, sir.
13             THE COURT:  So I should look at those objections
14   ahead of time.  I don't want to rule on them while the video
15   is playing.  That's crazy.
16             So what I need you to give me is the paper copy.  I
17   have the objections here.  Give me a paper copy of the
18   transcript.
19             MR. GOLLWITZER:  Of the transcript.
20             THE COURT:  And the four to a page is fine.  In fact,
21   I'd prefer the four to a page.
22             MR. WOLEK:  We have that for your Honor today.
23             THE COURT:  Great.  That would be good.
24             Anything else anybody can think of?
25             MR. WOLEK:  A couple other things, your Honor.  If we

1    could get an order to bring in coffee?

2              THE COURT:  Oh, to get past downstairs?

3              MR. WOLEK:  That's right, your Honor.

4              THE COURT:  Do people do that?  I have never been

5    asked before?

6              MR. WOLEK:  Yes.

7              THE COURT:  Do judges order that?

8              MR. WOLEK:  Yes.

9              THE COURT:  Who?

10             MR. GOLLWITZER:  I don't know.

11             MR. WOLEK:  Oh, my gosh, your Honor.  The last time

12   I've seen it was probably about five, six years ago, and it

13   was whichever judge -- magistrate judge in the case was, I

14   believe, Arlander Keys.

15             THE COURT:  Yeah.  I'm not going to do it, and here's

16   why.  I don't want to micromanage how the marshals run

17   downstairs.

18             So here's the deal I'll make with you.  I'll buy you

19   Starbucks.  Just give me your order ahead of time, I'll get

20   you some.

21             MR. WOLEK:  Your Honor, I mean, we could also go to

22   the second floor.  I don't want to trouble your Honor.

23             THE COURT:  It's not -- it's -- you know, it's

24   Starbucks Junior on the second floor.  It's Seattle's Best,

25   which I think is now actually owned by Starbucks, which did

1  not improve the quality when they bought it.

2  But I don't want to get into telling the marshals

3  what they should and shouldn't bring in.

4  MR. GOLLWITZER:  Your Honor, may I hand up those

5  depositions transcripts?  And we have copies for Mr. Wolek of

6  what I'm giving you.

7  THE COURT:  Okay.  So what I will try to do -- how

8  close -- Mr. Gollwitzer, how close to the beginning of the

9  case are these four going to be done?

10  MR. GOLLWITZER:  I'm sorry?

11  THE COURT:  How close to the beginning of your case

12  are you going to do -- are you planning to play these?

13  MR. GOLLWITZER:  Middle, right in the middle.

14  THE COURT:  So probably what's going to happen is

15  you're going to start seeing rulings from me over the weekend.

16  MR. GOLLWITZER:  Okay.

17  MR. WOLEK:  Your Honor, may I approach?

18  THE COURT:  Yeah, sure.

19  MR. WOLEK:  This may be -- that might be a little bit

20  more manageable with the tabs.

21  THE COURT:  That's fine.  Very good.

22  MR. WOLEK:  It's the depositions.

23  MR. GOLLWITZER:  I would like to have a copy of what

24  you handed to the judge.

25  MR. WOLEK:  No problem.

1      THE COURT:  There's more in here than what's at
2   issue, but I'm only going to look at the objections that I
3   have to rule on.
4      MR. WOLEK:  That's right, your Honor.  It's -- the
5   30(b)(6)s are in there as well.
6      THE COURT:  What else?
7      MR. GOLLWITZER:  Nothing from the plaintiff, your
8   Honor.
9      THE COURT:  Anything you can think of, Mr. Wolek?
10     MR. WOLEK:  No.  And this might have related to the
11  depositions, your Honor, and I was quickly trying to draft
12  notes.  You asked for something a couple days before the
13  beginning of the jury trial, but given --
14     THE COURT:  Don't worry about it.
15     MR. WOLEK:  Maybe about 10 minutes ago.  It might
16  have been the deposition.
17     THE COURT:  No, no, I was talking about if you were
18  trying a jury case, I would be sending you a draft jury
19  questionnaire and draft jury instructions.
20     MR. WOLEK:  It was after that, but that's all the --
21     THE COURT:  The exhibits, maybe?  The exhibits?  I
22  don't need those until the morning of.
23     MR. WOLEK:  Objections to the exhibits or something
24  like that?
25     THE COURT:  No, no, I am not going to rule on those

1    ahead of time.  I am going to rule on those as the exhibits
2    come in.

3            But what I'll need you to do is when an exhibit is
4    used, you're going to need to flag for me whether it's been
5    objected to or not.

6            MR. WOLEK:  As they come up in trial?

7            THE COURT:  Exactly.

8            And I will say that anything that's in the pretrial
9    order and not objected to is deemed admitted in evidence by
10   virtue of the local rule that applies to that, but it doesn't
11   mean you -- you can withdraw stuff.  I mean, it doesn't mean
12   if each side lists a thousand exhibits on the pretrial order
13   and nobody objects, that 2,000 exhibits automatically have to
14   come in.

15           MR. WOLEK:  Well, precisely.  And given your Honor's
16   rulings, we withdraw some of our objections as well.

17           THE COURT:  Yeah, okay.

18           Okay.  If there's nothing else, I'll see you Monday.

19           MR. GOLLWITZER:  Thank you, your Honor.

20     (Which were all the proceedings had in the above-entitled
21   cause on the day and date aforesaid.)

22     I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
23

24   Carolyn R. Cox                    Date
     Official Court Reporter
25   Northern District of Illinois
     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR